Evgeny Pistrak, pro se
1645 140th Ave NE Ste A4 #1220
Bellevue, WA 98005
425-214-2742
evpisa@gmail.com

# UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF WASHINGTON

### AT SEATTLE

| | |
|---|---|
| EVGENY PISTRAK,<br><br>JANE DOE<br><br>    Plaintiffs,<br><br> vs.<br><br>WASHINGTON STATE<br>(THE JUDICIAL BRANCH OF THE<br>WASHINGTON STATE GOVERNMENT),<br><br>    Defendant | Case No.: 2:23-cv-00362-TLF<br><br>CLASS ACTION COMPLAINT<br>SEEKING DECLARATARY RELIEF<br><br>RE: WHETHER WASHINGTON STATE<br>COURT HAS SUBJECT MATTER<br>JURISDICTION TO AWARD SPOUSAL<br>MAINTENANCE BASED SOLELY ON<br>IMMIGRATION STATUS |

## CLASS ACTION COMPLAINT

1. I, Evgeny Pistrak, individually, and on behalf of all others similarly situated, pro se, bring this action with the judicial branch of the Washington State government as defendant. This matter concerns the people of Washington and both parties want the same outcome – a Court ruling most beneficial to the people of Washington, even if not favorable to my case.

## INTRODUCTION

2. If I want my spouse from another country to stay with me in the US then my support of immigration is voluntary, according to immigration law, but if I am divorcing this person and do

CL SS  CTION COMPLAINT SEEKING DECL RATARY RE IEF RE: WHETHER
WASHINGTON STATE COURT HAS SUBJECT MATTER JURISDICTION TO AWARD
SPOUSAL MAINTENANCE BASED SOLELY ON IMMIGRATION STATUS - 1

not want to be together then my support of immigration is mandatory, according to state law. Spousal maintenance is supposed to be awarded based on various factors related to marriage, but here maintenance is awarded based solely on immigration status. This is not merely an issue in my case, this is a system error.

3.    I want to show the Court that this matter affects more than one person and I only want to bring this to the Court's attention as a matter of public interest. I want to show that there is a conflict of federal and state laws, and an average person is caught in between. In my case I lost $26,000 because I was ordered by Washington State to provide for a person who was perfectly capable of self-support through employment but whom the Federal government did not authorize to work in the country. Washington State does not have the power to authorize an immigrant to work in Washington, instead it coerces a resident to provide for the unauthorized immigrant to counteract the effect of immigration law. As an immigrant myself I feel it is unfair that I was forced to pay for someone else's immigration.

4.    This class action is based on my case[1] from Washington State Court. That case is now closed with all judgments satisfied. "[T]he lack of subject matter jurisdiction is a ground for objection to a tribunal's exercise of judicial authority and in some circumstances it is a ground that may be invoked after judgment for the purpose of holding the judgment to be a nullity"[2].

**THE PARTIES**

[1] Attached to this complaint is a complete record of the case up to and including the order for maintenance. The attachments also include later milestone rulings.

[2] Restatement (Second) of Judgments § 1 (1982), Comment a. Rationale

CLASS ACTION COMPLAINT SEEKING DECLARATARY RELIEF RE: WHETHER WASHINGTON STATE COURT HAS SUBJECT MATTER JURISDICTION TO AWARD SPOUSAL MAINTENANCE BASED SOLELY ON IMMIGRATION STATUS - 2

5.    **Plaintiff Evgeny Pistrak** is a citizen of the State of Washington.

6.    On November 6/11/15 Plaintiff was in Washington State Court at a hearing related to his divorce from a person from another country.

7.    Plaintiff never agreed to sponsor immigration of that person but at the hearing Plaintiff was ordered to pay spousal maintenance to that person because of that person's lack of work authorization caused by her expired visa and her unauthorized immigration status.

8.    **Plaintiff Jane Doe** is a stand in for any Class Member, her case illustrates the minimal factual requirements of the Class case.

9.    **Defendant** is a State of the United States, and its Judicial Branch of Government is responsible for issuing Court orders requiring a party to a divorce to pay spousal maintenance.

## JURISDICTION AND VENUE

10.    This court has subject matter jurisdiction over this action because this Class action involves federal immigration laws and the Supremacy principle of the US Constitution.

11.    Venue is proper because Washington State is in this district.

## THE COMLAINT

12.    The DHS estimates[3] the population of unauthorized immigrants in the United States in 2018 to be 11.4 million people. According to the report, "[t]he legally-resident, foreign-born population, includes naturalized citizens, persons granted lawful permanent residence, persons granted asylum, persons admitted as refugees, and persons admitted as resident nonimmigrants

---

[3] *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2015–January 2018 (dhs.gov)* - https://www.dhs.gov/immigration-statistics/population-estimates/unauthorized-resident

CLASS ACTION COMPLAINT SEEKING DECLARATARY RELIEF RE: WHETHER WASHINGTON STATE COURT HAS SUBJECT MATTER JURISDICTION TO AWARD SPOUSAL MAINTENANCE BASED SOLELY ON IMMIGRATION STATUS - 3

(i.e., students and temporary workers, as opposed to tourists) who have unexpired authorized periods of admission. The resident unauthorized immigrant population is defined as all foreign-born non-citizens who are not legal residents as defined above."

13.   An unauthorized immigrant is not authorized to work in the United States[4].

14.   During my divorce between an authorized immigrant and an unauthorized immigrant the Washington Court ordered financial support of ("awarded spousal maintenance to") the unauthorized immigrant spouse on the sole basis of lack of work authorization[5].

15.   Work authorization is directly related to immigration status and if the sole basis for award of maintenance is immigration status the claim should be viewed as an immigration matter. Black's Law Dictionary (2nd edition[6]) defines subject matter to be "the thing in controversy or the matter spoken of or written about." *Sublata causa tollitur effectus*. The cause being removed the effect ceases. According to this maxim, in case of lack of work authorization the subject matter is immigration status because if the issue of immigration status is removed (the unauthorized immigrant's status changes to one that permits employment or if the unauthorized immigrant returns to home country), the cause is removed and the effect (the need of work authorization) ceases.

---

[4] It is illegal for employers to knowingly hire, recruit, refer, or continue to employ unauthorized workers. *8 U.S.C.S. § 1324a(a)(1)(A) and (a)(2).*

[5] *See Dissolution Trial Findings:* "The wife was unable to work because of visa limitations until just before trial. During the time she was ineligible, from the date of separation until trial, the wife had extreme need for maintenance."

[6] https://archive.org/details/blacks-law-dictionary-2nd-edition-1910/page/1116/mode/2up

CLASS ACTION COMPLAINT SEEKING DECLARATARY RELIEF RE: WHETHER WASHINGTON STATE COURT HAS SUBJECT MATTER JURISDICTION TO AWARD SPOUSAL MAINTENANCE BASED SOLELY ON IMMIGRATION STATUS - 4

16.  I know that if I want to bring a foreign spouse into the country, I will need to sign an Affidavit of Support[7] agreeing to provide for the immigrant spouse, regardless of the length of marriage, if that person become a public charge. Federal Register[8] explains that sponsoring immigration of one's spouse is voluntary, and the sponsor is under no legal obligation to file a visa petition, nor is the sponsor obligated to sign Form I-864 (Affidavit of Support). State's order to provide financial support to an unauthorized immigrant spouse as maintenance to prevent them from becoming a public charge on account of immigration status alone is an attempt by the State to extend or supplement immigration law[9].

17.  Federal immigration law is a harmonious whole and that includes the Affidavit of Support law relevant to marriage to a foreign spouse. Because an immigrant may become a public charge on account of their immigration into the country, the Affidavit of Support law requires the resident spouse to promise the Federal government to provide for the immigrant spouse to avoid them becoming a public charge. This requirement is not automatically imposed on a marriage, and if the marriage is not working out, the resident spouse is not obligated to sponsor immigration of the foreign spouse.

18.  I know I am not a trained attorney and as a pro se party my attempts at reasoning about Law will be met with skepticism. I want to explain to the Court my viewpoint. As a naturalized

---

[7] 8 CFR part 213A

[8] "The … voluntary aspect … is to sponsor an immigrant or not sponsor an immigrant." *Federal Register :: Affidavits of Support on Behalf of Immigrants* https://www.federalregister.gov/d/06-5522/p-149

[9] "Where Congress occupies an entire field, … even complementary state regulation is impermissible." *See Arizona infra*

CLASS ACTION COMPLAINT SEEKING DECLARATARY RELIEF RE: WHETHER WASHINGTON STATE COURT HAS SUBJECT MATTER JURISDICTION TO AWARD SPOUSAL MAINTENANCE BASED SOLELY ON IMMIGRATION STATUS - 5

citizen I am required to have basic knowledge of the structure of government. By watching

educational materials on Law[10] I learned of the concept of Federalism and federal preemption.

19.  Federal preemption is a basis for finding of Court's lack of subject matter jurisdiction[11].

Subject matter jurisdiction means the power of the Court to hear a type of controversy[12]. In

application to this class action, the type of controversy is immigration status. By awarding

maintenance for lack of work authorization the State Court works to counteract the effect of

federal immigration law. This affects the conditions of presence of unauthorized immigrants and

is a regulation of immigration.

20.  When a person comes to Court and says they need work authorization, the Court should

simply issue the authorization. That is the straightforward way to resolve it. Unlike good health

or skill needed for work, employment authorization is a legal abstraction which can, in principle,

be resolved by an order or other legal document. It is not possible to make a person healthy or

skilled by an order, but it is possible to make a person authorized. Alas, Washington State cannot

authorize an immigrant to work and cannot order USCIS to issue work authorization.

Washington Court does not have subject matter jurisdiction over work authorization. Instead, it

treats it as a matter of financial support.

_____

[10] E.g. "Chemerinsky on Constitutional Law - The Structure of Government", *prof. Erwin Chemerisnky, University of California, Irvine, Coursera.org*

[11] "When a court has rendered a judgment … the parties are precluded from litigating … subject matter jurisdiction in subsequent litigations except if … allowing order to stand would substantially infringe the authority of another tribunal or agency of government." *Restatement (Second) of Judgments § 12*

[12] "the term 'subject matter jurisdiction' refers to the kinds of controversies a court may adjudicate" *Restatement (Second) of Judgments § 11 (a)*

CLASS ACTION COMPLAINT SEEKING DECLARATARY RELIEF RE: WHETHER WASHINGTON STATE COURT HAS SUBJECT MATTER JURISDICTION TO AWARD SPOUSAL MAINTENANCE BASED SOLELY ON IMMIGRATION STATUS - 6

21.  This complaint relies on *Arizona v United States 567 U.S. 387 (2012)*. I know of this case because I followed its coverage on the news. This is a case about who has the power to regulate immigration. The Supreme Court's opinion is that it is exclusively federal power[13]. In *Arizona* the Court explains federal preemption principles: "First, States are precluded from regulating conduct in a field that Congress has determined must be regulated by its exclusive governance. Intent can be inferred from a framework of regulation so pervasive that Congress left no room for the States to supplement it or where a federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject. Second, state laws are preempted when they conflict with federal law. This includes cases where compliance with both federal and state regulations is a physical impossibility, and those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

22.  Awarding maintenance based solely on the unauthorized immigrant's status amounts to regulation of immigration because it incentivizes the unauthorized immigrant to continue to stay in the country in violation of immigration laws. The Affidavit of Support law is the law on the same subject as maintenance law when maintenance is used to avoid a spouse becoming a public charge on account of their immigration status alone. The Congress decided *not to force* residents

---

[13] "The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens.", "The federal power to determine immigration policy is well settled.", "Federal governance of immigration and alien status is extensive and complex." *Arizona v United States 567 U.S. 387 (2012)*

CLASS ACTION COMPLAINT SEEKING DECLARATARY RELIEF RE: WHETHER WASHINGTON STATE COURT HAS SUBJECT MATTER JURISDICTION TO AWARD SPOUSAL MAINTENANCE BASED SOLELY ON IMMIGRATION STATUS - 7

to sponsor immigration of their spouses. The state order of support based solely on immigration status creates a conflict with the plan Congress put in place[14].

23.   When asked to resolve the issue of lack of work authorization of a foreign spouse, the Washington Court characterized the issue as one of maintenance. Annotated Revised Code of Washington has citations to opinions that cover various aspects of spousal maintenance law in Washington State:

- Alimony is an obligation contained within a divorce (now dissolution) decree wherein one spouse is directed to provide to the other a supportive amount terminable by the occurrence of various factors and fixed by considering the relative needs and abilities of the parties and society's desire to avoid persons becoming public charges. *Thompson v. Thompson, 82 Wn.2d 352, 510 P.2d 827, 1973 Wash. LEXIS 689 (Wash. 1973).*

- Alimony is awardable only upon a proper showing in the record of both need by the wife and ability to pay by the husband and is not considered a part of the property division. *Dreyer v. Dreyer, 10 Wn. App. 624, 519 P.2d 12, 1974 Wash. App. LEXIS 1479 (Wash. Ct. App. 1974).*

- An alimony allowance is not governed by any fixed rule nor is it awarded as a matter of right; at its inception, the allowance should be predicated upon the needs of the wife

---

[14] "Field pre-emption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." *see Arizona supra*

CLASS ACTION COMPLAINT SEEKING DECLARATARY RELIEF RE: WHETHER WASHINGTON STATE COURT HAS SUBJECT MATTER JURISDICTION TO AWARD SPOUSAL MAINTENANCE BASED SOLELY ON IMMIGRATION STATUS - 8

and the husband's ability to pay. *Edwards v. Edwards, 65 Wn.2d 904, 400 P.2d 303, 1965 Wash. LEXIS 787 (Wash. 1965).*

24.   From these citations we can see that in Washington State maintenance is awarded if there is financial need. Factors such as duration of marriage and standard of living may go to the amount and duration of maintenance, but the claim of financial need is what causes maintenance to be awarded at all. Maintenance is not a right. It is awarded to avoid a spouse becoming a public charge – same purpose as the Affidavit of Support law. The State's maintenance order and Affidavit of Support have the same goals but differ in technique[15]. The State's maintenance order forces one spouse to support the immigration of another while the federal law is explicit about that being a choice. It is not possible to comply with both state and federal law.

## CLASS ACTION ALLEGATIONS

25.   This action is brought as a class action pursuant to Rule 23(a) and 23(b)(1), (2) and (3) of the Federal Rules of Civil Procedure. Plaintiff seeks certification of a Class defined as follows:

26.   **Statewide Class**: All married persons who divorce an unauthorized immigrant with no children in Washington State where the unauthorized immigrant is capable of self-support through employment.

---

[15] "United States Supreme Court has recognized that a conflict in technique can be fully as disruptive to the system Congress enacted as conflict in overt policy." *See Arizona supra*

CLASS ACTION COMPLAINT SEEKING DECLARATARY RELIEF RE: WHETHER WASHINGTON STATE COURT HAS SUBJECT MATTER JURISDICTION TO AWARD SPOUSAL MAINTENANCE BASED SOLELY ON IMMIGRATION STATUS - 9

27. **Nationwide Class:** All married persons who divorce an unauthorized immigrant with no children in any State of the United States where the unauthorized immigrant is capable of self-support through employment.

28. **Numerosity**: According to Migration Policy Institute's (MPI[16]) report[17] on unauthorized immigrants compiled for the years 2015-2019, there are 246,000 unauthorized immigrants in Washington State of which 156,000 (68%) are in the labor force. These numbers are similar to those in a 2018 Pew Center report[18] on unauthorized immigration which shows the Washington State population of 240,000 and a labor force of 170,000 (70%). The MPI report on unauthorized immigrants in Washington State provides these data points:

| In Washington State | Estimate | % of Total |
|---|---|---|
| Unauthorized Population | 246,000 | 100% |
| Age 25 to 34 | 72,000 | 29% |
| Age 35 to 44 | 67,000 | 27% |
| Age 45 to 54 | 36,000 | 15% |
| Reside with no children | 129,000 | 55% |
| Married to a U.S. citizen | 32,000 | 14% |
| Married to a legal permanent resident (LPR) | 15,000 | 6% |
| Employed | 156,000 | 68% |
| *Married to non-U.S. citizen/non-LPR* | 62,000 | 27% |

---

[16] MPI data is used by Congressional Research Service. *E.g. see Citizenship and Immigration Statuses of the U.S. Foreign-Born Population* - https://crsreports.congress.gov/product/pdf/IF/IF11806

[17] *Profile of the Unauthorized Population - WA | migrationpolicy.org* - https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/WA

[18] *Pew-Research-Center_2018-11-27_U-S-Unauthorized-Immigrants-Total-Dips_Updated-2019-06-25.pdf (pewresearch.org)* - https://www.pewresearch.org/hispanic/wp-content/uploads/sites/5/2019/03/Pew-Research-Center_2018-11-27_U-S-Unauthorized-Immigrants-Total-Dips_Updated-2019-06-25.pdf

CLASS ACTION COMPLAINT SEEKING DECLARATARY RELIEF RE: WHETHER WASHINGTON STATE COURT HAS SUBJECT MATTER JURISDICTION TO AWARD SPOUSAL MAINTENANCE BASED SOLELY ON IMMIGRATION STATUS - 10

29.   We can use these numbers and the rate of divorce to estimate the numerosity per year. According to Washington Department of Health vital statistics[19] in the years 2015-2019 the average rate of divorce was 3.3 per 1,000 population. Based on the 2014 data from the Census Bureau[20] we know there were 36.4 percent of native-born persons who were ever divorced and only 20.3 percent of foreign-born persons who were ever divorced. Therefore, foreign-born people in the US are two times (20.3 / 36.4 = 0.56) less likely to be in a divorce. Factoring this in we can estimate the divorce rate for foreign-born persons in Washington State to be 3.3 * 0.56 = 1.85 per 1,000 population.

30.   We can estimate the number of people in the suggested Class annually by using the data from the MPI report and the following formula:

*Numerosity/year = total * adults * nochildren * married * employed * divorce_rate*

= 246,000 * (0.29 + 0.27 + 0.15) * 0.55 * (0.14 + 0.06 + 0.27) * 0.68 * 0.00185 = 56.79

31.   Here we estimated that there may be over 56 divorces per year which involve an unauthorized immigrant with no children capable of self-support through employment. To make a more conservative estimate we can take only that part of the unauthorized population who is married to a citizen/LPR:

---

[19] *422-099-2020-2010-VitalStatHighlights.pdf (wa.gov)* - https://doh.wa.gov/sites/default/files/legacy/Documents/Pubs/422-099-2020-2010-VitalStatHighlights.pdf

[20] *Number, Timing, and Duration of Marriages and Divorces: 2016 (census.gov)* https://www.census.gov/content/dam/Census/library/publications/2021/demo/p70-167.pdf

CLASS ACTION COMPLAINT SEEKING DECLARATARY RELIEF RE: WHETHER WASHINGTON STATE COURT HAS SUBJECT MATTER JURISDICTION TO AWARD SPOUSAL MAINTENANCE BASED SOLELY ON IMMIGRATION STATUS - 11

*Numerosity/year = total \* adults \* nochildren \* married_citizen_lpr \* employed \* divorce_rate*

= 246,000 \* (0.29 + 0.27 + 0.15) \* 0.55 \* (0.14 + 0.06) \* 0.68 \* 0.00185 = 24.16

32.   Using this more conservative calculation we estimated there to be 24 citizens/LPRs in Washington State per year who may be involved in a divorce with an unauthorized immigrant with no children and who is capable of self-support through employment.

33.   It is likely that marriages between a citizen/LPR and an unauthorized immigrant are short because typically the resident spouse would sponsor the unauthorized spouse's immigration and the marriage becomes one between a resident and an *authorized* immigrant. Therefore, most divorces between a citizen/LPR and an unauthorized immigrant are likely to be in a context of a short marriage.

34.   In summary, for Washington State, we have used the estimated rate of divorce for foreign-born persons and estimates of the total population of unauthorized immigrants and the number of employed, married adults with no children among the unauthorized immigrants. We estimated the Class numerosity to be **between 24 and 56 persons annually**.

35.   Washington has a relatively small population of unauthorized immigrants, but the general question of whether states can coerce residents to pay for unauthorized immigrants based solely on immigration status applies nationwide. Using the same rate of divorce as above and

CLASS ACTION COMPLAINT SEEKING DECLARATARY RELIEF RE: WHETHER WASHINGTON STATE COURT HAS SUBJECT MATTER JURISDICTION TO AWARD SPOUSAL MAINTENANCE BASED SOLELY ON IMMIGRATION STATUS - 12

data[21] on unauthorized immigrant population in different states we can estimate the Class size in the top 5 states by unauthorized population.

|  | Married Citizen/LPR | All Married |
|---|---|---|
| California | 248 | 634 |
| Texas | 145 | 387 |
| New York | 86 | 196 |
| Florida | 77 | 166 |
| New Jersey | 42 | 102 |
| **Total** | **598** | **1485** |

36.  If we take only the top 5 states by unauthorized immigrant population, we see that Class numerosity is hundreds of people annually.

37.  We can use the same formula and data[22] for the US to estimate the nationwide Class size to be **between 1001 and 2504 persons annually.**

38.  **Existence/Predominance of Common Questions of Fact and Law:** Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

39.  Common Questions of Fact:

---

[21] https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/CA, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/TX, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/NY, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/FL, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/NJ

[22] *Profile of the Unauthorized Population - US | migrationpolicy.org* https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/US

CLASS ACTION COMPLAINT SEEKING DECLARATARY RELIEF RE: WHETHER WASHINGTON STATE COURT HAS SUBJECT MATTER JURISDICTION TO AWARD SPOUSAL MAINTENANCE BASED SOLELY ON IMMIGRATION STATUS - 13

    (a) Were the class members married to an unauthorized immigrant at the time of their divorce?

    (b) Did the unauthorized immigrant have the ability, if not for the lack of work authorization, to support themselves through employment at the time of the divorce?

    (c) Did the state court order the class members to pay spousal maintenance to their unauthorized immigrant spouse because of spouse's immigration status?

    (d) What is the amount of spousal maintenance that was ordered by the state court?

40. Common Questions of Law:

    (e) Does the state court have jurisdiction to order spousal maintenance for an unauthorized immigrant spouse whose need for support is caused by their immigration status alone?

    (f) Does the federal Affidavit of Support law preempt state spousal maintenance law in cases where the unauthorized immigrant is capable of self-support through employment?

    (g) Is it a violation of the due process rights of the spouse from whom maintenance is sought to order spousal maintenance when the need for support is caused by immigration status?

    (h) Does ordering spousal maintenance for an unauthorized immigrant spouse whose need for support is caused by their immigration status violate the Supremacy Clause of the U.S. Constitution?

CLASS ACTION COMPLAINT SEEKING DECLARATORY RELIEF RE: WHETHER WASHINGTON STATE COURT HAS SUBJECT MATTER JURISDICTION TO AWARD SPOUSAL MAINTENANCE BASED SOLELY ON IMMIGRATION STATUS - 14

41.  **Typicality:** Plaintiff's claims are typical of the claims of the Class since Plaintiff divorced an unauthorized immigrant with no children who was capable of self-support through employment and whose only basis for the claim of need was lack of work authorization and who was awarded spousal maintenance because of that. Plaintiff and all Class members have the same claims and the same events giving rise to Plaintiff's claims are identical to those giving rise to the claims of all Class Members. Circumstances of Plaintiff's case are not different or unique to make Plaintiff's case distinct from those of other Class members. All members of the Class seek relief based on the same legal theories, such as the argument that maintenance orders based on immigration status conflicts with the federal Affidavit of Support law.

42.  **Adequacy:** Plaintiff's interests are aligned with the interests of the other class members, and there are no conflicts of interest between Plaintiff's claims and the claims of the other Class members. Plaintiff is an adequate representative for the Class because his interests do not conflict with the interests of the Class that he seeks to represent.

43.  **Superiority:** There are common questions of fact and law that are shared by all members of the class, making it more efficient to resolve these issues in one proceeding rather than multiple individual proceedings. Class certification would enable each member of the class to have their claims heard and decided upon in a fair and consistent manner. Individualized litigation presents potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. A class action would promote judicial economy and efficiency by avoiding multiple, duplicative trials and reducing the burden on the court system.

CLASS ACTION COMPLAINT SEEKING DECLARATARY RELIEF RE: WHETHER WASHINGTON STATE COURT HAS SUBJECT MATTER JURISDICTION TO AWARD SPOUSAL MAINTENANCE BASED SOLELY ON IMMIGRATION STATUS - 15

## PLAINTIFF EVGENY PISTRAK

44.  **Background:** An acquaintance of mine introduced me to a young woman from Russia who had arrived in the United States two weeks prior. She was in the country on a foreign student visa and was studying in college. We got married. Our marriage was short – after 8 months I filed for divorce in Russia. I never signed Affidavit of Support. A few months later I was served with divorce papers from the Washington Court.

45.  The woman still had her student visa when I filed for divorce in Russia, but around the time of the divorce in Washington the woman's visa expired. She remained in the country and applied for a new immigration status. While waiting for her application she was an unauthorized immigrant and did not have work authorization. The State Court ordered that I pay spousal maintenance until she can work again.

46.  **Relevant (incomplete) case record**

DECLARATIONS FOR MAINTENANCE

> WOMAN: I am an educated specialist with work experience … I am hopeful that, once my status is adjusted, I will not have a problem finding a new job. I am requesting temporary maintenance at least until my status is adjusted to permanent residency with full work authorization status and I am able to secure new employment.[23] I am requesting that the Court enter an order for temporary maintenance to be effective only until I am able to reacquire the right to work in this country. I do not deny and am, in fact, proud of the fact that I am well educated and, I believe, well qualified for good

---

[23] CP 30, 31

CLASS ACTION COMPLAINT SEEKING DECLARATARY RELIEF RE: WHETHER WASHINGTON STATE COURT HAS SUBJECT MATTER JURISDICTION TO AWARD SPOUSAL MAINTENANCE BASED SOLELY ON IMMIGRATION STATUS - 16

employment in this country[24]. The fact is that I did have the ability to support myself when I came on a student visa and I was nearly able to continue supporting myself at a minimal level until just a few days ago, when I was barred from working.[25] I expect to need support only to pass the difficult times of unemployment before I receive a new work authorization[26].

## HEARING ON MAINTENANCE

THE COURT: I'm laying it out for a judge above, because all party litigants have a right to revision. When you are dealing with maintenance and when you're dealing with a short-term marriage and when you're dealing with parties who may or may not work in the United States, it becomes the responsibility of the spouse, no matter how short the marriage is, to carry the responsibility of providing for the spouse rather than the citizens of the state of Washington[27].

## DISSOLUTION TRIAL FINDINGS

The wife was unable to work because of visa limitations until just before trial. She became eligible, and immediately employed. During the time she was ineligible, from the date of separation until trial, the wife had extreme need for maintenance. The wife no longer has the need for maintenance, but the temporary maintenance is confirmed.[28]

---

[24] CP 140

[25] CP 142

[26] CP 143

[27] Hearing transcript at 9

[28] Dissolution Trial Findings at 6 (Section 13)

CLASS ACTION COMPLAINT SEEKING DECLARATARY RELIEF RE: WHETHER WASHINGTON STATE COURT HAS SUBJECT MATTER JURISDICTION TO AWARD SPOUSAL MAINTENANCE BASED SOLELY ON IMMIGRATION STATUS - 17

1    OPINION ON APPEAL

2        Visa limitations relate to the "financial resources of the party seeking maintenance"

3    under RCW 26.09.090(1)(a). As presented to the trial court, visa limitations inhibited

4    the ability to work, which in turn affected financial resources[29].

5    47.  While the complete text of the declarations for maintenance contains allegations of

6    misconduct, it is not relevant because in Washington State maintenance is awarded without

7    regard to misconduct (RCW 26.09.90) and is not awarded punitively.

8    48.  From the relevant record we see that the spouse requesting maintenance informs the

9    Court that she could support herself until her work authorization expired. At dissolution the

10   Court found that as soon as she became authorized again the need for maintenance ceased. We

11   can see that in this case work authorization alone determines whether there is a need for

12   maintenance. Although all statutory factors must be considered, the Court expressly declined to

13   consider length of marriage (analogous to how Affidavit of Support is enforceable regardless of

14   the length of marriage).

15   49.  On appeal I argued citing *Khan*[30] that maintenance cannot be awarded based solely on a

16   non-statutory factor of lack of work authorization. The Washington Appellate Court ruled that

17   lack of work authorization caused financial need which in turn is a statutory factor. This view

18   defeats my argument that maintenance was awarded based on a non-statutory factor.

---

20   [29] State Appellate Court opinion at 8

21   [30] "although the statutory factors are not exclusive, the trial court cannot rely solely on a
     non-statutory factor in making a maintenance determination" *In re Marriage of Khan, 182 Wash.*
22   *App. 795, 797, 332 P.3d 1016, 1017 (2014)*

23   CLASS ACTION COMPLAINT SEEKING DECLARATARY RELIEF RE: WHETHER
     WASHINGTON STATE COURT HAS SUBJECT MATTER JURISDICTION TO AWARD
24   SPOUSAL MAINTENANCE BASED SOLELY ON IMMIGRATION STATUS - 18

50.   After the appeal I filed a motion for discretionary review in Washington Supreme Court asking the Court to make a finding regarding the State Appellate Court's subject matter jurisdiction to define lack of work authorization caused by immigration status as a statutory factor for maintenance based on local state law.

51.   The Commissioner of the Washington Supreme Court denied my motion for discretionary review. I then filed a motion to modify Commissioner's ruling which the Justices of the Court granted unanimously and "referred back to the Supreme Court Commissioner for further consideration in light of the arguments made". The Commissioner's second ruling again denied my motion for discretionary review.

52.   In Commissioner's words: "[the] court granted [the] motion to modify my ruling and referred the matter back to me for further consideration in light of arguments made in [the] motion to modify. Having done so, I adhere to the results of my original ruling".

53.   "In this instance, [Plaintiff] argued in his motion to revoke that the Court of Appeals lost subject matter jurisdiction over this marital dissolution matter when it considered immigration status in relation to maintenance. But as I explained in my earlier ruling[31], there is no conflict between federal immigration law and state dissolution law on this issue as it applies

---

[31] *Commissioner's first Ruling, footnote 2*: "As for the substantive basis of the motion, [Plaintiff] argued for the first time that the Court of Appeals lost subject matter jurisdiction when it considered immigration status in relation to maintenance. [Plaintiff] urges that by doing so the court impermissibly intruded into immigration law matters that are exclusively within federal jurisdiction. There is no conflict between federal immigration law and state dissolution law on this issue. *See, e.g., In re Marriage of Khan,* 182 Wn. App. 795, 801-803, 332 P.3d 1016 (2014). [Plaintiff]'s motion to revoke the Court of Appeals decision for lack of jurisdiction is plainly meritless."

CLASS ACTION COMPLAINT SEEKING DECLARATARY RELIEF RE: WHETHER WASHINGTON STATE COURT HAS SUBJECT MATTER JURISDICTION TO AWARD SPOUSAL MAINTENANCE BASED SOLELY ON IMMIGRATION STATUS - 19

1  to this case. *See, e.g.. In re Marriage of Khan*, 182 Wn. App. 795, 801-803, 332 P.3d 1016

2  (2014). There is no possibility [Plaintiff] can prevail under this jurisdictional theory. His motion

3  to revoke was plainly frivolous."

4      54.  "A matter is frivolous if, considering the entire record, the court determines that the

5  proponent has presented no debatable issues upon which reasonable minds might differ"[32].

6      55.  The five Justices of the State Supreme Court differed with the Commissioner when they

7  granted the motion to modify. If the jurisdictional theory was devoid of merit, there should have

8  been no need to look into it yet for the third time[33]. It is puzzling why the Commissioner's new

9  ruling is the same if the five Justices could have simply agreed with the original. The

10  Commissioner affords only three sentences to the merits of the motion and relies on *Khan* in

11  support of his opinion that there is no conflict between immigration law and maintenance law in

12  this case. The rest of the Commissioner's ruling is about procedure.

13      56.  In *Khan* the question was whether Affidavit of Support should be enforced through a

14  maintenance order. The Court ruled that Affidavit of Support is a separate obligation unrelated to

15  maintenance. If anything, this supports the view that maintenance law should not be used to

16  resolve immigration related issues such as lack of work authorization. In *Khan* one spouse

17  sponsored immigration of another and signed Affidavit of Support and there was no issue of

18  work authorization. Maintenance in *Khan* was awarded based on "traditional Washington law

19

20      [32] *Commissioner's second Ruling*

21      [33] "If the belated contention about lack of subject matter jurisdiction could be rejected out
of hand on its merits, the question of its being res judicata would not have much practical

22  significance" *Restatement (Second) Of Judgments §12 (d)*

23  CLASS ACTION COMPLAINT SEEKING DECLARATARY RELIEF RE: WHETHER
WASHINGTON STATE COURT HAS SUBJECT MATTER JURISDICTION TO AWARD

24  SPOUSAL MAINTENANCE BASED SOLELY ON IMMIGRATION STATUS - 20

analysis, i.e. consideration of the RCW 26.09.90 factors"[34], while in my case factors such as length of marriage were disregarded and immigration status deemed a statutory factor instead.

57. According to RCW 26.09.90, in Washington state, an order for financial support ("maintenance order") shall be in such amounts and for such periods of time as the court deems just, without regard to misconduct, after considering all relevant factors including but not limited to:

(a)    The financial resources of the party seeking maintenance

(b)    The time necessary to acquire sufficient education to find employment

(c)    The standard of living established during the marriage

(d)    The duration of the marriage

(e)    The age, physical and emotional condition of the party seeking maintenance

(f)    The ability of the party from whom maintenance is sought to pay

58. Based on the record, the only factors for maintenance in this case are "(a) financial resources of the party seeking maintenance" and "(f) ability of the party from whom maintenance is sought to pay", the rest of the factors were not given any weight:

(b)    The party, in her own words, is well educated and has work experience

(c)    The court focused on the party's standard of living *before* marriage[35]

---

[34] *See Khan supra*

[35] *See Maintenance Hearing Transcript at 17, 18*:

THE COURT: But she was in the same situation at the time she met him, correct? Because didn't she meet him here. She met him in the United States.

ATTORNEY: It's the standard of living during the marriage. It says right in the code here.

THE COURT: Right, but their marriage, even while separated, is barely 13 months.

CLASS ACTION COMPLAINT SEEKING DECLARATARY RELIEF RE: WHETHER WASHINGTON STATE COURT HAS SUBJECT MATTER JURISDICTION TO AWARD SPOUSAL MAINTENANCE BASED SOLELY ON IMMIGRATION STATUS - 21

1

(d)    The court awarded maintenance "no matter how short the marriage is"

2

(e)    The party, in her own words, could support herself until barred from working[36]

3

59.   Here maintenance was awarded based solely on immigration status, or rather lack

4

thereof, because the person was in the country illegally in the eyes of immigration law. Even

5

though the person applied for a new immigration status as a self-petitioner, the application itself

6

did not give her any lawful status and she was an unauthorized immigrant during the pendency of

7

her application. If one's self-petition application is approved, one can apply for an immigrant

8

visa in their home country at the US Consulate[37] and there is no need to stay in the US without

9

authorization.

10

60.   Technically, an unauthorized immigrant should return home, but in some instances, like

11

in this case, an administrative decision can be made to put an unauthorized immigrant in a

12

13

14

15

16

_____

[36] As a prerequisite to obtaining a foreign student visa one must provide evidence of their ability to pay for school and living expenses while in the US. *8 CFR § 214.2 (f)(1)(i)(B)* The woman in this case argued that once her student visa expired (and she was without status) she no longer had obligation to support herself and was able to claim need in the US as a spouse. *See Reply Declaration For Maintenance:* "I do not understand the point of [the] talk about my past need to prove ability [to] support myself as a student" CP 142.

[37] *8 CFR 204.2(c)(3)(i)* "If the self-petitioner will apply for an immigrant visa abroad, the approved self-petition will be forwarded to the Department of State's National Visa Center."

*See also Form I-360 petition for special immigrants Part 4 Section 1* "If the [self-petitioner] … does not wish to adjust status in the US, provide information about the US Consulate at which the person prefers to apply for an immigrant visa."

23

CLASS ACTION COMPLAINT SEEKING DECLARATARY RELIEF RE: WHETHER WASHINGTON STATE COURT HAS SUBJECT MATTER JURISDICTION TO AWARD SPOUSAL MAINTENANCE BASED SOLELY ON IMMIGRATION STATUS - 22

Deferred Action[38], meaning no removal will be initiated. Deferred Action is a federal immigration policy that allows unauthorized immigrants to continue to be present in the country illegally. As a result, one is here illegally, they do not have the papers, and they are not permitted to work (like royalty) while a local who met them only a few months, under threat of contempt, is made to provide for them. I ask the Court to determine if this is the objective of Congress and the federal immigration law to deny unauthorized immigrants the right[39] to work and to allow them to remain in the country so that they may become a burden on a resident.

61.  This case has exhausted all state options because the Washington Supreme Court Commissioner denied the motion for discretionary review of the question of subject matter jurisdiction. I seek declaration of party's rights by the Federal Court[40].

## PLAINTIFF JANE DOE

62.  Jane Doe is an American citizen from Seattle. She met a man from Vancouver, Canada, who was capable of self-support through employment. They got married. But the marriage did not work out, they had no children, and Ms. Doe asked for divorce. The marriage was short, and

---

[38] "Deferred action status, also known as 'non-priority status,' amounts to, in practical application, a reprieve for deportable aliens. No action (i.e., no deportation) will be taken . . .against an alien having deferred action status." *Estrada v. Becker, No. 17- 12668 (11th Cir. 2019)* "[a] principal feature of the removal system is the broad discretion exercised by immigration officials," *Id. citing Arizona, 567 U.S. at 396, 132 S. Ct. at 2499*

[39] "Congress […] has broad power over immigration and naturalization and regularly makes rules regarding aliens that would be unacceptable if applied to citizens" *Mathews v. Diaz, 426 U.S. 67 (1976)*

[40] "Questions of subject matter jurisdiction must be justiciable if the legal rules governing competency are to be given effect; some tribunal must determine them, either the court in which the action is commenced or some other court of referral." *Restatement (Second) Of Judgments §12 (a)*

CLASS ACTION COMPLAINT SEEKING DECLARATARY RELIEF RE: WHETHER WASHINGTON STATE COURT HAS SUBJECT MATTER JURISDICTION TO AWARD SPOUSAL MAINTENANCE BASED SOLELY ON IMMIGRATION STATUS - 23

1   she never filed any immigration documents on the man's behalf. At divorce it turned out that the

2   man overstayed his visa and was an unauthorized immigrant. He did not return to Canada,

3   instead, he stayed in the US and did not work (legally) because he did not have work

4   authorization. The man claimed need and asked for spousal maintenance. The Court ordered Ms.

5   Doe to provide for the man's stay in the US no matter how short their marriage was.

## SUBJECT MATTER JURISDICTION

7   63.  "It must be observed that the law of jurisdiction of the courts is neither procedural law

8   nor substantive law. It has nothing to do with either the creation or recognition of substantive

9   rights; it is simply a limitation on the power of a court to act as a court. Jurisdiction in general is

10  of the same character, and thus much of constitutional law and practically all of the conflict of

11  laws are not substantive. They impose limitations on the power of a state to act legally either in a

12  legislative, executive or judicial manner"[41].

13  64.  When adjudicating a question of subject matter jurisdiction Washington Supreme Court

14  relies on Restatement (Second) of Judgments: "We believe the appropriate test to be followed in

15  contesting subject matter jurisdiction is set forth in Restatement (Second) of Judgments §12

16  (1982)" *Marriage of Brown 98 Wn.2d 46, 653 P.2d 602 (1982)[42]*. Chapter 12 of the Restatement

17  talks about contesting subject matter jurisdiction after the judgment:

---

20  [41] *Gavit, Bernard C., "Jurisdiction of the Subject Matter and Res Judicata" (1932).
Articles by Maurer Faculty. 1125*

21  [42] Another example of Restatement (Second) Of Judgments being used by the WA court
22  is *Marley v Dep't of Labor & Indus., 125 Wn.2nd 533, 866 P.2d 189 (1994)*

23  CLASS ACTION COMPLAINT SEEKING DECLARATARY RELIEF RE: WHETHER
WASHINGTON STATE COURT HAS SUBJECT MATTER JURISDICTION TO AWARD
24  SPOUSAL MAINTENANCE BASED SOLELY ON IMMIGRATION STATUS - 24

65.  "When a court has rendered a judgment in a contested action, the judgment precludes the parties from litigating the question of the court's subject matter jurisdiction in subsequent litigation except if:

> (1)  The subject matter of the action was so plainly beyond the court's jurisdiction that its entertaining the action was a manifest abuse of authority; or
>
> (2)  Allowing the judgment to stand would substantially infringe the authority of another tribunal or agency of government; or
>
> (3)  The judgment was rendered by a court lacking capability to make an adequately informed determination of a question concerning its own jurisdiction and as a matter of procedural fairness the party seeking to avoid the judgment should have opportunity belatedly to attack the court's subject matter jurisdiction."

66.  This complaint is based on the above standard. (1) State Court does not have subject matter jurisdiction over employment authorization. (2) State order awarding maintenance for lack of work authorization infringes on the federal authority to regulate immigration and is a violation of the federal Supremacy principle. (3) State Court is not equipped to balance federal immigration policy concerns and cannot adequately determine its jurisdiction to resolve issues arising out of immigration of people into the country.

67.  "The interests primarily at stake in resolving [the question of subject matter jurisdiction] are governmental and societal, not those of the parties. … The question therefore is whether the public interest in observance of the particular jurisdictional rule is sufficiently strong to permit a possibly superfluous vindication of the rule … The public interest is of that strength

CLASS ACTION COMPLAINT SEEKING DECLARATARY RELIEF RE: WHETHER WASHINGTON STATE COURT HAS SUBJECT MATTER JURISDICTION TO AWARD SPOUSAL MAINTENANCE BASED SOLELY ON IMMIGRATION STATUS - 25

only if the tribunal … seriously disturbed the distribution of governmental powers or has infringed on a fundamental constitutional protection" [43].

68.  "An objection to subject matter jurisdiction may be taken at any time during an action, even on appeal, and may be taken after the action has become final under a … variety of circumstances …"[44]. "The question of subject matter jurisdiction is very different from the question of territorial jurisdiction or one of regularity or notice. …[A]n objection to subject matter jurisdiction is in some sense more fundamental…, in that a court is powerless to decide a controversy with respect to which it lacks subject matter jurisdiction."[45]

69.  Restatement (Second) of Judgments §11 (a) defines subject matter as "the kinds of controversies a court may adjudicate". Therefore, this Court should determine the kind of controversy in the Class case where awarding maintenance merely treats the symptom caused by the unauthorized immigrant's lack of work authorization. The fact that the person is in need because of immigration status emphasizes that the controversy is one of immigration.

## **DECLARATORY RELIEF**

70.  There exists an actual controversy, the Washington Supreme Court declined to accept discretionary review, and this Court has jurisdiction over the question of federal preemption and immigration law. Plaintiff desires a declaration of rights pursuant to 28 U.S.C. § 2201, or in the alternative, the state declaratory judgment laws of the states in which Plaintiff or Class members

---

[43] Restatement (Second) Of Judgments §12 (d) (1982)

[44] *Id.* §1 (a)

[45] *Id.* §11 (d)

CLASS ACTION COMPLAINT SEEKING DECLARATARY RELIEF RE: WHETHER WASHINGTON STATE COURT HAS SUBJECT MATTER JURISDICTION TO AWARD SPOUSAL MAINTENANCE BASED SOLELY ON IMMIGRATION STATUS - 26

1    reside, this Court may declare the rights and legal relations of any interested party seeking such

2    declaration, whether or not further relief is or could be sought.

3        71.   Plaintiff seeks a declaration of the parties' respective rights under the Supremacy

4    Clause and the exclusive federal authority to regulate immigration. Plaintiff seeks the Court's

5    answer regarding whether a State Court has jurisdiction to make a Class Member pay for

6    immigration status of the unauthorized immigrant.

7        72.   The court may order a speedy hearing of a declaratory judgment action.

8                                                **CONCLUSION**

9        73.   There is no question whether spousal maintenance can be awarded to an unauthorized

10   immigrant after considering all relevant factors. Undoubtedly, the State Court has subject matter

11   jurisdiction to award spousal maintenance at dissolution. Undoubtedly, unauthorized immigrants

12   should receive equal treatment in courts. But when the sole reason for the award is the very fact

13   that the unauthorized immigrant is not authorized, it creates an absurd result where a resident is

14   ordered to pay for the State Court's lack of power to authorize an immigrant to work while the

15   person violating immigration laws is awarded money because of that very violation[46].

16       74.   This matter involves a conflict of state and federal laws where State Court seeks to

17   avoid an unauthorized immigrant becoming a public charge while the federal law causes the

18   unauthorized immigrant to become a public charge because of lack of work authorization. Work

19   authorization is a legal abstraction that can be resolved by the appropriate authority. It is not

20   ─────────────────────

21       [46] E.g. requirement of valid status: "Once here, aliens are required … to carry proof of
     status … 8 U.S.C.S. §§1301 - 1306. Failure to do so is a federal misdemeanor" *see Arizona*

22   *supra*

23   CLASS ACTION COMPLAINT SEEKING DECLARATARY RELIEF RE: WHETHER
     WASHINGTON STATE COURT HAS SUBJECT MATTER JURISDICTION TO AWARD
24   SPOUSAL MAINTENANCE BASED SOLELY ON IMMIGRATION STATUS - 27

clear why the State made me pay tens of thousands of dollars for what is a mere abstraction that

is entirely within the jurisdiction of the Federal government.

75.  This issue affects many people and is a matter of public interest and I ask the court to

recognize it as such. I ask the court to issue a declaratory judgment recognizing that the

Constitution protects residents from being coerced by States into paying for immigration status

of unauthorized immigrants.


DATED this 10th day of March 2023.


Respectfully submitted by

*Evgeny Pistrak*

Evgeny Pistrak, pro se


CLASS ACTION COMPLAINT SEEKING DECLARATARY RELIEF RE: WHETHER
WASHINGTON STATE COURT HAS SUBJECT MATTER JURISDICTION TO AWARD
SPOUSAL MAINTENANCE BASED SOLELY ON IMMIGRATION STATUS - 28

## <u>ATTACHMENTS</u>

1.    Record of Plaintiff's case that was before the State Court at the time of hearing on

maintenance.

2.    Order for temporary maintenance (at CP 162).

3.    The hearing transcript.

4.    Dissolution trial findings.

5.    Opinion on appeal.

6.    Ruling denying discretionary review by Washington Supreme Court.

7.    Order to modify the ruling denying discretionary review.

8.    Second ruling denying discretionary review.

9.    Satisfaction of judgments.

10.    *In re Marriage of Khan, 182 Wash. App. 795, 797, 332 P.3d 1016, 1017 (2014)*

11.    MPI data on Washington unauthorized population.

12.    MPI data on US unauthorized population.

FILED

2015 SEP 25 AM 9: 48

KING COUNTY
SUPERIOR COURT CLERK
SEATTLE, WA

## Superior Court of Washington
## County of King

[X] In re the Marriage of:
[ ] In re the Domestic Partnership of:

Golubeva Ksenia

Petitioner,

and

Pistrak Evgeny

Respondent.

No. **15-3-06019-1 SEA**

**Summons
(SM)**

### To the Respondent:

1.  The petitioner has started an action in the above court requesting:

    [X]   that your marriage be dissolved.
    [ ]   that your domestic partnership be dissolved.
    [ ]   a legal separation.
    [ ]   that the validity of your marriage be determined.
    [ ]   that the validity of your domestic partnership be determined.

    Additional requests, if any, are stated in the petition, a copy of which is attached to this summons.

2.  You must respond to this summons and petition by serving a copy of your written response on the person signing this summons and by filing the original with the clerk of the court. If you do not serve your written response within 20 days (or 60 days if you are served outside of the state of Washington) after the date this summons was served on you, exclusive of the day of service, the court may enter an order of default against you, and the court may, without further notice to you, enter a decree and approve or provide for the relief requested in the petition. In the case of a dissolution of marriage or domestic partnership, the court will not enter the final decree until at least 90 days after filing and service. If you serve a notice of appearance on the undersigned person, you are entitled to notice before an order of default or a decree may be entered.

3.  Your written response to the summons and petition must be on form:

    [X]   WPF DR 01.0300, Response to Petition (Marriage).
    [ ]   WPF DR 01.0305, Response to Petition (Registered Domestic Partnership).

4.    This form may be obtained by contacting the clerk of the court at the address below, by contacting the Administrative Office of the Courts at (360) 705-5328, or from the Internet at the Washington State Courts homepage:

**http://www.courts.wa.gov/forms**

5.    If this action has not been filed with the court, you may demand that the petitioner file this action with the court. If you do so, the demand must be in writing and must be served upon the person signing this summons. Within 14 days after you serve the demand, the petitioner must file this action with the court, or the service on you of this summons and petition will be void.

6.    If you wish to seek the advice of an attorney in this matter, you should do so promptly so that your written response, if any, may be served on time.

7.    One method of serving a copy of your response on the petitioner is to send it by certified mail with return receipt requested.

This summons is issued pursuant to RCW 4.28.100 and Superior Court Civil Rule 4.1 of the state of Washington.

Dated: _____9/22/2015_____

_____
Signature of Petitioner or Lawyer/WSBA No.

_Ksenila  Golubeva_
Print or Type Name

**File original of your response with the clerk of the court at:**

**Serve a copy of your response on:**

[X] Petitioner (you may list an address that is not your residential address where you agree to accept legal documents. Any time this address changes while this action is pending, you must notify the opposing parties in writing and file an updated Confidential Information Form (WPF DRPSCU 09.0200) with the court clerk.)

[ ] Petitioner's Lawyer

_Ksenila  Golubeva_
(Name)

_750 Melody Lane, Edmonds_
(Address)

_WA  98020_

King County Superior Court
(Name of Court)

516 Third Avenue North, Room E609
(Address)

Seattle, WA  98104

_Summons (SM) - Page 2 of 2_
_WPF DR 01.0200 Mandatory (6/2008) - CR 4.1_

FILED

2015 SEP 25 AM 9: 48

KING COUNTY
SUPERIOR COURT CLERK
SEATTLE, WA

**Superior Court of Washington
County of** **KING**

In re the Marriage of:

*Golubeva   Kseniia*

                              Petitioner,

and

*Pistrak   Evgeny*

                              Respondent.

**15-3-06019-1 SEA**

**No.**
**Petition for Dissolution of Marriage
(PTDSS)**

**Para. 1.12:  check box if petition is
attached for:**
**[ ] Order for protection DV (PTORPRT)**
**[ ] Order for protection UH (PTORAH)**

**I. Basis**

**1.1    Identification of Petitioner**

Name (first/last) *Kseniia   Golubeva*_____, Birth date *08/26/1986*

Last known residence (county and state only) *Snohomish, Washington*.

**1.2    Identification of Respondent**

Name (first/last) *Evgeny   Pistrak*_____, Birth date *02/19/1980*

Last known residence (county and state only) *King, Washington*.

**1.3    Children of the Marriage Dependent Upon Either or Both Spouses**

[X]    Does not apply.  There are no children dependent upon either or both spouses.

[ ]    The petitioner and respondent are both the legal (biological or adoptive) parents of the following
dependent children:

Name (first/last) _____ Age _____

Name (first/last) _____ Age _____

Name (first/last) _____ Age _____

Name (first/last) _____ Age _____

Name (first/last) _____ Age _____

Name (first/last) _____ Age _____

[ ]   The petitioner is and the respondent is not the legal parent of the following dependent children:

Name (first/last) _____ Age _____

Name (first/last) _____ Age _____

[ ]   The respondent is and the petitioner is not the legal parent of the following dependent children:

Name (first/last) _____ Age _____

Name (first/last) _____ Age _____

## 1.4   Allegation Regarding Marriage

This marriage is irretrievably broken.

## 1.5   Date and Place of Marriage

The parties were married on (date) __09/13/2014__ _____ at (city
and state) __Seattle, Washington__ .

## 1.6   Separation

[ ]   Petitioner and respondent are not separated.
[X]   Petitioner and respondent separated on (date) __05/20/2015__ .
This is the date (check all that apply):
[ ] the parties moved into separate residences
[ ] the parties divided their assets and liabilities
[ ] petitioner filed this petition
[ ] both parties agreed is the date of separation
[X] other: _Petitioner moved out from the shared residence
because of the domestic violence._

## 1.7   Jurisdiction

This court has jurisdiction over the marriage.

[X]   This court has jurisdiction over the respondent because:
  [X]   the respondent is currently residing in Washington.
  [X]   the petitioner and respondent lived in Washington during their marriage and the
        petitioner continues to reside, or be a member of the armed forces stationed, in
        this state.
  [ ]   the petitioner and respondent may have conceived a child while within
        Washington.

[ ]    Other:

[ ]    This court does not have jurisdiction over the respondent.

## 1.8   Property

There is community or separate property owned by the parties. The court should make a fair and equitable division of all the property.

[ ]    The division of property should be determined by the court at a later date.
&#9746;    The petitioner's recommendation for the division of property is set forth below.

&#9746;    The petitioner should be awarded the parties' interest in the following property:

- As I already vacated the house and the respondent shows the intence to live there, he might stay there. My intence is to have half equity of the home including the downpayment, which was his gift to the marriage.

[ ]    The respondent should be awarded the parties' interest in the following property:

- Half the house
- The car Honda Accord, he had before we got married
- The car Honda CR-V.

[ ]    Other:

## 1.9    Debts and Liabilities

[ ]    The parties have no debts and liabilities.

☒    The parties have debts and liabilities.  The court should make a fair and equitable division of all debts and liabilities.

    [ ]    The division of debts and liabilities should be determined by the court at a later date.

    [☒]    The petitioner's recommendation for the division of debts and liabilities is set forth below.

        [ ]    The petitioner should be ordered to pay the following debts and liabilities to the following creditors:

        ☒    The respondent should be ordered to pay the following debts and liabilities to the following creditors:

*- Mortgage payment to First Tech Credit Union*
*- 300$ telephone bill Associated with my name*
*- reimburce ³⁰⁰$ cost of glasses he broke while domestic*
*                                   violence*
*- reimburce insurance coverage till the day of divorce.*

☒    Each party should pay their debts incurred since separation.

[ ]    Other:

## 1.10    Maintenance

[ ]    Maintenance should not be ordered.

☒    There is a need for maintenance as follows:

*- As I was unemployed housewife and Student and he was working professional I'm asking for reasonable maintenence. 1500$ per month since October 27 till I will get new EAD.*

[ ]    Other:

## 1.11   Continuing Restraining Order

[ ]   Does not apply.

[X]   A continuing restraining order should be entered which restrains or enjoins the
[ ] petitioner [X] respondent from disturbing the peace of the other party.

[X]   A continuing restraining order should be entered which restrains or enjoins the
[ ] petitioner [X] respondent from going onto the grounds of or entering the home, work
place or school of the other party or the day care or school of the following children:

_____

[X]   A continuing restraining order should be entered which restrains or enjoins the
[ ] petitioner [X] respondent from knowingly coming within or knowingly remaining within
(distance) __*500 feet*__ of the home, work place or school of the other party or the
day care or school of the children.
Other: _____.

[X]   A continuing restraining order should be entered which restrains or enjoins the
[ ] petitioner [X] respondent from assaulting, harassing, stalking, or molesting, the other
party or the children, or using, attempting to use, or threatening to use physical force
against the other party or the children that would reasonably be expected to cause bodily
injury, or engaging in other conduct that would place the other party in reasonable fear of
bodily injury to the other party or children. (If the court orders this relief, the restrained
person may be prohibited from obtaining or possessing a firearm, other dangerous
weapon, concealed pistol license, or ammunition under state or federal law for the
duration of the order.)

[ ]   Other:

## 1.12   Protection Order

[ ]   Does not apply.

[X]   There is a protection order between the parties filed in case number *15-2-21856-5 SEA*
court *King County*_____, which expires on (date) *10/21/2015*_____.

[ ]   The court should grant the [ ] domestic violence [ ] antiharassment petition for order for
protection:
[ ] attached to this petition.
[ ] filed separately under [ ] this case number [ ] case number _____.

**If you need immediate protection, contact the clerk/court for RCW 26.50 Domestic
Violence forms or RCW 10.14 Antiharassment forms.**

## 1.13  Pregnancy

    ☒    No party is pregnant.

    [ ]    (Name) _____ is pregnant.  **Note:  Under RCW 26.26.116, the other party is the presumed parent.  If either party believes the other party is not the parent, this presumption may be challenged up to four years after the birth of the child or as otherwise provided in RCW 26.26.500 through 26.26.625.**

    [ ]    Other:

## 1.14  Jurisdiction Over the Children

    ☒    Does not apply because there are no dependent children.

    [ ]    This court has jurisdiction over the children for the reasons set forth below:

    [ ]    This court has exclusive continuing jurisdiction. The court has previously made a child custody. parenting plan, residential schedule or visitation determination in this matter and retains jurisdiction under RCW 26.27.211.

    [ ]    This state is the home state of the children because:

        [ ]    the children lived in Washington with a parent or a person acting as a parent for at least six consecutive months immediately preceding the commencement of this proceeding.

        [ ]    the children are less than six months old and have lived in Washington with a parent or a person acting as parent since birth.

        [ ]    any absences from Washington have been only temporary.

        [ ]    Washington was the home state of the children within six months before the commencement of this proceeding and the children are absent from the state but a parent or person acting as a parent continued to live in this state.

    [ ]    The children and the parents or the children and at least one parent or person acting as a parent have significant connection with the state other than mere physical presence; and substantial evidence is available in this state concerning the children's care, protection, training and personal relationships, and

        [ ]    the children have no home state elsewhere.

        [ ]    the children's home state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under RCW 26.27.261 or .271.

    [ ]    All courts in the children's home state have declined to exercise jurisdiction on the ground that a court of this state is the more appropriate forum to determine the custody of the children under RCW 26.27.261 or .271.

    [ ]    No other state has jurisdiction.

[ ]    This court has temporary emergency jurisdiction over this proceeding because the children
       are present in this state and the children have been abandoned or it is necessary in an
       emergency to protect the children because the children. or a sibling or parent of the children
       is subjected to or threatened with abuse. RCW 26.27.231.

       [ ]    There is a previous custody determination that is entitled to be enforced under
              this chapter or a child custody proceeding has been commenced in a court of a
              state having jurisdiction under RCW 26.27.201 through 26.27.221.  The
              requirements of RCW 26.27.231(3) apply to this matter.  This state's jurisdiction
              over the children shall last until (date) _____.

       [ ]    There is no previous custody determination that is entitled to be enforced under
              this chapter and a child custody proceeding has not been commenced in a court
              of a state having jurisdiction under RCW 26.27.201 through 26.27.221.  If an
              action is not filed in (potential home state) _____ by the time
              the child has been in Washington for six months, (date) _____,
              then Washington's jurisdiction will be final and continuing.

[ ]    Other:

## 1.15   Child Support and Parenting Plan for Dependent Children

[X]    The parties have no dependent children.
[ ]    A parenting plan and an order of child support pursuant to the Washington State child
       support statutes should be entered for the following children who are dependent upon
       both parties:

       Names of Children

       The petitioner's proposed parenting plan for the children listed above:

       [ ]    is attached and is incorporated by reference as part of this Petition.
       [ ]    will be filed and served at a later date pursuant to RCW 26.09.181.

       (The following information is required only for those children who are included in the
       petitioner's proposed parenting plan.)

       During the last five years, the children have lived:

       [ ]    in no place other than the state of Washington and with no person other than the
              petitioner or the respondent.

*Pet for Disso of Marriage (PTDSS) - Page 7 of 10*
*WPF DR 01.0100 Mandatory (06/2014) - RCW 26.09.020*

[ ]     in the following places with the following persons (list each place the children lived, including the state of Washington, the dates the children lived there and the names of the persons with whom the children lived. The present addresses of those persons must be listed in the required Confidential Information Form):

Claims to custody or visitation:

[ ]     The petitioner does not know of any person other than the respondent who has physical custody of, or claims to have custody or visitation rights to, the children.

[ ]     The following persons have physical custody of, or claim to have custody or visitation rights to the children (list their names and the children concerned below and list their present addresses in the Confidential Information Form.  Do not list the responding party):

Involvement in any other proceeding concerning the children:

[ ]     The petitioner has not been involved in any other proceeding regarding the children.

[ ]     The petitioner has been involved in the following proceedings regarding the children (list the court, the case number, and the date of the judgment or order):

Other legal proceedings concerning the children:

[ ]     The petitioner does not know of any other legal proceedings concerning the children.

[ ]     The petitioner knows of the following legal proceedings that concern the children (list the children concerned, the court, the case number, and the kind of proceeding):

## 1.16  Other

## II. Relief Requested

The petitioner **requests** the court to enter a decree of dissolution and to grant the relief below.

    [X]    Provide reasonable maintenance for the [X] petitioner [ ] respondent.

    [ ]    Approve the petitioner's proposed parenting plan for the dependent children listed in paragraph 1.15.

    [ ]    Determine support for the dependent children listed in paragraph 1.15 pursuant to the Washington State child support statutes.

    [ ]    Approve the separation contract or prenuptial agreement.

    [X]    Divide the property and liabilities.

    [X]    Change name of petitioner to (first, middle, last):  _Golubeva_.

    [ ]    Change name of respondent to (first, middle, last):  _____.

    [X]    Enter a domestic violence protection order.

    [X]    Enter an antiharassment protection order.

    [X]    Enter a continuing restraining order.

    [ ]    Order payment of day care expenses for the children listed in paragraph 1.15.

    [ ]    Award the tax exemptions for the dependent children listed in paragraph 1.15 as follows:

    [X]    Order payment of attorney fees, other professional fees and costs.

    [ ]    Other:

Dated:  _9/24/2015_

_____
Signature of Petitioner or Lawyer/WSBA No.

_Kseniia Golubeva_
Print Name

I declare under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

Signed at (city) _Seattle_, (state) _WA_ on (date) _9/24/2015_.

_____
Signature of Petitioner

_Kseniia Golubeva_
Print Name

[ ]    **Joinder**

I, the respondent, join in the petition. I understand that by joining in the petition, a decree or judgment and order may be entered in accordance with the relief requested in the petition, unless prior to the entry of the decree or judgment and order, a response is filed and served.

    [ ] I waive notice of entry of the decree.

    [ ] I demand notice of all further proceedings in this matter. Further notice should be sent to the following address (you may list an address that is not your residential address where you agree to accept legal documents):

_____

_____

Any time this address changes while this action is pending, you must notify the opposing parties in writing and file an updated Confidential Information Form (WPF DRPSCU 09.0200) with the court clerk.

Dated: _____    _____

                                               Signature of Respondent

                                               _____

                                               Print Name

FILED

2015 SEP 29 AM 11: 18

KING COUNTY
SUPERIOR COURT CLERK
SEATTLE, WA

## Superior Court of Washington
## County of    KING

☒ In re the Marriage of:
☐ In re the Domestic Partnership of:

Ksenlla Galubeva
                Petitioner,

and

Evgeny Pistrak
                Respondent.

No. /5- 3 -06019 - 1 SEA

**Motion/Declaration for Ex Parte Restraining Order and for Order to Show Cause
(MTSC)**

### I. Motion

Based upon the declaration below, the undersigned moves the court for a temporary order and order to show cause.

### 1.1   Ex Parte Restraining Order

A temporary restraining order should be granted without written or oral notice to the other party or the other party's lawyer because immediate and irreparable injury, loss, or damage will result before other party or the other party's lawyer can be heard in opposition. This order should restrain or enjoin:

☒ the ☐ petitioner ☒ respondent from transferring, removing, encumbering, concealing or in any way disposing of any property except in the usual course of business or for the necessities of life and requiring each party to notify the other of any extraordinary expenditures made after the order is issued.

☐ the ☐ petitioner ☐ respondent from disturbing the peace of the other party or of any child.

☐ (Name) _____ from going onto the grounds of or entering the ☐ parties' shared residence ☐ residence of (name) _____.
(Name) _____ waives confidentiality of the address which is (address) _____

☐ the ☐ petitioner ☐ respondent from going onto the grounds of or entering the home, work place or school of the other party or the day care or school of these children:
_____
_____

*Mtn/Decl for Ex Parte Restraining Ord (MTSC) - Page 1 of 6*
*WPF DR 04.0150 Mandatory (06/2014) - CR 65 (b); RCW 26.09.060.*

☐    the ☐ petitioner ☐ respondent from knowingly coming within or knowingly remaining within (distance) _____ of the home, work place or school of the other party or the day care or school of these children:_____

_____.

☐    the ☐ petitioner ☐ respondent from assaulting, harassing, stalking, or molesting the other party or the children, or using, attempting to use, or threatening to use physical force against the other party or the children that would reasonably be expected to cause bodily injury, or engaging in other conduct that would place the other party in reasonable fear of bodily injury to the other party or children. (If the court orders this relief, the restrained person may be prohibited from obtaining or possessing a firearm, other dangerous weapon, concealed pistol license, or ammunition under state or federal law for the duration of the order.)

☐    the ☐ petitioner ☐ respondent from removing any of the children from the state of Washington.

☒    the ☐ petitioner ☒ respondent from assigning, transferring, borrowing, lapsing, surrendering or changing entitlement of any insurance policies of either or both parties whether medical, health, life or auto insurance.

☐    other:

The other party should be required to appear and show cause why these restraints should not be continued in full force and effect pending final determination of this action.

## 1.2   Other Ex Parte Relief

☐    Order that the ☐ petitioner ☐ respondent shall be the parent with whom the child(ren) reside until the hearing.

☐    Other:

## 1.3   Ex Parte Surrender of Firearms or Other Deadly Weapons

☒    Does not apply.

☐    The court should require the ☐ petitioner ☐ respondent to surrender any firearm or other deadly weapon in his or her immediate possession or control or subject to his or her immediate possession or control to the sheriff of the county having jurisdiction of this proceeding, to his or her lawyer or to a person designated by the court.

## 1.4   Other Temporary Relief

☐    Does not apply.

☒    The ☐ petitioner ☒ respondent should also be required to appear and show cause why the court should not enter a temporary order which:

      ☒    orders temporary maintenance.

      ☐    orders child support as determined pursuant to the Washington State child support statutes.

*Mtn/Decl for Ex Parte Restraining Ord (MTSC) - Page 2 of 6*
*WPF DR 04.0150 Mandatory (06/2014) - CR 65 (b); RCW 26.09.060.*

Page 14

☐ approves the parenting plan which is proposed by the ☐ petitioner ☐ respondent.

☐ approves the Temporary Residential Time re Military Parents proposed by the ☐ petitioner ☐ respondent pursuant to RCW 26.09.260(11), (12).

☒ makes each party immediately responsible for their own future debts whether incurred by credit card or loan, security interest or mortgage.

☐ divides responsibility for the debts of the parties.

☐ authorizes the family home to be occupied by the ☐ petitioner ☐ respondent.

☐ orders the use of property.

☐ requires the ☐ petitioner ☐ respondent to vacate the family home.

☐ requires the ☐ petitioner ☐ respondent to pay temporary attorney's fees, other professional fees and costs in the amount of $_____ to:

☐ appoints a guardian ad litem on behalf of the minor children.

☒ other: The respondent shall not sell the family house until dissolution of marriage hearing.

## 1.5   Other

Dated: _9/28/2015_

_____
Signature of Requesting Party or Lawyer/WSBA No.

_Ksenia Golubeva_
Print or Type Name

## II. Declaration

## 2.1   Injury to be Prevented

The ex parte restraining order, other relief, or surrender of weapon requested in paragraphs 1.1, 1.2 and 1.3 above are to prevent the following injury (define the injury):

— financial loss

*Mtn/Decl for Ex Parte Restraining Ord (MTSC) - Page 3 of 6*
*WPF DR 04.0150 Mandatory (06/2014) - CR 65 (b); RCW 26.09.060.*

Page 15

## 2.2    Reasons why the Injury may be Irreparable

This injury may be irreparable because:

— Because the petitioner will be unable to work and unable to recoup the money, if the respondent will sell their family house.

## 2.3    Reasons for a Temporary Order

☐    Does not apply.
☒    It is necessary that the court issue a temporary order with the relief requested in paragraph 1.4 above for the reason set forth below:

— Should prevent the respondent from termination from the insurance and selling the property before the hearing of dissolation of marriage.
— Provide reasonable maintanence for the petitioner as she will not be able to work since October 27 2015 for at least 6 month.
— Protect the petitioner from the debts made by the respondent.

*Mtn/Decl for Ex Parte Restraining Ord (MTSC) - Page 4 of 6*
*WPF DR 04.0150 Mandatory (06/2014) - CR 65 (b); RCW 26.09.060.*

☐    If a Temporary Residential Time re Military Parents is requested, and I request delegation of residential time or visitation rights to a nonparty, to the best of my knowledge, that person:
    ☐ would
    ☐ would not
be subject to limitations on residential time under RCW 26.09.191.  (See paragraph 2.1 and 2.2 of the parenting plan.)

## 2.4   Service Member or Dependent of Service Member

☐    If the other party is not present and:
a) is on active duty and is a National Guard member or Reservist residing in Washington, or
b) is a dependent of a National Guard member or Reservist residing in Washington on active duty, list the reasons why this temporary order should be granted despite the absence of the other party:

## 2.5   Was notice of this request for an emergency order given to the other party or lawyer?

☐    **Yes**. Explain what **efforts** have been made to give written or oral notice to the other party or other party's lawyer:

☒    **No**. Explain the reasons **why** you believe that immediate and irreparable injury, loss, or damage will happen if notice is given:
*We have no contact order and not to violate it the petitioner is going to serve the papers today with King County sheriff.*

I declare under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

Signed at (city) _Bellevue_ , (state) _WA_ on (date) _9/28/2015_ .

Signature _____    Print or Type Name _Ksenlla Golakeva_

***Do not attach financial records, personal health care records or confidential reports to this declaration. Such records should be served on the other party and filed with the court using one of these cover sheets:***

*Mtn/Decl for Ex Parte Restraining Ord (MTSC) - Page 5 of 6*
*WPF DR 04.0150 Mandatory (06/2014) - CR 65 (b); RCW 26.09.060.*

1) *Sealed Financial Source Documents (WPF DRPSCU 09.0220) for financial records*
2) *Sealed Personal Health Care Records (WPF DRPSCU 09.0260) for health records*
3) *Sealed Confidential Report (WPF DRPSCU 09.270) for confidential reports*

*If filed separately using a cover sheet, the records will be sealed to protect your privacy (although they will be available to all parties in the case, their attorneys, court personnel and certain state agencies and boards.) See GR 22(C)(2).*

*Mtn/Decl for Ex Parte Restraining Ord (MTSC) - Page 6 of 6*
*WPF DR 04.0150 Mandatory (06/2014) - CR 65 (b); RCW 26.09.060.*

Page 18

FILED

2015 SEP 29 AM 11: 25

KING COUNTY
SUPERIOR COURT CLERK
SEATTLE, WA

EXP01

ISSUED

| C/PROC |
| CUST |
| CASH |
| JUDG |
| DISB |
| CRIM |
| ACCTG |
| EXH |

Law Enforcement Info Sheet.
The filing party or attorney
didn't provide the Clerk with the

Present in Person

## Superior Court of Washington
## County of    KING

[X] In re the Marriage of:
[ ] In re the Domestic Partnership of:

Ksenia Golubeva

Petitioner,

and

Evgeny Pistrak

Respondent.

No. 15-3-06019-1 SEA

**Ex Parte Restraining Order/
Order to Show Cause
(TPROTSC/ORTSC)**

[X] Clerk's Action Required
[ ] Law Enforcement Notification, ¶
4.1, 4.3

Restraining Order Summary:
[X] Does not apply.
[ ] Restraining Order Summary is set forth below:

| Name of person(s) restrained: _____ , Name of |
| person(s) protected: _v._ _____ **See paragraph 4.1.** |

*Violation of a Restraining Order in paragraph 4.1 below with actual knowledge of its
terms is a criminal offense under Chapter 26.50 RCW and will subject the violator to
arrest. RCW 26.09.060.*

### I. Show Cause Order

*It is Ordered* the [ ] petitioner [X] respondent appear and show cause, if any, why the restraints below should not be continued in full force and effect pending final determination of this action and why the other relief, if any, requested in the motion should not be granted. A hearing has been set for the following date, time and place:

Date: 10-22-15    Time: 9:00 [X] a.m./p.m.

Place: King County Superior Court
Side Third Ave, Seattle WA    Room/Department: W291-Family Law

If you disagree with any part of the motion, you must respond to the motion in writing before the hearing and by the deadline for your county. At the hearing, the court will consider *Written* sworn affidavits or declarations. Oral testimony may *Not* be allowed. To respond you must: (1) file your documents with the court; (2) provide a copy of those documents to the judge or commissioner's staff; (3) serve the other party's attorney with copies of your documents (or have the other party served if that party does not have an attorney); and (4) complete your filing and service of documents within the time period required by the local court rules in effect in your county. If you need more information, you are advised to consult an attorney or a courthouse facilitator.

*Ex Parte Restraining Ord (TPROTSC/ORTSC) - Page 1 of 4
WPF DR 04.0170 Mandatory (6/2014) - CR 65 (b); RCW 26.09.060*

*Failure to appear may result in a Temporary Order being entered by the court that grants the relief requested in the motion without further notice.*

## II. Basis

A motion for a temporary restraining order without written or oral notice to the [ ] petitioner [ ] respondent or that party's lawyer has been made to this court.

## III. Findings

The court adopts paragraphs 2.1, 2.2, and 2.4 of the Motion/Declaration for an Ex Parte Restraining Order and for an Order to Show Cause (Form WPF DR 04.0150) as its findings, except as follows:


[ ]   Further, the court finds that the nonrequesting party is absent and a) is on active duty as a National Guard member or Reservist residing in Washington, or b) is a dependent of a National Guard member or Reservist residing in Washington on active duty. Despite the service member's or dependent's absence, failure to enter the temporary orders below would result in manifest injustice to the other interested parties.

## IV. Order

*It is Ordered:*

---

**4.1   Restraining Order**

*Violation of a Restraining Order in paragraph 4.1 with actual notice of its terms is a criminal offense under Chapter 26.50 RCW and will subject the violator to arrest. RCW 26.09.060.*

   ⊠   Does not apply.

[ ]   The [ ] petitioner [ ] respondent is restrained and enjoined from:
    [ ]   disturbing the peace of the other party or of any child.
    [ ]   going onto the grounds of or entering the home, work place or school of the other party or the day care or school of the following protected children:
    _____

    [ ]   knowingly coming within or knowingly remaining within
       (distance) _____ of the home, work place or school
       of the other party or the day care or school of the protected children.
    [ ]   assaulting, harassing, stalking, or molesting the other party or the children, or using, attempting to use, or threatening to use physical force against the other party or the children that would reasonably be expected to cause bodily injury, or engaging in other conduct that would place the other party in reasonable fear of bodily injury to the other party or the children.
       **If the court orders this relief after the hearing, the restrained person may be prohibited from obtaining or possessing a firearm, other dangerous weapon, concealed pistol license, or ammunition under state or federal law for the duration of the order.**

---

*Ex Parte Restraining Ord (TPROTSC/ORTSC) - Page 2 of 4*
*WPF DR 04.0170 Mandatory (6/2014) - CR 65 (b); RCW 26.09.060*

[ ]    **Clerk's Action.** The clerk of the court shall forward a copy of this order, on or before the next judicial day, to (name of the appropriate law enforcement agency) _____ which shall enter this order into any computer-based criminal intelligence system available in this state used by law enforcement agencies to list outstanding warrants. (**A law enforcement information sheet must be completed by the party or the party's attorney and provided with this order before this order will be entered into the law enforcement computer system.**)

## Service

The requesting party must arrange for service of this order on the restrained party. File the original Return of Service with the clerk and provide a copy to the law enforcement agency listed above.

## Full Faith and Credit

Pursuant to 18 U.S.C. § 2265, a court in any of the 50 states, the District of Columbia, Puerto Rico, any United States territory, and any tribal land within the United States shall accord full faith and credit to the order.

## 4.2    Other Restraining Orders

[X]    The [ ] petitioner [X] respondent is restrained and enjoined from transferring, removing, encumbering, concealing or in any way disposing of any property except in the usual course of business or for the necessities of life and requiring each party to notify the other of any extraordinary expenditures made after the order is issued.

[ ]    The [ ] petitioner [ ] respondent is restrained and enjoined from removing any of the children from the state of Washington.

[X]    The [ ] petitioner [X] respondent is restrained and enjoined from assigning, transferring, borrowing, lapsing, surrendering or changing entitlement of any insurance policies of either or both parties whether medical, health, life or auto insurance.

[ ]    The [ ] petitioner [ ] respondent shall be the parent with whom the child(ren) reside until the hearing.

[X]    Other: *The respondent shall not sell the family home until dissolution of marriage hearing*

## 4.3    Surrender of Firearm or other Dangerous Weapons

[X]    Does not apply.

[ ]    It is ordered that (name) _____ surrender any firearm or other dangerous weapon in his or her immediate possession or control or subject to his or her immediate possession or control to the person or agency named in the Order to Surrender Weapon (Issued without Notice) signed by the court on this date, under this cause number.

## 4.4    Expiration Date

This order shall expire on the hearing date set forth above or 14 days from the date of issuance, which ever is sooner, unless otherwise extended by the court. *Extended to allow service of Summons and Petition.*

**4.5    Waiver of Bond**

⊠    Does not apply.
[ ]    The filing of a bond or the posting of security is waived.

**4.6    Other**

Dated: _____9/29/15_____ at __11:05__ a.m./p.m.

_____
**Judge/Commissioner**

Larry Garrett
Pro Tem

Presented by:

_____
Signature of Party or Lawyer/WSBA No.

_Ksenia Golubeva_    _9/29/2015_
Print or Type Name         Date

**FILED**

15 OCT 14 PM 3:31

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 15-3-06019-1 SEA



## SUPERIOR COURT OF WASHINGTON
## COUNTY OF KING

In re the Marriage of:

KSENIIA GOLUBEVA,

                      Petitioner,

and

EVGENY PISTRAK,

                    Respondent.

NO. 15-3-06019-1SEA

FINANCIAL DECLARATION
[X] PETITIONER
(FNDCLR)

Name: Kseniia Golubeva                Date of Birth: 8/26/1986

### I. Summary of Basic Information

| | |
|---|---|
| Declarant's Total Monthly Net Income (from § 3.3 below) | $ 2385.67 |
| Declarant's Total Monthly Household Expenses (from § 5.9 below) | $ 2455.51 |
| Declarant's Total Monthly Debt Expenses (from § 5.11 below) | $ 0.00 |
| Declarant's Total Monthly Expenses (from § 5.12 below) | $ 2465.51 |
| Estimate of the other party's gross monthly income (from § 3.1f below) [X] | $ 12,000.00 |

*Financial Declaration (FNDCLR) - Page 1*
*WPF DRPSCU 01.1550 (6/2006) - RCW 26.18.220(1)*

**Law Office Charles R. Horner, PLLC**
1001 Fourth Avenue, Suite 3200
Seattle, Washington 98154
Tel.: 206-381-8454 Fax: 866-876-8280

## II. Personal Information

2.1    Occupation: HR Assistant

2.2    The highest year of education completed: Master's degree (in Russia)

2.3    Are you presently employed? [X] Yes

    a. If yes:    (1)    Where do you work. Beyond Soft Consulting, Inc.

                  (2)    When did you start work there: 2/2015

## III. Income Information

If child support is at issue, complete the Washington State Child Support Worksheet(s), skip Paragraphs 3.1 and 3.2. If maintenance, fees, costs or debts are at issue and child support is *Not* an issue this entire section should be completed. (Estimate of other party's income information is optional.)

3.1    Gross Monthly Income

    If you are paid on a weekly basis, multiply your weekly gross pay by 4.3 to determine your monthly wages and salaries. If you are paid every two weeks, multiply your gross pay by 2.15. If you are paid twice monthly, multiply your gross pay by 2. If you are paid once a month, list that amount below.

| | | | Name<br>Kseniia | Name<br>Evgeny Pistrak |
|---|---|---|---|---|
| | a. | Wages and Salaries | $ 2610.00 | $ 12,000 (est.) |
| | b. | Interest and Dividend Income | $ 0.00 | $ Unknown |
| | c. | Business Income | $ 0.00 | $ Unknown |
| | d. | Spousal Maintenance Received | | |
| | | From ____ 12_____ | $ 0.00 | $ Unknown |
| | e. | Other Income | $ 0.00 | $ Unknown |
| | f. | Total Gross Monthly Income | $ 2385.00 | $ 12,000 (est. |
| | g. | Actual Gross Income (Year-to-date) | $ 17,280.00 | $ 108,000 (est.) |

3.2    Monthly Deductions From Gross Income

| | | | | |
|---|---|---|---|---|
| | a. | Income Taxes | $ 224.33 | $ 2542.25 (est.) |
| | b. | FICA/Self-employment Taxes | $ 0 (b/c current visa<br>(status; may change later) | $ 918.00 (est.) |
| | c. | State Industrial Insurance Deductions | $ 0.00 | $ Unknown |
| | d. | *Mandatory* Union/Professional Dues | $ 0.00 | $ Unknown |

*Financial Declaration (FNDCLR) - Page 2*
*WPF DRPSCU 01.1550 (6/2006) - RCW 26.18.220(1)*

**Law Office Charles R. Horner, PLLC**
1001 Fourth Avenue, Suite 3200
Seattle, Washington 98154
Tel.: 206-381-8454 Fax: 866-876-8280

| | | | | |
|---|---|---|---|---|
| e. | Pension Plan Payments | $ 0.00 | | $ Unknown |
| f. | Spousal Maintenance Paid | $ 0.00 | | $ Unknown |
| g. | Normal Business Expenses | $ 0.00 | | $ Unknown |
| h. | Total Deductions from Gross Income (add lines 3.2a through 3.2g) | $ 224.33 | | $ 3460.25 |

3.3  Monthly Net Income (Line 3.1f minus line 3.2h or line 3 from the Child Support Worksheet(s).)  $ 2385.67    $ 8539.75

3.4  Miscellaneous Income

| | | | |
|---|---|---|---|
| a. | Child support received from other relationships | $ 0.00 | $ 0.00 |
| b. | Other miscellaneous income (list source and amounts) | $ 0.00 | $ Unknown |
| c. | Total Miscellaneous Income (add lines 3.4a through 3.4b) | $ 0.00 | $ Unknown |

3.5  Income of Other Adults in Household  $ N/A    $ Unknown

3.6  If the income of either party is disputed, state monthly income you believe is correct and explain below:

Not applicable

## IV. Available Assets

4.1  Cash on hand  $ 0.00
4.2  On deposit in banks  $ 7035.63
4.3  Stocks and bonds, cash value of life insurance  $ 0.00
4.4  Other liquid assets:  $ 0.00

## V. Monthly Expense Information

Monthly expenses for myself and 0 dependents are:

**5.1    Housing**

Rent, 1st mortgage or contract payments  $ 450.00

*Financial Declaration (FNDCLR) - Page 3*
*WPF DRPSCU 01.1550 (6/2006) - RCW 26.18.220(1)*

**Law Office Charles R. Horner, PLLC**
1001 Fourth Avenue, Suite 3200
Seattle, Washington 98154
Tel.: 206-381-8454  Fax: 866-876-8280

| | | |
|---|---|---|
| | Installment payments for other mortgages or encumbrances | $ _____ |
| | Taxes & insurance (if not in monthly payment) | $ _____ |
| | Total Housing | $ 450.00 ____ |
| **5.2** | **Utilities** | |
| | Heat (gas & oil) | $ 70.00 ____ |
| | Electricity | $ 0.00 ____ |
| | Water, sewer, garbage | $ 0.00 ____ |
| | Telephone | $ 55.75 ____ |
| | Cable | $ _____ |
| | Other | $ _____ |
| | Total Utilities | $ 125.75 ____ |
| **5.3** | **Food and Supplies** | |
| | Food for 1 person | $ 300.00 ____ |
| | Supplies (paper, tobacco, pets) | $ _____ |
| | Meals eaten out | $ 200.00 ____ |
| | Other | $ _____ |
| | Total Food Supplies | $ 500.00 |
| **5.4** | **Children** | |
| | Day Care/Babysitting | $ __ ____ |
| | Clothing | $ _____ |
| | Tuition (if any) | $ _____ |
| | Other child-related expenses | $ _____ |
| | Total Expenses Children | $ 0.00 ____ |
| **5.5** | **Transportation** | |
| | Vehicle payments or leases | $ 0.00 ____ |
| | Vehicle insurance & license | $ 254.76 ____ |
| | Vehicle gas, oil, ordinary maintenance | $ 400.00 ____ |
| | Parking | $ 20.00 ____ |
| | Other transportation expenses | $ _____ |
| | Total Transportation | $ 674.76 ____ |

*Financial Declaration (FNDCLR) - Page 4*
*WPF DRPSCU 01.1550 (6/2006) - RCW 26.18.220(1)*

**Law Office Charles R. Horner, PLLC**
1001 Fourth Avenue, Suite 3200
Seattle, Washington 98154
Tel.: 206-381-8454 Fax: 866-876-8280

**5.6     Health Care (Omit if fully covered)**

| | |
|---|---|
| Insurance | $ 15.00 |
| Uninsured dental, orthodontic, medical, eye care expenses | $ 150.00 |
| Other uninsured health expenses | $ 30.00 |
| Total Health Care | $ 195.00 |

**5.7     Personal Expenses (Not including children)**

| | |
|---|---|
| Clothing | $ 300.00 |
| Hair care/personal care expenses | $ 50.00 |
| Clubs and recreation | $ 50.00 |
| Education | $ |
| Books, newspapers, magazines, photos | $ 10.00 |
| Gifts | $ 100.00 |
| Other | $ |
| Total Personal Expenses | $ 510.00 |

**5.8     Miscellaneous Expenses**

| | |
|---|---|
| Life insurance (if not deducted from income) | $ 0.00 |
| Other _____ _____ | $ 0.00 |
| Total Miscellaneous Expenses | $ 0.00 |

**5.9     Total Household Expenses** (The total of Paragraphs 5.1 through 5.8)     $ 2455.51

**5.10     Installment Debts Included in Paragraphs 5.1 Through 5.8**

None.

**5.11     Debts and Monthly Expenses not Included in Paragraphs 5.1 Through 5.8**

None.

**5.12     Total Expenses (Add Paragraphs 5.9 and 5.11)**     $ 2455.51

*Financial Declaration (FNDCLR) - Page 5*
*WPF DRPSCU 01.1550 (6/2006) - RCW 26.18.220(1)*

**Law Office Charles R. Horner, PLLC**
1001 Fourth Avenue, Suite 3200
Seattle, Washington 98154
Tel.: 206-381-8454  Fax: 866-876-8280

## VI. Attorney Fees

6.1    Amount paid for attorney fees and costs to date:                    $ 1500.00 (deposit)

6.2    The source of this money was: Personal funds

6.3    Fees and costs incurred to date:                                    $ Not billed yet.

6.4    Arrangements for attorney fees and costs are: Pay as billed from attorney trust account or direct payment.

6.5    Other:

I declare under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

Signed at _Bellevue_____ [City], Washington, on October 14, 2015.

Ksenia Golubeva

The following financial records are being provided to the other party and filed separately with the court.

Financial records pertaining to myself:

[X] Pay stubs for the dates of 3/23/15-9/20/15

[X] Other: Bank account records, April through August 2015.

*Do not attach these financial records to the financial declaration. These financial records should be served on the other party and filed with the court separately using the sealed financial source documents cover sheet (WPF DRPSCU 09.0220). If filed separately using the cover sheet, the records will be sealed to protect your privacy (although they will be available to all parties in the case, their attorneys, court personnel and certain state agencies and boards.) See GR 22 (C)(2).*

Financial Declaration (FNDCLR) - Page 6
WPF DRPSCU 01.1550 (6/2006) - RCW 26.18.220(1)

**Law Office Charles R. Horner, PLLC**
1001 Fourth Avenue, Suite 3200
Seattle, Washington 98154
Tel.: 206-381-8454 Fax: 866-876-8280

FILED

15 OCT 23 PM 4:10

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 15-3-06019-1 SEA

1

2

3

4

5

6

7

**IN THE SUPERIOR COURT OF WASHINGTON
FOR KING COUNTY**

8

In re Marriage of:

9

KSENIIA GOLUBEVA,

10

                    Petitioner,

11

and

12

EVGENY PISTRAK,

13

                    Respondent.

14

NO. 15-3-06019-1SEA

SUPPLEMENTAL DECLARATION
OF KSENIIA GOLUBEVA IN
SUPPORT OF MOTION FOR
TEMPORARY ORDERS

15

    I, KSENIIA GOLUBEVA, declare the following matters to be true and correct under

16

penalty of perjury under the laws of the statement of Washington:

17

    1.     I was born in Russia and am 29 years old. I am presently seeking divorce from

18

Evgeny Pistrak. We have no children.

19

    2.     Evgeny and I separated on May 20, 2015, when I moved out of our Redmond

20

home because I could no longer tolerate his continual physical and emotional abuse of me. I

21

am seeking an order for protection against him in a separate case, No. 15-2-21856-5 and I have

22

described the abuse in my declarations in that case. That case is on hold until at least

23

December because a criminal domestic violence case, King County District Court Case

24

25

SUPPL. GOLUBEVA DECL. - 1

**Law Office Charles R. Horner, PLLC**
1001 Fourth Avenue, Suite 3200
Seattle, Washington 98154
Tel.: 206-381-8454 Fax: 866-876-8280

No. 415143807, has also been filed against Evgeny and he is claiming the right not to testify in the protection order case at this time. The court has kept the temporary protection order in place until the next hearing, on December 8. Although I am at this time asking the Court in this case only to make temporary orders about financial matters and property, I believe it is important for the Court to know that Evgeny's actions forced me to leave our home and put me in my present state of financial need.

**Temporary Maintenance.**

3.     It has been very difficult for me to cover my basic living expenses since fleeing my home with Evgeny. My standard of living compared to when I was living there (not considering his abuse of me, of course) has fallen greatly.

4.     I am legally present in the United States pursuant to F-1 status. I am currently on F-1 OPT status, which has permitted me to work for Beyondsoft Consulting, Inc. I am working as HR Assistant there. My OPT is expiring on October 27 2015, as is shown on my Employment Authorization Card, a true and correct copy of which is attached as **Exhibit A**. I will not be able to work after that time unless and until my status changes.

5.     I presently petitioning for "Amerasian, Widow(-er), or Special Immigrant" status based on Evgeny's domestic violence against me. I understand that the earliest I can expect to receive adjustment of my immigration status and the right to work again in this country is April 14, 2016 (180 days for petition approval and three more months for new EAD approval). Because I am an educated specialist with work experience in the human resources filed, I am hopeful that, once my status is adjusted, I will not have a problem finding a new job in human resources. But until that happens, I will have no income to meet my basic living

SUPPL. GOLUBEVA DECL. - 2

**Law Office Charles R. Horner, PLLC**
1001 Fourth Avenue, Suite 3200
Seattle, Washington 98154
Tel.: 206-381-8454  Fax: 866-876-8280

needs, which even my current income does not fully cover. For these reasons, I am requesting the Evgeny provide me temporary maintenance at least until my status is adjusted to permanent residency with full work authorization status and I am able to secure new employment.

6.    I have presented my recent paystubs and bank account information in my Sealed Financial Documents. I do not have a 2014 tax return because Evgeny kept it and has not given me a copy. My paystubs show that I earn gross income of $2610 per month, which, after taxes, presently gives me a net income of $2385. As I stated, I will not have even that income after October 27.

7.    As the Court can see from my Financial Declaration, my current expenses, even without considering the expenses of hiring an attorney for this case (I also had to hire an immigration attorney), are more than my current income. I am paying rent of $450 per month for a room in the home of friends along with contributing of $50 to $70 per month for utilities.

8.    Evgeny continues to live, I believe, in the 1820-square foot house at 12834 - 176th Place Northeast in Redmond that we purchased in October 2014 (it is in Evgeny's name because of the bank loan). While I believe he continues to live in the home, I have only a single bedroom in a house to myself with limited privacy and the risk that my friends could ask me to leave at any time. Having to leave my home because of Evgeny's violence has left us in much different circumstances.

9.    I have looked into rents for small apartments (studios and one-bedroom apartments) and have found even they are very expensive. Because I work in Bellevue, I looked into what it would cost for me rent just a studio apartment in that area. I performed a search for apartments on zillow.com and did not find any studios renting for less than $1175

SUPPL. GOLUBEVA DECL. - 3

**Law Office Charles R. Horner, PLLC**
1001 Fourth Avenue, Suite 3200
Seattle, Washington 98154
Tel.: 206-381-8454  Fax: 866-876-8280

per month.  The average (including a one-bedroom apartment in Sammamish) was over $1400. A true and correct copy of my search results is attached as **Exhibit B**.  Even were I not about to lose my work authorization, there is no way I could afford such rent with just my income.

10.    Evgeny is also a Russian citizen, but I believe he has legal permanent resident status.  He came to the United Stated ten years ago to work as a computer programming contractor.  He worked for Microsoft as a Software Development Engineer II in the Office Team when we were together.  I believe he still works at Microsoft based on a recent view of his Facebook page, a true and correct copy of which is attached as **Exhibit C**, which states he works there.

11.    Based on my knowledge of his income when we were together, I believe that Evgeny earns and is capable of earning gross income of around $12,000 per month, leaving him a net income of around $8540, I estimate.  That is over 3.5 times what I earn now.

12.    Based on the drop in my standard of living compared to when I was living with Evgeny, the very large difference between our incomes, and my present financial needs, including the fact that I am about to lose my right to work in this country for at least five and a half months, I am requesting that the Court order the Evgeny pay me temporary maintenance while the divorce case is pending as follows:

> ➢ $3000 monthly during the period when I am not permitted to work, which starts on October 27.  My commuting expenses will decrease when I not allowed to work, but my other living expenses, including need to pay rent, will continue.

Based on his much higher income, I believe that Evgeny will be able to meet his needs if he is ordered to pay the temporary maintenance I am requesting.

SUPPL. GOLUBEVA DECL. - 4

**Law Office Charles R. Horner, PLLC**
1001 Fourth Avenue, Suite 3200
Seattle, Washington  98154
Tel.: 206-381-8454  Fax: 866-876-8280

13.    If, after my right to work is restored, I am still in financial need, I would like to be able to make another motion for temporary maintenance based on the circumstances at that time, which I cannot now predict. My hope is that my employment situation will work out so that it will not be necessary for me to bring such a motion, however.

**Require Evgeny to Keep Me on His Health Insurance.**

14.    Evgeny has again and again tried to take me off his health insurance through Microsoft since I left him based on his claim of "Divorce or Legal Separation," even though we are not divorced or legally separated at this time. I found out that he did this when I received a COBRA Election Notice from Microsoft dated May 22, 2015, just two days after I left him. I contacted Microsoft and explained the situation and I was put back on the insurance. Then Evgeny did it again on June 22, 2015. True and correct copies of the two COBRA Election Notices are received are attached as **Exhibits D** and **E**.

15.    I do not know if I am on Evgeny's Microsoft health insurance policy at this time. I do not receive medical coverage through my work and, in any case, I will not be able to work after October 27.

16.    I cannot afford and might not even be permitted to buy my own health insurance in this country considering my immigration status. I am just one illness or accident away from financial disaster without any coverage. I ask that the Court order Evgeny to put me back onto his Microsoft coverage and to keep me on it until our divorce is final.

SUPPL. GOLUBEVA DECL. - 5

**Law Office Charles R. Horner, PLLC**
1001 Fourth Avenue, Suite 3200
Seattle, Washington 98154
Tel.: 206-381-8454  Fax: 866-876-8280

**Property Restraints.**

17.     I am asking that the Court restrain Evgeny from hiding, transferring, removing, encumbering or disposing of any property, including the Redmond home, which was purchased during the marriage, until the divorce is final.

18.     I am requesting that I continue to have use of a 2011 Honda CR-V EX-L until the divorce is final (I presently have use of it under the temporary protection order, but that might not remain in place after December 8). Evgeny took it from a parking lot where I had parked it while at work on June 16, 2015. He then sent me an email, a true and correct copy of which is attached as **Exhibit F**, that stated that it was "repossessed by the vehicle owner," which he apparently claims to be, and asked me to send back the key. I need a Court order that I have temporary use of that car to stop him from doing that again and leaving me stranded.

**Attorneys' Fees.**

19.     I have had to hire an attorney to represent me in this case. Evgeny has been able to hire multiple attorneys for the various cases involving us. With me not being able to cover even my basic living expenses, attorneys' fees are a very heavy weight on me. I believe Evgeny has the ability to contribute to my attorneys' fees. I respectfully ask that the Court award me $1500 of temporary attorneys' fees at this time, which is the amount of my fee and cost deposit with my attorney, Charles R. Horner, who agreed to represent me at a reduced hourly rate of $150 considering my situation.

//

//

SUPPL. GOLUBEVA DECL. - 6

**Law Office Charles R. Horner, PLLC**
1001 Fourth Avenue, Suite 3200
Seattle, Washington 98154
Tel.: 206-381-8454 Fax: 866-876-8280

1

2    SIGNED this 23rd day of October 2015, at Bellevue, Washington.

3

4                                   _____

5                                   Ksenia Golubeva

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   SUPPL. GOLUBEVA DECL. - 7           **Law Office Charles R. Horner, PLLC**
                                        1001 Fourth Avenue, Suite 3200
                                        Seattle, Washington 98154
                                        Tel.: 206-381-8454  Fax: 866-876-8280



24582736



**U.S. Citizenship
and Immigration
Services**

This card is not evidence of U.S. citizenship or permanent residence.
This document is valid if altered, and may be revoked by the U.S. Government.
The person identified is authorized to work in the U.S. for the validity of this card.

FORM I-766 Rev (17-2012)

If found, drop in any US Mailbox. USPS: Mail to USCIS, PO Box 82521, Lincoln, NE 68501 2521

```
IAUSA1182353443LIN1590027811<<
8608262F1510276RUS<<<<<<<<<<<4
GOLUBEVA<<KSENIIA<<<<<<<<<<<<<<
```

**EXHIBIT A**

**Approx price**: (1570 + 1250 + 1475 + 1495 + 1299 + 1560 + 1395 + 1175) /8 = 1402.38

All information from the Zillow.com

Aventine, Firenze
211 112th Ave NE, Bellevue, WA 98004
**Studio 1 bath 485 sqft**

---

**FOR RENT**
$1,570+/mo

Excalibur Apartments,
Camlin I & II123 112th Ave NE, Bellevue, WA 98004
**Studio 1 bath 464 sqft**

---

**FOR RENT**
$1,250+/mo

Alley111, Studio11011 NE 9th St, Bellevue, WA 98004
**Studio 1 bath -- sqft**

---

**FOR RENT**
$1,475+/mo

Avalon Towers Bellevue, S310349 NE 10th St, Bellevue, WA 98004
**Studio 1 bath 465 sqft**

---

**FOR RENT**
$1,495+/mo

Ellington at Bellevue,
A1.111200 NE 11th St, Bellevue, WA 98004
**Studio 1 bath 541 sqft**

---

**FOR RENT**
$1,299+/mo

Avalon Meydenbauer, S110410 NE 2nd St, Bellevue, WA 98004
**Studio 1 bath 506 sqft**

---

**FOR RENT**
$1,560+/mo

**EXHIBIT B**



Madison Sammamish, 1
br, $1,595

Studio - 1 bath - 416 sqft



Eugene Pistrak



# Eugene Pistrak

| | Timeline | About | Friends |
|---|---|---|---|

**DO YOU KNOW EUGENE?**

To see what he shares with friends, _send him a friend request._



**FRIENDS · 288**

Jonathan Boles

Iskander Osmanov

Jie Pan

Геннадий Выборгов

Vladimir Mishchenko

Nick Firsow

Luza Sotinsky

Евгения Мафтер

Lioness De Solar

Works at Microsoft

Lives in Seattle, Washington

From Moscow, Russia

# EXHIBIT C

1042638 303
KSENIIA GOLUBEVA
AND QUALIFIED BENEFICIARIES
12834 176TH PL NE
REDMOND, WA 98052 US

**EXHIBIT D**

BenefitConnect™ | COBRA        Page 40        1042638  1

BenefitConnect™ | COBRA

**COBRA FAQs**

**What is a Qualified Beneficiary?**
A qualified beneficiary is an individual covered by a group health plan on the day before a qualifying event who is an employee, the employee's spouse, or employee's dependent child(ren). In addition, any child born to or placed for adoption with a covered employee during the period of COBRA coverage is considered a qualified beneficiary. Agents, independent contractors, and directors who participate in the group health plan may also be qualified beneficiaries. *In certain cases, a retired employee, the retired employee's spouse or dependent child(ren), domestic partner and/or any child(ren) of a domestic partner may be qualified beneficiaries.*

**Only my spouse or dependent(s) need to continue coverage. How do I proceed?**
Each dependent can become their own Qualified Beneficiary (QB). To enroll dependent(s), have each dependent complete the election form provided in this packet and mail the forms to BenefitConnect | COBRA (you may make a copy for each QB). **Only the person listed on this notice is able to enroll using Employee Self Service (https://cobra.ehr.com), if another qualified beneficiary wishes to enroll as an individual COBRA beneficiary, copies of the election form are acceptable.**

**What is the difference between enrolling and electing continuing coverage?**
- If you log on to https://cobra.ehr.com (information provided in this packet), the second screen you enter begins your "enrollment". This means you have accepted the COBRA offering and your initial payment period (45 days) begins.
- After accepting the second screen, you will be asked to review/change your benefit elections in the screens following the "enroll me" page.

**What pages do I need to return to BenefitConnect | COBRA?** ONLY return the election form if you are unable to enroll online at https://cobra.ehr.com. Elections listed on any other page of this packet are not considered acceptable. Unacceptable elections will result in a request for you to resend information which may result in coverage delays.

**What if I DO NOT want to continue benefits through COBRA?**
Do nothing; you will receive a non-commencement letter verifying no continuation of coverage once your enrollment period has passed. (60 days from the LATER of the COBRA start date or the election form PRINT date).

**How will I know when payment is due?**
- You must remit the initial COBRA payment within 45 days of the date of your election. This payment must include the amount due for all months retroactive to the date coverage terminated through the months of the COBRA election, including any premium that has come due during this 45-day grace period. Your COBRA election is considered made as of its postmark date or the date you enrolled online.
- Once the initial 45-day payment has been received, all future payment(s) are DUE on the first of the month with a 30-day grace period. The deadline date for each payment period is listed on the payment coupons.

**Will I receive monthly invoices for COBRA payments?**
No, once you have enrolled in COBRA via Employee Self Service (https://cobra.ehr.com) or by sending in the election form you received via US Postal Service, you will receive COBRA payment coupons for each month in the current plan year or until your subsidy ends (if applicable) or COBRA expiration.

**What if I do not receive my COBRA payment coupons in time?**
Payment for COBRA continuation coverage is always due the first of the month following the initial 45-day payment, regardless of the receipt of payment coupons. You may call or write to BenefitConnect | COBRA for an additional copy of the payment coupons.

**How will you verify my payment is on time?**
- We will verify the timeliness of payment(s) based on the postmark date of the payment envelope. *If the postmark is not included or illegible the date of the check will be used.*
- If the deadline date falls on a Sunday or holiday the due date is extended to the following day.
- Any payment received will be cashed upon receipt *but does not confirm eligibility.*

**What happens if my payment is received after the deadline date?**
If you fail to make a monthly payment before the end of the grace period for that month, you will lose all rights to COBRA coverage under the Plan. For complete details, please refer to the "Grace Period for monthly payments" section of this notice.

**What are some actions that I can take to ensure my payments are received by the deadline date?**
- Check your COBRA account online by going to your Payment Summary Information before the end of each month to confirm your payment was received and applied to your account.
- Confirm the new COBRA rate resulting from changes to your account or new plan year and adjust your monthly payment accordingly. Check your online account to confirm the change has taken place.
- Enroll in Auto Pay.
- Contact BenefitConnect | COBRA immediately at 1-877-29-COBRA (26272) [(858) 314-5108 International callers only] about any payments you sent that were not applied to your account.

**When will my COBRA benefits become active with the insurance carriers (Aetna, BCBS, UnitedHealthcare, Cigna, etc.)?**
You will become active with the carriers only **AFTER** enrolling/electing (via https://cobra.ehr.com) or mailing an election form **AND your** initial payment has been received.

**How often do you send information to the insurance carriers?**
Information is electronically sent to all carriers on a weekly basis.

**Can I make changes to my dependent(s) coverage?**
You can decline continuation coverage under COBRA on behalf of your dependent(s) during initial COBRA offering; however, additions CANNOT be made until a Family Status Change (FSC) has occurred or during Open Enrollment.



1042638 3

**How do I cancel one (or more) benefit(s) OR dependent(s), while keeping others after already enrolled in COBRA?**
Send your request in writing, with detailed instructions (who/what to be cancelled), or contact us. Benefit/dependent changes will *typically* become effective the first of the month following the request. If your request is due to gaining other group health coverage your request must be submitted within 60 days, this event may also cause an early termination of all coverage regardless if a certain benefit is not offered under the new plan (exceptions due to pre-existing condition clauses may apply). Please note Health Care Flexible Spending Account (Health FSA) can only be cancelled at initial enrollment or when cancelling all other coverage.

**I am eligible for Medicare B:**
If you are ELIGIBLE for Medicare **Part B** and do NOT enroll due to receiving COBRA coverage, you may incur penalties and possible delay of benefits regarding the "special enrollment period" under the Social Security Administration. If you are receiving Medicare Part B AND COBRA medical benefits, Medicare will be primary, except in cases of End Stage Renal Disease (ESRD) for the first 30 months (it is your responsibility to keep your service providers informed as to which coverage is primary). In some cases COBRA will be secondary even if Medicare is not elected (please review your Summary Plan Description). For more details please contact your local SSA office or navigate to
https://secure.ssa.gov/apps10/poms.nsf/lnx/0600805330.

**What is a health insurance Exchange (or Marketplace)?**
The Patient Protection and Affordable Care Act (PPACA) made it easier for people without health insurance to purchase coverage by creating a new Marketplace to purchase individual health insurance. The new Marketplaces are available in each state. No pre-existing condition exclusions will apply. Being offered COBRA continuation coverage does not limit your eligibility for coverage or for a tax credit through the Marketplace.

**When can I enroll in Marketplace coverage?**
You have 60 days from the time you lose your group health plan coverage to enroll in the Marketplace. **After 60 days your special enrollment period will end and you may not be able to enroll, so you should take action right away.** In addition, during what is called an "open enrollment" period, anyone can enroll in Marketplace coverage.

**What Marketplace do I go to and how do I contact them?**
You can apply for a Marketplace insurance plan at the Marketplace of the state in which you currently live. You can contact the Marketplace by phone, on their website or in person at their local facility. For information on your state Marketplace, go to www.healthcare.gov.

**Are the Marketplace health plans better than my COBRA coverage?**
There are four different levels of plans available through the Marketplace. If you go to your Marketplace's website you will be able to compare all of the plans offered by the Marketplace with the benefits available through COBRA.

**Do the Marketplace health plans cost less than my COBRA coverage?**
Since the COBRA premium is the full cost of your former employer group health plan plus a 2% administrative fee, it is possible that one or more of the Marketplace plans will be less expensive than COBRA coverage. If you go to your Marketplace's website, you will be able to compare the cost for all plans available through the Marketplace with the cost of COBRA coverage.

**Is it true that some people can get help from the government to pay for a Marketplace plan?**
The government provides subsidies to individuals who fall within a certain range of income that is based on the Federal Poverty Level (FPL). If your household income falls between 133% and 400% of the FPL for the size of your family, you may qualify for a federal subsidy to help you purchase a Marketplace plan. If your household income is below 133% of the FPL, you may qualify for a Medicaid plan provided by your State. For more information contact your local Marketplace.

**If I sign up for COBRA continuation coverage, can I switch to coverage in the Marketplace? What about if I choose Marketplace coverage and want to switch back to COBRA continuation coverage?**
If you sign up for COBRA continuation coverage, you can switch to a Marketplace plan during a Marketplace open enrollment period. You can also cancel your COBRA continuation coverage early and switch to a Marketplace plan if you have another qualifying event such as marriage or birth of a child through something called a "special enrollment period." Be careful with your change, if you terminate your COBRA continuation coverage early without another qualifying event, you will have to wait to enroll in Marketplace coverage until the next open enrollment period, and could end up without any health coverage in the interim.

Once you have exhausted your COBRA continuation coverage and the coverage expires, you will be eligible to enroll in Marketplace coverage through a special enrollment period, even if Marketplace open enrollment has ended. You must request special enrollment within 30 days of the loss of continuation coverage.

If you sign up for Marketplace coverage instead of COBRA continuation coverage, you cannot switch to COBRA continuation coverage under any circumstances.

**What are my other options for getting health insurance besides the Marketplace and COBRA?**
If you become employed at a new organization, it may provide employees with an employer group health plan in which you can enroll. Small businesses can also now purchase benefits for their employees through the Marketplace. Having access to a large employer group health plan may disqualify you for the federal government subsidy, however. If you are age 65 or older, you may be eligible for Medicare benefits. You may also qualify for Medicare benefits if you have been totally disabled for 24 months. Remember, beginning January 1, 2014, you will have to pay a penalty if you do not have health insurance that meets certain requirements. If you contact your local Marketplace, they can help you decide the best alternative for your insurance needs.

**Where can I find more COBRA information?**
http://www.dol.gov/dol/topic/health-plans/cobra.htm or www.dol.gov/COBRA

**Where can I find more Marketplace information?**
www.healthcare.gov or call 800-318-2596

**COBRA ELECTION NOTICE**
**Microsoft Health & Welfare Benefits Plan**

**Qualifying Event Date:** May 22, 2015    **Return Form Deadline Date:** August 20, 2015
**COBRA Start Date:** May 23, 2015         **Date Printed:** June 16, 2015
**COBRA Expiration Date:** May 22, 2018

KSENIIA GOLUBEVA
AND QUALIFIED BENEFICIARIES

This notice contains important information about your right to continue your health care coverage in the Microsoft Health & Welfare Benefits Plan (the Plan), as well as other health coverage alternatives that may be available to you through the Health Insurance Marketplace. Please read the information in this notice carefully to understand your rights regarding COBRA continuation.  We use the pronoun "you" in this notice (including the enclosed election form) to refer to each of the individual addressees named above.

According to our records, you experienced a loss of coverage on May 22, 2015 due to Divorce or Legal Separation. This event is referred to as your "qualifying event" and the date is your "qualifying event date".  Your prior coverage continues until May 22, 2015. Each person shown below is considered a "qualified beneficiary" and is entitled to elect COBRA coverage under one or more of the group health components of the Plan as shown.

| Name | Relationship |
|---|---|
| Kseniia Golubeva | Self |

If elected, COBRA coverage will begin on May 23, 2015 and can be continued until May 22, 2018 (except for Health FSA coverage which, if available, will not be available after the end of the first plan year.)  If you do not elect COBRA, your coverage under the Plan ends effective May 22, 2015.

The current monthly cost of your COBRA coverage is as follows (**employer-sponsored** subsidies have already been calculated if applicable).  If other options are available to you, pricing information is available via https://cobra.ehr.com. These amounts may change in the future and will likely increase.  You will be notified of COBRA premium changes prior to the date they take effect.

| Benefit Option | Coverage Level | Monthly Cost |
|---|---|---|
| Health Savings Plan (Premera) | Individual Only | $453.00 |
| Dental Plus | Individual Only | $64.00 |

**Next Steps**

You must actively elect COBRA continuation coverage by enrolling online or by completing and submitting the enclosed paper Election Form. You have 60 days from the LATER of the COBRA start date or the election form PRINT date to enroll in COBRA coverage. This date has been calculated and listed as the Return Form Deadline date printed above. IF YOU DO NOT COMPLETE THE ELECTION PROCESS FOR COBRA WITHIN 60 DAYS, YOU WILL LOSE YOUR RIGHT TO ELECT COBRA CONTINUATION COVERAGE.

You do not need to send payment with the election form. However, your initial premium payment is due within 45 days of the date you make your COBRA election. Your COBRA election information will not be updated at the carrier until payment is received. Additional information about payment for COBRA coverage is included in the pages following the election form.

**Instructions for Enrolling Online**
- On your web browser, navigate to https://cobra.ehr.com.
- Follow the prompts to set up a password as a new user. Your USER ID is 10426382004.
- Accept the Online Authorization to continue.
- Read the "Enroll Me Now" instructions then click on the "Enroll Me Now" button.
- Click on "COBRA Benefits" to make your elections.
- Review your elections on the Enrollment Confirmation page. If correct, click on the "continue" button. You may also print a paper copy of your confirmation page for your records.
- If you have questions, call 1-877-29-COBRA (26272)  [(858) 314-5108 International callers only].

**Instructions for Enrolling Using the Paper Election Form**

If you are unable to enroll for COBRA continuation benefits online, you can enroll using the enclosed paper form. You may make photocopies of the election form for other qualified beneficiaries who wish to enroll in COBRA coverage as an individual. Your election must be postmarked no later than 60 days from the LATER of the COBRA start date or the Election Notice PRINT date. If you reject COBRA before the due date, you may change your mind as long as you complete and send in a completed election form before the due date.

**Are there alternatives for health coverage other than COBRA?**

If you become entitled to elect COBRA continuation coverage when you otherwise would lose group health coverage under a group health plan, you should consider all options you may have to get other health coverage before you make your decision.

One coverage option is the new health insurance marketplace (Marketplace). The Marketplace offers health insurance that includes comprehensive coverage, from doctors and medications to hospital visits. Qualified health plans in the Marketplace present their price and benefit information in simple terms so that you can compare the plan elements that are important to you. For more information, visit healthcare.gov.

Another option may be "special enrollment" into other group health coverage. Under the Health Insurance Portability and Accountability Act (HIPAA), if you or your dependents are losing eligibility for group health coverage, including eligibility for continuation coverage, you may have a right to special enroll (enroll without waiting until the next open season for enrollment) in other group health coverage. For example, an employee losing eligibility for group health coverage may be able to special enroll in a spouse's plan. A dependent losing eligibility for group health coverage may be able to special enroll in a different parent's group health plan. To have a special enrollment opportunity, you or your dependent must have had other health coverage when you previously declined coverage in the plan in which you now want to enroll. To special enroll, you or your dependent must request special enrollment within 30 days of the loss of other coverage.

If you or your dependent chooses to elect COBRA continuation coverage instead of other coverage, you may not have another opportunity to request a special enrollment in a Marketplace plan until you have exhausted your continuation coverage. In order to exhaust COBRA continuation coverage, you or your dependent must receive the maximum period of continuation coverage available without early termination. You must request special enrollment within 30 days of the loss of continuation coverage.

In addition, individuals in a family may be eligible for health insurance coverage through the Children's Health Insurance Program (CHIP). For more information, visit insurekidsnow.gov or call 1.877.KIDS.NOW (1.877.543.7669).

Sincerely,
BenefitConnect | COBRA

# COBRA ELECTION FORM

**Employer: Microsoft**

| | |
|---|---|
| **Qualifying Event:** Divorce or Legal Separation | **Duration of COBRA:** 36 Months |
| **Qualifying Event Date:** May 22, 2015 | **Return Form Deadline:** August 20, 2015 |
| **COBRA Start Date:** May 23, 2015 | **COBRA Expiration Date:** May 22, 2018 |

| | |
|---|---|
| Kseniia Golubeva | UserId: 10426382004 |
| 12834 176th Pl Ne | Social Security # : ####3466 |
| | Phone Number: |
| Redmond, WA 98052 | |

If any of the information above is blank, please provide. Note:  A valid SS# is required to notify carriers of your COBRA coverage.

## PARTICIPANT INFORMATION

Please note: you MUST check the applicable boxes of coverage you would like to enroll in below.

**Please refer to the table on page 5 for eligible benefits (certain benefits listed below may not be applicable to you).**

| Decline | Enroll | Coverage Type | Plan/Option Name |
|---|---|---|---|
| ☐ | ☐ | Medical | _____ |
| ☐ | ☐ | Dental | _____ |
| ☐ | ☐ | Vision | _____ |
| ☐ | ☐ | Healthcare Flexible Spending Account (HCRA; HCSA; HC FSA; MRA; etc.) | |
| ☐ | ☐ | Employee Assistance Program | |
| ☐ | ☐ | Wellness Program (as applicable, refer to the table on page 5) | |

## DEPENDENT INFORMATION

Dependent changes only apply to individuals that meet the definition of a dependent as defined by your former employer's group health plan.

| Decline | | | | | Name | | Relationship | SS# | Date of Birth | Enroll | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Med | Den | Vis | EAP | Wellness | Last | First | | | | Med | Den | Vis | EAP | Wellness |
| ☐ | ☐ | ☐ | ☐ | ☐ | | | | | __/__/__ | ☐ | ☐ | ☐ | ☐ | ☐ |
| ☐ | ☐ | ☐ | ☐ | ☐ | | | | | __/__/__ | ☐ | ☐ | ☐ | ☐ | ☐ |
| ☐ | ☐ | ☐ | ☐ | ☐ | | | | | __/__/__ | ☐ | ☐ | ☐ | ☐ | ☐ |
| ☐ | ☐ | ☐ | ☐ | ☐ | | | | | __/__/__ | ☐ | ☐ | ☐ | ☐ | ☐ |
| ☐ | ☐ | ☐ | ☐ | ☐ | | | | | __/__/__ | ☐ | ☐ | ☐ | ☐ | ☐ |

## YOUR CERTIFICATION

By signing below, you authorize the benefit coverage choices you have made on this form and understand that these choices will remain in effect for the 2015 plan year, or until the expiration of COBRA continuation coverage, whichever comes first. You further certify that all information is complete and accurate to the best of your knowledge.

Please note that any person who knowingly provides materially false, incomplete or misleading information is considered to have committed an act to defraud or deceive the Plan Sponsors. The filing of any application for insurance or other claim for benefits based on false, misleading or incomplete information is a fraudulent act and is a crime and may result in criminal or civil penalties.

Your Signature _____   Date __/__/__

**A spouse's signature is required if a spouse was previously covered under the group plan and is now declining one or more of the coverage(s) being offered. (Failure to supply proper signatures will result in your election form being returned to you as incomplete.)**

Spouse Signature _____   Date __/__/__

**Enroll online at https://cobra.ehr.com, or return completed form to:**

BenefitConnect | COBRA
P.O. Box 1185
Pittsburgh, PA  15230
1-877-29-COBRA (26272)  [(858) 314-5108 International callers only]

**IMPORTANT INFORMATION ABOUT YOUR COBRA CONTINUATION COVERAGE RIGHTS**

**What is COBRA coverage?**
COBRA coverage is a continuation of Plan coverage required under Federal law. This law requires that most group health plans (including this Plan) give "qualified beneficiaries" the opportunity to continue their health care coverage when there is a "qualifying event" that would result in a loss of coverage under an employer's plan. Depending on the type of qualifying event, "qualified beneficiaries" can include the employee (or retired employee) covered under the group health plan, the covered employee's spouse, dependent child(ren) of the covered employee. (Certain newborns, newly adopted children, and alternate recipients under QMCSOs may also be qualified beneficiaries. This is discussed in more detail in the paragraph titled "More information about individuals who may be Qualified Beneficiaries" below.) COBRA coverage is the same coverage that the Plan gives to other participants or beneficiaries under the Plan who are not receiving COBRA coverage. Each qualified beneficiary who elects COBRA will have the same rights under the Plan as other participants or beneficiaries covered under the coverage(s) of the Plan elected by the qualified beneficiary, including open enrollment and special enrollment rights. COBRA (and the description of COBRA coverage contained in this notice) applies only to the group health benefits offered under the Plan (the Medical, Dental, Vision, Employee Assistance Program and Health FSA plan(s) as applicable) and not to any other benefits offered under the Plan or by Microsoft. The Plan provides no greater COBRA rights than what COBRA requires—nothing in this notice is intended to expand your rights beyond COBRA's requirements.

**More information about individuals who may be qualified beneficiaries**
*Children born to or placed for adoption with the covered employee during COBRA coverage period*
A child born to, adopted by, or placed for adoption with a covered employee during a period of COBRA coverage is considered to be a qualified beneficiary provided that, if the covered employee is a qualified beneficiary, the covered employee has elected COBRA coverage for himself or herself. The child's COBRA coverage begins when the child is enrolled in the Plan, whether through special enrollment or open enrollment, and it lasts for as long as COBRA coverage lasts for other family members of the employee. To be enrolled in the Plan, the child must satisfy the otherwise applicable Plan eligibility requirements (for example, regarding age).

*Alternate recipients under QMCSOs*
A child of the covered employee who is receiving benefits under the Plan pursuant to a Qualified Medical Child Support Order (QMCSO) received by Microsoft during the covered employee's period of employment with **Microsoft** is entitled to the same rights to elect COBRA as an eligible dependent child of the covered employee.

*Domestic Partners*
Domestic partners and dependent child(ren) of the domestic partner may also be considered qualified beneficiaries if they are defined as eligible participants by **Microsoft**.

**How can you elect COBRA?**
To elect COBRA, you must enroll online or complete the election form according to the directions on the form and mail it to BenefitConnect | COBRA by the date specified on the election form. Failure to do so will result in loss of the right to elect COBRA coverage under the Plan. Each qualified beneficiary has a separate right to elect COBRA. For example, the employee's spouse may elect COBRA even if the employee does not. COBRA may be elected for only one, several, or for all dependent child(ren) who are qualified beneficiaries. A parent may elect COBRA on behalf of any dependent child(ren). The employee, the employee's spouse (if the spouse is a qualified beneficiary) can elect COBRA on behalf of all of the qualified beneficiaries. You may elect COBRA under any or all of the group health plan(s) plan coverage(s) (Medical, Dental, Vision, Employee Assistance Program and Health FSA) under which you were covered on the day before the qualifying event. (For example, if a qualified beneficiary was covered under Medical and Dental on the day before a qualifying event, he or she may elect COBRA under Dental only, Medical only, or under both Medical and Dental.) Such a qualified beneficiary could not elect COBRA under Health FSA, because he or she was not covered under this plan on the day before the qualifying event. However, COBRA coverage under Health FSA is offered only to certain qualified beneficiaries and is available only for a limited period. See the paragraph below entitled "Electing COBRA under the Health FSA for more information. Additional information about the group health benefits of the Plan are available in the Plan's summary plan description. If you do not have a copy of the summary plan description, you may obtain one from Microsoft. Qualified beneficiaries who are entitled to elect COBRA may do so even if they have other group health plan coverage or are entitled to Medicare benefits on or before the date on which COBRA is elected. However, as discussed in more detail below, a qualified beneficiary's COBRA coverage may terminate automatically if, after electing COBRA, he or she becomes entitled to Medicare benefits or becomes covered under other group health plan coverage. See the paragraph below entitled "How long will COBRA coverage last?"

**Electing COBRA under the Health FSA**



Page 48

1042638  9

COBRA coverage under the Health FSA will be available only to qualified beneficiaries whose annual elected amount, minus reimbursements of expenses incurred up to the time of the qualifying event, is equal to or more than the amount of the premiums for Health FSA COBRA coverage for the remainder of the plan year. This rule protects beneficiaries from paying more in premiums for FSA coverage than they would receive in reimbursed expenses. COBRA FSA coverage will consist of the elected FSA annual amount minus expenses reimbursed up to the time of the qualifying event. Health FSA coverage may end on your qualifying event date. The COBRA Health FSA premium will begin the first of the month following the qualifying event date and all premiums paid to continue COBRA coverage are post-tax. The use-it-or-lose it rule will continue to apply, so any unused amounts will be forfeited at the end of the plan year's grace period for claim submission. COBRA coverage will not be available after the end of the first plan year. All qualified beneficiaries who were covered under the Health FSA will continue to be covered as a family unit.  However, each qualified beneficiary could elect their own, separate COBRA coverage with a separate Health FSA annual coverage limit and a separate COBRA premium. Contact BenefitConnect | COBRA for more information if you are interested in this alternative. Once you have elected the Health FSA at initial enrollment it can only be cancelled along with all other coverage (or it will self-cancel at the end of the plan year).

**How long will COBRA coverage last?**
In the case of a loss of coverage due to end of employment or reduction of hours of employment, coverage under the Plan's group health benefits generally may be continued for up to a total of 18 months.  When the qualifying event is the end of employment or reduction of the employee's hours of employment, and the employee became entitled to Medicare benefits less than 18 months before the qualifying event, COBRA coverage under the Plan's group health benefits for qualified beneficiaries (other than the employee) who lose coverage as a result of the qualifying event can last until up to 36 months after the date of Medicare entitlement. This COBRA coverage period is available only if the covered employee becomes entitled to Medicare within 18 months BEFORE the termination or reduction of hours. Please note if the original employee is included in the original qualifying event notice, the extended coverage does not apply.

In the case of losses of coverage due to an employee's death, divorce or legal separation, or a dependent child ceasing to be a dependent under the terms of the Plan, coverage under the Plan's group health benefits may be continued for up to a total of 36 months.

COBRA coverage under the Health FSA plan can last only until the end of the plan year in which the qualifying event occurred—see the paragraph above entitled "Electing COBRA under the Health FSA".

This notice shows the maximum period of COBRA coverage available to the qualified beneficiaries. COBRA coverage may automatically terminate before the end of the maximum period if:

- any required premium is not paid in full on time;
- a qualified beneficiary becomes covered, after electing COBRA, under another group health plan;
- a qualified beneficiary becomes entitled to Medicare benefits (under Part A, Part B, or both) after electing COBRA;
- the employer ceases to provide any group health plan for its employees; or
- during a disability extension period (the disability extension is explained below), the disabled qualified beneficiary is determined by the Social Security Administration to no longer be disabled (COBRA coverage for all qualified beneficiaries, not just the disabled qualified beneficiary, will terminate).

COBRA coverage may also be terminated for reasons related to any attempt by COBRA beneficiaries to acquire or extend COBRA benefit coverage through fraudulent activity.

You must notify **BenefitConnect | COBRA** in writing within 30 days if, after electing COBRA, a qualified beneficiary becomes entitled to Medicare (Part A, Part B, or both) or becomes covered under other group health plan coverage.

In addition, if you were already entitled to Medicare before electing COBRA, notify BenefitConnect | COBRA of the date of your Medicare entitlement at the address shown in the box entitled "Notice Procedures."

**How can you extend the length of COBRA coverage?**
If you elect COBRA, an extension of the maximum period of coverage may be available if a qualified beneficiary is disabled or a second qualifying event occurs. You must notify BenefitConnect | COBRA of a disability or a second qualifying event in order to extend the period of COBRA coverage. Failure to provide timely notice of a disability or second qualifying event will eliminate the right to extend the period of COBRA coverage. (The period of COBRA coverage under the Health FSA cannot be extended under any circumstances.)

**Disability**

If any of the qualified beneficiaries is determined by the Social Security Administration to be disabled, the maximum COBRA coverage period that results from a covered employee's termination of employment or reduction of hours (generally 18 months, as described above) may be extended to a total of up to 29 months. The disability must have started at some time before the 61st day after the covered employee's termination of employment or reduction of hours and must last at least until the end of the period of COBRA coverage that would be available without the disability extension (generally 18 months, as described above). Each qualified beneficiary who has elected COBRA coverage will be entitled to the disability extension if one of them qualifies.

The disability extension is available only if you notify BenefitConnect | COBRA in writing of the Social Security Administration's initial determination of disability (which includes disability onset date) within 60 days after the latest of:
- the date of the Social Security Administration's disability determination;
- the date of the covered employee's termination of employment or reduction of hours; and
- the date on which the qualified beneficiary loses (or would lose) coverage under the terms of the Plan as a result of the covered employee's termination or reduction of hours.

You must also provide this notice within 18 months after the covered employee's termination of employment or reduction of hours in order to be entitled to a disability extension. You must follow the notice procedures specified in the box at the end of this notice titled "Notice Procedures." If these procedures are not followed or if the notice is not provided to BenefitConnect | COBRA during the 60-day notice period and within 18 months after the covered employee's termination of employment or reduction of hours, **THEN THERE WILL BE NO DISABILITY EXTENSION OF COBRA COVERAGE**.

If the qualified beneficiary is determined by the Social Security Administration to no longer be disabled, you must notify BenefitConnect | COBRA of that fact within 30 days after the Social Security Administration's determination. You must follow the notice procedures specified in the box at the end of this notice entitled "Notice Procedures."

**Additional Information Required for Notice of Disability:**

Any notice of disability that you provide must include: (1) the name and address of the disabled qualified beneficiary; (2) the date that the qualified beneficiary became disabled; (3) the names and addresses of all qualified beneficiaries who are still receiving COBRA coverage; (4) the date that the Social Security Administration made its determination; (5) a copy of the Social Security Administration's determination; and (6) a statement whether the Social Security Administration has subsequently determined that the disabled qualified beneficiary is no longer disabled.

**Second Qualifying Event**

An extension of coverage will be available to spouses and dependent children who are receiving COBRA coverage if a second qualifying event occurs during the 18 months (or, in the case of a disability extension, the 29 months) following the covered employee's termination of employment or reduction of hours. The maximum amount of COBRA coverage available when a second qualifying event occurs is 36 months. Such second qualifying events may include the death of a covered employee, divorce or legal separation from the covered employee or ceasing to be eligible for coverage as a dependent under the Plan. These events can be a second qualifying event only if they would have caused the qualified beneficiary to lose coverage under the Plan if the first qualifying event had not occurred. (This extension is not available under the Plan when a covered employee becomes entitled to Medicare after his or her termination of employment or reduction of hours.)

This extension due to a second qualifying event is available only if you notify BenefitConnect | COBRA in writing of the second qualifying event within 60 days after the date of the second qualifying event. You must follow the notice procedures specified in the box at the end of this notice entitled "Notice Procedures". If these procedures are not followed or the notice is not provided to BenefitConnect | COBRA during the 60-day notice period, **THERE WILL BE NO EXTENSION OF COBRA COVERAGE DUE TO A SECOND QUALIFYING EVENT**.

**Additional Information Required for Notice of Second Qualifying Event:**

Any notice of a second qualifying event that you provide must include: (1) the names and addresses of all qualified beneficiaries who are still receiving COBRA coverage; (2) the second qualifying event and the date that it happened; and (3) if the second qualifying event is a divorce or legal separation, a copy of the decree of divorce or legal separation.

**How much does COBRA coverage cost?**

Each qualified beneficiary is required to pay the entire cost of COBRA coverage. The amount a qualified beneficiary may be required to pay may not exceed 102 percent (or, in the case of an extension of COBRA coverage due to a disability, 150 percent) of the cost to the group health plan (including both employer and employee contributions) for coverage of a

**BenefitConnect**™ COBRA

1042638  11

similarly situated plan participant or beneficiary who is not receiving COBRA coverage. All premiums paid to continue COBRA coverage are post-tax. The required monthly payment for each group health component of the Plan under which you are entitled to elect COBRA is described in this notice.

## When and how must payment for COBRA coverage be made?

COBRA premiums may be paid by check, cashier's check, money order, or by enrolling in the Auto Pay service. If you are sending a check please include your payment coupon or reference your unique Customer ID COB01042638. **If you are paying for more than one account please include separate checks and coupon remittance slips.**

## First payment for COBRA coverage

Shortly after you enroll in COBRA coverage, you will receive monthly COBRA payment coupons that should be used to submit payments. You do not have to send any payment with the election form. **However, you must make your first payment for COBRA coverage by check or money order (Auto Pay is not available for the initial payment) not later than 45 days after the date of your enrollment.** (This is the date your election form is postmarked, if mailed, or the date you complete your online enrollment.) If you do not make your first payment for COBRA coverage in full within 45 days after the date of your enrollment, you will lose all COBRA rights under the Plan.

Your first payment must cover the cost of COBRA coverage from the time your coverage under the Plan would have otherwise terminated up through the end of the month before the month in which you make your first payment. (i.e. Sue's employment terminates on September 30, and she loses coverage on September 30. Sue elects COBRA on November 15. Her initial premium payment equals the premiums for October and November and is due on or before December 30, the 45th day after the date of her COBRA enrollment. December payment deadline date is December 31.) You are responsible for making sure that the amount of your first payment is correct. To confirm the correct amount of your first payment, you may contact:

BenefitConnect | COBRA
1-877-29-COBRA (26272)  [(858) 314-5108 International callers only]
https://cobra.ehr.com

Medical claims for reimbursement will not be processed and paid until you have elected COBRA and made the first payment for it.

## Monthly payments for COBRA coverage

After you make your first payment for COBRA coverage, you will be required to make monthly payments for each subsequent month of COBRA coverage. The amount due for each month for each qualified beneficiary is shown in this notice. Under the Plan, each of these monthly payments for COBRA coverage is due on the first day of the month for that month's COBRA coverage. If you make a monthly payment on or before the first day of the month to which it applies, your COBRA coverage under the Plan will continue for that month without any break. BenefitConnect | COBRA will not send periodic notices of payments due for these coverage periods (that is, we will not send a bill to you for your COBRA coverage—it is your responsibility to pay your COBRA premiums on time). As a courtesy we will send COBRA payment coupons with due date reminders and remittance slips. In order to expedite processing, please be sure to include payment coupons with all payments. Payments that cannot be cashed by our bank do not constitute a payment.

## Please make checks payable to Microsoft.

Your first payment and all monthly payments for COBRA coverage should be mailed to:

Microsoft Corporation
3555 Solutions Center
Chicago, IL  60677-3005

## Overnight payments must be mailed to:

PNC Bank c/o Microsoft Corporation
Lockbox Number 773555
350 East Devon Avenue
Itasca, IL  60143

However, if the Plan notifies you of a new address for payment, you must mail all future payments for COBRA coverage to the new address. Payments are automatically cashed upon receipt at the lockbox however this does not confirm coverage. If mailed, your payment is considered to have been made on the date that it is postmarked. If the postmark date is illegible the date of the check will be used. You will not be considered to have made any payment by mailing a

check if your check is returned due to insufficient funds or otherwise. Please note as a banking standard if a check has a different value in the numeric and written fields, the written field will be used to determine the amount of the check. It is your responsibility to ensure timely full payments. You can review your account information online at any time while your COBRA coverage is active.

**Auto Pay Service**
Once you have made your initial payment and your COBRA coverage has been activated you may elect to enroll in Auto Pay. The Auto Pay program enables the automatic payment of COBRA premiums each month via direct debit from your bank account. Deductions will be taken on the first business day of each month, and will include premiums due for the current month, as well as any outstanding balance amounts owed in prior months.

You may enroll in Auto Pay online at https://cobra.ehr.com, or by calling BenefitConnect | COBRA at 1-877-29-COBRA (26272) [(858) 314-5108 International callers only]. You may also go online at any time to cancel or update your Auto Pay information.

**Grace periods for monthly payments**
Although monthly payments are due on the first day of each month of COBRA coverage, you will be given a grace period, defined by the group health plan (usually 30 days) after the first day of the month to make each monthly payment. Your COBRA coverage will be provided for each month as long as payment for that month is made before the end of the grace period for that payment. However, if you pay a monthly payment later than the first day of the month to which it applies, but before the end of the grace period for the month, your coverage under the Plan may be suspended as of the first day of the month and then retroactively reinstated (going back to the first day of the month) when the monthly payment is received. This means that any claim you submit for benefits while your coverage is suspended may be denied and may have to be resubmitted once your coverage is reinstated. If you fail to make a monthly payment before the end of the grace period for that month, you will lose all rights to COBRA coverage under the Plan.

If a partial payment is received and the balance due is not received by the end of the 30-day grace period (or 45-day initial payment period), coverage will terminate. If the amount of the payment is short by an insignificant amount (defined by the lesser of or equal to10% or $50 of the monthly premium), Benefit Connect | COBRA Service Center will notify of the deficiency and you will have 30 days from the date of the notice to pay the difference.

**For more information**
This notice does not fully describe COBRA coverage or other rights under the Plan. More information about COBRA coverage and your rights under the Plan is available in your summary plan description or from Microsoft. If you have any questions concerning the information in this notice, your rights to coverage, or if you want a copy of your summary plan description, you should contact Microsoft.

For more information about your rights under ERISA, including COBRA, the Health Insurance Portability and Accountability Act (HIPAA), and other laws affecting group health plans, visit the U.S. Department of Labor's Employee Benefits Security Administration (EBSA) website at www.dol.gov/ebsa or call their toll-free number at 1-866-444-3272. For more information about health insurance options available through a Health Insurance Marketplace, visit www.healthcare.gov.

**Keep your plan informed of address changes**
In order to protect your and your family's rights, you must keep BenefitConnect | COBRA informed in writing of any changes in your address and the addresses of family members.

**Notice Procedures**
**Notices Must Be Submitted Timely:**

**Warning: If your notice is late or if you do not follow these notice procedures, you and all related qualified beneficiaries will lose the right to any extension of COBRA coverage.** Any notice that you provide must be in writing or by contacting BenefitConnect | COBRA. Faxed notices are not acceptable.

**Where to Send Notices:**
You must mail your notice to:

       BenefitConnect | COBRA
       Microsoft
       P.O. Box 1185



Page 52

1042638  13

Pittsburgh, PA 15230
https://cobra.ehr.com

**Information Required for All Notices:**
Any notice you provide must include: (1) the name of the Plan (Microsoft Health & Welfare Benefits Plan); (2) the name and address of the employee who is (or was) covered under the Plan; (3) the name(s) and address(es) of all qualified beneficiary(ies) who lost coverage as a result of the qualifying event; (4) the qualifying event and the date it happened; and (5) the certification, signature, name, address, and telephone number of the person providing the notice.

Please also keep BenefitConnect | COBRA informed of such changes. You should also keep a copy, for your records, of any notices you send to BenefitConnect | COBRA

**Who May Provide Notices?**
The covered employee (i.e. the employee or former employee who is or was covered under the Plan), a qualified beneficiary who lost coverage due to the qualifying event described in the notice, or a representative acting on behalf of either may provide notices. A notice provided by any of these individuals will satisfy any responsibility to provide notice on behalf of all qualified beneficiaries who lost coverage due to the qualifying event described in the notice.

**More Information;**
Guidance and other information is available on the Department of Labor web site at www.dol.gov/COBRA. You can also call 1-866-444-3272 to speak to an Employee Benefits Security Administration Benefits Advisor.

1085817 506
KSENIIA GOLUBEVA
AND QUALIFIED BENEFICIARIES
12834 176TH PL NE
REDMOND, WA 98052 US

BenefitConnect™ | COBRA

**EXHIBIT E**

1085817 1

**COBRA FAQs**

**What is a Qualified Beneficiary?**
A qualified beneficiary is an individual covered by a group health plan on the day before a qualifying event who is an employee, the employee's spouse, or employee's dependent child(ren).  In addition, any child born to or placed for adoption with a covered employee during the period of COBRA coverage is considered a qualified beneficiary.  Agents, independent contractors, and directors who participate in the group health plan may also be qualified beneficiaries. *In certain cases, a retired employee, the retired employee's spouse or dependent child(ren), domestic partner and/or any child(ren) of a domestic partner may be qualified beneficiaries.*

**Only my spouse or dependent(s) need to continue coverage. How do I proceed?**
Each dependent can become their own Qualified Beneficiary (QB). To enroll dependent(s), have each dependent complete the election form provided in this packet and mail the forms to BenefitConnect | COBRA (you may make a copy for each QB). **Only the person listed on this notice is able to enroll using Employee Self Service (https://cobra.ehr.com), if another qualified beneficiary wishes to enroll as an individual COBRA beneficiary, copies of the election form are acceptable.**

**What is the difference between enrolling and electing continuing coverage?**
- If you log on to https://cobra.ehr.com (information provided in this packet), the second screen you enter begins your "enrollment".  This means you have accepted the COBRA offering and your initial payment period (45 days) begins.
- After accepting the second screen, you will be asked to review/change your benefit elections in the screens following the "enroll me" page.

**What pages do I need to return to BenefitConnect | COBRA?** ONLY return the election form if you are unable to enroll online at https://cobra.ehr.com. Elections listed on any other page of this packet are not considered acceptable. Unacceptable elections will result in a request for you to resend information which may result in coverage delays.

**What if I DO NOT want to continue benefits through COBRA?**
Do nothing; you will receive a non-commencement letter verifying no continuation of coverage once your enrollment period has passed. (60 days from the LATER of the COBRA start date or the election form PRINT date).

**How will I know when payment is due?**
- You must remit the initial COBRA payment within 45 days of the date of your election.  This payment must include the amount due for all months retroactive to the date coverage terminated through the months of the COBRA election, including any premium that has come due during this 45-day grace period. Your COBRA election is considered made as of its postmark date or the date you enrolled online.
- Once the initial 45-day payment has been received, all future payment(s) are DUE on the first of the month with a 30-day grace period.  The deadline date for each payment period is listed on the payment coupons.

**Will I receive monthly invoices for COBRA payments?**
No, once you have enrolled in COBRA via Employee Self Service (https://cobra.ehr.com) or by sending in the election form you received via US Postal Service, you will receive COBRA payment coupons for each month in the current plan year or until your subsidy ends (if applicable) or COBRA expiration.

**What if I do not receive my COBRA payment coupons in time?**
Payment for COBRA continuation coverage is always due the first of the month following the initial 45-day payment, regardless of the receipt of payment coupons. You may call or write to BenefitConnect | COBRA for an additional copy of the payment coupons.

**How will you verify my payment is on time?**
- We will verify the timeliness of payment(s) based on the postmark date of the payment envelope. *If the postmark is not included or illegible the date of the check will be used.*
- If the deadline date falls on a Sunday or holiday the due date is extended to the following day.
- Any payment received will be cashed upon receipt but does not confirm eligibility.

**What happens if my payment is received after the deadline date?**
If you fail to make a monthly payment before the end of the grace period for that month, you will lose all rights to COBRA coverage under the Plan.  For complete details, please refer to the "Grace Period for monthly payments" section of this notice.

**What are some actions that I can take to ensure my payments are received by the deadline date?**
- Check your COBRA account online by going to your Payment Summary Information before the end of each month to confirm your payment was received and applied to your account.
- Confirm the new COBRA rate resulting from changes to your account or new plan year and adjust your monthly payment accordingly. Check your online account to confirm the change has taken place.
- Enroll in Auto Pay.
- Contact BenefitConnect | COBRA immediately at 1-877-29-COBRA (26272)  [(858) 314-5108 International callers only]  about any payments you sent that were not applied to your account.

**When will my COBRA benefits become active with the insurance carriers (Aetna, BCBS, UnitedHealthcare, Cigna, etc.)?**
You will become active with the carriers only **AFTER** enrolling/electing (via https://cobra.ehr.com) or mailing an election form **AND your** initial payment has been received.

**How often do you send information to the insurance carriers?**
Information is electronically sent to all carriers on a weekly basis.

**Can I make changes to my dependent(s) coverage?**
You can decline continuation coverage under COBRA on behalf of your dependent(s) during initial COBRA offering; however, additions CANNOT be made until a Family Status Change (FSC) has occurred or during Open Enrollment.



1085817_3

**How do I cancel one (or more) benefit(s) OR dependent(s), while keeping others after already enrolled in COBRA?**
Send your request in writing, with detailed instructions (who/what to be cancelled), or contact us. Benefit/dependent changes will *typically* become effective the first of the month following the request, however some exceptions may apply. If your request is due to gaining other group health coverage your request must be submitted within 60 days, this event may also cause an early termination of all coverage regardless if a certain benefit is not offered under the new plan (exceptions due to pre-existing condition clauses may apply). Please note Health Care Flexible Spending Account (Health FSA) can only be cancelled at initial enrollment or when cancelling all other coverage.

**I am eligible for Medicare B:**
If you are ELIGIBLE for Medicare **Part B** and do NOT enroll due to receiving COBRA coverage, you may incur penalties and possible delay of benefits regarding the "special enrollment period" under the Social Security Administration. If you are receiving Medicare Part B AND COBRA medical benefits, Medicare will be primary, except in cases of End Stage Renal Disease (ESRD) for the first 30 months (it is your responsibility to keep your service providers informed as to which coverage is primary). In some cases COBRA will be secondary even if Medicare is not elected (please review your Summary Plan Description). For more details please contact your local SSA office or navigate to
https://secure.ssa.gov/apps10/poms.nsf/lnx/0600805330.

**What is a health insurance Exchange (or Marketplace)?**
The Patient Protection and Affordable Care Act (PPACA) made it easier for people without health insurance to purchase coverage by creating a new Marketplace to purchase individual health insurance. The new Marketplaces are available in each state. No pre-existing condition exclusions will apply. Being offered COBRA continuation coverage does not limit your eligibility for coverage or for a tax credit through the Marketplace.

**When can I enroll in Marketplace coverage?**
You have 60 days from the time you lose your group health plan coverage to enroll in the Marketplace. **After 60 days your special enrollment period will end and you may not be able to enroll, so you should take action right away.** In addition, during what is called an "open enrollment" period, anyone can enroll in Marketplace coverage.

**What Marketplace do I go to and how do I contact them?**
You can apply for a Marketplace insurance plan at the Marketplace of the state in which you currently live. You can contact the Marketplace by phone, on their website or in person at their local facility. For information on your state Marketplace, go to www.healthcare.gov.

**Are the Marketplace health plans better than my COBRA coverage?**
There are four different levels of plans available through the Marketplace. If you go to your Marketplace's website you will be able to compare all of the plans offered by the Marketplace with the benefits available through COBRA.

**Do the Marketplace health plans cost less than my COBRA coverage?**
Since the COBRA premium is the full cost of your former employer group health plan plus a 2% administrative fee, it is possible that one or more of the Marketplace plans will be less expensive than COBRA coverage. If you go to your Marketplace's website, you will be able to compare the cost for all plans available through the Marketplace with the cost of COBRA coverage.

**Is it true that some people can get help from the government to pay for a Marketplace plan?**
The government provides subsidies to individuals who fall within a certain range of income that is based on the Federal Poverty Level (FPL). If your household income falls between 133% and 400% of the FPL for the size of your family, you may qualify for a federal subsidy to help you purchase a Marketplace plan. If your household income is below 133% of the FPL, you may qualify for a Medicaid plan provided by your State. For more information contact your local Marketplace.

**If I sign up for COBRA continuation coverage, can I switch to coverage in the Marketplace? What about if I choose Marketplace coverage and want to switch back to COBRA continuation coverage?**
If you sign up for COBRA continuation coverage, you can switch to a Marketplace plan during a Marketplace open enrollment period. You can also cancel your COBRA continuation coverage early and switch to a Marketplace plan if you have another qualifying event such as marriage or birth of a child through something called a "special enrollment period." Be careful with your change, if you terminate your COBRA continuation coverage early without another qualifying event, you will have to wait to enroll in Marketplace coverage until the next open enrollment period, and could end up without any health coverage in the interim.

Once you have exhausted your COBRA continuation coverage and the coverage expires, you will be eligible to enroll in Marketplace coverage through a special enrollment period, even if Marketplace open enrollment has ended. You must request special enrollment within 30 days of the loss of continuation coverage.

If you sign up for Marketplace coverage instead of COBRA continuation coverage, you cannot switch to COBRA continuation coverage under any circumstances.

**What are my other options for getting health insurance besides the Marketplace and COBRA?**
If you become employed at a new organization, it may provide employees with an employer group health plan in which you can enroll. Small businesses can also now purchase benefits for their employees through the Marketplace. Having access to a large employer group health plan may disqualify you for the federal government subsidy, however. If you are age 65 or older, you may be eligible for Medicare benefits. You may also qualify for Medicare benefits if you have been totally disabled for 24 months. Remember, beginning January 1, 2014, you will have to pay a penalty if you do not have health insurance that meets certain requirements. If you contact your local Marketplace, they can help you decide the best alternative for your insurance needs.

**Where can I find more COBRA information?**
http://www.dol.gov/dol/topic/health-plans/cobra.htm or www.dol.gov/COBRA

**Where can I find more Marketplace information?**
www.healthcare.gov or call 800-318-2596

4 1085817

BenefitConnect™ | COBRA

**COBRA ELECTION NOTICE**
**Microsoft Health & Welfare Benefits Plan**

**Qualifying Event Date:** June 22, 2015  **Return Form Deadline Date:** September 26, 2015
**COBRA Start Date:** June 23, 2015    **Date Printed:** July 23, 2015
**COBRA Expiration Date:** June 22, 2018

KSENIIA GOLUBEVA
AND QUALIFIED BENEFICIARIES

This notice contains important information about your right to continue your health care coverage in the Microsoft Health & Welfare Benefits Plan (the Plan), as well as other health coverage alternatives that may be available to you through the Health Insurance Marketplace. Please read the information in this notice carefully to understand your rights regarding COBRA continuation.  We use the pronoun "you" in this notice (including the enclosed election form) to refer to each of the individual addressees named above.

According to our records, you experienced a loss of coverage on June 22, 2015 due to Divorce or Legal Separation. This event is referred to as your "qualifying event" and the date is your "qualifying date".  Your prior coverage continues until June 22, 2015. Each person shown below is considered a "qualified beneficiary" and is entitled to elect COBRA coverage under one or more of the group health components of the Plan as shown.

| Name | Relationship |
|---|---|
| Kseniia Golubeva | Self |

If elected, COBRA coverage will begin on June 23, 2015 and can be continued until June 22, 2018 (except for Health FSA coverage which, if available, will not be available after the end of the first plan year.)  If you do not elect COBRA, your coverage under the Plan ends effective June 22, 2015.

The current monthly cost of your COBRA coverage is as follows (**employer-sponsored** subsidies have already been calculated if applicable).  If other options are available to you, pricing information is available via https://cobra.ehr.com. These amounts may change in the future and will likely increase.  You will be notified of COBRA premium changes prior to the date they take effect.

| Benefit Option | Coverage Level | Monthly Cost |
|---|---|---|
| Health Savings Plan (Premera) | Individual Only | $453.00 |
| Dental Plus | Individual Only | $64.00 |

**Next Steps**

You must actively elect COBRA continuation coverage by enrolling online or by completing and submitting the enclosed paper Election Form. You have 60 days from the LATER of the COBRA start date or the election form PRINT date to enroll in COBRA coverage. This date has been calculated and listed as the Return Form Deadline date printed above. IF YOU DO NOT COMPLETE THE ELECTION PROCESS FOR COBRA WITHIN 60 DAYS, YOU WILL LOSE YOUR RIGHT TO ELECT COBRA CONTINUATION COVERAGE.

You do not need to send payment with the election form. However, your initial premium payment is due within 45 days of the date you make your COBRA election. Your COBRA election information will not be updated at the carrier until payment is received. Additional information about payment for COBRA coverage is included in the pages following the election form.

**Instructions for Enrolling Online**
- On your web browser, navigate to https://cobra.ehr.com.
- Follow the prompts to set up a password as a new user. Your USER ID is 10858170104.
- Accept the Online Authorization to continue.
- Read the "Enroll Me Now" instructions then click on the "Enroll Me Now" button.
- Click on "COBRA Benefits" to make your elections.
- Review your elections on the Enrollment Confirmation page. If correct, click on the "continue" button. You may also print a paper copy of your confirmation page for your records.
- If you have questions, call 1-877-29-COBRA (26272) [(858) 314-5108 International callers only].

**Instructions for Enrolling Using the Paper Election Form**
If you are unable to enroll for COBRA continuation benefits online, you can enroll using the enclosed paper form. You may make photocopies of the election form for other qualified beneficiaries who wish to enroll in COBRA coverage as an individual. Your election must be postmarked no later than 60 days from the LATER of the COBRA start date or the Election Notice PRINT date. If you reject COBRA before the due date, you may change your mind as long as you complete and send in a completed election form before the due date.

**Are there alternatives for health coverage other than COBRA?**
If you become entitled to elect COBRA continuation coverage when you otherwise would lose group health coverage under a group health plan, you should consider all options you may have to get other health coverage before you make your decision.

One coverage option is the new health insurance marketplace (Marketplace). The Marketplace offers health insurance that includes comprehensive coverage, from doctors and medications to hospital visits. Qualified health plans in the Marketplace present their price and benefit information in simple terms so that you can compare the plan elements that are important to you. For more information, visit healthcare.gov.

Another option may be "special enrollment" into other group health coverage. Under the Health Insurance Portability and Accountability Act (HIPAA), if you or your dependents are losing eligibility for group health coverage, including eligibility for continuation coverage, you may have a right to special enroll (enroll without waiting until the next open season for enrollment) in other group health coverage. For example, an employee losing eligibility for group health coverage may be able to special enroll in a spouse's plan. A dependent losing eligibility for group health coverage may be able to special enroll in a different parent's group health plan. To have a special enrollment opportunity, you or your dependent must have had other health coverage when you previously declined coverage in the plan in which you now want to enroll. To special enroll, you or your dependent must request special enrollment within 30 days of the loss of other coverage.

If you or your dependent chooses to elect COBRA continuation coverage instead of other coverage, you may not have another opportunity to request a special enrollment in a Marketplace plan until you have exhausted your continuation coverage. In order to exhaust COBRA continuation coverage, you or your dependent must receive the maximum period of continuation coverage available without early termination. You must request special enrollment within 30 days of the loss of continuation coverage.

In addition, individuals in a family may be eligible for health insurance coverage through the Children's Health Insurance Program (CHIP). For more information, visit insurekidsnow.gov or call 1.877.KIDS.NOW (1.877.543.7669).

Sincerely,
BenefitConnect | COBRA

# COBRA ELECTION FORM

**Employer: Microsoft**

| | |
|---|---|
| **Qualifying Event:** Divorce or Legal Separation | **Duration of COBRA:** 36 Months |
| **Qualifying Event Date:** June 22, 2015 | **Return Form Deadline:** September 26, 2015 |
| **COBRA Start Date:** June 23, 2015 | **COBRA Expiration Date:** June 22, 2018 |

| | |
|---|---|
| Kseniia Golubeva | UserId: 10858170104 |
| 12834 176th Pl Ne | Social Security # : #####3466 |
| | Phone Number: |
| Redmond, WA 98052 | |

If any of the information above is blank, please provide.  Note:  A valid SS# is required to notify carriers of your COBRA coverage.

## PARTICIPANT INFORMATION

Please note: you MUST check the applicable boxes of coverage you would like to enroll in below.

**Please refer to the table on page 5 for eligible benefits (certain benefits listed below may not be applicable to you).**

| Decline | Enroll | Coverage Type | Plan/Option Name |
|---|---|---|---|
| ☐ | ☐ | Medical | _____ |
| ☐ | ☐ | Dental | _____ |
| ☐ | ☐ | Vision | _____ |
| ☐ | ☐ | Healthcare Flexible Spending Account (HCRA; HCSA; HC FSA; MRA; etc.) | |
| ☐ | ☐ | Employee Assistance Program | |
| ☐ | ☐ | Wellness Program (as applicable, refer to the table on page 5) | |

## DEPENDENT INFORMATION

Dependent changes only apply to individuals that meet the definition of a dependent as defined by your former employer's group health plan.

| Decline | | | | | Name | | | | Date of | Enroll | | | | |
| Med | Den | Vis | EAP | Wellness | Last | First | Relationship | SS# | Birth | Med | Den | Vis | EAP | Wellness |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | | | | | __/__/__ | ☐ | ☐ | ☐ | ☐ | ☐ |
| ☐ | ☐ | ☐ | ☐ | ☐ | | | | | __/__/__ | ☐ | ☐ | ☐ | ☐ | ☐ |
| ☐ | ☐ | ☐ | ☐ | ☐ | | | | | __/__/__ | ☐ | ☐ | ☐ | ☐ | ☐ |
| ☐ | ☐ | ☐ | ☐ | ☐ | | | | | __/__/__ | ☐ | ☐ | ☐ | ☐ | ☐ |
| ☐ | ☐ | ☐ | ☐ | ☐ | | | | | __/__/__ | ☐ | ☐ | ☐ | ☐ | ☐ |

## YOUR CERTIFICATION

By signing below, you authorize the benefit coverage choices you have made on this form and understand that these choices will remain in effect for the 2015 plan year, or until the expiration of COBRA continuation coverage, whichever comes first. You further certify that all information is complete and accurate to the best of your knowledge.

Please note that any person who knowingly provides materially false, incomplete or misleading information is considered to have committed an act to defraud or deceive the Plan Sponsors.  The filing of any application for insurance or other claim for benefits based on false, misleading or incomplete information is a fraudulent act and is a crime and may result in criminal or civil penalties.

Your Signature _____    Date __/__/__

**A spouse's signature is required if a spouse was previously covered under the group plan and is now declining one or more of the coverage(s) being offered.** (Failure to supply proper signatures will result in your election form being returned to you as incomplete.)

Spouse Signature _____    Date __/__/__

**Enroll online at https://cobra.ehr.com, or return completed form to:**

BenefitConnect | COBRA
P.O. Box 1185
Pittsburgh, PA  15230
1-877-29-COBRA (26272)  [(858) 314-5108 International callers only]

**BenefitConnect™ | COBRA**

1085817_7

This page is intentionally left blank.

B 1085817

Benefit**Connect**™ ⏐ COBRA

**IMPORTANT INFORMATION ABOUT YOUR COBRA CONTINUATION COVERAGE RIGHTS**

**What is COBRA coverage?**
COBRA coverage is a continuation of Plan coverage required under Federal law. This law requires that most group health plans (including this Plan) give "qualified beneficiaries" the opportunity to continue their health care coverage when there is a "qualifying event" that would result in a loss of coverage under an employer's plan. Depending on the type of qualifying event, "qualified beneficiaries" can include the employee (or retired employee) covered under the group health plan, the covered employee's spouse, dependent child(ren) of the covered employee. (Certain newborns, newly adopted children, and alternate recipients under QMCSOs may also be qualified beneficiaries. This is discussed in more detail in the paragraph titled "More information about individuals who may be Qualified Beneficiaries" below.)  COBRA coverage is the same coverage that the Plan gives to other participants or beneficiaries under the Plan who are not receiving COBRA coverage. Each qualified beneficiary who elects COBRA will have the same rights under the Plan as other participants or beneficiaries covered under the coverage(s) of the Plan elected by the qualified beneficiary, including open enrollment and special enrollment rights. COBRA (and the description of COBRA coverage contained in this notice) applies only to the group health benefits offered under the Plan (the Medical, Dental, Vision, Employee Assistance Program and Health FSA plan(s) as applicable) and not to any other benefits offered under the Plan or by Microsoft. The Plan provides no greater COBRA rights than what COBRA requires—nothing in this notice is intended to expand your rights beyond COBRA's requirements.

**More information about individuals who may be qualified beneficiaries**
*Children born to or placed for adoption with the covered employee during COBRA coverage period*
A child born to, adopted by, or placed for adoption with a covered employee during a period of COBRA coverage is considered to be a qualified beneficiary provided that, if the covered employee is a qualified beneficiary, the covered employee has elected COBRA coverage for himself or herself. The child's COBRA coverage begins when the child is enrolled in the Plan, whether through special enrollment or open enrollment, and it lasts for as long as COBRA coverage lasts for other family members of the employee. To be enrolled in the Plan, the child must satisfy the otherwise applicable Plan eligibility requirements (for example, regarding age).

*Alternate recipients under QMCSOs*
A child of the covered employee who is receiving benefits under the Plan pursuant to a Qualified Medical Child Support Order (QMCSO) received by Microsoft during the covered employee's period of employment with **Microsoft** is entitled to the same rights to elect COBRA as an eligible dependent child of the covered employee.

*Domestic Partners*
Domestic partners and dependent child(ren) of the domestic partner may also be considered qualified beneficiaries if they are defined as eligible participants by **Microsoft**.

**How can you elect COBRA?**
To elect COBRA, you must enroll online or complete the election form according to the directions on the form and mail it to BenefitConnect | COBRA by the date specified on the election form. Failure to do so will result in loss of the right to elect COBRA coverage under the Plan. Each qualified beneficiary has a separate right to elect COBRA. For example, the employee's spouse may elect COBRA even if the employee does not. COBRA may be elected for only one, several, or for all dependent child(ren) who are qualified beneficiaries. A parent may elect COBRA on behalf of any dependent child(ren). The employee, the employee's spouse (if the spouse is a qualified beneficiary) can elect COBRA on behalf of all of the qualified beneficiaries. You may elect COBRA under any or all of the group health plan(s) plan coverage(s) (Medical, Dental, Vision, Employee Assistance Program and Health FSA) under which you were covered on the day before the qualifying event. (For example, if a qualified beneficiary was covered under Medical and Dental on the day before a qualifying event, he or she may elect COBRA under Dental only, Medical only, or under both Medical and Dental.) Such a qualified beneficiary could not elect COBRA under Health FSA, because he or she was not covered under this plan on the day before the qualifying event. However, COBRA coverage under Health FSA is offered only to certain qualified beneficiaries and is available only for a limited period. See the paragraph below entitled "Electing COBRA under the Health FSA for more information. Additional information about the group health benefits of the Plan are available in the Plan's summary plan description. If you do not have a copy of the summary plan description, you may obtain one from Microsoft. Qualified beneficiaries who are entitled to elect COBRA may do so even if they have other group health plan coverage or are entitled to Medicare benefits on or before the date on which COBRA is elected. However, as discussed in more detail below, a qualified beneficiary's COBRA coverage may terminate automatically if, after electing COBRA, he or she becomes entitled to Medicare benefits or becomes covered under other group health plan coverage. See the paragraph below entitled "How long will COBRA coverage last?"

**Electing COBRA under the Health FSA**



COBRA coverage under the Health FSA will be available only to qualified beneficiaries whose annual elected amount, minus reimbursements of expenses incurred up to the time of the qualifying event, is equal to or more than the amount of the premiums for Health FSA COBRA coverage for the remainder of the plan year. This rule protects beneficiaries from paying more in premiums for FSA coverage than they would receive in reimbursed expenses. COBRA FSA coverage will consist of the elected FSA annual amount minus expenses reimbursed up to the time of the qualifying event. Health FSA coverage may end on your qualifying event date. The COBRA Health FSA premium will begin the first of the month following the qualifying event date and all premiums paid to continue COBRA coverage are post-tax. The use-it-or-lose it rule will continue to apply, so any unused amounts will be forfeited at the end of the plan year's grace period for claim submission. COBRA coverage will not be available after the end of the first plan year. All qualified beneficiaries who were covered under the Health FSA will continue to be covered as a family unit. However, each qualified beneficiary could elect their own, separate COBRA coverage with a separate Health FSA annual coverage limit and a separate COBRA premium. Contact BenefitConnect | COBRA for more information if you are interested in this alternative. Once you have elected the Health FSA at initial enrollment it can only be cancelled along with all other coverage (or it will self-cancel at the end of the plan year).

## How long will COBRA coverage last?

In the case of a loss of coverage due to end of employment or reduction of hours of employment, coverage under the Plan's group health benefits generally may be continued for up to a total of 18 months. When the qualifying event is the end of employment or reduction of the employee's hours of employment, and the employee became entitled to Medicare benefits less than 18 months before the qualifying event, COBRA coverage under the Plan's group health benefits for qualified beneficiaries (other than the employee) who lose coverage as a result of the qualifying event can last until up to 36 months after the date of Medicare entitlement. This COBRA coverage period is available only if the covered employee becomes entitled to Medicare within 18 months BEFORE the termination or reduction of hours. Please note if the original employee is included in the original qualifying event notice, the extended coverage does not apply.

In the case of losses of coverage due to an employee's death, divorce or legal separation, or a dependent child ceasing to be a dependent under the terms of the Plan, coverage under the Plan's group health benefits may be continued for up to a total of 36 months.

COBRA coverage under the Health FSA plan can last only until the end of the plan year in which the qualifying event occurred—see the paragraph above entitled "Electing COBRA under the Health FSA".

This notice shows the maximum period of COBRA coverage available to the qualified beneficiaries. COBRA coverage may automatically terminate before the end of the maximum period if:

- any required premium is not paid in full on time;
- a qualified beneficiary becomes covered, after electing COBRA, under another group health plan;
- a qualified beneficiary becomes entitled to Medicare benefits (under Part A, Part B, or both) after electing COBRA;
- the employer ceases to provide any group health plan for its employees; or
- during a disability extension period (the disability extension is explained below), the disabled qualified beneficiary is determined by the Social Security Administration to no longer be disabled (COBRA coverage for all qualified beneficiaries, not just the disabled qualified beneficiary, will terminate).

COBRA coverage may also be terminated for reasons related to any attempt by COBRA beneficiaries to acquire or extend COBRA benefit coverage through fraudulent activity.

You must notify **BenefitConnect | COBRA** in writing within 30 days if, after electing COBRA, a qualified beneficiary becomes entitled to Medicare (Part A, Part B, or both) or becomes covered under other group health plan coverage.

In addition, if you were already entitled to Medicare before electing COBRA, notify BenefitConnect | COBRA of the date of your Medicare entitlement at the address shown in the box entitled "Notice Procedures."

## How can you extend the length of COBRA coverage?

If you elect COBRA, an extension of the maximum period of coverage may be available if a qualified beneficiary is disabled or a second qualifying event occurs. You must notify BenefitConnect | COBRA of a disability or a second qualifying event in order to extend the period of COBRA coverage. Failure to provide timely notice of a disability or second qualifying event will eliminate the right to extend the period of COBRA coverage. (The period of COBRA coverage under the Health FSA cannot be extended under any circumstances.)

**Disability**
If any of the qualified beneficiaries is determined by the Social Security Administration to be disabled, the maximum COBRA coverage period that results from a covered employee's termination of employment or reduction of hours (generally 18 months, as described above) may be extended to a total of up to 29 months. The disability must have started at some time before the 61st day after the covered employee's termination of employment or reduction of hours and must last at least until the end of the period of COBRA coverage that would be available without the disability extension (generally 18 months, as described above). Each qualified beneficiary who has elected COBRA coverage will be entitled to the disability extension if one of them qualifies.

The disability extension is available only if you notify BenefitConnect | COBRA in writing of the Social Security Administration's initial determination of disability (which includes disability onset date) within 60 days after the latest of:
- the date of the Social Security Administration's disability determination;
- the date of the covered employee's termination of employment or reduction of hours; and
- the date on which the qualified beneficiary loses (or would lose) coverage under the terms of the Plan as a result of the covered employee's termination or reduction of hours.

You must also provide this notice within 18 months after the covered employee's termination of employment or reduction of hours in order to be entitled to a disability extension. You must follow the notice procedures specified in the box at the end of this notice titled "Notice Procedures." If these procedures are not followed or if the notice is not provided to BenefitConnect | COBRA during the 60-day notice period and within 18 months after the covered employee's termination of employment or reduction of hours, **THEN THERE WILL BE NO DISABILITY EXTENSION OF COBRA COVERAGE**.

If the qualified beneficiary is determined by the Social Security Administration to no longer be disabled, you must notify BenefitConnect | COBRA of that fact within 30 days after the Social Security Administration's determination. You must follow the notice procedures specified in the box at the end of this notice entitled "Notice Procedures."

**Additional Information Required for Notice of Disability:**
Any notice of disability that you provide must include: (1) the name and address of the disabled qualified beneficiary; (2) the date that the qualified beneficiary became disabled; (3) the names and addresses of all qualified beneficiaries who are still receiving COBRA coverage; (4) the date that the Social Security Administration made its determination; (5) a copy of the Social Security Administration's determination; and (6) a statement whether the Social Security Administration has subsequently determined that the disabled qualified beneficiary is no longer disabled.

**Second Qualifying Event**
An extension of coverage will be available to spouses and dependent children who are receiving COBRA coverage if a second qualifying event occurs during the 18 months (or, in the case of a disability extension, the 29 months) following the covered employee's termination of employment or reduction of hours. The maximum amount of COBRA coverage available when a second qualifying event occurs is 36 months. Such second qualifying events may include the death of a covered employee, divorce or legal separation from the covered employee or ceasing to be eligible for coverage as a dependent under the Plan. These events can be a second qualifying event only if they would have caused the qualified beneficiary to lose coverage under the Plan if the first qualifying event had not occurred. (This extension is not available under the Plan when a covered employee becomes entitled to Medicare after his or her termination of employment or reduction of hours.)

This extension due to a second qualifying event is available only if you notify BenefitConnect | COBRA in writing of the second qualifying event within 60 days after the date of the second qualifying event. You must follow the notice procedures specified in the box at the end of this notice entitled "Notice Procedures". If these procedures are not followed or the notice is not provided to BenefitConnect | COBRA during the 60-day notice period, **THERE WILL BE NO EXTENSION OF COBRA COVERAGE DUE TO A SECOND QUALIFYING EVENT**.

**Additional Information Required for Notice of Second Qualifying Event:**
Any notice of a second qualifying event that you provide must include: (1) the names and addresses of all qualified beneficiaries who are still receiving COBRA coverage; (2) the second qualifying event and the date that it happened; and (3) if the second qualifying event is a divorce or legal separation, a copy of the decree of divorce or legal separation.

**How much does COBRA coverage cost?**
Each qualified beneficiary is required to pay the entire cost of COBRA coverage. The amount a qualified beneficiary may be required to pay may not exceed 102 percent (or, in the case of an extension of COBRA coverage due to a disability, 150 percent) of the cost to the group health plan (including both employer and employee contributions) for coverage of a

**BenefitConnect™ | COBRA**

1085817 11

similarly situated plan participant or beneficiary who is not receiving COBRA coverage. All premiums paid to continue COBRA coverage are post-tax. The required monthly payment for each group health component of the Plan under which you are entitled to elect COBRA is described in this notice.

**When and how must payment for COBRA coverage be made?**
COBRA premiums may be paid by check, cashier's check, money order, or by enrolling in the Auto Pay service. If you are sending a check please include your payment coupon or reference your unique Customer ID COB01085817. **If you are paying for more than one account please include separate checks and coupon remittance slips.**

**First payment for COBRA coverage**
Shortly after you enroll in COBRA coverage, you will receive monthly COBRA payment coupons that should be used to submit payments.  You do not have to send any payment with the election form. **However, you must make your first payment for COBRA coverage by check or money order (Auto Pay is not available for the initial payment) not later than 45 days after the date of your enrollment.** (This is the date your election form is postmarked, if mailed, or the date you complete your online enrollment.)  If you do not make your first payment for COBRA coverage in full within 45 days after the date of your enrollment, you will lose all COBRA rights under the Plan.

Your first payment must cover the cost of COBRA coverage from the time your coverage under the Plan would have otherwise terminated up through the end of the month before the month in which you make your first payment. (i.e. Sue's employment terminates on September 30, and she loses coverage on September 30. Sue elects COBRA on November 15.  Her initial premium payment equals the premiums for October and November and is due on or before December 30, the 45th day after the date of her COBRA enrollment. December payment deadline date is December 31.) You are responsible for making sure that the amount of your first payment is correct.  To confirm the correct amount of your first payment, you may contact:

BenefitConnect | COBRA
1-877-29-COBRA (26272)  [(858) 314-5108 International callers only]
https://cobra.ehr.com

Medical claims for reimbursement will not be processed and paid until you have elected COBRA and made the first payment for it.

**Monthly payments for COBRA coverage**
After you make your first payment for COBRA coverage, you will be required to make monthly payments for each subsequent month of COBRA coverage. The amount due for each month for each qualified beneficiary is shown in this notice. Under the Plan, each of these monthly payments for COBRA coverage is due on the first day of the month for that month's COBRA coverage. If you make a monthly payment on or before the first day of the month to which it applies, your COBRA coverage under the Plan will continue for that month without any break. BenefitConnect | COBRA will not send periodic notices of payments due for these coverage periods (that is, we will not send a bill to you for your COBRA coverage—it is your responsibility to pay your COBRA premiums on time).  As a courtesy we will send COBRA payment coupons with due date reminders and remittance slips.  In order to expedite processing, please be sure to include payment coupons with all payments. Payments that cannot be cashed by our bank do not constitute a payment.

**Please make checks payable to Microsoft.**
Your first payment and all monthly payments for COBRA coverage should be mailed to:

Microsoft Corporation
3555 Solutions Center
Chicago, IL  60677-3005

**Overnight payments must be mailed to:**

PNC Bank c/o Microsoft Corporation
Lockbox Number 773555
350 East Devon Avenue
Itasca, IL  60143

However, if the Plan notifies you of a new address for payment, you must mail all future payments for COBRA coverage to the new address. Payments are automatically cashed upon receipt at the lockbox however this does not confirm coverage. If mailed, your payment is considered to have been made on the date that it is postmarked. If the postmark date is illegible the date of the check will be used. You will not be considered to have made any payment by mailing a

check if your check is returned due to insufficient funds or otherwise. Please note as a banking standard if a check has a different value in the numeric and written fields, the written field will be used to determine the amount of the check. It is your responsibility to ensure timely full payments. You can review your account information online at any time while your COBRA coverage is active.

**Auto Pay Service**
Once you have made your initial payment and your COBRA coverage has been activated you may elect to enroll in Auto Pay. The Auto Pay program enables the automatic payment of COBRA premiums each month via direct debit from your bank account. Deductions will be taken on the first business day of each month, and will include premiums due for the current month, as well as any outstanding balance amounts owed in prior months.

You may enroll in Auto Pay online at https://cobra.ehr.com, or by calling BenefitConnect | COBRA at 1-877-29-COBRA (26272) [(858) 314-5108 International callers only]. You may also go online at any time to cancel or update your Auto Pay information.

**Grace periods for monthly payments**
Although monthly payments are due on the first day of each month of COBRA coverage, you will be given a grace period, defined by the group health plan (usually 30 days) after the first day of the month to make each monthly payment. Your COBRA coverage will be provided for each month as long as payment for that month is made before the end of the grace period for that payment. However, if you pay a monthly payment later than the first day of the month to which it applies, but before the end of the grace period for the month, your coverage under the Plan may be suspended as of the first day of the month and then retroactively reinstated (going back to the first day of the month) when the monthly payment is received. This means that any claim you submit for benefits while your coverage is suspended may be denied and may have to be resubmitted once your coverage is reinstated. If you fail to make a monthly payment before the end of the grace period for that month, you will lose all rights to COBRA coverage under the Plan.

If a partial payment is received and the balance due is not received by the end of the 30-day grace period (or 45-day initial payment period), coverage will terminate. If the amount of the payment is short by an insignificant amount (defined by the lesser of or equal to10% or $50 of the monthly premium), Benefit Connect | COBRA Service Center will notify of the deficiency and you will have 30 days from the date of the notice to pay the difference.

**For more information**
This notice does not fully describe COBRA coverage or other rights under the Plan. More information about COBRA coverage and your rights under the Plan is available in your summary plan description or from Microsoft. If you have any questions concerning the information in this notice, your rights to coverage, or if you want a copy of your summary plan description, you should contact Microsoft.

For more information about your rights under ERISA, including COBRA, the Health Insurance Portability and Accountability Act (HIPAA), and other laws affecting group health plans, visit the U.S. Department of Labor's Employee Benefits Security Administration (EBSA) website at www.dol.gov/ebsa or call their toll-free number at 1-866-444-3272. For more information about health insurance options available through a Health Insurance Marketplace, visit www.healthcare.gov.

**Keep your plan informed of address changes**
In order to protect your and your family's rights, you must keep BenefitConnect | COBRA informed in writing of any changes in your address and the addresses of family members.

**Notice Procedures**
**Notices Must Be Submitted Timely:**

**Warning: If your notice is late or if you do not follow these notice procedures, you and all related qualified beneficiaries will lose the right to any extension of COBRA coverage.** Any notice that you provide must be in writing or by contacting BenefitConnect | COBRA. Faxed notices are not acceptable.

**Where to Send Notices:**
You must mail your notice to:

       BenefitConnect | COBRA
       Microsoft
       P.O. Box 1185



1085817  13

**Information Required for All Notices:**
Any notice you provide must include: (1) the name of the Plan (Microsoft Health & Welfare Benefits Plan); (2) the name and address of the employee who is (or was) covered under the Plan; (3) the name(s) and address(es) of all qualified beneficiary(ies) who lost coverage as a result of the qualifying event; (4) the qualifying event and the date it happened; and (5) the certification, signature, name, address, and telephone number of the person providing the notice.

Please also keep BenefitConnect | COBRA informed of such changes. You should also keep a copy, for your records, of any notices you send to BenefitConnect | COBRA

**Who May Provide Notices?**
The covered employee (i.e. the employee or former employee who is or was covered under the Plan), a qualified beneficiary who lost coverage due to the qualifying event described in the notice, or a representative acting on behalf of either may provide notices. A notice provided by any of these individuals will satisfy any responsibility to provide notice on behalf of all qualified beneficiaries who lost coverage due to the qualifying event described in the notice.

**More Information;**
Guidance and other information is available on the Department of Labor web site at www.dol.gov/COBRA. You can also call 1-866-444-3272 to speak to an Employee Benefits Security Administration Benefits Advisor.

Benefit**Connect**™ COBRA



**Kseniia Golubeva <golubevaks@gmail.com>**

## vehicle

**Eugene Pistrak** <evpisa@gmail.com>
To: Ксения Голубева <golubevaks@gmail.com>

16 June 2015 at 11:51

Hello,

The vehicle (lic# ATR9616) has been repossessed by the vehicle owner. Please mail in the car key to 12834 176th Pl NE Redmond WA 98052.

Thanks.

# EXHIBIT F

FILED

15 OCT 23 PM 4:10

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 15-3-06019-1 SEA

1

2

3

4

5

6

7

**IN THE SUPERIOR COURT OF WASHINGTON
FOR KING COUNTY**

8

In re Marriage of:

9

KSENIIA GOLUBEVA,

NO. 15-3-06019-1SEA

10

and

DECLARATION OF
CHARLES R. HORNER RE:
ATTORNEY'S FEES

11

EVGENY PISTRAK

12

I, CHARLES R. HORNER, declare the following matters to be true and correct under

13

14

penalty of perjury under the laws of the statement of Washington:

15

1.       I am petitioner' attorney.

16

2.       I have reduced my usual hourly rate of $200.00 to $150.00 for this dissolution

17

case for Kseniia Golubeva.  I believe my regular and reduced hourly rates are reasonable for an

18

attorney of my experience, 12 years in family law and 18 years overall in the Seattle area.

19

3.       As of this writing, at 4:02 p.m. on October 23, 2015, I have devoted a total of

20

10.41 hours to working on this dissolution case, including, but not limited to, assisting Kseniia

21

in preparing her Supplemental Declaration, Financial Declaration and financial documents, and

22

this declaration for the temporary orders hearing on November 6, 2015.  This time does not

23

include work on the separate protection order case, in which my client is also requesting an

24

25

HORNER DECL. RE: FEES - 1

**Law Office Charles R. Horner, PLLC**
1001 Fourth Avenue, Suite 3200
Seattle, Washington  98154
Tel.: 206-381-8454  Fax: 866-876-8280

1 | award of fees, except as to the preparation of the financial documents, which was overlapping

2 | work.

3 |     4.    I believe that that the time I have devoted to this dissolution action to date is

4 | reasonable in relation to the tasks involved and the issues at stake and that it does not include

5 | wasteful or duplicative efforts.

6 |     SIGNED this 23rd day of October 2015, at Tacoma, Washington.

7

8 | Charles R. Horner

9 | Charles R. Horner

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25 | HORNER DECL. RE: FEES - 2            **Law Office Charles R. Horner, PLLC**
1001 Fourth Avenue, Suite 3200
Seattle, Washington 98154
Tel.: 206-381-8454 Fax: 866-876-8280

**Exhibit 1. Time expended on Marriage of Golubeva and Pistrak.**

| Date | Time (hours) | Task |
|---|---|---|
| 10/09/15 | 1.5 | Meeting with client and review of documents procedural status of case; filed working copies of temporary order motion papers |
| 10/12/15 | 1.16 | Drafted notice of appearance; telephone conference with Darren DeFrance; drafted agreed order continuing hearing; confirmed hearing |
| 10/13/15 | 0.2 | Presented order for continuance of restraints on husband |
| 10/14/15 | 1.4 | Review of client's financial documents and draft financial declaration; assisted in editing and finalization of financial documents |
| 10/21/15 | 0.8 | Reviewed jurisdictional issues related to separate divorce proceeding husband is pursuing in Russia in client's absence there and advised client |
| 10/22/15 | 1.8 | Work on client's draft supplemental declaration for temporary orders hearing |
| 10/23/15 | 3.55 | Worked on editing and finalization of client's supplemental declaration for temporary orders with consultation with her; prepared fee affidavit; research re: maintenance in context of immigrant spouse; prepared documents for filing and service |
| **TOTAL** | **10.41** | |

**EXHIBIT 1**

FILED

15 OCT 30 AM 9:15

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 15-3-06019-1 SEA

# Superior Court of Washington
# County of King

| | |
|---|---|
| In re the Marriage of: | No. 15-3-06019-1 SEA |
| KSENIIA GOLUBEVA, | **Response to Petition** |
| Petitioner, | **(Marriage)** |
| and | **(RSP)** |
| EVGENY PISTRAK, | |
| Respondent. | |

**To:**      Kseniia Golubeva, Petitioner
**And To:**   Charles R. Horner, Attorney for Petitioner

## I. Response

**1.1    Admissions and Denials**

The allegations of the petition in this matter are ***admitted*** or ***denied*** as follows:

Paragraph of the Petition

| | |
|---|---|
| 1.1 | Admitted |
| 1.2 | Admitted |
| 1.3 | Admitted |
| 1.4 | Admitted |
| 1.5 | Admitted and denied. |
| 1.6 | Admitted and denied. |
| 1.7 | Denied |

GOLDBERG & JONES, PLLC
1200 Westlake Avenue North, Suite 700
Seattle, WA 98109
(206) 448-1010

| | |
|---|---|
| 1.8 | Denied |
| 1.9 | Denied |
| 1.10 | Denied |
| 1.11 | Admitted and denied. |
| 1.12 | Admitted |
| 1.13 | Admitted |
| 1.14 | Admitted |
| 1.15 | Admitted |
| 1.16 | Does not apply |

Each allegation of the petition that is denied, is denied for the following reasons:

Paragraph 1.5: The parties were married on September 19, 2014 at the Russian Consulate General in Seattle, Washington.

Paragraph 1.6: Respondent admits that the parties separated on May 20, 2015, as this is the date the parties moved into separate residences. Respondent denies that he committed domestic violence.

Paragraph 1.7: It is unknown at this time whether the court has jurisdiction over this marriage.

Paragraph 1.8: The division of property should be determined by a court at a later date.

Paragraph 1.8: The division of property should be determined by a court at a later date.

Paragraph 1.9: The division of debts and liabilities should be determined by a court at a later date.

Paragraph 1.10: Whether or not there is a need to receive and ability to pay maintenance is unknown at this time.

Paragraph 1.11: Reasonable and necessary mutual restraints as determined by the court should be entered

**1.2    Notice of Further Proceedings**
Notice of all further proceedings in this matter should be sent to the address below.

*Response to Petition (RSP) - Page 2 of 3*
*WPF DR 01.0300 Mandatory (12/2012) - RCW 26.09.0300*

GOLDBERG & JONES, PLLC
1200 Westlake Avenue North, Suite 700
Seattle, WA 98109
(206) 448-1010

Page 73

**1.3    Other**

Does not apply.

## II. Request for Relief

Without waiving any jurisdictional arguments, the respondent requests the court to grant the relief requested below.

Enter a decree.

Dispose of property and liabilities.

Order payment of attorney fees, other professional fees and costs.

Any other relief deemed just and equitable in the premises.

Dated: October 30, 2015

Darren DeFrance, WSBA No. 39371
Attorney for Respondent

## VERIFICATION

I declare under penalty of perjury under the laws of the State of Washington that I have read the foregoing Response to Petition and that it is true and correct to the best of my knowledge.

Signed at _Seattle_, Washington on October 30, 2015.

Evgeny Pistrak
Respondent

Response to Petition (RSP) - Page 3 of 3
WPF DR 01.0300 Mandatory (12/2012) - RCW 26.09.0300

GOLDBERG & JONES, PLLC
1200 Westlake Avenue North, Suite 700
Seattle, WA 98109
(206) 448-1010

Page 74

**FILED**

15 OCT 30 PM 12:31

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 15-3-06019-1 SEA

**Superior Court of Washington**
**County of King**

| | |
|---|---|
| In re the Marriage of: | No. 15-3-06019-1 SEA |
| KSENIIA GOLUBEVA, | **Amended Response to Petition** |
| Petitioner, | **(Marriage)** |
| and | **(RSP)** |
| EVGENY PISTRAK, | |
| Respondent. | |

**To:**       Kseniia Golubeva, Petitioner
**And To:**   Charles R. Horner, Attorney for Petitioner

### I. Response

**1.1    Admissions and Denials**

The allegations of the petition in this matter are *admitted* or *denied* as follows:

Paragraph of the Petition

| | |
|---|---|
| 1.1 | Admitted |
| 1.2 | Admitted |
| 1.3 | Admitted |
| 1.4 | Admitted |
| 1.5 | Admitted and denied. |
| 1.6 | Admitted and denied. |
| 1.7 | Admitted |

*Amended Response to Petition (RSP) - Page 1 of 3*
*WPF DR 01.0300 Mandatory (12/2012) - RCW 26.09.0300*

GOLDBERG & JONES, PLLC
1200 Westlake Avenue North, Suite 700
Seattle, WA 98109
(206) 448-1010

Page 75

1.8        Denied

1.9        Denied

1.10       Denied

1.11       Admitted and denied.

1.12       Admitted

1.13       Admitted

1.14       Admitted

1.15       Admitted

1.16       Does not apply

Each allegation of the petition that is denied, is denied for the following reasons:

Paragraph 1.5:  The parties were married on September 19, 2014 at the Consulate General of The Russian Federation located at 600 University Street, Seattle, Washington.

Paragraph 1.6:  The parties separated on May 20, 2015; this is the date the parties moved into separate residences.

Paragraph 1.8:  The division of property should be determined by a court at a later date.

Paragraph 1.8:  The division of property should be determined by a court at a later date.

Paragraph 1.9:  The division of debts and liabilities should be determined by a court at a later date.

Paragraph 1.10:  Whether or not there is a need to receive and ability to pay maintenance is unknown at this time.

Paragraph 1.11:  Reasonable and necessary mutual restraints as determined by the court should be entered

**1.2    Notice of Further Proceedings**

Notice of all further proceedings in this matter should be sent to the address below.

///

Amended Response to Petition (RSP) - Page 2 of 3
WPF DR 01.0300 Mandatory (12/2012) - RCW 26.09.0300

GOLDBERG & JONES, PLLC
1200 Westlake Avenue North, Suite 700
Seattle, WA 98109
(206) 448-1010

Page 76

## 1.3    Other

Does not apply.

## II. Request for Relief

Without waiving any jurisdictional arguments, the respondent requests the court to grant the relief requested below.

Enter a decree.

Dispose of property and liabilities.

Order payment of attorney fees, other professional fees and costs.

Any other relief deemed just and equitable in the premises.

Dated: October  30, 2015

Darren DeFrance, WSBA No. 39371
Attorney for Respondent

## **VERIFICATION**

I declare under penalty of perjury under the laws of the State of Washington that I have read the foregoing Response to Petition and that it is true and correct to the best of my knowledge.

Signed at Seattle , Washington on October 30, 2015.

Evgeny Pistrak
Respondent

Amended Response to Petition (RSP) - Page 3 of 3
WPF DR 01.0300 Mandatory (12/2012) - RCW 26.09.0300

GOLDBERG & JONES, PLLC
1200 Westlake Avenue North, Suite 700
Seattle, WA 98109
(206) 448-1010

1

## GR 17 AFFIDAVIT

2   1. I am Darren DeFrance, attorney for Respondent Evgeny Pistrak, in King County Cause

3      No. 15-3-06019-1 SEA, In re the Marriage of Pistrak.

4   2. I have examined the Amended Response to Petition, determined that it consists of four

5      pages, including this affidavit page, and that the document is complete and legible.

6

7

8                                                    _____
                                                     Darren DeFrance
9                                                    Attorney for Respondent
                                                     WSBA No. 39371
10                                                   Goldberg & Jones, PLLC
                                                     Fax: (206) 448-0736
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GR 17 Affidavit

FILED
15 NOV 02 AM 10:39

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 15-3-06019-1 SEA

**Superior Court of Washington**
**County of KING**

In re:

KSENIIA GOLUBEVA

                  Petitioner,

And

EVGENY PISTRAK

                 Respondent.

No. 15-3-06019-1

**Financial Declaration**
[ ]Petitioner
[X]Respondent
(FNDCLR)

Name: Evgeny Pistrak           Date of Birth: 02/19/1980

### I. Summary of Basic Information

| | | |
|---|---|---|
| Declarant's Total Monthly Net Income (from § 3.3 below) | | - |
| Declarant's Total Monthly Household Expenses (from § 5.9 below) | | $6,499.30 |
| Declarant's Total Monthly Debt Expenses (from § 5.11 below) | | - |
| Declarant's Total Monthly Expenses (from § 5.12 below) | | $6,499.30 |
| Estimate of the other party's gross monthly income (from § 3.1g below) | [X] | $2,610.00 |
| | [ ] | Unknown |

### II. Personal Information

2.1   Occupation: Unemployed

2.2   The highest year of education completed: 12

2.3   Are you presently employed?   [ ] Yes    [ ] No
      a. If yes:   (1) Where do you work, **Employer's name and address must be listed on the Confidential Information Form.**
             (2) When did you start work there? (month/year)

      b. If no:   (1) When did you last work? (month/year) 10/02/2015

             (2) What were your gross monthly earnings?   -

             (3) Why are you presently unemployed?
                Resigned in lieu of termination due to poor job performance caused by domestic discord.

Financial Declaration (FNDCLR) - Page 1 of 6
WPF DRPSCU 01.1550 (6/2006) - RCW 26.18.220 (1)

GOLDBERG & JONES, PLLC
1200 Westlake Ave. N., Suite 700
Seattle, WA 98109
206.448.1010

SupportCalc/FD 2015

### III. Income Information

If child support is at issue, complete the Washington State Child Support Worksheet(s), skip Paragraphs 3.1 and 3.2. If maintenance, fees, costs or debts are at issue and child support is Not an issue this entire section should be completed. (Estimate of other party's income information is optional.)

3.1  Gross Monthly Income
   If you are paid on a weekly basis, multiply your weekly gross pay by 4.3 to determine your monthly wages and salaries. If you are paid every two weeks, multiply your gross pay by 2.15. If you are paid twice monthly, multiply your gross pay by 2. If you are paid once a month, list that amount below.

| | | Kseniia golubeva | Evgeny pistrak |
|---|---|---|---|
| a. | Imputed Income | - | - |
| b. | Wages and Salaries | $2,610.00 | - |
| c. | Interest and Dividend Income | - | - |
| d. | Business Income | - | - |
| e. | Spousal Maintenance Received From | - | - |
| f. | Other Income | | - |
| g. | **Total Gross Monthly Income** (add lines 3.1a through 3.1e) | **$2,610.00** | - |
| h. | Actual Gross Income (Year-to-date) | - | - |

3.2  Monthly Deductions From Gross Income

| | | Kseniia golubeva | Evgeny pistrak |
|---|---|---|---|
| a. | Income Taxes | $324.30 | - |
| b. | FICA/Self-employment Taxes | $199.67 | - |
| c. | State Industrial Insurance Deductions | | - |
| d. | Mandatory Union/Professional Dues | - | - |
| e. | Pension Plan Payments | - | - |
| f. | Spousal Maintenance Paid | - | - |
| g. | Normal Business Expenses | - | - |
| h. | **Total Deductions from Gross Income** (add lines 3.2a through 3.2g) | **$523.97** | - |

3.3  **Monthly Net Income** (Line 3.1f minus line 3.2h or line 3 from the Child Support Worksheet(s).)  **$2,086.03**  -

Financial Declaration (FNDCLR) - Page 2 of 6
WPF DRPSCU 01.1550 (6/2006) - RCW 26.18.220 (1)

GOLDBERG & JONES, PLLC
1200 Westlake Ave. N., Suite 700
Seattle, WA 98109
206.448.1010

SupportCalc/FD 2015

Page 80

| | | Kseniia golubeva | Evgeny pistrak |
|---|---|---|---|
| 3.4 | Miscellaneous Income | | |
| a. | Child support received from other relationships | | |
| | Name: | - | - |
| | Name: | - | - |
| b. | Other miscellaneous income (list source and amounts) | | |
| | Income of current spouse | | |
| | Name: | - | - |
| | Name: | - | - |
| | Income of children | | |
| | Name: | - | - |
| | Name: | - | - |
| | Income from assistance programs | | |
| | Name: | - | - |
| | Name: | - | - |
| | Non-recurring income | | |
| | Name: | - | - |
| | Name: | - | - |
| | Other Income: | | |
| | | - | - |
| | | - | - |
| | | - | - |
| c. | **Total Miscellaneous Income** (add lines 3.4a through 3.4b) | - | - |
| 3.5 | Income of Other Adults in Household | | |
| | Name: | - | - |
| | Name: | - | - |

3.6   If the income of either party is disputed, state monthly income you believe is correct and
explain below:

## IV.  Available Assets

| | | |
|---|---|---|
| 4.1 | Cash on hand | $200.00 |
| 4.2 | On deposit in banks | $34,493.97 |
| 4.3 | Stocks and bonds | $43,000.00 |
| | Cash value of life insurance | |
| 4.4 | Other liquid assets: | - |

## V.  Monthly Expense Information

Monthly expenses for myself and      dependents are:  (Expenses should be calculated for the future, after
separation, based on the anticipated residential schedule for the children.)

| | | |
|---|---|---|
| 5.1 | Housing | |
| | Rent, 1st mortgage or contract payments | $1,453.05 |
| | Installment payments for other mortgages or encumbrances | - |
| | Taxes & insurance (if not in monthly payment) | $554.16 |
| | **Total Housing** | **$2,007.21** |

Financial Declaration (FNDCLR) - Page 3 of 6
WPF DRPSCU 01.1550 (6/2006) - RCW 26.18.220 (1)

**GOLDBERG & JONES, PLLC**
1200 Westlake Ave. N., Suite 700
Seattle, WA 98109
206.448.1010

SupportCalcFD 2015

| | | | |
|---|---|---|---|
| 5.2 | Utilities | | |
| | Heat (gas & oil) | | $150.00 |
| | Electricity | | $50.00 |
| | Water, sewer, garbage | | $120.00 |
| | Telephone | | $400.00 |
| | Cable | | - |
| | Other: | | - |
| | **Total Utilities** | | **$720.00** |
| | | | |
| 5.3 | Food and Supplies | | |
| | Food for  1 persons | | $530.00 |
| | Supplies (paper, tobacco, pets) | | $25.00 |
| | Meals eaten out | | $470.00 |
| | Other: | | - |
| | **Total Food Supplies** | | **$1,025.00** |
| | | | |
| 5.4 | Children | | |
| | Day Care/Babysitting | | - |
| | Clothing | | - |
| | Tuition (if any) | | - |
| | Other child-related expenses | | - |
| | **Total Expenses Children** | | **-** |
| | | | |
| 5.5 | Transportation | | |
| | Vehicle payments or leases | | $360.09 |
| | Vehicle insurance & license | | $360.00 |
| | Vehicle gas, oil, ordinary maintenance | | $300.00 |
| | Parking | | - |
| | Other transportation expenses | | - |
| | **Total Transportation** | | **$1,020.09** |
| | | | |
| 5.6 | Health care  (Omit if fully covered) | | |
| | Insurance | | $400.00 |
| | Uninsured dental, orthodontic, medical, eye care expenses | | - |
| | Other uninsured health expenses | | - |
| | **Total Health Care** | | **$400.00** |
| | | | |
| 5.7 | Personal Expenses (Not including children) | | |
| | Clothing | | $100.00 |
| | Hair care/personal care expenses | | $100.00 |
| | Clubs and recreation | | $200.00 |
| | Education | | $200.00 |
| | Books, newspapers, magazines, photos | | $100.00 |
| | Gifts | | $100.00 |
| | Other:  Charity | | $27.00 |
| | **Total Personal Expenses** | | **$827.00** |

Financial Declaration (FNDCLR) - Page 4 of 6
WPF DRPSCU 01.1550 (6/2006) - RCW 26.18.220 (1)

GOLDBERG & JONES, PLLC
1200 Westlake Ave. N., Suite 700
Seattle, WA 98109
206.448.1010

SupportCalc/FD 2015

5.8　Miscellaneous Expenses
　　Life insurance (if not deducted from income)　　　　　　　　-
　　Other:　Home Repairs　　　　　　　　　　　　　　$500.00
　　Other:　　　　　　　　　　　　　　　　　　　　　-
　　**Total Miscellaneous Expenses**　　　　　　　　**$500.00**

5.9　**Total Household Expenses**　　　　　　　　**$6,499.30**
　　(The total of Paragraphs 5.1 through 5.8)

5.10　Installment Debts Included in Paragraphs 5.1 Through 5.8

| Creditor/Description of Debt | Balance | Month of Last Payment |
|---|---|---|
| First Tech - Mortgage | $332,755.36 | 10/2015 |
| Alaska USA - Auto Loan | $18,000.00 | 10/2015 |

5.11　Other Debts and Monthly Expenses not Included in Paragraphs 5.1 - 5.8

| Creditor/Description of Debt | Balance | Month of Last Payment | Amount of Monthly Payment |
|---|---|---|---|

Financial Declaration (FNDCLR) - Page 5 of 6
WPF DRPSCU 01.1550 (6/2006) - RCW 26.18.220 (1)

GOLDBERG & JONES, PLLC
1200 Westlake Ave. N., Suite 700
Seattle, WA 98109
206.448.1010

SupportCalc/FD 2015

| | | |
|---|---|---|
| 1 | Total Monthly Payments for Other Debts and Monthly Expenses | - |
| 2 | | |
| 3 | 5.12    Total Expenses (Add Paragraphs 5.9 and 5.11) | **$6,499.30** |

**VI.  Attorney Fees**

6.1    Amount paid for attorney fees and costs to date:                    $3,500.00

6.2    The source of this money was: Earnings/Savings

6.3    Fees and costs incurred to date:                                          -

6.4    Arrangements for attorney fees and costs are:

6.5    Other:

I declare under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

Signed at _____, [City] _____ [State] on_____ [Date].


See attached
Evgeny Pistrak
Signature of Declarant

The following financial records are being provided to the other party and filed separately with the court.

Financial records pertaining to myself:

　　　　[x] Individual  [ ] Partnership or Corporate Income Tax returns for
　　　　the years:                                                including all W-2s and schedules;

　　　　[x] Pay stubs for the dates of

　　　　[x] Other: Bank Statements

**Do not attach these financial records to the financial declaration.  These financial records should be served on the other party and filed with the court separately using the sealed financial source documents cover sheet (WPF DRPSCU 09.0220).  If filed separately using the cover sheet, the records will be sealed to protect your privacy (although they will be available to all parties in the case, their attorneys, court personnel and certain state agencies and boards.) See GR 22 (c)(2).**

Financial Declaration (FNDCLR) - Page 6 of 6
WPF DRPSCU 01.1550 (6/2006) - RCW 26.18.220 (1)

**GOLDBERG & JONES, PLLC**
1200 Westlake Ave. N., Suite 700
Seattle, WA 98109
206.448.1010

Template: z:\supportcalc files\eugene pistrak\fd edited.dtf
Client: z:\supportcalc files\eugene pistrak\eugene pistrak.scp 11/02/2015 10:13 am
SupportCalc/FD 2015

Page 84

I declare under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

Signed at ___10/30/2015___, [City] __Seattle__ [State] on __WA__ _____ [Date].

_____        ENGENY PISTRAK

Signature of Declarant                    Print or Type Name

*Financial Declaration (FNDCLR) - Page 8 of 6*
*WPF DRPSCU 01.1550 (6/2006) - RCW 26.18.220(1)*

GOLDBERG & JONES, PLLC
1200 Westlake Avenue N., Suite 700
Seattle, WA 98109
206.448.1010

Page 85

FILED

15 NOV 02 AM 10:39

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 15-3-06019-1 SEA

1

3

5

7

9

11

13

## Superior Court of Washington
## County of King

In re the Marriage of:

KSENIIA GOLUBEVA,

                        Petitioner,

and

EVGENY PISTRAK,

                        Respondent.

No.  15-3-06019-1 SEA

**Declaration of Eugene Pistrak**

### Background

   My name is Evgeny ("Eugene") Pistrak and I am 35-years-old.  I was born and raised in Russia.  During a 9th grade school project I wrote that someday I would acquire my dream job of working for Microsoft.  In 2004 this dream came true when an IT company sponsored my H1B Skilled Worker Visa as a Computer Programmer.  I first worked with uBid.com in Chicago, , and then in March 2005 I was sponsored to move to Redmond to work at Microsoft.  I have lived in

*Declaration of Eugene Pistrak (DCLR) - Page 1 of 10*
*WPF DRPSCU 01.0100 (6/2006)*

GOLDBERG & JONES, PLLC
1200 Westlake Avenue N., Suite 700
Seattle, WA 98109
206.448.1010

Page 86

Washington State ever since. I have no close relatives in the U.S. so I travel back to Russia

every year.

Kseniia, the petitioner, is also from Russia. She arrived in the U.S. in September of 2013

with a F1 Foreign Student Nonimmigrant Visa status. Her purpose in traveling to the U.S. was

to complete a 12 month Human Resources Occupational Preparation Program at the Lake

Washington Institute of Technology in Kirkland. She has now completed that program (see

Commencement pamphlet at **Exhibit A**). Kseniia has close relatives in the Seattle area and

Skypes daily with her family members in Russia.

Two weeks after Kseniia arrived in Seattle we were introduced by an acquaintance of

mine who is also a close friend of Kseniia's aunt and who knew Kseniia when they both lived in

Vladivostok, Russia. Kseniia told me later that she saw on my Facebook page that I worked for

Microsoft and so she wanted to meet me. When we met Kseniia was living in a rented room

with a "host family" in Kirkland. At the time I lived in a condominium I rented in Bellevue. In

April of 2014 we tried living together for one week. When I told Kseniia that I enjoyed living

together and asked her if she wanted to move in permanently, she said that I would need to buy

her a diamond ring first. On May 1, 2014 I bought Kseniia a $900 diamond ring and she moved

out of her host family's house and into my condominium. Soon after I asked her what it meant

to be engaged, and she replied: "I don't have a place to stay." This answer hurt my feelings very

much. Soon after, Kseniia told me that I had until September of 2014 (one year since we met) to

*Declaration of Eugene Pistrak (DCLR) - Page 2 of 10*
*WPF DRPSCU 01.0100 (6/2006)*

GOLDBERG & JONES, PLLC
1200 Westlake Avenue N., Suite 700
Seattle, WA 98109
206.448.1010

Page 87

marry her, otherwise she would "find another man." I proposed, Kseniia accepted, and we began making plans.

Before we married, I asked Kseniia if she would consider drafting a prenuptial agreement. She became angry and started insulting me. She used a derogatory term for a Hebrew person in Russian, she called me stingy and distrustful. She said it was a sign for her that she should not marry me and refused intimacy. This hurt me very much. I explained to her that it was not because of distrust, but because we are adults, we are in the fourth decade of our life and we have past experiences and future needs that may not be readily accommodated by the standard Russian Family Code which governs divorces. I told her that a prenuptial agreement would benefit her and our young family and I asked her to reconsider, but she refused to discuss it any further.

On August 20, 2014 Kseniia and I went to the Consulate General of the Russian Federation located at 600 University Street in Seattle and submitted the petition for marriage paperwork, which was registered on September 19, 2014. In early 2015, after my parents visited to celebrate the wedding, life with Kseniia changed quickly and the home life deteriorated quickly. My work performance, which had always been stellar previously, also suffered. Following a May, 2015 incident Kseniia and I separated when I asked her to move out. On June 23, 2015, in a Russian court, I filed a petition to dissolve our marriage. Prior to this Kseniia signed an agreed petition (in Russia, divorces are filed as either "agreed" or "unagreed") to

*Declaration of Eugene Pistrak (DCLR) - Page 3 of 10*
*WPF DRPSCU 01.0100 (6/2006)*

GOLDBERG & JONES, PLLC
1200 Westlake Avenue N., Suite 700
Seattle, WA 98109
206.448.1010

Page 88

dissolve our marriage in Russia, however she changed her mind so the petition I filed is an unagreed petition.

To my great surprise, on August 3, 2015 I found out that I was being charged with misdemeanor assault stemming from the May incident (King County District Court Cause Number 415143807). Then on September 8, 2015 Kseniia acquired a temporary domestic violence protection order (King County Superior Court Cause Number 15-2-21856-5). I fully expect the protection order to be dismissed and the misdemeanor charge to be dismissed or acquittal if it proceeds to trial. Both matters are next due for hearings in December. On September 22nd the court continued the domestic violence protection order hearing to October 21st. On September 25th Kseniia filed this dissolution of marriage action. On September 29th, Kseniia acquired an ex parte restraining order, without providing notice to me, which restrains me from selling "the family home until the dissolution of marriage hearing." The show cause hearing was set for October 15th and our attorneys then agreed to continue the hearing to November 6th.

**Financial Issues**

<u>Husband's Financial Situation</u>

I currently have no income. My last day of work at Microsoft was on October 2, 2015. Due to months of increasingly poor performance (despite years of stellar performance), I was essentially given the option to resign or be terminated. I chose to resign. An agreement was worked out with Microsoft where I received a "voluntary separation" payment of approximately

*Declaration of Eugene Pistrak (DCLR) - Page 4 of 10*
*WPF DRPSCU 01.0100 (6/2006)*

GOLDBERG & JONES, PLLC
1200 Westlake Avenue N., Suite 700
Seattle, WA 98109
206.448.1010

Page 89

$26,000. This is indicated on my October 15 pay stub, submitted separately under seal. Microsoft is a very high-paced IT company, the emotional and psychological stress caused by these four separate concurrent legal actions is too great to allow me to work at a satisfactory level at Microsoft or anywhere ele. I'm actually experiencing negative medical effects due to the anxiety and stress caused by the situation (see my **sealed medical records**, submitted separately). For the first time in my life I'm facing a criminal charge. I'm a green card holder and I could apply for U.S. citizenship next year; the charge puts my current residency status in jeopardy and creates significant obstacles for me to obtain U.S. citizenship in the future. Further, as a citizen I could have petitioned for my elderly Russian parents to obtain U.S. green cards and reside with me, however now this plan is also in jeopardy. Fortunately I have some savings to sustain me for a few months in this tumultuous period. I've had to spend over $10,000 so far in attorney's fees on the various pending cases, and those costs are only likely to keep rising.

<u>Wife's Financial Situation</u>

As stated in her supplemental declaration, Kseniia has been earning $2,610 per month gross and $2,385 per month net. I do not believe that Ksenia has disclosed all of her financial accounts to the court. On August 25, 2014 Kseniia paid for her tuition with a Mastercard ending in account number 3956 (see **Exhibit B**). No records for this account were provided to the court. As part of the F-1 visa process, students must demonstrate how they will pay for their "educational, living, and travel costs" (see **Exhibit C** at page 3). Around the time we were married Kseniia told me that she had over $30,000 in funds in a Russian bank account. I know

*Declaration of Eugene Pistrak (DCLR) - Page 5 of 10*
*WPF DRPSCU 01.0100 (6/2006)*

GOLDBERG & JONES. PLLC
1200 Westlake Avenue N., Suite 700
Seattle, WA 98109
206.448.1010

Page 90

that her parents gave her over $8,000 cash as a wedding gift. I also know that Kseniia owns a

vacation rental property in Estonia that likely generates income for her. Kseniia has a Master's

degree from Vladivostok University and has global workforce experience since at least 2008 (see

her LinkedIn profile at **Exhibit D**). Kseniia told me that when she lived in Russia she would

often travel to Europe, the Far East, and Africa with her parents, paying for everyone's travel

with her own funds.

Spousal Maintenance

In Kseniia's initial proposed temporary order, signed on 09/28/2015, she requested

$1,500 per month in maintenance (see **Exhibit E, page 3**). Now, represented by counsel, she is

requesting $3,000 per month *for six months. We have been married for 13 months; less than 9*

*months pre-separation.*

In Kseniia's original 9/24/2015 Financial Statement submitted to the court with her

Motion and Declaration for Waiver of Civil Fees and Surcharges she claimed total household

expenses in the amount of $1,844.42 (see **Exhibit F**). Now, represented by counsel, on her

Financial Declaration Kseniia is claiming total monthly expenses of $2,465.51. Kseniia's largest

expense, and alleged $450 monthly rent payment ($500 according to her original Financial

Statement), is not corroborated by her financial records. Kseniia hasn't written a check for

months, and there are no large cash withdrawals – so how is she making her rent payments? In

her declaration Kseniia claims to be living with "friends," however the address Kseniia has listed

on court documents and police reports over the past few months is 750 Melody Lane in

*Declaration of Eugene Pistrak (DCLR) - Page 6 of 10*
*WPF DRPSCU 01.0100 (6/2006)*

GOLDBERG & JONES, PLLC
1200 Westlake Avenue N., Suite 700
Seattle, WA 98109
206.448.1010

Page 91

Edmonds. This home is owned by Keith Soltner, who is the husband of Kseniia's aunt (we are all pictured together in **Exhibit G**). I believe Kseniia has been living at this home rent-free. I also know that Kseniia lived with her cousin in his spacious Kirkland home during the entire month of June, 2015.

Although rent expenses are not indicated on her statements, the types of expenses which are indicated include:

- 4/14   Nordstrom                                                    $174.25
- 5/6    Macy's                                                       $162.94
- 6/6    Nordstrom                                                    $198.88
- 6/28   POS transaction (to purchase a Mitsubishi Mirage car)   $1,200.00
- 7/20   Nordstrom                                                    $284.83
- 7/28   Match.com                                                    $59.97
- 8/14   Seven (a salon)                                              $195.66

Are these the spending habits of a spouse in dire need of temporary spousal maintenance? Kseniia has no debt, no car payment, and very minimal living expenses that her local family has been providing and undoubtedly is willing to continue to provide.

Kseniia's June statement also lists several hundred dollars in payments to an immigration attorney. I once overheard Kseniia and her cousin scheming about how Kseniia could deal with the problem of her F-1 visa expiring by fabricating a fake political asylum story. Instead she apparently went the route of claiming status as a domestic violence victim. The October 2014 State Department Visa Bulleting is attached at **Exhibit H**. Page 2 shows that the applications for spouses and children of permanent residents in February of 2013 are currently being processed.

*Declaration of Eugene Pistrak (DCLR) - Page 7 of 10*
*WPF DRPSCU 01.0100 (6/2006)*

GOLDBERG & JONES, PLLC
1200 Westlake Avenue N., Suite 700
Seattle, WA 98109
206.448.1010

Page 92

So if Kseniia and I had filed for her green card right after we were married in September of 2014, the application likely wouldn't have even been processed for about two and half years, and simply filing the application would not have authorized her to remain in the country after her F-1 visa expired on 10/27/2015. Thus, but for the DV victim status she is now applying for, she would not have been authorized to continue residing in the U.S.

In conclusion, I currently have no income and my savings must sustain me for the next several months, my expenses are substantial, including a mortgage, a car loan, and enormous attorney's fees. On the other hand, Kseniia has very limited living expenses, claims to have approximately $7,000 in savings and likely did not disclose all of her assets, and we have only been married for 13 months. I respectfully request that the court deny Kseniia's request for temporary spousal maintenance.

Attorney's Fees

Both Kseniia and I have spent our savings on our respective attorney's fees. I've had to hire four attorneys for the four pending actions (two dissolution actions, the protection order, and the criminal charge). This at a time when I was essentially forced out of my job. I acknowledge that my savings are greater than Kseniia's, so I respectfully request that the court orders a payment of $500 in attorney's fees. There are no children involved; there are very few assets and debts to divide (and the biggest asset, the home, was purchased as my separate property and quit claimed to me by Kseniia – see **Exhibit I**); and, again, this is only a 13 month marriage. The post-temporary orders costs associated with this action should be minimal.

*Declaration of Eugene Pistrak (DCLR) - Page 8 of 10*
*WPF DRPSCU 01.0100 (6/2006)*

GOLDBERG & JONES, PLLC
1200 Westlake Avenue N., Suite 700
Seattle, WA 98109
206.448.1010

Page 93

Vehicles

In 2005 I bought a 1999 2-door Honda Accord on a loan, which was paid off in 2007. The Accord now has over 150,000 miles on it. In December of 2014 I took out an approximate $20,000 loan from Alaska USA Federal Credit Union to purchase a 2011 Honda CR-V for my personal use. The home I purchased required (and still requires) a great deal of maintenance, so I needed a sport utility vehicle to transport larger materials. I also live on a hill with a dangerous curve containing a roadside memorial at the bottom. The CR-V has modern safety features like Electronic Stability Control which allowed me to safely get up and down the hill in cold weather. Both the loan and the title to the car are solely in my name.

In June of 2015 Kseniia purchased a 1999 Mitsubishi Mirage for $1,500. At the protection order hearing on September 22nd Kseniia twice told the court under oath that she did not have a car in her name (see transcript excerpt at **Exhibit J**). Less than an hour after the hearing Kseniia called my attorney on the Temporary Order of Protection case and told her that she had a car registered in her name and she wouldn't be taking possession of the CR-V. She irrefutably has been driving the Mirage: **Exhibit K** is a 9/17/15 speeding infraction Kseniia received (also note the listed Melody Lane address) and **Exhibit L** is a 9/30/2015 CAD log indicating that Kseniia was sitting in the Mirage. **Exhibit M** is another infraction notice Kseniia received on 6/28/2015 for both speeding and driving without insurance. I'm very uncomfortable with Kseniia driving around in my CR-V if she still hasn't obtained insurance, especially considering her history of receiving speeding and other infractions.

*Declaration of Eugene Pistrak (DCLR) - Page 9 of 10*
*WPF DRPSCU 01.0100 (6/2006)*

GOLDBERG & JONES, PLLC
1200 Westlake Avenue N., Suite 700
Seattle, WA 98109
206.448.1010

Page 94

Despite what she told the DVPO court, Kseniia possesses a car for any necessary travel, which will not include traveling to work given that she is now not eligible to work. I respectfully request that the court orders Kseniia to return the CR-V to my possession.

**Other Restraints**

- The restraint regarding "transferring, removing, encumbering, etc." any property should be made mutual.

- A mutual "disturbing the peace" restraint should be entered.

- The insurance policies restraint should be made mutual. Further, on 9/2/2015 I received a letter from Alaska USA (see **Exhibit N**), the legal owner of my CR-V, requesting that I amend my auto insurance policy deductible limit, so I am requesting permission from the court to make that amendment with my auto insurance provider according to Alaska's instructions. Regarding health insurance, I now must pay for COBRA coverage as I am no longer employed by Microsoft. Please see **Exhibit O** regarding my October 6, 2015 COBRA Election Notice.

I declare under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

Signed on October _____, 2015 at _____, Washington

Please see attached
Eugene Pistrak
Respondent

*Declaration of Eugene Pistrak (DCLR) - Page 10 of 10*
*WPF DRPSCU 01.0100 (6/2006)*

GOLDBERG & JONES, PLLC
1200 Westlake Avenue N., Suite 700
Seattle, WA 98109
206.448.1010

1  I declare under penalty of perjury under the laws of the state of Washington that the foregoing is true and
   correct.

3

5  Signed at _____Seattle_____, [City] _WA_ [State] on _10/30/2015_ [Date].

7

9  _____          EVGENY PISTRAK
   Signature of Declarant               Print or Type Name

11

13

15

17

19

21

23

25

27

29

31

33

35

37

39

41

43

*Declaration (DCLR)*                    GOLDBERG & JONES, PLLC
*WPF DRPSCU 01.0100 (6/2006)*            1200 Westlake Avenue N., Suite 700
                                         Seattle, WA 98109
                                         206.448.1010

**Exhibit A**

# LAKE WASHINGTON
# INSTITUTE OF TECHNOLOGY

## COMMENCEMENT EXERCISES

Friday, June 20TH, 2014

Lynnwood Convention Center

2:00 p.m.



PRESIDENT

Dr. Amy Morrison Goings

## GRADUATES

| | | |
|---|---|---|
| Dawn J. Fierro | CP | Social & Human Services |
| Tamara Fitzgerald | AAS/CP/CC | Medical Assisting/Medical Assisting/Medical Assisting: Office Administration |
| Oksana Fjodorova | AAS | Nursing |
| Alexander Fleege + | CP | Social & Human Services |
| Joel Fuller *** | AAS | Diesel & Heavy Equipment Technician |
| Jose Gavino Jr. * | AAS/CP/CP | Computer Security & Network Technology/Computer Security & Network Technician: Network Technician/Computer Security & Network Technician: IT Support Technician |
| Jason C. Gear | AAS/CP | Motorcycle, Marine & Power Equipment Service Technology; Harley - Davidson/Motorcycle, Marine & Power Equipment Service Technology |
| Soy M. Gearheart † ** | AAS | Dental Hygiene |
| Amber Louise Goldsmith | AAS/CP, DIPLOMA | Dental Assisting/Dental Assisting/High School |
| Ksenia Golubeva | CC | Human Resources Management |
| Angel Colleen Gonzalez | AAS | Social & Human Services |
| Chase Austin Goodnight | AAS/CC/CC/CC | Engineering Graphics Mechanical Design Emphasis/Engineering Graphics: AutoCAD/Engineering Graphics: SolidWorks/Engineering Graphics: Tool Design Graphics |
| Kristel Goodwin † | AAS | Dental Hygiene |
| Brooke Gordon | CC | Certified Nursing Assistant |
| Vanessa Graves-MacLeod | AAS | Pre-Nursing DTA/MRP |
| Summer Grigsby * | AAS | Dental Hygiene |
| Anna M. Gronowski * | AAS | Dental Hygiene |
| Brian Guse | AAS | Diesel & Heavy Equipment Technician |
| Dyllan L. Hackett ** | AAS | Multimedia Design & Production: Digital Design |
| Ashley J. Haight | AAS | Baking Arts |

This commencement program lists both graduates and candidates for graduation. It does not constitute an official record of graduation or of honors earned upon graduating.

11

## GRADUATES

| | | |
|---|---|---|
| Dennis Hanson | AAS/CP | Welding Fabrication & Maintenance Technology/Welding Fabrication & Maintenance Technology |
| Michael W. Hanson | AAS | Funeral Service Education |
| Jesse Lee Harrigan | AAS | Diesel & Heavy Equipment Technician |
| Tamera J. Harris | AAS/AAS | Culinary Arts/Baking Arts |
| Drew Hendrickson †** | AAS | Technology MRP, DTA |
| Marcela A. Hernandez | CC | Medical Assisting: Office Administration |
| Tineil D. Holman | AAS | Business Technology |
| Stephen Gregory Hong | AAS/CC/CC | Business Administration Support/Business Administration Support: Microsoft Office Applications)/Business Administration Support: Office Assistant |
| Susan Huber * | AAS | Dental Hygiene |
| Gregg Hunston | AAS/CP | Social & Human Services/Social & Human Services |
| Vera A. Izotov | AAS | Dental Hygiene |
| Baharak Jamaleddin | AAS/CP/CC | Accounting/Accounting Paraprofessional/Accounting Assistant |
| Jenna Jenkins * | AAS | Dental Hygiene |
| Carla M. Jestrab ** | AAS/CP/CC | Accounting/Accounting Paraprofessional/Accounting Assistant |
| Guyana Kasparova ** | AAS | Culinary Arts |
| Olga Khristoforova | AAS/CP/CP/CC | Accounting/Accounting Paraprofessional/Medical Assisting: Medical Billing & Coding/Accounting Assistant |
| James R. King † | AAS | Diesel & Heavy Equipment Technician |
| Michelle Kinjo ** | CP | Massage Practitioner |
| Michael Andrew Paul Koeppen | AAS/CP | Welding Fabrication & Maintenance Technology/Welding Fabrication & Maintenance Technology |

This commencement program lists both graduates and candidates for graduation. It does not constitute an official record of graduation or of honors earned upon graduating.

12

# Exhibit B

```
  L&11 CASHIER
 11605 132ND AVE NE
KIRKLAND. WA 98034850
                                LAKE WASHINGTON INST TECHN
TERMINAL ID.:      04919776  .:48 AM                              GOLUBEVA KSENIIA
MERCHANT #:     345683945885
                                    STUDENT SCHEDULE
MC

HUNMHH956                       648   Birthdate: 08/26/86   Advisor: INTL Advisor
SALE
BATCH: 000091    INVOICE 3752084517  995    Citizen: F1   Vet Status:
DATE: Aug 25. 14   TIME: 11:50     NON-RESDNT                 Program: 551E BUSINESS TECHNOLOG
REG. BALL       AUTH:188251        NON-RESIDENT                Intent:F OCCUPATIONAL PREP

TOTAL          $225.00     VA KSENIIA
                           ELLEVUE WAY NE 4
GOLUBEVA KSENIA            UE          WA 98004
       CUSTOMER COPY
```

| | DEPT | CRS | | | | | | START | END | START | END | | FEE | CLASS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ITEM | DIV | NUM | SEC | COURSE TITLE | UNITS | GR | LOCATION | DAYS | TIME | TIME | DATE | DATE | INSTRUCTOR | PAY | FEE |
| INEP | INEP | 000 | 01 | INTL INSURANCE | | | | | | | | | | 99 | |
| | | | | TOTAL CREDITS | 0.0 | | | | | | | | | | |

```
          TUITION CHARGES ..        .00       PRIOR PAYMENTS ...        .00
          FEE CHARGES.......     225.00       COVERED BY FINAID         .00
                                ========                            ========
          TOTAL CHARGES ....     225.00       TOTAL PAYMENTS....        .00

                                    .00       TOTAL DUE ........     225.00
```

# Exhibit C

Travel.state.gov   U.S. Passports &   Students Abroad   U.S. Visa   Intercountry Adoption   International Parental   Contact Us   [Our U.S. Embassies]
                   International Travel                                                    Child Abduction                          & Consulates



SEARCH

Set Location    Set Nationality

travel.state.gov > Visas > Study and Exchange > **Student Visa**

Print    Email

# Student Visa

## Overview

Expand All

**Important Notice: Same-sex Marriage**

Generally, a citizen of a foreign country who wishes to enter the United States must first obtain a visa, either a nonimmigrant visa for temporary stay, or an immigrant visa for permanent residence. You must have a student visa to study in the United States. Your course of study and the type of school you plan to attend determine whether you need an F-1 visa or an M-1 visa.

| To enter the United States to attend: | You need the following visa category: |
|---|---|
| University or college | F |
| High School | |
| Private elementary school | |
| Seminary | |
| Conservatory | |
| Another academic institution, including a language training program | |
| Vocational or other recognized nonacademic institution, other than a language training program | M |

**Students cannot travel on the Visa Waiver Program or with Visitor Visas**
Citizens of Visa Waiver Program (VWP) participating countries who intend to study cannot travel on the VWP or on visitor (B) visas, except to undertake recreational study as part of a tourist visit. Students must travel to the United States with student (F-1 or M-1) visas. For more information on the VWP, see Visa Waiver Program.

**For short periods of recreational study, a Visitor (B) visa can be used**
Enrollment in a short recreational course of study, which is not for credit toward a degree or academic certificate, is permitted on a visitor (B) visa. Learn more about Visitor Visas.

Study leading to a U.S. conferred degree or certificate is not permitted on a visitor (B) visa, even if it is for a short duration. For

example, distance learning which requires a period of time on the institution's U.S. campus requires an F-1 visa.

**Student Acceptance at a SEVP Approved School**

Before you can apply at a U.S. Embassy or Consulate for an F or M student visa, you must first apply to and be accepted by a SEVP approved school. Visit the Department of State EducationUSA   website to learn about educational opportunities for undergraduate and graduate study, opportunities for scholars, admissions, and more. You can also visit the DHS Study in the States   school search page to search for SEVP-certified schools.

When you are accepted by the U.S. school you plan to attend, you will be enrolled in the Student and Exchange Visitor Information System (SEVIS). You must pay the SEVIS I-901 Fee. The U.S. school will provide you with a Form I-20 to present to the consular officer when you attend your visa interview. If your spouse and/or children intend to reside with you in the United States while you study, they must obtain individual Form I-20s, but they do not pay the SEVIS fee. Visit the U.S. Immigration and Customs Enforcement (ICE) Student and Exchange Visitor Program (SEVP)   website to learn more about SEVIS and the SEVIS I-901 Fee.

# How to Apply

There are several steps to apply for a visa. The order of these steps and how you complete them may vary at the U.S. Embassy or Consulate where you apply. Please consult the instructions available on the embassy or consulate website where you intend to apply.

## Complete the Online Visa Application

- **Online Nonimmigrant Visa Application, Form DS-160** – Learn more about completing the DS-160. You must: 1) complete the online visa application and 2) print the application form confirmation page to bring to your interview.
- **Photo** –You will upload your photo while completing the online Form DS-160. Your photo must be in the format explained in the Photograph Requirements.

## Schedule an Interview

While interviews are generally not required for applicants of certain ages outlined below, consular officers have the discretion to require an interview of any applicant, regardless of age.

| If you are age: | Then an interview is: |
| --- | --- |
| 13 and younger | Generally not required |
| 14-79 | Required (some exceptions for renewals) |
| 80 and older | Generally not required |

You must schedule an appointment for your visa interview, generally, at the U.S. Embassy or Consulate in the country where you live. You may schedule your interview at any U.S. Embassy or Consulate, but be aware that it may be difficult to qualify for a visa outside of your place of permanent residence.

Wait times for interview appointments vary by location, season, and visa category, so you should apply for your visa early. Review the interview wait time for the location where you will apply:

## Appointment Wait Time

Select a U.S. Embassy or Consulate:

Where will you apply? 

**New Students** – F-1 and M-1 student visas can be issued up to 120 days in advance of your course of study start date. However, you will not be allowed to enter the United States in F-1 or M-1 status earlier than 30 days before your start date.

**Continuing Students** - May renew their visas at any time, as long as they have maintained student status and their SEVIS records are current. Continuing students may enter the United States at any time before their classes start.

## Prepare for Your Interview

- **Fees - Pay the non-refundable visa application fee**, if you are required to pay it before your interview. When your visa is approved, you may also pay a visa issuance fee, if applicable to your nationality. Fee information is provided below:

Application Fee

**$160**

ALL FEES

Select your nationality to see Issuance Fee

| Select a country/authority or area | GO |

- Review the instructions available on the website of the embassy or consulate where you will apply to learn more about fee payment.

## Gather Required Documentation

Gather and prepare the following required documents before your visa interview:

- **Passport** valid for travel to the United States - Your passport must be valid for at least six months beyond your period of stay in the United States (unless exempt by country-specific agreements). If more than one person is included in your passport, each person who needs a visa must submit a separate application.
- **Nonimmigrant Visa Application, Form DS-160 confirmation page**
- **Application fee payment receipt,** if you are required to pay before your interview
- **Photo** – You will upload your photo while completing the online Form DS-160. If the photo upload fails, you must bring one printed photo in the format explained in the Photograph Requirements.
- **Certificate of Eligibility for Nonimmigrant (F-1) Student Status–For Academic and Language Students, Form I-20** or **Certificate of Eligibility for Nonimmigrant (M-1) Student Status for Vocational Students, Form I-20** – Your school will send you a SEVIS-generated Form I-20 once they have entered your information in the SEVIS database. You and your school official must sign the Form I-20. All students, their spouse and minor children if they intend to reside in the United States with the student, must be registered in the Student and Exchange Visitor System (SEVIS). Each person receives an individual Form I-20.

### Additional Documentation May Be Required

Review the instructions for how to apply for a visa on the website of the embassy or consulate where you will apply. Additional documents may be requested to establish that you are qualified. For example, additional requested documents may include evidence of:

- Your academic preparation, such as:
- Transcripts, diplomas, degrees, or certificates from schools you attended; and
- Standardized test scores required by your U.S. school;
- Your intent to depart the United States upon completion of the course of study; and
- How you will pay all educational, living and travel costs.

## Attend Your Visa Interview

During your visa interview, a consular officer will determine whether you are qualified to receive a visa, and if so, which visa category is appropriate based on your purpose of travel. You will need to establish that you meet the requirements under U.S. law to receive the category of visa for which you are applying.

Ink-free, digital fingerprint scans will be taken as part of your application process. They are usually taken during your interview, but this varies based on location.

After your visa interview, your application may require further administrative processing. You will be informed by the consular officer if further processing is necessary for your application.

When the visa is approved, you may pay a visa issuance fee if applicable to your nationality, and will be informed how your passport with visa will be returned to you. Review the visa processing time, to learn how soon your passport with visa will generally be ready for pick-up or delivery by the courier.

## Additional Information

- We cannot guarantee that you will be issued a visa. Do not make final travel plans or buy tickets until you have a visa.
- For information about employment, review Students and Employment   and Form I-765 Work Authorization Instructions   on the USCIS website.

- Students who are outside the United States, and who have not been attending classes for five (5) months or more, should apply for a new student visa to reenter the United States.
- Spouse and children
- Your spouse and unmarried, minor children who intend to reside with you during your study may apply for F-2 or M-2 visas. Although SEVIS fee payment is not required, your school must issue them an individual Form I-20, which is required to apply for their visas. You must provide a copy of your F-1 or M-1 visa and provide proof of relationship.
- Your minor children are permitted to attend school in the United States while accompanying you.
- Unless canceled or revoked, a visa is valid until its expiration date. Therefore, a valid U.S. visa in an expired passport is still valid. If you have a valid visa in your expired passport, do not remove it from your expired passport. You may use your valid visa in your expired passport along with a new valid passport for travel and admission to the United States.

Expand All

**Can I enter the United States more than 30 days in advance?**

**Optional Practical Training**

**Attending Public Secondary School**

**Visa Renewal**

**Visa Denial and Ineligibility**

**I was refused a visa, under section 214(b). May I reapply?**

**Misrepresentation or Fraud**

**Citizens of Canada and Bermuda**

**Further Questions**

More Information

- A-Z Index
- Lost/Stolen Travel Documents
- Denials
- SEVIS-ICE
- DHS-Study in the States
- Visa Expiration Date
- Automatic Revalidation
- Nonimmigrants in the United States–Applying for Visas in Canada or Mexico
- Student Visa Validity Following a Break in Studies
- Find a U.S. Embassy or Consulate
- Student Advising Center
- Visa Applicants - State Sponsors of Terrorism

# Exhibit D



in     Search

# Kseniia Golubeva

HR/Legal Assistant @Beyondsoft
Greater Seattle Area | Human Resources

130 connections             Lake Washington Technical College

 **Beyondsoft**
HR Assistant/Legal Assistant
February 2015 - Present (9 months)

## Background

Summary

Experienced HR in Tech industry
5+years administrative and supporting experience
International corporate experience in fast-paced tech and maritime industries
Various HRIS (Paylocity, HR Ascentis, EmpXtrack), SAP
Interpersonal communication – Languages: English, Russian…

Experience

 **HR Assistant/Legal Assistant**
Beyondsoft
February 2015 - Present (9 months) | United States, WA Bellevue

 **Payroll Assistant (WorkStudy)**
Lake Washington Institute of Technology
January 2014 - April 2014 (4 months) | WA, Kirkland

 **Administrative specialist**
Maersk Line
October 2010 - September 2013 (3 years) | St Petersburg the 10th Krasnoarmeyskaya St, 22

 **Accounts Assistant**
The Central Bank of the Russian Federation (Bank of Russia). Association «ROSINKAS»
April 2010 - July 2010 (4 months) | Vladivostok, Far East Region, Russia

 **Customer Assistant, Executive Assistant**
The Seventh Continent Ltd.
August 2008 - July 2009 (1 year) | Vladivostok, Russia

Languages

**Russian, English, Chinese**

Education



**Lake Washington Technical College**
Human resource management, Human Resources Management/Personnel Administration, General, GPA 3.78
2013 – 2014



**Far Eastern Federal University**
Master's degree, international tourism and hospitality management
2003 - 2008

Skills

  **HRIS**

  **Labor Relations**

**18 more skills**  ❯

More about Kseniia ❯

# Recommendations



Young H.
Director of Legal & Business Affairs at Beyondsoft

Kseniia has been working with our team and she has made an immediate, positive, and sustained impact. She is very task/goal oriented and needs little guidance once the project parameters are established. Moreover, she has tremendous attention to detail, which makes her work product reliable and predictable. I would recommend highly recommend Kseniia.

August 10, 2015, Young was senior to Kseniia but didn't manage directly

See all ❯

# Recent activity



**Kseniia Golubeva**
HR/Legal Assistant @Beyondsoft

6d



**Exhibit E**

Proposed

## Superior Court of Washington
## County of King

[X] In re the Marriage of:
[ ] In re the Domestic Partnership of:

Ksenlla Galubera

Petitioner,

and

Evgeny Pistrak

Respondent.

No. 15-3-06619-1 sea

**Temporary Order
(TMO)**

[ ] Clerk's Action Required, 3.2
[ ] Law Enforcement Notification, ¶ 3.1
3.2

## I. Money Judgment Summary

[X] Does not apply.
[ ] Judgment Summary is set forth below.

| | | |
|---|---|---|
| A. | Judgment creditor | _____ |
| B. | Judgment debtor | _____ |
| C. | Principal judgment amount | $ _____ |
| D. | Interest to date of judgment | $ _____ |
| E. | Attorney fees | $ _____ |
| F. | Costs | $ _____ |
| G. | Other recovery amount | $ _____ |
| H. | Principal judgment shall bear interest at _____ % per annum | |
| I. | Attorney fees, costs and other recovery amounts shall bear interest at _____ % per annum | |
| J. | Attorney for judgment creditor | _____ |
| K. | Attorney for judgment debtor | _____ |
| L. | Other: | |

## II. Basis

A motion for a temporary order was presented to this court and the court finds reasonable cause to issue the order.

*Temp Order (TMO) - Page 1 of 5*
*WPF DR 04.0250 Mandatory (06/2014) - RCW 26.09.060; .110; .120; .194, .300(2)*

[ ]    Further, the court finds that the nonrequesting party is absent and a) is on active duty as a National Guard member or Reservist residing in Washington, or b) is a dependent of a National Guard member or Reservist residing in Washington on active duty. Despite the service member's or dependent's absence, failure to enter the temporary orders below would result in manifest injustice to the other interested parties.

## III. Order

*It is Ordered:*

### 3.1    Restraining Order

[ ]    There are no restraining orders in effect under this cause number and the court is not entering one now.

[X]    The prior temporary restraining order restraining (name) _____
dated _____ remains in full force and effect.

[ ]    All prior **Restraining Order(s)** that restrain (name) _____
signed by the court under this cause number are terminated. *Clerk's Action.* The clerk of the court shall forward a copy of this order, on or before the next judicial day to: _____ law enforcement agency where *the protected person* resides which shall enter this order into any computer-based criminal intelligence system available in this state used by law enforcement agencies to list outstanding warrants.

[ ]    The parties shall comply with the Restraining Order restraining (name) _____
signed by the court on this date or dated _____, under this cause number.

### 3.2    Surrender of Weapons

[X]    Does not apply:  There is no surrender of weapon order in effect under this cause number and the court is not entering one now.

Prior temporary order continued:  The prior temporary **Order to Surrender Weapons** issued after a hearing against [ ] petitione:    respondent dated _____ remains in full force and effect.

[ ]    Prior temporary order is terminated:  There was a temporary **Order to Surrender Weapons** against (name) _____ previously signed by the court under this cause number. The court terminates the order.

(The restrained person may file a motion for release of weapons. The restrained person may have limited time to collect the weapons before law enforcement disposes of them as allowed by law.)

*Clerk's Action.* The clerk of the court shall forward a copy of this order, on or before the next judicial day to: _____ law enforcement agency where *the temporary Order to Surrender Weapons was sent. The agency* shall enter this order into the Washington Crime Information Center.

*Temp Order (TMO) - Page 2 of 5*
*WPF DR 04.0250 Mandatory (06/2014) - RCW 26.09.060; .110; .120; .194, .300(2)*

[ ]    Temporary **Order to Surrender Weapons:**

    [ ]    The current request is denied.

    [ ]    The current request is granted based on the following:

    [ ]    Surrender is **mandatory** because the court finds:

        [ ]    that the restrained person and the protected person are spouse or former spouse, current or former domestic partner, parent of a child in common, or cohabitants as part of a dating relationship. The restrained person had **actual notice** and an opportunity to be heard. The restrained person represents a credible threat to the physical safety of the protected party or children. The restrained party is restrained above from assaulting, harassing, etc.

        [ ]    **by clear and convincing evidence,** the restrained person:

            [ ]    Has used, displayed, or threatened to use a firearm or other dangerous weapon in a felony.

            [ ]    Previously committed an offense making him or her ineligible to possess a firearm under RCW 9.41.040.

    [ ]    Surrender is **discretionary** and the court finds **by a preponderance of evidence,** the restrained person:

        [ ]    presents a serious and imminent threat to public health or safety, or the health or safety of any individual by possessing a firearm or other dangerous weapon,

        [ ]    has used, displayed, or threatened to use a firearm or other dangerous weapon in a felony.

        [ ]    previously committed an offense making him or her ineligible to possess a firearm under RCW 9.41.040.

## Order:

(Name) _____ shall immediately **surrender** all firearms and other dangerous weapons that he/she owns or has in his/her possession, and any concealed pistol license to the person or agency named in the Order to Surrender Weapons signed by the court on this date, under this cause number.

(Name) _____ is **prohibited** from obtaining or possessing a firearm or other dangerous weapon, or a concealed pistol license **while this order is in effect.**

## 3.3    Temporary Relief

[X]    The [ ] petitioner [X] respondent shall pay the other party $ *1500* per month maintenance.

Starting Date:    *10-27-15*



Day(s) of the month payment is due: ___27___

Payments shall be made to:

[ ]    the Washington State Child Support Registry (if child support is ordered).
[X]    directly to the other spouse or domestic partner. *Direct Deposit into*
[ ]    the clerk of this court as trustee for remittance to the other spouse or domestic partner (if there are no dependent children).
[ ]    Other:

[ ]    Child support shall be paid in accordance with the order of child support, signed by the court.

[ ]    The parties shall comply with the Temporary Parenting Plan signed by the court.

[ ]    The parties shall comply with the Temporary Residential Time Re Military Parents signed by the court.

[X]    The [ ] petitioner [X] respondent is restrained and enjoined from transferring, removing, encumbering, concealing or in any way disposing of any property except in the usual course of business or for the necessities of life and requiring each party to notify the other of any extraordinary expenditures made after the order is issued.

[ ]    The [ ] petitioner [ ] respondent is restrained and enjoined from removing any of the children from the state of Washington.

[X]    The [ ] petitioner [X] respondent is restrained and enjoined from assigning, transferring, borrowing, lapsing, surrendering or changing entitlement of any insurance policies of either or both parties whether medical, health, life or auto insurance.

[X]    Each party shall be immediately responsible for their own future debts whether incurred by credit card or loan, security interest or mortgage.

[ ]    Responsibility for the debts of the parties is divided as follows:

[ ]    The family home shall be occupied by the [ ] petitioner [ ] respondent.

[ ]    Use of property shall be as follows:

[ ]    The [ ] petitioner [ ] respondent shall vacate the family home. You have a right to keep your residential address confidential. [ ] (name) _____ waives confidentiality of the address which is: _____

[ ]    The [ ] petitioner [ ] respondent shall pay temporary attorney fees, other professional fees and costs in the amount of $_____ to:

[X]    Other: *the respondent shall not sell the family house until dissolution of marriage hearing.*

# Exhibit F

Case Name: _____    Case Number: _____

| Financial Statement (Attachment) | | |
|---|---|---|
| **1.** My name is: Ksenia Golubeva | | |
| **2.** [ ] I provide support to people who live with me: How many?    Age(s): | | |

| **3. My Monthly Income:** 2287.70 | | | **6. My Monthly Household Expenses:** | | |
|---|---|---|---|---|---|
| Employed [X]    Unemployed [ ] | | | Rent/Mortgage: | $ | 500.00 |
| Employer's Name: Beyondsoft | | | Food/Household Supplies: | $ | 300.00 |
| Gross pay per month (salary or hourly pay): | | 15/hour | Utilities: | $ | 85.00 |
| Take home pay per month: | $ | 1787.70 | Transportation: | $ | 300.00 |
| **4. Other Sources of Income Per Month in my Household:** | | | Ordered Maintenance actually paid: | $ | 0 |
| Source: | | $ | Ordered Child Support actually paid: | $ | 0 |
| Source: | | $ | Clothing: | $ | 200.00 |
| Source: | | $ | Child Care: | $ | 0 |
| Source: | | $ | Education Expenses: | $ | 0 |
| Sub-Total: | $ | 0 | Insurance (car, health): | $ | 103.67 |
| [ ] I receive food stamps. | | | Medical Expenses: | $ | |
| **Total Income, lines 3 (take home pay) and 4:** | $ | 1787.70 | Sub-Total: | $ | 1488.67 |

| **5. My Household Assets:** | | | **7. My Other Monthly Household Expenses:** | | |
|---|---|---|---|---|---|
| Cash on hand: | $ | 0 | phone bill | $ | 55.75 |
| Checking Account Balance: | $ | 6480.98 | Car Maintanence | $ | 300.00 |
| Savings Account Balance: | $ | 0 | | $ | |
| Auto #1 (Value less loan): | $ | 700.00 | | $ | |
| Auto #2 (Value less loan): | $ | 0 | Sub-Total: | $ | 355.75 |
| Home (Value less mortgage): | $ | 0 | **8. My Other Debts with Monthly Payments:** | | |
| Other: | $ | | | $ | /mo |
| Other: | $ | | | $ | /mo |
| Other: | $ | | | $ | /mo |
| Other: | $ | | | $ | /mo |
| Other: | $ | | Sub-Total: | $ | |
| **Total Household Assets:** | $ | 7180.98 | **Total Household Expenses and Debts, lines 6, 7, and 8:** | $ | 1844.42 |
| Date: 9/24/2015 | | | Signature: | | |

**Exhibit G**



# Exhibit H



**United States Department of State**
**Bureau of Consular Affairs**

# VISA BULLETIN

Number 73 Volume IX                                                    Washington, D.C.

### IMMIGRANT NUMBERS FOR OCTOBER 2014

A.  STATUTORY NUMBERS

This bulletin summarizes the availability of immigrant numbers during October.
Consular officers are required to report to the Department of State documentarily
qualified applicants for numerically limited visas; U.S. Citizenship and
Immigration Services in the Department of Homeland Security reports applicants
for adjustment of status.  Allocations were made, to the extent possible, in
chronological order of reported priority dates, for demand received by
September 8th. If not all demand could be satisfied, the category or foreign
state in which demand was excessive was deemed oversubscribed.  The cut-off date
for an oversubscribed category is the priority date of the first applicant who
could not be reached within the numerical limits.  Only applicants who have a
priority date earlier than the cut-off date may be allotted a number. If it
becomes necessary during the monthly allocation process to retrogress a cut-off
date, supplemental requests for numbers will be honored only if the priority date
falls within the new cut-off date announced in this bulletin.  If at any time an
annual limit were reached, it would be necessary to immediately make the
preference category "unavailable", and no further requests for numbers would be
honored.

2.  Section 201 of the Immigration and Nationality Act (INA) sets an annual
minimum family-sponsored preference limit of 226,000.  The worldwide level for
annual employment-based preference immigrants is at least 140,000.  Section 202
prescribes that the per-country limit for preference immigrants is set at 7% of
the total annual family-sponsored and employment-based preference limits, i.e.,
25,620.  The dependent area limit is set at 2%, or 7,320.

3.  INA Section 203(e) provides that family-sponsored and employment-based
preference visas be issued to eligible immigrants in the order in which a
petition in behalf of each has been filed.  Section 203(d) provides that
spouses and children of preference immigrants are entitled to the same status,
and the same order of consideration, if accompanying or following to join the
principal.  The visa prorating provisions of Section 202(e)
apply to allocations for a foreign state or dependent area when visa demand
exceeds the per-country limit.  These provisions apply at present to the
following oversubscribed chargeability areas:  CHINA-mainland born, INDIA,
MEXICO, and PHILIPPINES.

4.  Section 203(a) of the INA prescribes preference classes for allotment of Family-sponsored immigrant visas as follows:

## FAMILY-SPONSORED PREFERENCES

**First**:  **(F1)** Unmarried Sons and Daughters of U.S. Citizens:  23,400 plus any numbers not required for fourth preference.

**Second**:  Spouses and Children, and Unmarried Sons and Daughters of Permanent Residents:  114,200, plus the number (if any) by which the worldwide family preference level exceeds 226,000, plus any unused first preference numbers:

A. **(F2A)** Spouses and Children of Permanent Residents:  77% of the overall second preference limitation, of which 75% are exempt from the per-country limit;

B. **(F2B)** Unmarried Sons and Daughters (21 years of age or older) of Permanent Residents:  23% of the overall second preference limitation.

**Third**:  **(F3)** Married Sons and Daughters of U.S. Citizens:  23,400, plus any numbers not required by first and second preferences.

**Fourth**:  **(F4)** Brothers and Sisters of Adult U.S. Citizens:  65,000, plus any numbers not required by first three preferences.

On the chart below, the listing of a date for any class indicates that the class is oversubscribed (see paragraph 1); "C" means current, i.e., numbers are available for all qualified applicants; and "U" means unavailable, i.e., no numbers are available.  (NOTE:  Numbers are available only for applicants whose priority date is **earlier** than the cut-off date listed below.)

| Family-Sponsored | All Chargeability Areas Except Those Listed | CHINA-mainland born | INDIA | MEXICO | PHILIPPINES |
|---|---|---|---|---|---|
| F1 | 22MAY07 | 22MAY07 | 22MAY07 | 22JUN94 | 01SEP04 |
| F2A | 01FEB13 | 01FEB13 | 01FEB13 | 22JUL12 | 01FEB13 |
| F2B | 01NOV07 | 01NOV07 | 01NOV07 | 01AUG94 | 15DEC03 |
| F3 | 01DEC03 | 01DEC03 | 01DEC03 | 22OCT93 | 01JUN93 |
| F4 | 22JAN02 | 22JAN02 | 22JAN02 | 01FEB97 | 08APR91 |

*NOTE:  For October, F2A numbers EXEMPT from per-country limit are available to applicants from all countries with priority dates earlier than 22JUL12.  F2A numbers SUBJECT to per-country limit are available to applicants chargeable to all countries EXCEPT MEXICO with priority dates beginning 22JUL12 and earlier than 01FEB13.  (All F2A numbers provided for MEXICO are exempt from the per-country limit; there are no F2A numbers for MEXICO subject to per-country limit.)

# Exhibit I



1/72

When recorded return to:

Evgeny Pistrak
12834 176th Place NE
Redmond, WA 98052

```
20141010001389
NEXTITLE          UD
PAGE-001 OF 001          72.00
10/10/2014 16:24
KING COUNTY, WA

E2695017
10/10/2014 16:22
KING COUNTY, WA
TAX          $7,552.20
SALE         $424,000.00          PAGE-001 OF 001
```

## STATUTORY WARRANTY DEED

Escrow No.: 1409055
Title Order No.: NXWA-0152926

THE GRANTOR(S)

David Takeshi Ikegami, Trustee of the David Takeshi Ikegami Revocable Trust, dated March 18, 1985

for and in consideration of Ten dollars and other good and valuable consideration in hand paid, conveys, and warrants to

Evgeny Pistrak, a married man as his sole and separate estate

the following-described real estate, situated in the County of King, State of Washington:

LOT 2, HOLLYMOR IV, ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 130 OF PLATS AT PAGE(S) 1, 2 AND 3, IN KING COUNTY, WASHINGTON.

SUBJECT TO: All matters of public record only.

Tax Parcel Number(s): 339683-0020-02

Dated: 10-9-2014

David Takeshi Ikegami, Trustee of the
David Takeshi Ikegami Revocable Living
Trust, dated March 18, 1985

By: _____
David Takeshi Ikegami, Trustee

State of Hawaii

City/County of Honolulu

I certify that I know or have satisfactory evidence that David Takeshi Ikegami is the person who appeared before me, and said person acknowledged that he, signed this instrument, on oath stated that he is authorized to execute the instrument and acknowledged it as the Trustee of David Takeshi Ikegami Revocable Living Trust, dated March 18, 1985 to be the free and voluntary act of such party for the uses and purposes mentioned in the instrument.

Dated: October 9, 2014

_____
Notary Public in and for the State of Hawaii
Residing at: Honolulu, HI
My Appointment Expires: Jan 01, 2018

NOREEN HO, FIRST CIRCUIT
Doc. Date: 10-9-14     # Pages: 1
Doc. Description: Statutory Warranty Deed
Notary Signature _____ Date 10-9-14

LPB 10-05(ir-I)



NEXTITLE
A TITLE & ESCROW CO
Recorded by NexTitle
Order No. *152926*
1/72 -

When recorded return to:

Evgeny Pistrak
12834 176th Place NE.
Redmond, WA 98052



20141014000770
NEXTITLE          QCD       72.00
PAGE-001 OF 001
10/14/2014 12:03
KING COUNTY, WA

E2695173
10/14/2014 12:01
KING COUNTY, WA
TAX          $10.00
SALE          $0.00          PAGE-001 OF 001

## QUIT CLAIM DEED

Escrow No.: 1409055A
Title Order No.: NXWA-0152926

THE GRANTOR(S)

Kseniia Golubeva, wife of Evgeny Pistrak

for in consideration of No Consideration - To Create Separate Property - WAC - 458-61A-203(1) in hand paid, conveys and quit claims to

Evgeny Pistrak, a married man as his sole and separate

the following-described real estate, situated in the County of King, State of Washington, together with all after acquired title of the Grantor(s) therein:

LOT 2, HOLLYMOR IV, ACCORDING TO THE PLAT THEREOF RECORDED IN VOLUME 130 OF PLATS AT PAGE(S) 1, 2 AND 3, IN KING COUNTY, WASHINGTON.

Tax Parcel Number(s): 339683-0020-02

Dated: 10/07/2014

Kseniia Golubeva

STATE OF Washington )
                                          )-SS
COUNTY OF King )

I certify that I know or have satisfactory evidence that Kseniia Golubeva is the person who appeared before me, and said person acknowledged that he/she signed this instrument and acknowledged it to be his/her free and voluntary act for the uses and purposes mentioned in this instrument.

Dated: 10-7-14

R. SCOTT COZAD
NOTARY PUBLIC
STATE OF WASHINGTON
COMMISSION EXPIRES
JULY 5, 2017

Notary name printed or typed: R. Scott Cozad
Notary Public in and for the State of Washington
Residing at: Burien
My appointment expires: 7-5-2017

LPB 12-05(i-I)

**Exhibit J**

1

2  COMMISSIONER HON. MELINDA JOHNSON-TAYLOR: MS GOLUBEVA?

3  MS GOLUBEVA: YES?

4  COMMISSIONER: DO YOU HAVE ANY OBJECTIONS TO MR PISTRAK RETAINING
5  THE CRV WHICH APPEARS TO BE IN HIS NAME?

6  GOLUBEVA: UH, YES ACTUALLY, THIS IS THE SECOND CAR IN THE HOUSEHOLD
7  WHICH WAS BOUGHT FOR ME SO I CAN GO TO WORK AND I STILL NEED TO GO
8  TO WORK SO I WANT TO USE THIS CAR.

9  COMMISSIONER: AND DO YOU HAVE ANOTHER CAR IN YOUR POSSESSION?

10  GOLUBEVA: UH, I HAVE LIKE A TEMPORARY CAR.

11  COMMISSIONER: OK.

12  GOLUBEVA: SO...

13  COMMISSIONER: BUT NOT A CAR IN YOUR NAME?

14  GOLUBEVA: YES.

15  ...

16  COMMISSIONER: WELL, IT SEEMS AS THOUGH IF THERE IS TWO CARS THAT
17  WERE OBTAINED DURING THE MARRIAGE, THEN MOST CERTAINLY USE OF THE
18  VEHICLE WOULD BE SOMETHING THAT SHOULD BE, UM, PROVIDED TO MS
19  GOLUBEVA SINCE MR PISTRAK IS REQUESTING AN EXTENSIVE CONTINUANCE TO
20  THE MIDDLE OF OCTOBER, SO... MS GRIFFIN?

21  COUNSELOR GRIFFIN: IF I MAY JUST CLARIFY, SO, PETITIONER IS
22  INDICATING THAT SHE DOES NOT HAVE A CAR IN HER NAME, IS THAT
23  CORRECT?

24  GOLUBEVA: YES.

25  COMMISSIONER: THAT'S CORRECT.

26  COUNSELOR: THANK YOU, YOUR HONOR.

27  COMMISSIONER: OK.

28

# Exhibit K



**King County District Court**
**East Division, Bellevue Courthouse**
1309 114th Ave. SE, Suite 100
Bellevue, WA 98004

# NOTICE OF INFRACTION

This infraction will **not** be a part of your driving record and will be processed as a parking infraction.

| COMPLAINT #: | BEP102229 |
|---|---|
| NOTICE #: | 1511500215954 |
| PIN: | 3820 |

**Amount Due:**    $124.00
**Due Date:**    10/13/2015



**KSENIIA YURYEVNA GOLUBEVA**
**750 MELODY LN**
**EDMONDS, WA 98020-2649**

| VIOLATION DATE 09/17/2015 | | VIOLATION TIME 02:51 PM | | FINE AMOUNT $124.00 |
|---|---|---|---|---|
| VEHICLE PLATE # AVN3756 | | STATE WA | POSTED SPEED 20    MPH | ACTUAL SPEED 32    MPH |
| YEAR 1999 | MAKE MITS | MODEL MIRCP | STYLE 2D | COLOR |
| LOCATION WB NE 8TH ST @ 143RD AVE NE | | | | |
| DEFENDANT KSENIIA YURYEVNA GOLUBEVA | | | | |
| STREET ADDRESS 750 MELODY LN | | | | |
| CITY EDMONDS | | STATE WA | | ZIP 98020-2649 |

I certify under penalty of perjury under the laws of the State of Washington the following is true and correct. I am a sworn Bellevue Police Officer and based upon my review of the electronic images made by the automated traffic safety camera, I have probable cause to believe, and do believe, that on the date and time and at the location listed above, the vehicle described above was in violation of  RCW 46.61.440 as adopted by Bellevue City Code 11.49.010 (Exceeds a speed limit in a school speed zone) and enforced pursuant to BCC 11.49 (Automated Traffic Cameras). The school speed zone is fully posted with school speed limit signs indicating a 20 MPH speed limit when warning lights are flashing or children are present. I know the technology is such that the camera is operating only when flashing lights are in operation. The electronic images taken together showing the vehicle and its license plate portray a fair and accurate representation of the location listed above and indicate the vehicle was speeding in the school zone as described as in the ordinance. Based on my knowledge of how the above listed defendant's name was identified, I have probable cause to believe and do believe that the above named defendant was the registered owner of the above pictured and listed vehicle at the time of the infraction.





| OFFICER J. JESSON | BADGE # P241 | PLACE Bellevue, WA |
|---|---|---|
| Bellevue, Washington | | ISSUE DATE 09/23/2015 |

This Notice of Infraction is available at the King County District Court. To find a location visit www.kingcounty.gov/courts/DistrictCourt/Locations.aspx



Mail your check or money order with this coupon to the address below.

| NAME: KSENIIA YURYEVNA GOLUBEVA | | DUE: 10/13/2015 |
|---|---|---|
| COMPLAINT #: BEP102229 | VERSION: 1 | ISSUED: 09/23/2015 |
| PLATE: AVN3756 | STATE: WA | TYPE: |

Your response must be postmarked by midnight of the DUE DATE by one of the following methods:

1. Pay the penalty (insert the coupon in the enclosed envelope along with your payment); OR
2. Request a mitigation hearing to explain the circumstances (see Hearing Request form for explanation of hearing); OR
3. Request a hearing to contest the infraction (see Hearing Request form for explanation of hearing); OR
4. Submit a Declaration of Non-Responsibility (see reverse for instructions).

This Notice of Infraction is a determination that a school speed zone infraction was committed by you. This determination is final unless you respond by the DUE DATE using methods 2, 3 or 4 above.

**AMOUNT DUE: $124.00**

PAYMENT COUPON

**King County District Court**
**Bellevue Photo Enforcement Program**
**516 3rd Ave, Ste 340 C**
**Seattle, WA 98104**

1 1511500215954 000031440934 124001

# Exhibit L

## Detailed History for Police Event #K15283214 As of 10/15/2015 16:31:38

Output for: 95161

Priority:3 Type:STNBY - Civil Standby
Location:11435 AVONDALE RD NE,RED
LocCross:btwn NE 113TH WAY and NE 116TH ST
Info:PCC MARKET

| Created: | 09/30/2015 18:11:50 | C103 | 107 |
|---|---|---|---|
| Entered: | 09/30/2015 18:18:45 | C103 | 107 |
| Dispatch: | 09/30/2015 18:22:10 | M651 | 94471 |
| Enroute: | 09/30/2015 18:24:25 | M651 | 94471 |
| Onscene: | 09/30/2015 18:32:13 | M651 | 94471 |
| Transprt: | 09/30/2015 18:39:31 | D153 | 29 |
| Complete: | 09/30/2015 18:44:20 | D153 | 29 |
| Closed: | 09/30/2015 19:14:35 | M651 | 94471 |

IC: PrimeUnit:2B68 FCR:566B0 Type:STNBY - Civil Standby
Agency:KCS Group:N District:B7 RA:B7(R05001)    ☐ Detail

---

| 18:11:50 CREATE | Location:11435 AVONDALE RD NE,RED Type:STNBY Info:PCC MARKET Name:GOLUBEVA, KSENIIA Y RPaddr:D/08261986 Phone:425/273-8352 Group:N PDist:R05001 TypeDesc:Civil Standby LocCross:btwn NE 113TH WAY and NE 116TH ST Priority:3 Response:1P Agency:KCS LocType:S Contact:Yes |
|---|---|
| 18:18:45 ENTRY | PDist:R05001-->B7 Comment:GOING TO 12834 176TH PL NE TO P/UP PERSONAL BELONGINGS AND A VEH...PREV HX OF DV AND THERE ARE 2 ORDERS BETWEEN THEM W/RP AS PPN, ORDER ALLOWS FOR STNBY...RP WAITING IN GOLD MITS MIRAGE |
| 18:18:45 SUBJ | S#:1 Sex:M Age:35 DOB:02191980 Name:PISTRAK, EVGENY |
| 18:18:45 -PREMIS | Comment:PPR |
| 18:18:50 NOMORE | |
| 18:19:11 LOGM | Message:0115100101190001659 MessageType:HTML Received:09/30/2015 18:15:40 Comment:RP'S DOL, 10-60 INVLD IN ORDERS |
| 18:19:41 LOGM | Message:0115100101190001671 MessageType:HTML Received:09/30/2015 18:19:16 Comment:MALE'S DOL, 10-60 INVLD IN ORDERS |
| 18:20:36 STACK | 2B68 |
| 18:20:39 HOLD | |
| 18:21:00 LOGM | Message:0115100101210001712 MessageType:Text Received:09/30/2015 18:19:15 Comment:MOST RECENT TPO, GOOD SERVED |
| 18:22:10 *DISP | 2B68 Operator:94471 OperNames:DALLON, JEREMY |
| 18:24:25 *ENRTE | 2B68 |
| 18:32:13 *ARRIVE | 2B68 |
| 18:39:31 TRANSP | 2B68 Location:12834 176TH PL NE,KCS Mileage:658 |
| 18:44:20 CMPLT | 2B68 Mileage:660 |
| 19:14:10 *MISC | 2B68 Comment:STANDBY COMPLETED. RP COLLECTED EVERYTHING ON THE LIST. |
| 19:14:35 *CLEAR | 2B68 FCR:566B0 DispoLevel:16 |
| 19:14:35 -PRIU | 2B68 |
| 19:14:35 -CLEAR | |
| 19:14:35 *CLOSE | |



---

CONTACT INFO:

| Name | Phone | RPaddr | Contact | Fire/Aid | Rt/Coach | Box4 |
|---|---|---|---|---|---|---|
| GOLUBEVA, KSENIIA Y | 425/273-8352 | D/08261986 | Yes | | | |

# Exhibit M

INFRACTION # 5Z0704242 LWP IT

GOLUBEVA, KSENIIA Y 082686

**INFRACTION**

☑ TRAFFIC ☐ NON-TRAFFIC    ☑ MUNICIPAL COURT OF    COURT ORI # WA031074J    INFRACTION #: 5Z0704242    REPORT #:

IN THE ☐ DISTRICT    LEA: WA0310400    LYNNWOOD MUNICIPAL COURT
☐ STATE OF WASHINGTON    ☐ COUNTY OF    ☑ CITY/TOWN OF    LYNNWOOD    , PLAINTIFF VS. NAMED DEFENDANT

THE UNDERSIGNED CERTIFIES AND SAYS THAT IN THE STATE OF WASHINGTON

| DRIVER'S LICENSE NO. (SCANNED) | STATE | EXPIRES | PHOTO I.D. MATCHED ☑ YES ☐ NO | NAME: LAST GOLUBEVA | FIRST KSENIIA | MIDDLE YURYEVNA | SFX | CDV/CLP ☐ YES ☑ NO |

| ADDRESS | | IF NEW ADDRESS ☐ | | CITY | | STATE | ZIP CODE |

**EMPLOYER**
EMPLOYER LOCATION

| DATE OF BIRTH 08-26-86 | RACE W | SEX F | EXPIRES 04-01-16 | ☐ INTERPRETER NEEDED LANG: | HAIR BRO | EYES BRO | WEIGHT 115 | HEIGHT 5'07" | RESIDENTIAL PHONE NO. | CELL/PAGER PHONE NO. | WORK PHONE NO. |

VIOLATION DATE 06/28/2015 09:40    ON OR ABOUT

DID OPERATE THE FOLLOWING VEHICLE MOTOR VEHICLE ON A PUBLIC HIGHWAY AND

| VEH LIC NO AUA7496 | STATE WA | EXPIRES 04-01-16 | VEH YR 1999 | MAKE MITSUBISHI | MODEL MIRAGE | I.M.P. BLOCK # 3000 | STYLE SEDAN 2 DR | COLOR |

| TR #1 LIC NO | STATE | EXPIRES | TR YR | AT LOCATION REF. TRAFFICWAY | ALDERWOOD MALL BLVD 28 AVE W | TR #2 LIC NO | STATE | EXPIRES | CITY/COUNTY OF LYNNWOOD/SNOHOMISH | TR YR |

OWNER/COMPANY IF OTHER THAN DRIVER

| ADDRESS | | | | CITY | | STATE | ZIP CODE |

| ACCIDENT NO. | COMMERCIAL VEHICLE | ☐ YES ☑ NO | 16+ ☑ PASS | VEH YR ☐ YES ☑ NO | HAZMAT | ☐ YES ☑ NO | EXEMPT VEHICLE | FIRE ☐ LEA |

DID THEN AND THERE COMMIT EACH OF THE FOLLOWING OFFENSES

VEH SPEED 50    IN A 35    ZONE    ☑ SMD ☐ PACE ☐ AIRCRAFT

| 1. VIOLATION/STATUTE CODE 46.61.400 ACTUAL 51/35 | SPEEDING 15 MPH OVER LIMIT (40 OR U | PENALTY $ 164.00 |

| 2. VIOLATION/STATUTE CODE 46.30.020 | OP MOT VEH W/OUT INSURANCE | PENALTY $ 550.00 |

| 3. VIOLATION/STATUTE CODE | | PENALTY $ |

| 4. VIOLATION/STATUTE CODE | | PENALTY $ |

| 5. VIOLATION/STATUTE CODE | | PENALTY $ |

RELATED #    DATE ISSUED    06-28-15    TOTAL PENALTY $ 704.00

☑ TICKET SERVED ON VIOLATOR

☐ TICKET SENT TO COURT FOR MAILING

☐ TICKET REFERRED TO PROSECUTOR

I CERTIFY UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF WASHINGTON THAT I HAVE ISSUED THIS ON THE DATE AND AT THE LOCATION ABOVE, THAT I HAVE PROBABLE CAUSE TO BELIEVE THE ABOVE NAMED PERSON COMMITTED THE ABOVE OFFENSE(S), AND I AM ENTERING MY AUTHORIZED USER ID AND PASSWORD TO AUTHENTICATE IT.

OFFICER    TROY HAMMERSMITH    # 1430
OFFICER    #

| INF # | RESPONSE | | DISPOSITION | | | | PENALTY | SUSPENDED | SUB-TOTAL | FINDING/JUDGMENT DATE |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | C | NC | C NC D P DF | | | | $ | $ | $ | ABSTRACT MLD TO OLYMPIA |
| 2 | C | NC | C NC D P DF | | | | $ | $ | $ | |
| 3 | C | NC | C NC D P DF | | | | $ | $ | $ | |
| 4 | C | NC | C NC D P DF | | | | $ | $ | $ | |
| 5 | C | NC | C NC D P DF | | | | $ | $ | $ | TOTAL COSTS $ |

JUDGMENT OF ABSTRACT INFRACTION

PAGE 1 OF 3

Page 133

# Exhibit N



**AlaskaUSA**
*Federal Credit Union*®
PO BOX 691608
SAN ANTONIO, TX 78269-1608

3785 0.3820 AT 0.416     18 1 111

ıılııılllılııılllıılllılllılıplılılıplılıplılıplııml

EVGENY PISTRAK
12834 176TH PL NE
REDMOND WA 98052-1161

SEPTEMBER 2, 2015

| Loan #: ****430-01 |
| Reference #: 6501 |
| Unique Identifier #: 5261086101 |

| Year | Make | VIN |
|------|------|-----|
| 11 | HONDA | BC009935 |

Dear Evgeny Pistrak:

Thank you for taking the time to respond to this request. We recently received a policy covering the collateral listed above. The deductibles shown exceed what is required by us. Please note that the maximum deductible is listed at the end of this notice. The policy you provide must show us as the lienholder/loss payee, and contain comprehensive and collision coverage with deductibles not to exceed the amount shown below.

Please contact your agent and request that a corrected policy or an endorsement to amend or include the information be sent to us.

Thank you for your prompt attention. If you have any questions regarding the required insurance coverage or if we may be of assistance in any way, please contact us at (800) 570-9964. You may also fax us toll free fax at (866) 403-8158, or send us your policy information via the internet at **www.imcovered.com/AlaskaUSA**.

Thank you.
Insurance Services



PLEASE TAKE ACTION IMMEDIATELY

GO TO www.imcovered.com/AlaskaUSA TO UPDATE OR CHECK YOUR INSURANCE POLICY. YOU CAN ALSO ACCESS THIS SITE FROM YOUR MOBILE DEVICE BY SCANNING THE QR CODE BELOW.

MAIL YOUR POLICY TO:
Alaska USA FCU
PO BOX 691608
San Antonio, TX 78269-1608

FAX YOUR POLICY TO:
(866) 403-8158

Need help? Call (800) 570-9964

| Reference #: | 6501 |
| Unique Identifier #: | 5261086101 |

AF0067  016501RL9ZZ       A

01 IMPAIRMENT LETTER 1 - D   022

**Exhibit O**

**COBRA ELECTION NOTICE**
**Microsoft Health & Welfare Benefits Plan**

**Qualifying Event Date:** October 2, 2015
**COBRA Start Date:** October 3, 2015
**COBRA Expiration Date:** April 2, 2017

**Return Form Deadline Date:** December 10, 2015
**Date Printed:** October 6, 2015

EVGENY PISTRAK
AND QUALIFIED BENEFICIARIES

This notice contains important information about your right to continue your health care coverage in the Microsoft Health & Welfare Benefits Plan (the Plan), as well as other health coverage alternatives that may be available to you through the Health Insurance Marketplace. Please read the information in this notice carefully to understand your rights regarding COBRA continuation. We use the pronoun "you" in this notice (including the enclosed election form) to refer to each of the individual addressees named above.

According to our records, you experienced a loss of coverage on October 2, 2015 due to Termination of Benefits. This event is referred to as your "qualifying event" and the date is your "qualifying event date". Your prior coverage continues until October 2, 2015. Each person shown below is considered a "qualified beneficiary" and is entitled to elect COBRA coverage under one or more of the group health components of the Plan as shown.

| Name | Relationship |
|------|--------------|
| Evgeny G Pistrak | Self |

If elected, COBRA coverage will begin on October 3, 2015 and can be continued until April 2, 2017 (except for Health FSA coverage which, if available, will not be available after the end of the first plan year.) If you do not elect COBRA, your coverage under the Plan ends effective October 2, 2015.

The current monthly cost of your COBRA coverage is as follows (**employer-sponsored** subsidies have already been calculated if applicable). If other options are available to you, pricing information is available via https://cobra.ehr.com. These amounts may change in the future and will likely increase. You will be notified of COBRA premium changes prior to the date they take effect.

| Benefit Option | Coverage Level | Monthly Cost |
|----------------|----------------|--------------|
| Health Savings Plan (Premera) | Individual Only | $453.00 |
| Dental Plus | Individual Only | $64.00 |

**BenefitConnect™** COBRA

**FILED**

15 NOV 04 AM 11:43

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 15-3-06019-1 SEA

## IN THE SUPERIOR COURT OF WASHINGTON
## FOR KING COUNTY

| | |
|---|---|
| In re Marriage of: | NO. 15-3-06019-1SEA |
| KSENIIA GOLUBEVA, | REPLY DECLARATION OF KSENIIA GOLUBEVA IN SUPPORT OF MOTION FOR TEMPORARY ORDERS |
| and | |
| EVGENY PISTRAK | |

I, KSENIIA GOLUBEVA, declare the following matters to be true and correct under penalty of perjury under the laws of the statement of Washington:

1.    Just as Evgeny dreamed about working at Microsoft, my childhood dream was about having happy, loving marriage and family, a dream that has completely crashed, deeply wounding me. Things like an engagement ring or wedding ceremony with a white dress were the things I thought are necessary for a classic, loving marriage.  Apparently, I should have just said, "no," to the man who came to my host family and stood on his knee with a $900 ring.

**A.    My Present Living Situation**

2.    Out of luck, I did have some distant relatives in Washington state to go to after I had to leave my home with Evgeny.  Otherwise, I would have had to go to a shelter, as do so many other battered women who experienced similar situations of domestic violence or abuse.

GOLUBEVA REPLY DECL. - 1

3.       For the first month after I left Evgeny, I lived with my cousin in Kirkland. However, he and his wife have a small 1.5-year old child and my living with them was not comfortable for all of us.

4.       For the next three months, I stayed with my aunt and her husband at the Melody Lane address in Edmonds, in a that was still being built. This was the place where Evgeny mistakenly thinks I am still living. They could not have me for longer because of their own reasons. They wanted me to apply for an order to let me stay by myself in the house where I resided with Evgeny. I declined to do that because I did not want to go back to the house where I had suffered and cried so much. I also know Evgeny does not have any relatives he can stay with in this country.

5.       On September 15, 2015, I found a place to live through my church. I do not wish to disclose the address or the names of the people I am living with considering Evgeny's abusiveness and violence toward me.

6.       I have been paying rent to live in my current resident, starting with payment of rent in September 2015, and including, to this time, rent for October 2015. These payments are shown in more recent online bank records, a true and correct copy of which is attached as **Exhibit G** (Check No. 1105, cashed on 9/21/15, and Check No. 1109, cashed on 10/20/15).

B.   <u>**My Lack of Financial Resources.**</u>

7.       As I stated in my Supplemental Declaration, I am unable to work at this time due to the expiration of my right to work on October 27, 2015. Attached as **Exhibit H** is a true and correct copy of my exit checklist from Beyondsoft dated October 27, 2015. Incidentally, the COBRA benefit the checklist refers to applies only to the dental and vision benefit, since I did not have health insurance through that company.

GOLUBEVA REPLY DECL. - 2

8.      Again, I am requesting that the Court enter an order for temporary maintenance to be effective only until I am able to reacquire the right to work in this country. I am doing whatever I can to obtain an adjustment of my immigration status so I can back to work as soon as possible.

9.      I do not deny and am, in fact, proud of the fact that I am well educated and, I believe, well qualified for good employment in this country. My current inability to support myself is not in my control. The only alternative way for me to survive would have been to try to somehow remain with an abusive and violent husband, which is unacceptable to me.

10.     Evgeny's statements that I am hiding income are false and are attempt to confuse the Court and to try to make me look bad. There is no "$30,000 in funds in a Russian bank account," as he claims. Actually, that account was the same as the MasterCard (debit) account ending in 3956 he talks about. That ruble-denominated account contained only money for my education and related expenses for <u>one year</u>. It contained the equivalent of about $25,000 at the start. I spent much of the money in that account on my living expenses. I spent the rest on my wedding dress, tailoring, jewelry, wedding make-up and hair, and some minor things for our household. The account has been empty, in believe, since around November 2014. I cannot access records for that account at this time because, when I attempted to regain access, the bank sent the PIN to my old cell phone number. As I mentioned in my declaration in the domestic violence case, Evgeny cancelled that phone service without notifying me. I have contacted Russian branch of Citibank to open access for the account to prove that it's empty, but I have not received a reply yet.

GOLUBEVA REPLY DECL. - 3

11.    The wedding gift from my parents Evgeny talks about was actually about $2000 (the same amount he received from his parents as wedding gift as well), not the $8000 he claims, and was spent while living with him for our minor needs, my shopping, and even food.

12.    Although I don't believe it is relevant to this case, the fact is that my parents cannot support me. They are both retired now and the economic crisis in Russia has halved their savings. Since I left Evgeny. Although my parents sent me $3000 in July to help me out in my situation (see bank statements, 7/15/15), but they could afford to send me any more money after that.

13.    Evgeny tries to make me look bad for going to department stores, but he does not mention that, when I left him in May, I was able to grab only several summer dresses and some cosmetics with the Sheriff's escort and he did not allowed me back and did not gave me the rest of my clothes back until much later. This forced me to buy new clothes to be able to feel properly dressed for work. Even when he was served with the Temporary Protection Order during a civil standby on September 19, Evgeny argued with the Sheriff deputy for a while before just throwing some of my things to the driveway.

14.    While Evgeny tries to make me look like a big spender, I see he has blacked out all of the details about his bank transactions. Isn't he required to show his bank records, instead of hiding them from the Court? But even the blacked-out records and his Financial Declaration show that Evgeny is spending a lot of money on himself each month (including nearly $12,000 in May and nearly $8500 in June 2015, from the First Tech account no. ending in *300).

15    My parents and I do own an apartment in Estonia together. I estimate it is worth only around €1000 since that is what I paid for it before giving shares to my parents. Evgeny

GOLUBEVA REPLY DECL. - 4

does not mention that he is, I believe, a co-owner of an apartment in Moscow, a much more expensive location, that his parents live in.

**C.    Evgeny's Arguments About My Immigration Status Have Nothing to Do With the Question at Hand and Just to Make Me Look Bad.**

16.    I do not understand the point of Evgeny's talk about my past need to prove ability support myself as a student before I ever met him and his claim that I would have been forced to leave this country even had we not separated, as if he has any qualifications to describe immigration law to this Court.  The fact is that I did have the ability to support myself when I came on a student visa (see MasterCard debit account, above) and I was nearly able to continue supporting myself at a minimal level until just a few days ago, when I was barred from working.

17.    When I married Evgeny, I planned for a life together with him, which I believed would include our doing whatever was possible to ensure we could remain together in this country and that would allow me to work to help support our family.  It was my intent to make a life with him.  Those dreams were destroyed by his continuing abuse toward me, which he neither discusses nor denies in his statement.

18.    I want to state that, before I left Evgeny because of his abusive and violent behavior, I was not aware of any programs of the U.S. government for battered women.  I would've left him even if such programs did not exist.  What I've learned after I left my husband when I called domestic violence hot-lines was that many times, due to the complicated immigration situations, women become trapped with their abusive and/or violent husbands.  To avoid this type of the discrimination, various programs were designed to provide help and support for women in such situations.  Sometimes husbands are so abusive that it makes living

GOLUBEVA REPLY DECL. - 5

with them impossible. Even the verbal abuse I've been through could be enough to become a participant in one of such programs, I believe.

19.    As I said, immigration rules had nothing to do with my leaving Evgeny. I loved him and kept trying to live with him even after several domestic violence episodes and endless conflicts. If I had some kind of advance plan, I would've just gone to the police in October 2014, after he physically hurt me for the first time in our house in Redmond. Even after I left him, I asked him to go to the counseling and tried one more time to work on our relationships. Evgeny just laughed at me, and said his position was he would be better off finding himself another woman who would be perfect for me without any counseling.

20.    Even if I am forced to leave this country despite my situation, I would still need temporary maintenance from Evgeny as I do not have a job in Russia or any sufficient financial resources anywhere. It is very cynical of Evgeny, after his constant abuse of me, to try to portray me, his wife, as some kind of suspect alien so he can make me suffer financially, compared to his living situation, and to try to prevent me from pursuing my rights under U.S. law.

**D.    My Maintenance Request.**

21.    Evgeny's and my actual living together started at the end of April/beginning of May 2014, before our official marriage. We are still married, which in total is about 20 month, although we have not been living together since May 20 2015. I understand that our marriage was short and that is why I'm not asking for a long-term maintenance. I expect to need support only to pass the difficult times of unemployment before I receive a new work authorization. As Evgeny mentioned on his statement I'm a qualified specialist with global work experience.

GOLUBEVA REPLY DECL. - 6

22.    The difference between the financial statement I submitted to start the case and my current Financial Declaration is simply that, once I had more time to sit down and think about my expenses, I realized I had more of them.  So I am in even more financial need based on my current situation, not less, especially since I now have no income.

23.    The amount of maintenance I requested when I filed my Petition for Dissolution is out-of-day because I am no longer able to work.  This is why the number has increased from $1500 to $3000, nothing more than that.

**E.    Evgeny's Should be Required to Pay Temporary Maintenance.**

24.    I notice that Evgeny falsely states in his Financial Declaration that his highest year of education completed was "12."  That is false.  He has, as his LinkedIn profile, a true and correct copy of which is attached as **Exhibit I**, states, an M.S. in Computer Science from Moscow State Institute of Radio Engineer, Electronics and Automation.  Such degree takes longer than 12 years of schooling, I believe.  He has been able to stay employed in the IT industry in the U.S. since at least 2004.

25.    It is interesting that Evgeny voluntarily quit his job in early October 2015, just one week after I filed my Petition requesting maintenance temporary maintenance until I can work again.  He claims that Microsoft gave him no choice but to resign, but there is only his word for that and no confirming evidence.  The only written reference is to a paystub that states "voluntary separation" (emphasis added) and shows that he received a gross payout of $38,263. That is nearly $7000 more that I would make in an entire year working for Beyondsoft.

26.    Evgeny claims psychological stress prevents him from working at Microsoft or anywhere else, but, again, he expects just to be taken at his word.  He provides no medical proof that he is unable to work, not even a statement from the general practice doctor who

GOLUBEVA REPLY DECL. - 7

supposedly tried to get Ritalin from in order to increase his concentration at work. If those notes are accepted as any kind of evidence by the Court, which they should not be, they would indicate only that Evgeny refused recommended treatment for depression, which might have helped his situation.

27.    Evgeny admits he has "some savings to sustain me for a few months." He also has a 401(k), to which he continued to contribute a large amount to right up to the last paycheck, when he supposedly became unemployable. He says in his Financial Declaration, he has another $43,000 of stocks and bonds. He does not mention any plans to reduce his expenses, such as by not having a $400 per month phone service, $1025 per month of food expenses, $500 per month of home repairs, or any of the other daily spending he redacted from his bank records. Evgeny's Financial Declaration helps show the kind of lifestyle we had during the marriage and the lifestyle Evgeny still plans to have in the future. He does not mention making efforts to find work, but it does not look like he is worried about being able to do so since he has no plans to restrict his spending.

28.    I have to say surprised that Evgeny has no savings from working at well paying jobs at Microsoft and other companies for over 10 years. I believe it is possible he has sent money to his parents in Russia, for whom he also bought an apartment in Moscow.

F.    **CR-V (car).**

29.    By towing away the Honda CR-V I while I was at work, Evgeny forced me to buy other car on Craigslist. I tried to apply for the car loan at my bank, but due to no credit history my application was rejected. As I do not have any credit history and did not have enough money to get myself a good vehicle, I was only was able to buy the 1999 Mitsubishi Mirage.

GOLUBEVA REPLY DECL. - 8

30.    The Mirage was in the fair condition when I bought it, but because I was commuting every day from Edmonds to Bellevue and back, pretty soon the condition of car became bad.

31.    During the on September 22, 2015, protection order hearing, I was so tense I mistakenly stated that car is not on my name.  When I reached the vehicle after the hearing, I saw that it was in my name and tried to go back to court to correct my statement and also told Evgeny's lawyer about it.  But she was so busy, she could not come back to court to continue the hearing and I stated I would not take the CR-V at that time.

32.    After the hearing, however, the Mirage had serious mechanical problems.  The car started switching speed to neutral while driving and was not able to go uphill.  I took it to a mechanic on September 28, 2015, and was given a repair estimate of $1374.35, which I could not afford.  A true and correct copy of that estimate is attached as **Exhibit J**.  I needed a car to be able to drive to work and that is why I picked-up the CR-V with civil standby on September 30, 2015.

33.    Evgeny also thinks I don't need a car every day since I'm not working, by I'm living in the place where you cannot go anywhere without a car, even grocery shopping.  I'm asking to keep the car with me only until I am able to work again and can make other arrangements.  In the meantime, the car is insured, as can be seen from the payment to Geico on October 28, 2015, in the attached screen prints from my bank account, Exhibit G, and the true and correct attached copy of my insurance card, **Exhibit K**.

## G.    <u>Medical Insurance.</u>

34.    I am experiencing huge anxiety and stress because of my broken marriage, hurtfulness of the domestic violence and abuse, and an uncooperative husband's behavior. I've

GOLUBEVA REPLY DECL. - 9

lost approximately 15 pounds (having a weight of 121 pounds before, which indicated on my driver's license) since we got married. Unlike Evgeny, I do not even have medical insurance to go to the doctor and do the health checkup. Because he dropped me from it for the false reason of our "divorce or legal separation."

35.    I see that, since Evgeny voluntarily quit his job at Microsoft, he is eligible for COBRA coverage for himself. I request that the Court require that he include me on his coverage, whether through employment or COBRA at this time.

**H.    Attorneys' Fees.**

36.    After forcing me to obtain further help from my attorney to respond to all of the false information and accusations in his declarations, Evgeny states I should receive an award of only $500 of temporary attorneys' fees. His actions and statements are only increasing my attorneys' fees. I request I receive an award of at least $1500, if not more based on the work that he has forced my attorney to perform in response to his actions.

SIGNED this 4th day of November 2015, at _Edmonds_____, Washington.


_____
Kseniia Golubeva


GOLUBEVA REPLY DECL. - 10



| | | First Tech Online Banki... × | |
| --- | --- | --- | --- |

storyParameters.aspx   C   Search

WAU

| 7/13/2015 | POS Transaction<br>FRED MEYER 023 BELLEVUE WAUS | -$12.19 | $2,318.04 |
| 7/13/2015 | POS Transaction<br>21626400005336 STARBUCKS #03332 REDMONRedmond<br>WAUS | -$6.08 | $2,311.98 |
| 7/14/2015 | Check<br>#1101 | -$10.00 | $2,301.96 |
| 7/15/2015 | Deposit | $3,000.00 | $5,301.96 |
| 7/15/2015 | POS Transaction<br>USPS 5406030193/15731 NBELLEVUE WAUS | -$26.50 | $5,275.46 |
| 7/16/2015 | Electronic Check<br>SEATTLE CHURCH O (PUCHASE) Accounts Receivable<br>Entry SERIAL #: 1103 #1103 | -$20.00 | $5,255.46 |
| 7/17/2015 | ACH Deposit<br>BB499 BEYONDSOFT 201660311 – DIR DEP | $1,143.85 | $6,399.31 |
| 7/17/2015 | POS Transaction<br>FRED MEYER 023 BELLEVUE WAUS | -$9.45 | $6,389.86 |
| 7/17/2015 | POS Transaction<br>SHELL Service Station SHELL BELLEVUE WA | -$29.89 | $6,359.97 |
| 7/18/2015 | POS Transaction<br>22704011099 SEATTLE 684-PARK SEATTLE WAUS | -$1.00 | $6,358.97 |
| 7/19/2015 | POS Transaction<br>70 BARTELL DRUGS 3625 148TH ST. SW LYNNWOOD<br>WAUS | -$6.88 | $6,352.09 |
| 7/19/2015 | Credit<br>NORDSTROM 015 19500 ALDLYNNWOOD WAUS | $197.83 | $6,549.97 |
| 7/19/2015 | POS Transaction<br>NORDSTROM 015 19500 ALDLYNNWOOD WAUS | -$284.83 | $6,265.14 |
| 7/19/2015 | POS Transaction | -$13.74 | $6,251.40 |

**EXHIBIT G-1**



| Date | Transaction | | Amount | Balance |
|---|---|---|---|---|
| 9/20/2015 | POS Transaction<br>SHELL Service Station SHELL BELLEVUE WA | | -$23.83 | $8,276.90 |
| 9/20/2015 | POS Transaction<br>IKEA – USA RENTON WAUS | | -$54.13 | $8,222.77 |
| 9/20/2015 | POS Transaction<br>536385460052814 THE FRENCH BAKERY<br>CROSSBELLEVUE WAUS | | -$4.00 | $8,218.77 |
| 9/21/2015 | ACH Deposit<br>Postmates - TRANSFER Postmates Couri | | $56.80 | $8,275.57 |
| 9/21/2015 | POS Transaction<br>FRED MEYER FRED MEYER 0BELLEVUE WAUS | | -$36.63 | $8,238.94 |
| 9/21/2015 | Check<br>#1105 | | -$450.00 | $7,788.94 |
| 9/21/2015 | POS Transaction<br>977200035888 JUST US CAFE SEATTLE WAUS | | -$1.55 | $7,787.39 |
| 9/21/2015 | POS Transaction<br>7637977125MDZ1 MCDONALDS M7125 OF WA BELLEVUE<br>WAUS | | -$5.03 | $7,782.36 |
| 9/22/2015 | POS Transaction<br>362342000886 MACDONALD, HOAGUE BA 206-694-1658<br>WAUS | | -$1,069.97 | $6,712.39 |
| 9/22/2015 | POS Transaction<br>650000006100518 POPPINJAYS BELLEVUE<br>COLBELLEVUE WAUS | | -$7.66 | $6,704.73 |
| 9/23/2015 | POS Transaction<br>345020600887 GOOD2GO REPLENISHMENT 866-936-8246<br>WAUS | | -$30.00 | $6,674.73 |
| 9/23/2015 | POS Transaction<br>356213774884 SEATTLE PARKING FEE SEATTLE WAUS | | -$3.00 | $6,671.73 |
| 9/23/2015 | Check | | -$85.00 | $6,586.73 |

**EXHIBIT G-2**



| | | | |
|---|---|---|---|
| | WAUS | | |
| 10/15/2015 | POS Transaction<br>SAFEWAY FUEL 049 1645 140TH NE BELLEVUE WAUS | -$30.69 | $6,314.75 |
| 10/15/2015 | POS Transaction<br>5389400005336 SQ *PAPAZZI PIZZERIA Bellevue WAUS | -$7.15 | $6,307.60 |
| 10/15/2015 | POS Transaction<br>34528163488 KHOOBSURAT BOUTIQUE BOTHELL WAUS | -$104.43 | $6,203.17 |
| 10/16/2015 | POS Transaction<br>FRED MEYER 023 BELLEVUE WAUS | -$37.99 | $6,165.18 |
| 10/16/2015 | Check<br>#1111 | -$85.00 | $6,080.18 |
| 10/18/2015 | POS Transaction<br>IKEA - USA RENTON WAUS | -$14.55 | $6,065.63 |
| 10/19/2015 | POS Transaction<br>178027716996 IKEA SEATTLE RENTON WAUS | -$8.74 | $6,056.89 |
| 10/19/2015 | POS Transaction<br>2700000490055 1645 140TH NE BELLEVUE WAUS | -$25.07 | $6,031.82 |
| 10/19/2015 | POS Transaction<br>7637977125MDZ1 MCDONALDS M7125 OF WA BELLEVUE<br>WAUS | -$7.65 | $6,024.17 |
| 10/20/2015 | POS Transaction<br>8788430043599 SUSHI ME BELLEVUE WAUS | -$14.00 | $6,010.17 |
| 10/20/2015 | Check<br>#1109 | -$450.00 | $5,560.17 |
| 10/22/2015 | ACH Deposit<br>B8499 BEYONDSOFT 201880311 - DIR DEP | $1,143.85 | $6,704.02 |
| 10/26/2015 | Withdrawal<br>Golubeva Pmt from 9324608653 CK | -$136.13 | $6,567.89 |
| 10/28/2015 | POS Transaction<br>239892000238521 GEICO *AUTO 800-841-3000 DCUS | -$205.01 | $6,362.88 |

**EXHIBIT G-3**

Beyondsoft Consulting, Inc.
14711 NE 29th Place, Suite 110
Bellevue, WA 98007
P: +1.425.242.5419
F: +1.425.298.4056


**BEYONDSOFT**
beyond your expectations

## Employment Exit Checklist

Employee Name: ___Kseniia GOLUBEVA___    Phone: ___(425) 273 8352___

Date: ___10-27-2015___    Home Email: ___golubevaks@gmail.com___

*(PLEASE PUT EMPLOYEE / INTERVIEWER INITIAL FOR EACH ITEM)*

*K.G.* ___Exit date: Last date of employment is specified as Date ___10-27-2015___.

*K.G.* ___Return of company property: Keys, ID badges, computers, monitors, cell phones, books and materials, and any other company-owned items.

*K.G.* ___Passwords: Provide HR with passwords and other information pertaining to accessing computer files and telephone messages.

*K.G.* ___Benefits status: Insurances terminate at the end of the month.  COBRA notice will be sent.

*K.G.* ___Vacation pay: Unused, accrued vacation balance is ___34.15___ hours.  as of 10-27-2015

*K.G.* ___Payment of money owed the employee: Any unpaid expenses for company business purposes (turned in on an expense report), unpaid salary, commission and bonuses will be paid: ___w/ last pay check___.

*N/A* ___Repayment of advances: Any unpaid payroll advances will be subtracted from the employee's final check.

*K.G.* ___Review of confidentiality agreement or non-compete agreement: Terms in Employment Agreement has been mutually understood.

*K.G.* ___Permission for reference checking: Giving the company permission to provide reference information when potential employers call.

*K.G.* ___Please email to payroll-us@beyondsoft.com    for home address update to make sure W2 delivered without trouble.

**EXHIBIT H-1**



## Fixed Asset Sign-Out/Check in Sheet

☑ Laptop

☐ Desktop

☑ Monitor

☐ Other – Please Specify: _mouse, keyboard_

| Sign-out User Information | |
|---|---|
| Employee Name | Kseniia Galuleva |
| Email Address | Ksenia.goraseva@ golubewks@gmail.com |
| Contact Number | 925 275 8552 |
| Project Name | |
| Account Manager | |
| User Account | |
| **Asset Information** | |
| Asset Model Name | DELL |
| Fixed Asset Number | 102 1311 |
| Serial Number | |
| Cost Center/WBS | |
| Condition Upon Sign-Out | |
| **Check-in Information** | |
| Computer Admin Name | |
| Password Upon Return | |
| Microsoft lab asset | |

Sign-out Signature (Employee):_____  Date:_____

Check-in Signature (Employee):_____  Date: 10/27/2015

(By signing this document I accept full responsibility to pay for any repair costs not attributed to normal use)

## EXHIBIT H-2

☰ ∨   Search for people, jobs, companies, and more...     🔍   Advanced

Home    Profile    Connections    Jobs    Interests      Business Services

Continue To Grow As A CEO - Join the world's leading peer advisory membership organization. Learn more. | Read More »

# Eugene Pistrak

Software Development

Greater Seattle Area   Computer Software

| | |
|---|---|
| Previous | Global Consulting Group Inc., Microsoft, Siemens |
| Education | Moscow State Institute of Radio Engineering, Electronics and Automation (Technical University) |

| Connect | |
|---|---|

**73**
connections

https://www.linkedin.com/pub/eugene-pistrak/17/930-090

Background

##  Summary

Goal-oriented professional, with over ten years of experience creating quality software individually and in teams with a wide range of knowledge and expertise. A technology enthusiast, early adopter, passionate about product quality and innovative in solving problems. Software engineering for the Windows platform (C++/C#). Front-end, middleware and server tiers (Win32API, .NET, Web). Solid understanding of software (OOP) and database (SQL) design principles. Strong debugging and problem analysis skills. Understanding of multithreading and multiprocessor development techniques. Excellent communication skills. (SCRUM/Agile).

##  Experience

**SDE**
Global Consulting Group Inc.
2004 – 2010 (6 years)

**SDE4**
Microsoft
2008 – 2009 (1 year)

**SDE3**
Siemens
2008 – 2009 (1 year)





**SIEMENS**

**Software Engineer**
Global Consulting Group
2004 – 2009 (5 years)

**SDE3**
Microsoft
2006 – 2007 (1 year)



**Senior Software Developer**
Dell
2003 – 2004 (1 year)

 

##  Education



**People Also Viewed**

**Alex Fedin**
.NET Architect at Visa

**kseniya golubeva**
independent contractor

**kseniya golubeva**
—

**Kelly Huss**
Senior Software Engineer at Motorola Solutions

**Catherine Cleary**
Software Engineer at Raytheon Intelligence, Information and Services

**Matthew Beine**
Software Developer at Epic

**Emily Schaeffer**
Senior Software Engineer

**Elizabeth Amundsen**
Software Design Engineer at Cummins Allison

**Megan Reid**
Senior Software Engineer at Stenograph

**John Sallivan**
Web Developer presso Twitter

**In Common with Eugene**

⬭ Eugene

# EXHIBIT I-1

https://www.linkedin.com/profile/view?id=ADEAAAQF0swBH9ckUJv2X7hfPllSlCrifSrFNk&authType=NAME_SEARCH&authToken=Wxvl&locale=en_US    1/2

**Moscow State Institute of Radio Engineering, Electronics and Automation (Technical University)**
MS, Computer Science
1997 – 2003





---

Recommendations

Given (1)

**Alex Fedin**
Associate Architect

❝ Alex is a highly skilled professional. His work is always respected by his peers and superiors. Alex moves projects forward, generates ideas and inspires team members with vision and passion for quality product.

February 14, 2013, Eugene worked directly with Alex at Wachovia Securities

**People Similar to Eugene**



Junfeng Zhou
Senior SDE Lead at Microsoft
Connect

---

Following

## Schools



**Moscow State Institu...**
Russian Federation
Follow

**Ads You May Be Interested In**



**Run a Law Firm?**
Potential legal clients need attorneys. Setup legal category and location.



**CEOs Talking With CEOs**
Have conversations that make a difference to your business. Join Vistage.

**The Top Trial Lawyers**
Million Dollar Advocates Forum. Are you qualified for membership?

---

Help Center | About | Careers | Advertising | Talent Solutions | Sales Solutions | Small Business | Mobile | Language | **Upgrade Your Account**

LinkedIn Corporation © 2015 | User Agreement | Privacy Policy | Ad Choices | Community Guidelines | Cookie Policy | Copyright Policy | Send Feedback

**EXHIBIT I-2**

Page 1 of 2

# EXHIBIT J-1

**ALIGNMENTS PLUS**

13710 NE SPRING BLVD.

Bellevue, WA 98005
Shop Phone: (425) 746-7852
Fax: (425) 603-1655
Email: Info@AlignmentsPlus.net
Web Address: www.AlignmentsPlus.net

**Estimate**

| 10875 |
|---|

Estimate Ref #10,875
Date Printed: 09/28/2015
Printed Time: 11:37 am

Hat/Ref:                    ASE CERTIFIED TECHNICIAN'S - YOUR SERVICE ALTERNATIVE TO THE DEALER!          Time Promised:

**KSENLLA**                                 1999 MITSUBISHI  MIRAGE  L4 1.5L 1468CC 90CID FI GAS N 4G15
VIN:
License: AVN3756          Mileage In: 0          Date Written:    09/28/2015
Home:        Work:          Unit #:          Mileage Out: 0          Written By: Nick Egee
Cell: (425) 273-8352                      DOM:          Save Old Parts: No

| Job Name | Description | Technician | Qty | List | Extended |
|---|---|---|---|---|---|
| **SPEED SENSOR** | **REPLACE SPEED SENSOR** | | | | |
| Labor  3.0 | Work Requested - REPLACE SPEED SENSOR | | 2.00 | 75.00 | 150.00 |
| Part | SPEED SENSOR | | 1.00 | 165.00 | 165.00 |
| | | | | | |
| **AIR FILTER** | **INSTALL NEW AIR FILTER** | | | | |
| Labor  3.0 | Work Requested - AIR FILTER | | 0.10 | 75.00 | 7.50 |
| Work Performed - INSTALL NEW AIR FILTER | | | | | |
| Part   PBA4878 | AIR FILTER | | 1.00 | 22.95 | 22.95 |
| | | | | | |
| **BRAKE FLUID FLUSH DOT 3** | **Bleed And Flush Brake System** | | | | |
| Labor  3.0 | Work Requested - BRAKE FLUID FLUSH | | 1.50 | 75.00 | 112.50 |
| Work Performed - BLEED AND FLUSH BRAKE SYSTEM | | | | | |
| Part   BRK 1 | BRAKE FLUID DOT 3 | | 2.00 | 8.95 | 17.90 |
| | | | | | |
| **LOF** | **Change engine oil and filter, check all fluid...** | | | | |
| Labor  3.0 | Work Requested - LUBE, OIL, FILTER | | 1.00 | 30.00 | 30.00 |
| Work Performed - Change engine oil and filter, check all fluid levels , all belts & hoses complete lubrication of all chassis lube points - 5 QUARTS | | | | | |
| | | | | | |
| **REAR BRAKES** | **CLEAN AND ADJUST REAR BRAKES** | | | | |
| Labor  3.0 | Work Requested - CLEAN AND ADJUST REAR BRAKES | | 1.00 | 75.00 | 75.00 |
| | | | | | |
| **SPARK** | **SPARK PLUGS** | | | | |
| Labor  3.0 | Work Requested - SPARK PLUGS | | 0.50 | 75.00 | 37.50 |
| Work Performed - REPLACE | | | | | |
| Part   F-1111 | SPARK PLUGS | | 4.00 | 6.95 | 27.80 |
| | | | | | |
| **TRANSMISSION FLUSH** | **TRANSMISSION FLUSH** | | | | |
| Labor  3.0 | Work Requested - FLUSH TRANSMISSION | | 1.00 | 75.00 | 75.00 |
| Part   ATF | TRANSMISSION FLUID | | 15.00 | 5.51 | 82.65 |
| | | | | | |
| **WATER PUMP** | **WATER PUMP** | | | | |
| Labor  3.0 | Work Requested - WATER PUMP | | 3.50 | 75.00 | 262.50 |
| Work Performed - REPLACE PUMP, AND TIMING BELT | | | | | |
| Part   COOLANT | Coolant | | 1.00 | 28.95 | 28.95 |
| Part   F-CP9050 | WATER PUMP | | 1.00 | 64.95 | 64.95 |

Page 155

Page 2 of 2

**EXHIBIT J-2**

**ALIGNMENTS PLUS**

13710 NE SPRING BLVD.

Bellevue, WA 98005

Shop Phone: (425) 746-7852

Fax: (425) 603-1655

Email: Info@AlignmentsPlus.net

Web Address: www.AlignmentsPlus.net

Estimate

| | |
|---|---|
| | 10875 |

Estimate Ref #10,875

Date Printed: 09/28/2015

Printed Time: 11:37 am

Hat/Ref:      ASE CERTIFIED TECHNICIAN'S - YOUR SERVICE ALTERNATIVE TO THE DEALER!        Time Promised:

**KSENLLA**                    1999 MITSUBISHI  MIRAGE  L4 1.5L 1468CC 90CID FI GAS N 4G15

VIN:

License: AVN3756            Mileage In: 0            Date Written:    09/28/2015

Home:          Work:        Unit #:                Mileage Out: 0          Written By: Nick Egee

Cell: (425) 273-8352                              DOM:                    Save Old Parts: No

| Part | F-TB545 | TIMING BELT | 1.00 | 48.95 | 48.95 |
|------|---------|-------------|------|-------|-------|

| Payment Date | Type | Method | Amount |
|--------------|------|--------|--------|
| | | **Payment Totals:** | |

| | |
|---|---|
| Parts: | $459.15 |
| Labor: | $750.00 |
| Sublet: | $0.00 |
| Misc: | $0.00 |
| Hazmat: * | $44.54 |
| Supplies: * | $5.79 |

| | |
|---|---|
| Tax Total: | $114.87 |
| **Estimate Total:** | **$1,374.35** |

Thank you for your business!

I hereby authorize the above repair work to be done along with the necessary material and hereby grant you and/or your employees permission to operate the car or truck herein described on streets, highways or elsewhere for the purpose of testing and/or inspection. An express mechanic's lien is hereby acknowledged on above car or truck to secure the amount of repairs thereto.

Authorized By _____      Page 156      Date _____      Time _____

**GEICO.**
geico.com
Washington Insurance ID Card
1-800-841-3000

GEICO SECURE INSURANCE COMPANY
PO BOX 509090    SAN DIEGO, CA 92150-9090

| Policy Number | Effective Date | Expiration Date |
|---|---|---|
| 4400356103 | 10-02-15 | 12-28-15 |

| Year | Make | Model | Vehicle ID No. |
|---|---|---|---|
| 2011 | HONDA | CR-V EX | JHLRE4H72BC009935 |

Insured:

KSENIIA GOLUBEVA

## Important Information

Here are your Policy Identification Cards. Please destroy your old cards when the new cards become effective. If your policy is canceled for any reason whatsoever your ID card becomes invalid. You must notify us within 15 days if you add or change a car and new cards will be sent to you.

Due to space limitations on the ID card, only the Named Insured, and the Co-Insured are listed. For a full list of drivers covered under this policy, please reference the Drivers section of your Declarations Page, which is included with your insurance packet.

Please notify us promptly of any change in your address to be sure you receive all important policy documents. Prompt notification will enable us to service you better.

Your policy is recorded under the name and policy number shown on the card. If you would like additional ID cards you can go online to geico.com or call us at 1-800-841-3000.

### What to do at the time of an accident.

- Do not admit fault.
- Do not reveal the limits of your liability coverage to anyone.
- Exchange contact information; get year, make, model, plate number, insurance carrier and policy number of all involved. Also, identify witnesses and collect contact information.
- Contact the police or 911 if applicable.
- Contact GEICO by calling **1-800-841-3000** or visit geico.com to report the accident.

U-4-WA (11-09)

# EXHIBIT K

FILED

15 NOV 04 AM 11:43

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 15-3-06019-1 SEA

1

2

3

4

5

6

7

**IN THE SUPERIOR COURT OF WASHINGTON**
**FOR KING COUNTY**

8    In re Marriage of:

9    KSENIIA GOLUBEVA,

10   and

11   EVGENY PISTRAK

NO. 15-3-06019-1SEA

SUPPLEMENTAL DECLARATION
OF CHARLES R. HORNER RE:
ATTORNEY'S FEES

12

13   I, CHARLES R. HORNER, declare the following matters to be true and correct under

14   penalty of perjury under the laws of the statement of Washington:

15         1.      As of this writing, at 10:56 a.m. on November 4, 2015, I have devoted a total of

16   17.54 hours to working on this dissolution case, primarily including, but not limited to,

17   assisting Kseniia in preparing her Supplemental Declaration, Financial Declaration and

18   financial documents, Reply Declaration, and my declarations regarding attorneys' fees for the

19   temporary orders hearing on November 6, 2015. A true and correct statement of my hours

20   worked on this dissolution action is attached as **Exhibit 1**. This time does not include work on

21   the separate protection order case, in which my client is also requesting an award of fees,

22   except as to the preparation of the financial documents, which was overlapping work. I do not

23   believe my time record in this case includes any wasteful or duplicative efforts.

24

25   SUPPL. HORNER DECL. RE: FEES - 1

**Law Office Charles R. Horner, PLLC**
1001 Fourth Avenue, Suite 3200
Seattle, Washington 98154
Tel.: 206-381-8454 Fax: 866-876-8280

2.      The equivalent value of my time on this case to date, at my discounted hourly rate of $150.00, presently stands at **$2631.00**, which I believe to be a reasonable attorney fee in relation to the time I have had to devote to his case to date the tasks involved and the issues at stake.

3.      I anticipate devoting approximately two additional hours in preparing for and attending the temporary orders hearing, not including waiting time in the courtroom.

SIGNED this 4th day of November 2015, at Tacoma, Washington.

Charles R. Hon

Charles R. Horner

SUPPL. HORNER DECL. RE: FEES - 2          **Law Office Charles R. Horner, PLLC**
1001 Fourth Avenue, Suite 3200
Seattle, Washington 98154
Tel.: 206-381-8454  Fax: 866-876-8280

**Exhibit 1. Time expended on Marriage of Golubeva and Pistrak.**

| Date | Time (hours) | Task |
|---|---|---|
| 10/09/15 | 1.5 | Meeting with client and review of documents procedural status of case; filed working copies of temporary order motion papers |
| 10/12/15 | 1.16 | Drafted notice of appearance; telephone conference with Darren DeFrance; drafted agreed order continuing hearing; confirmed hearing |
| 10/13/15 | 0.2 | Presented order for continuance of temporary restraints on husband |
| 10/14/15 | 1.4 | Review of client's financial documents and draft financial declaration; assisted in editing and finalization of financial documents |
| 10/21/15 | 0.8 | Reviewed jurisdictional issues related to separate divorce proceeding husband is pursuing in Russia in client's absence there and advised client |
| 10/22/15 | 1.8 | Worked on client's draft supplemental declaration for temporary orders hearing |
| 10/23/15 | 3.55 | Worked on editing and finalization of client's supplemental declaration for temporary orders in consultation with her; prepared fee affidavit; research re: maintenance in context of immigrant spouse; prepared documents for filing and service |
| 10/30/15 | 0.6 | Reviewed and analyzed Response to Petition; email to opposing counsel re: husband's jurisdictional denial, which he then amended |
| 11/02/15 | 0.93 | Reviewed Evgeny's responsive temporary orders papers and emailed client re: same; telephone conference with client |
| 11/03/15 | 0.1 | Quick review of client's draft reply statement and email to her re: exhibits |
| 11/04/15 | 5.5 | Reviewed client's draft statement and additional evidentiary materials in detail; edited reply declaration from draft supplied by client; telephone conferences with client to clarify points; updated fee declaration |
| **TOTAL** | **17.54** | |

**EXHIBIT 1**

## FAMILY LAW CLERK'S MINUTES

SCOMIS CODE: MTHRG

Commissioner:  Bonnie Canada-Thurston
Coordinator:  Danielle Anderson
Court Clerk:  Victor A. Bigornia
Digital Record: ~~W275~~ W 276 *
    Start: `9:52:03/10:00:04/10:59:04
    Stop:  9:53:01/10:18:40/11:04:58

Dept. FAM 01
Date: 11/6/2015

---

## KING COUNTY CAUSE NO.: 15-3-06019-1 SEA

### In re the Marriage of: Kseniia Golubeva and Evgeny Pistrak

---

**Appearances:**

Petitioner appearing in person and by counsel, **Charles Horner**
Respondent appearing in person and by counsel, **Darren Defrance**

## MINUTE ENTRY

Petitioner's      Motion for Temporary Orders is heard:

☐ Adequate cause is granted., major modification.

☐ Petitioner motion for contempt is denied.

Orders are entered as follows:
☐ Mutual restraining orders
☐ Final Parenting Plan is ordered:
      ☐ Holidays         ☐ Vacations ☐ Transportation/Exchange
☐ Professional Supervised visitation:  father
☐ Temporary Order of Child Support
☐ Transfer payment of $    per month commencing    to be paid by  Respondent
☐ Daycare pro rata share
☒ Temporary Spousal Maintenance to petitioner of $2,000.00 commencing November 1, 2015.

**Rev:  10/24/12 Page 1 of 2**



FILED

'5 NOV -6 AM 11: 34

KING COUNTY
SUPERIOR COURT CLERK
SEATTLE, WA

FAM01

## SUPERIOR COURT OF WASHINGTON
## COUNTY OF KING

In re Marriage of:

KSENIIA GOLUBEVA,

and

EVGENY PISTRAK

**No.** 15-3-06019-1SEA

**Temporary Order
(TMO)**

[ ] **Clerk's Action Required, 3.2**
[ ] **Law Enforcement Notification, ¶
3.1 3.2**

### I. Money Judgment Summary

[ ]   Does not apply.
[X]   Judgment Summary is set forth below.

| | | |
|---|---|---|
| A. | Judgment creditor | Kseniia Golubeva |
| B. | Judgment debtor | Evgeny Pistrak |
| C. | Principal judgment amount | $ 0.00 |
| D. | Interest to date of judgment | $ 0.00 |
| E. | Attorney fees | $ 2500.00 |
| F. | Costs | $ |
| G. | Other recovery amount | $ |
| H. | Principal judgment shall bear interest at N/A % per annum | |
| I. | Attorney fees, costs and other recovery amounts shall bear interest at 12 % per annum | |
| J. | Attorney for judgment creditor | Charles R. Horner |
| K. | Attorney for judgment debtor | Darren DeFrance |
| L. | Other: | |

## II. Basis

A motion for a temporary order was presented to this court and the court finds reasonable cause to issue the order.

## III. Order

### It is Ordered:

**3.1   Restraining Order**

> There are no restraining orders in effect under this cause number and the court is not entering one now except the financial restraints specified below. *See* Case No. 15-2-21856-5SEA for any other restraints.

**3.2   Surrender of Weapons**

[X]   Does not apply: There is no surrender of weapon order in effect under this cause number and the court is not entering one now. *See* Case No. 15-2-21856-5SEA.

**3.3   Temporary Relief**

[X]   The respondent shall pay the other party $ *2000.00* per month maintenance.

Starting Date: *Nov. 1, 2015*
Day(s) of the month payment is due: *1st except for Nov.*
*2015, by 11/15/15.*

Payments shall be made to:

[X̶]   ~~directly to the other spouse or domestic partner by~~ *direct deposit to petitioner's First Tech checking account.*

[ ]   the clerk of this court as trustee for remittance to the other spouse or domestic partner (if there are no dependent children).

[X]   Other: *Petitioner's attorney, Charles R. Horner, in trust, due to no contact order in criminal case.*

[X]   The [X] petitioner [X] respondent is restrained and enjoined from transferring, removing, encumbering, concealing or in any way disposing of any property except in the usual course of business or for the necessities of life and requiring each party to notify the other of any extraordinary expenditures made after the order is issued.

[X]    The [ ] petitioner [ ] respondent is restrained and enjoined from assigning, transferring, borrowing, lapsing, surrendering or changing entitlement of any insurance policies of either or both parties whether medical, health, life or auto insurance.

[X]    Each party shall be immediately responsible for their own future debts whether incurred by credit card or loan, security interest or mortgage.

[X]    Use of property shall be as follows: Respondent shall have use of 2011 Honda CR-V. *Petitioner*

[X]    The [ ] petitioner [X] respondent shall pay temporary attorney fees, other professional fees and costs in the amount of $ *2500.00* to: Charles R. Horner in trust for Kseniia Golubeva.

[X]    Other: Ksennia Golubeva shall maintain insurance on 2011 Honda CR-V.

## 3.4    Bond or Security

[X]    Does not apply.

## 3.5    Other

*Respondent shall enroll wife on health insurance available to him through current (or) former employment including COBRA benefits, for November and December 2015.*

Dated: *November 6, 2015*

*Judge/Commissioner*
BONNIE CANADA-THURSTON

*Wife shall be responsible for own health insurance starting Jan. 1, 2016.*

Temp Order (TMO) - Page 3 of 4
WPF DR 04.0250 Mandatory (06/2014) - RCW 26.09.060; .110; .120; .194, .300(2)

Petitioner or petitioner's attorney:
A signature below is actual notice of this order.
order.
[X] Presented by:
[ ] Approved for Entry:
[ ] Notice for presentation waived:

LAW OFFICE OF CHARLES R. HORNER,
PLLC

By: _Charles R. Hon_

Charles R. Horner, WSBA No. 27504
Attorney for Petitioner

Respondent or respondent's attorney:
A signature below is actual notice of this
order.
[ ] Presented by:
[X] Approved for Entry:
[ ] Notice for presentation waived:

GOLDBERG JONES, PLLC

By: _____

Darren DeFrance, WSBA No. 39371
Attorney for Respondent

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

---

In re the marriage of:          )
                                )
KSENIIA GOLUBEVA,               )
                                )
                                )
          Petitioner,           )   King County Cause No.
     vs.                        )   15-3-06019-1 SEA
                                )
                                )   COA No. 76373-3-I
EVGENY PISTRAK,                 )
                                )
          Respondent.           )

---

VERBATIM REPORT OF RECORDED PROCEEDINGS
BEFORE COMMISSIONER BONNIE CANADA-THURSTON
November 6, 2015

---

APPEARANCES:

For the Petitioner:

    CHARLES HORNER
    1001 Fourth Avenue, Suite 3200
    Seattle, Washington 98154-1003


For the Respondent:

    DARREN DEFRANCE
    2918 Colby Avenue, Suite 201
    Everett, Washington 98201-4077

REBECCA E. DONLEY, CCR 3184
Casey & Donley, Inc.
1053 Northeast Rindal Court
Poulsbo, Washington 98370
(509) 539-6153
E-mail: Rdonley@caseydonley.com

```
 1                  (Recorded proceeding commences.)

 2      THE CLERK:  For the record, 15-3-060191-0, Seattle.

 3      THE COURT:  You have five minutes per side.  I've read

 4  everything submitted.  Please begin.

 5      MR. HORNER:  Well, Your Honor, this is a request for

 6  temporary orders and the primary focus is --

 7      THE COURT:  Who are you?

 8      MR. HORNER:  Oh, sorry.  I'm Charles Horner for the

 9  petitioner, Kseniia Golubeva.

10      THE COURT:  Go ahead.  I'm just letting you say who you

11  are on the record.  Go ahead.

12      MR. HORNER:  Okay.  So, obviously the major issue here

13  is maintenance.  You see what the request is.  It's $3,000

14  per month for a decidedly temporary period.  She is seeking

15  to adjust her status.  She does not have the right to work

16  right now in the United States, so by definition she is

17  without income --

18      THE COURT:  Excuse me, Judge Eby is available.  I will

19  come back.  Please have a seat.

20      MR. HORNER:  Thank you.

21      THE COURT:  Forgive the interruption.

22                  (Pause in proceedings.)

23      THE CLERK:  Your Honor, again for the record,

24  15-3-06019-1, Seattle, No. 21.

25      THE COURT:  And you'll be starting over.  I apologize
```

Casey & Donley, Inc.   509.539.6153   rdonley@caseydonley.com

1    for the interruption.  Thank you.

2        MR. HORNER:  Yes.  Again, I'm Charles Horner for the

3    petitioner, Kseniia Golubeva.  As stated before, she's

4    requesting $3,000 per month of course for what is decidedly

5    a temporary period.  She has literally no ability to work

6    in this country.  So, I mean, there's not even a question

7    of imputing anything to her at this time.  And her request

8    is modest.  I mean, she layed out her financial declaration

9    and modest financial needs.  She's living in a room in a

10   house and can't afford even her own place to live.  She's

11   requesting only $3,000 a month, which is less than half of

12   what Mr. Pistrak states he's spending on routine expenses

13   every month and apparently has no plan to change.

14       The Court is, of course, aware of the factors for

15   maintenance.  I'm not going to belabor those.  Whatever is

16   just and proper for an appropriate period of time for an

17   appropriate amount.  I'm sure the Court can look at the

18   factors under .090 for temporary maintenance, although I

19   think it might be even more liberal in this case because

20   we're just talking about a temporary situation.

21       The point remains, of course, to avoid a spouse from

22   being dropped into immediate poverty and to at least

23   somewhat equalize the living conditions of the two spouses.

24   And that's not what she's even asking for.  She's not

25   asking to equalize the expenses.  She's asking to survive.

1    In terms of, you know, his -- he certainly has the
2    potential to earn income.  He has shown that he has income.
3    He has over $77,500 in assets just sitting there in his
4    hand right now by my calculation, but during the projected
5    period of temporary maintenance for the next six months or
6    so, you know, that would leave money left over even if he
7    did pay his own expenses and pay her temporary maintenance
8    of $3,000 a month.
9    There's no evidence before the Court that he can't work
10   and, you know, I think every presumption has to be given
11   that he can.  He hasn't presented any admissible evidence
12   of a medical disability to work, because a hearsay
13   statement from a doctor shouldn't be considered.  Clearly,
14   it's not evidence.  And there's no evidence from any other
15   source, from his employer that he was basically -- had to
16   quit in lieu of being fired or anything like that.  The pay
17   stub -- last pay stub says he voluntarily quit.  He has the
18   education, he has the money, he has the resources.  He can
19   pay.  She doesn't.  She doesn't have a job.  She needs
20   income.
21   Now, there's a lot of -- I think there's a lot of talk
22   in his papers where he's essentially attempting to try to
23   somehow leverage some concept of fault to say she shouldn't
24   get anything or to say:  Well, this, in a sense, wasn't a
25   real marriage, you know, so I shouldn't have to pay

Casey & Donley, Inc.  509.539.6153  rdonley@caseydonley.com

4

1   anything.  That's certainly not the standard.  The fact is,

2   there was a marriage, and there's ample evidence that the

3   condition in which she finds herself now is the reason why

4   she needs temporary maintenance at this time.

5      It's kind of unseemly and not very nice that he is

6   essentially treating her as if she's almost an interloper

7   or, you know, some kind of an illegal alien that was albeit

8   his wife that he married orderly for an indefinite period

9   of time in a, you know, seemingly romantic situation.

10      For him to say that:  Well, you know, she -- despite our

11  marriage and despite our commitment to each other, you

12  know, once her time was up on the visa, she would have to

13  ship out and -- she would have to ship out and fly back to

14  Russia, and too bad.  For one thing, he's not an

15  immigration lawyer.  There's no evidence before the Court

16  of what would have happened.

17      The fact is, there apparently was lots of friction

18  between the parties.  I didn't give the Court the

19  declaration from the domestic violence case because I

20  thought it would exceed the page limit, but I think, point

21  made, there was -- you know, there are serious allegations

22  of domestic --

23      THE COURT:  I looked it up.

24      MR. HORNER:  Okay, serious allegations of domestic

25  violence.  This is not a happy marriage.  So, you know,

1    naturally -- was he going to apply for her to have a visa

2    to stay here while she petitioned to come in as a spouse or

3    stay here as a spouse?  Well, naturally not.  And this is

4    the situation she finds herself.  And there's just -- the

5    Court should just reject those arguments about her status.

6    I mean, it's simple enough just to go back to the law of

7    maintenance on this.  All -- you know, most of the factors

8    are present --

9       THE COURT:  Do you want to save the rest of your time?

10       MR. HORNER:  Yeah, sure.  I just want -- well, I want to

11    mention attorneys' fees.  Those are requested in the amount

12    of -- temporary attorneys' fees in the amount stated in my

13    supplemental declaration --

14       THE COURT:  For what amount?

15       MR. HORNER:  I'm sorry?

16       THE COURT:  What is your amount?  And did you submit an

17    attorney fee declaration --

18       MR. HORNER:  I did.

19       THE COURT:  -- in support?

20       MR. HORNER:  I did.  I submitted a supplemental

21    declaration at the end, and it state $2631 plus two more

22    hours for today.

23       THE COURT:  All right, thank you.

24       MR. HORNER:  At $150 an hour.

25       THE COURT:  Thank you.

1     MR. HORNER:  There's a car and there's some property.

2     We'll get to that, I guess.

3     THE COURT:  Counsel, you are?

4     MR. DEFRANCE:  Good morning, Your Honor.  Darren

5     DeFrance on behalf of the respondent, who goes by Eugene

6     Pistrak, and he is standing to my left.

7     THE COURT:  I've read everything submitted by everyone.

8     I didn't go into the file to read all of the DV.  I just

9     looked up the reissuance order since it was referenced.

10     MR. DEFRANCE:  Okay, thank you, Your Honor.

11     THE COURT:  And it was an agreed order reissued to

12     December the 8th, and it says on the face that it was

13     signed by me, that it was agreed because there are criminal

14     issues pending.

15     MR. DEFRANCE:  Correct, Your Honor.

16     THE COURT:  No assumption was made from it.  I want to

17     make sure that's clear.  Go on.

18     MR. DEFRANCE:  Thank you.  And, Your Honor, as Counsel

19     indicated, he didn't go into the maintenance factors, but

20     one of those maintenance factors, and perhaps the

21     controlling maintenance factor, is the length of the

22     marriage.

23     THE COURT:  Exactly.  But could you be specific?  Is it

24     a full year or less than a year?

25     MR. DEFRANCE:  Your Honor, my calculation is as of

1    today, it's just over 13 months.

2         THE COURT:  Okay.  Go on.

3         MR. DEFRANCE:  So we have approximately a 13-month

4    marriage --

5         THE COURT:  Okay.  And which would be the order from the

6    attorney?

7         THE CLERK:  (Inaudible).

8         MR. DEFRANCE:  And at this time, Your honor, Mr. Pistrak

9    is not working.  He currently has no income.  He does have

10   considerable savings, we'll concede this.  Your Honor,

11   however, most of those savings, especially the stock,

12   primarily the stock, is all stock that was earned

13   pre-marriage from Microsoft, as Microsoft shares.  So

14   essentially --

15        MR. HORNER:  I don't know if that's -- objection, I

16   don't --

17        THE COURT:  Counsel.

18        MR. HORNER:  -- know if that was in the --

19        THE COURT:  Counsel.

20        MR. HORNER:  -- argument.

21        THE COURT:  Mr. Horner, please don't interrupt him.  And

22   the reason that I had asked -- I said "thank you" is

23   because you were just asking for maintenance.  Just because

24   you're given five minutes doesn't mean, when I said I read

25   everything, you had to take it all.  But the thing is this:

1   The reason that you don't have to object is because I know
2   the law.  And in a dissolution, all assets from all sources
3   are before the Court.
4       MR. DEFRANCE:  And, Your Honor, so essentially I think
5   what he's asking for is a premarital distribution of Mr.
6   Pistrak's savings.  He received a large separation payment
7   of about $25,000 from Microsoft last month.  Again, that
8   was based primarily on the work he conducted --
9       THE COURT:  May I ask the question that I want you to
10  answer, in all fairness?
11      MR. DEFRANCE:  Sure.
12      THE COURT:  And I'll pose it because I'm laying it out
13  for a judge above, because all party litigants have a right
14  to revision.  When you are dealing with maintenance and
15  when you're dealing with a short-term marriage and when
16  you're dealing with parties who may or may not work in the
17  United States, it becomes the responsibility of the spouse,
18  no matter how short the marriage is, to carry the
19  responsibility of providing for the spouse rather than the
20  citizens of the state of Washington.  So that's what I'll
21  be looking at in the interim when I order maintenance.
22      So I'm letting you and the judge above know, if I were
23  you, I'd look at the financial declaration that's been
24  submitted and address whether or not the $3,000 that I'm
25  being asked to order is reasonable in light of the standard

1    of living that is asserted came into being in this short

2    period of time, or is necessary.

3    MR. DEFRANCE:  Okay.  Thank you, Your Honor, for the

4    guidance there.  And I think the point you're leading to

5    here is that the petitioner has very little expenses.  Her

6    primary expense is rent, which is $450 a month.  Her second

7    largest expense is car insurance, which is $250 a month.

8    It's fairly high, likely due to infractions or something.

9    But besides that, she has no debt.  She has no auto loans,

10    she has no student loans, she has no mortgage, she has no

11    credit cards.  Her expenses are extremely, extremely low at

12    this point.

13    And again, apparently she's not working, so there's no

14    need for transportation expenses or anything like that.  So

15    her need to receive is very, very low, Your Honor, at this

16    point.  Counsel is asking for maintenance also as far as

17    duration for an unknown period of time.  In Court, it's one

18    thing.  In the declaration it's two other things, either

19    until trial or until she's able to work again in the United

20    States, which is -- again, we're just speculating that it's

21    approximately nine months from today.

22    Trial in this case is set in August, so we're looking at

23    a possible 10-month maintenance order for a 13-month

24    marriage from a spouse that currently doesn't have any

25    income, Your Honor.  That doesn't seem just or accurate

1    under the statute.

2      THE COURT:  What is your response to the request that

3    between the spouses on the need and ability to pay, her

4    attorney is requesting attorney fees in the sum of about

5    $2,600 and it's based on need and ability to pay?  You have

6    my attention.  In conclusion.

7      MR. DEFRANCE:  Okay.  In conclusion, Your Honor, I

8    believe in his declaration he asked for at least $1500.  I

9    understand it probably adds up to $2,600.

10     THE COURT:  Oh, okay.  See, I didn't see the attorney

11   fee declaration that was submitted as supplemental, because

12   in my humble opinion, under the law, it was supposed to be

13   submitted with the motion.

14     MR. DEFRANCE:  Okay, fair enough, Your Honor.  I think

15   he had some supplemental fees he included in there.

16     THE COURT:  Right, but I want you to have an opportunity

17   to address it, because it's being requested on need and

18   ability to pay.

19     MR. DEFRANCE:  Certainly, Your Honor.  And again, Mr.

20   Pistrak's ability to pay is basically nil at this point.

21   He's not working --

22     THE COURT:  He has assets that are all before the Court.

23   You know, I can't ignore that and the judge above can't

24   either.

25     MR. DEFRANCE:  I understand, Your Honor, but most of

1  those assets are basically earned prior to the date of

2  marriage.

3      THE COURT:  Yes.

4      MR. DEFRANCE:  I mean, it's savings and stock that he

5  accumulated while working at Microsoft.  And those savings

6  are needed -- he currently has four pending legal matters.

7  He's got a divorce in Russia, he has a divorce here, he has

8  a criminal charge here --

9      THE COURT:  From the same person --

10      MR. DEFRANCE:  Yes, Your Honor.

11      THE COURT:  In Russia?

12      MR. DEFRANCE:  Yes.

13      THE COURT:  Okay, go on.

14      MR. DEFRANCE:  He has a domestic violence protection

15  order he's defending against here, and he has a criminal

16  charge here.  I believe the return date on that for the

17  pretrial is December 1st.  He has a right to defend

18  himself.  He has a right to an attorney in the United

19  States.  Neither one of them are citizens.  However, he

20  does have a right to an attorney.  So all of those funds,

21  all of that savings, his only source of income right now is

22  needed to defend those actions.

23      His life has essentially been devastated by what's

24  happened in the last six months.  He has no job.  He has no

25  wife --

1      THE COURT:  Thank you.

2      MR. DEFRANCE:  Okay.  And, Your Honor, last item --

3      THE COURT:  Yes, sir.

4      MR. DEFRANCE:  -- the Honda CRV.  At this point in time,

5  the petitioner has two vehicles.  She has the Honda CRV,

6  which was purchased during the marriage by my client, and

7  she also has a Mitsubishi Mirage which she purchased after

8  the date of separation.  My client would ask the Court

9  order that she return the Honda CRV.  He would much rather

10  pay her some amount of money, $500 to $1000 to help with

11  any needed repairs, and he can have the CRV back.  That's

12  his request.

13      THE COURT:  Is that part of a motion because -- the

14  reason I ask you this, Counsel, is that I need you to think

15  about this.  If it's not part of a motion, I don't have

16  jurisdiction to rule on it.

17      MR. DEFRANCE:  Yeah.  Your Honor, I believe --

18      THE COURT:  Whose motion is it?

19      MR. DEFRANCE:  I believe the petitioner did ask for the

20  CRV in her original pro se declaration.

21      THE COURT:  And she has it?

22      MR. DEFRANCE:  She does.

23      THE COURT:  And you're saying deny it?

24      MR. DEFRANCE:  Correct.

25      THE COURT:  But who has it at the moment?

1    MR. DEFRANCE:  She has it, so I'm asking to deny that

2    and return it to Mr. Pistrak.

3    THE COURT:  Okay, thank you.

4    MR. DEFRANCE:  Thank you.

5    THE COURT:  Would you start with the Honda CRV?  Is it

6    part of your motion?  If it is, Counsel's asking that it be

7    returned and offering -- because you're saying she has

8    access to two cars, is that correct?

9    MR. DEFRANCE:  Correct, Your Honor.

10    MR. HORNER:  The Mirage is broken down.  She presented

11    that in her reply declaration.

12    THE COURT:  And they're offering to pay for it to be

13    fixed.  Would you address that?

14    MR. HORNER:  I would not be able to address that until

15    consulting with my client, if that's even --

16    THE COURT:  Okay, and maybe you need to do that out in

17    the hall, okay --

18    MR. HORNER:  -- feasible, a feasible possibility,

19    perhaps, but --

20    THE COURT:  Good, okay.

21    MR. HORNER:  -- I mean, the fact is --

22    THE COURT:  Okay, so you'll --

23    MR. HORNER:  -- she needs transportation.

24    THE COURT:  -- talk about it out in the hall, right?

25    MR. HORNER:  Yeah, because we need to talk about it out

1    in the hall because I can't address it unless you give me a

2    moment to confer.

3        THE COURT:  Okay, that's fine.  But if it was part of

4    the motion, it wasn't argued, so it's something you need to

5    talk about out in the hall.

6        MR. HORNER:  Yeah, we -- yeah, I mean, she has this --

7    she was ordered to keep the CRV.  She wants to keep it.

8    This is --

9        THE COURT:  Well, she wasn't.  It's part of the full

10   hearing today.  It's just that it didn't come up in the

11   motion, in the oral argument.  And they addressed it in

12   response.  He wants the CRV back, so you'll need to discuss

13   that out in the hall.

14       MR. HORNER:  All right.  And she requested it in her

15   papers --

16       THE COURT:  Okay, now let's go to the -- in reply, one

17   minute.  On the issue of the maintenance that's being asked

18   for is too high in light of the following.  This is a

19   short-term marriage.  Your client hasn't lived the life

20   that she purports to want to live now at $3,000 per month.

21   This is just his argument because I'm having to take what

22   I've read and turn it into the legal argument.  And all the

23   income that's been made has come to an end in October for

24   whatever reason, and I'm being asked to deplete his savings

25   that he earned prior to the marriage --

1      MR. HORNER:  Well, and --

2      THE COURT:  Counsel, are you going to let me finish my

3  sentence?

4      MR. HORNER:  I'm sorry.  Absolutely.  I thought you were

5  done, Your Honor.

6      THE COURT:  That's what you need to address in one

7  minute.  Please begin.

8      MR. HORNER:  All right.  Yes, it's a short-term marriage

9  and it's a request for short-term maintenance.  I think

10 there was an attempt to create some confusion --

11     THE COURT:  No -- but I'm not confused, and I think a

12 judge above with my question would understand that I'm not

13 confused.  I've had to direct both attorneys on the law,

14 and so my concern is, looking at your client's financial

15 declaration, why would I order $3,000 per month

16 maintenance?  They have been married less than two years.

17 It's pushing 13 months.  Looking at her financial

18 declaration.  Why would I order $3,000 maintenance?

19     MR. HORNER:  Because she simply can't support herself at

20 all at this point, least of all in the lifestyle which had

21 been established during the marriage, however short.  The

22 request, I wanted to clarify, is until she can work again,

23 not until trial.  The request is until she can work again.

24 She wants to work.

25     THE COURT:  She can work soon?  She can?

1      MR. HORNER:  Provided the immigration service will

2    process her application.

3      THE COURT:  But if they don't, it's not his

4    responsibility, correct?  It's not his issue?

5      MR. HORNER:  Well, the request is until she can work

6    again.  I mean, her need will continue.  She doesn't

7    control the feds on this, but she's moving as quickly as

8    she can through -- the point is her intent.  Her intent is

9    not to bleed him dry.  That's the point here.

10     THE COURT:  But she was in the same situation at the

11   time she met him, correct?  What was she earning when she

12   met him?

13     MR. HORNER:  I --

14     THE COURT:  Counsel, what was --

15     MR. HORNER:  -- I don't -- I'm not actually sure when

16   she began her job at Beyondsoft.

17     THE COURT:  Because didn't she meet him here.  She met

18   him in the United States.

19     MR. HORNER:  Yes.  I'm sure she can clarify if you want

20   to ask when she started working --

21     THE COURT:  No, I'm asking, but I'm asking you.  This

22   attorney is arguing your client is trying to raise her

23   level of living beyond what she was making living in the

24   United States.  Isn't that what you're arguing?

25     MR. DEFRANCE:  Yes, Your Honor, she was a student.

1    THE COURT: Thank you.

2    MR. HORNER: But it's the standard of living during the

3    marriage. It says right in the code here. It says --

4    THE COURT: Right, but their marriage, even while

5    separated, is barely 13 months.

6    MR. HORNER: Plus they lived together before that for a

7    period of time, and that was also noted in the papers,

8    several months before they were married, another six months

9    or so --

10   THE COURT: Okay, then just go ahead and argue the

11   financial declarations, because Counsel says it's above --

12   you're asking for $3,000. He doesn't earn $3,000 per month

13   now that were in November.

14   MR. HORNER: The math was laid out that it's because she

15   lost her job. The initial request was for $1,500. She

16   looked around, she presented the evidence of what it costs

17   to rent a studio apartment, which is far less than what he

18   has, a 2000 square-foot house and that is -- that's the

19   basis of the amount.

20   THE COURT: But, Mr. Horner, you are missing what he's

21   saying. He doesn't have any earnings in the month of

22   November. You're trying to make him --

23   MR. HORNER: Because he quit his --

24   THE COURT: -- lose his assets.

25   MR. HORNER: He can do whatever he wants to pay that.

He quit his job.  The only evidence that is before the
Court that's worthy of any credibility is he voluntarily
quit his job.  And in fact, the timing is very suspicious
of when all this happened, when everything was coming down.
He runs to Russia, files a case where arguably there's --
there was jurisdiction.  This Court has jurisdiction.  He
has expense from an action there?  Too bad.  He chose to do
that.  Has to defend himself against DV charges?
Prosecutor brought that.  How is that her fault?  And maybe
he's -- maybe he's guilty, maybe it's determined.  Should
he be allowed to leverage that against her and leave her in
poverty, leave her penniless, while he lives in a 2000-
square-foot house?  And, like I say, he quit his job.  Now,
if he has to tap --

    THE COURT:  But wasn't that his house before marriage?

    MR. HORNER:  No, it was bought during the marriage.

    THE COURT:  Okay.

    MR. HORNER:  Yes, but he bought it in his sole name
because of the bank loan issue.  You know how that goes,
credit rating.  But, I mean, the point is, he can get the
money from wherever he wants.  If he has to deplete his
assets, that's his choice.  This is not -- this has nothing
to do with -- this is never the twain shall meet.  This is
not a request for an early distribution of marital
property --

```
1        THE COURT:  Thank you --
2        MR. HORNER:  -- it's attempting to conflate the
3    issues --
4        THE COURT:  Thank you.
5        MR. HORNER:  -- it's a confusion.  Maintenance stands on
6    its own --
7        THE COURT:  Thank you --
8        MR. HORNER:  -- and it's fair and just, that there
9    should be a reasonable period of modest maintenance, Your
10   Honor.
11       THE COURT:  The Court hereby orders $2,000 per month
12   maintenance starting with the month of November and awards
13   your attorney fees in the sum of $2,500.  That concludes
14   this hearing.  Thank you.
15                    (Pause in proceedings.)
16       THE COURT:  What's your -- you can approach for what
17   your one issue is.  We are not re-arguing.  I just want you
18   to tell me what your issue is.
19       MR. HORNER:  Two small issues.  We're not re-arguing the
20   meat of it.  Two small issues, one on the car.  We dickered
21   out in the hallway, we didn't come to an agreement, and
22   I'll just say the request was her to keep the CRV
23   temporarily, and that's --
24       THE COURT:  Okay, let me ask -- so I just need to -- I
25   know what the issue is.  I just need to ask the question.
```

1    It was asserted there is no reason for her to keep the CRV

2    because your client has access to two other cars.  Is that

3    true?  That's what was said.

4        MR. HORNER:  That's not true.  She had access to one

5    other car that's broken down and had like a thirteen

6    hundred dollar eighty, you know, estimate to -- I mean,

7    it's a 1999 Mitsubishi Mirage, so it's disabled.

8        THE COURT:  How long did your client drive the car?

9        MR. HORNER:  Which car?

10       THE COURT:  How long has she had access to the CRV?

11       MR. HORNER:  The CRV?  I believe -- I believe it was

12   restored to her in I think September in the DV side.

13       THE COURT:  And has she been driving it during the

14   marriage?

15       MR. HORNER:  I -- yes, I believe so.

16       THE COURT:  Okay, so why shouldn't she be allowed to

17   continue to drive it, Counsel?

18       MR. DEFRANCE:  Because the one car that the respondent

19   has is a very old car, 150,000 miles.  He needs the CRV to

20   transport -- he's trying to remodel his house.  He needs

21   the SUV to transport big materials back and forth.  He

22   lives on a steep hill.  He'd prefer to have the CRV and

23   even contribute to repairing --

24       THE COURT:  So he has enough money to buy a new car.  So

25   why should -- why shouldn't she be allowed to continue to

1    drive it?

2        MR. DEFRANCE:  Your Honor, he needs those funds for much

3    more serious expenses.

4        THE COURT:  I'm going to allow her to continue to use

5    the CRV.  What's the next issue?

6        MR. HORNER:  There was an issue on health insurance that

7    was raised about her, him taking her off his insurance

8    repeatedly.

9        THE COURT:  Okay, let's stop.

10       MR. HORNER:  Yes.

11       THE COURT:  The bottom line is, you're not allowed to do

12    that pending -- in the middle of a trial.  So what's the

13    issue?

14       MR. DEFRANCE:  So, Your Honor, now that he's not

15    employed with Microsoft he doesn't have health insurance.

16    He's eligible for Cobra insurance, and I think their

17    request was to have him sign up for Cobra and to add the

18    wife, if that's even possible.

19       THE COURT:  Did your client have insurance listed on her

20    financials?

21       MR. HORNER:  For an expense, a health insurance expense?

22       THE COURT:  Yes.

23       MR. HORNER:  I will have to consult her, sorry.

24       THE COURT:  Well, I mean, because she may have to buy

25    her own during this interim period of time.  They're

1    husband and wife and they haven't been married that long.

2        MR. HORNER:  Yeah, I mean, she would have to buy it,

3    obviously -- yeah, here's Petitioner's, what she put for --

4        MR. DEFRANCE:  $195, Your Honor.

5        THE COURT:  I will have him cover her for the remainder

6    of the year, but effective with the month of January -- and

7    now is open enrollment for government health care or Obama

8    insurance -- she should list and buy her own pending trial.

9        MR. HORNER:  As of January 2016?

10        THE COURT:  Starting in January.  That's what I'm

11    saying.  He can cover her for the remainder of the year,

12    but this is the enrollment time now for her to sign up for

13    her own.  Starting with the month of November, it's on her

14    to buy.

15        MR. DEFRANCE:  Okay.  Commissioner --

16        THE COURT:  And that's the issue I've ruled on.

17        MR. DEFRANCE:  He currently doesn't have health

18    insurance, so is he also being ordered to acquire Cobra or

19    whatever?

20        THE COURT:  To include for his wife, yes.  Now, let me

21    explain for your client why.  They're still husband and

22    wife.  If something happens to both of them -- and I expect

23    you to be the one explaining this to them.  This is a

24    community property state.  The responsibility of them

25    caring for each other is going to fall to them, not the

1    citizens of this state.  That's why the ruling that I'm

2    making, I am making.  And for a judge above, I'm finding he

3    has the ability to do it for the month of November and

4    December, and I can look to his assets to do it.

5        If a judge believes that what I did was unfair or wrong,

6    they may very well say at trial that she owes a judgment to

7    the husband for those two months.  And I feel fine, but I

8    would rather err on that than let either one of them have a

9    catastrophic illness or be hurt, and then the community --

10   because you still are a community until the state of

11   Washington divorces you, you can wind up with a debt that

12   is joint and several on both of you, and they're going to

13   go for the deep pocket of the individual.  That's the

14   reason for my ruling.

15       Please have the orders to my staff in five minutes.  No

16   sir, I'm not going to answer your question and back.  I was

17   brought out for two questions.  My presence is not an

18   invitation to ask questions of a judicial officer that

19   wasn't properly before the Court.

20       Not you, sir, it's your attorney.  Now, what is the

21   question?

22       MR. DEFRANCE:  Your Honor, that's fine.  We're --

23       THE COURT:  Is it a motion issue?

24       MR. DEFRANCE:  No, Your Honor.  I was basically going to

25   ask you to clarify if there was a ruling that Mr. Pistrak

1  was voluntarily unemployed at this time.

2      THE COURT:  I didn't find him voluntarily unemployed.

3  Can I ask you something, just out of respect for me?

4      MR. DEFRANCE:  Certainly.

5      THE COURT:  If there is any.  Why would you ask me that

6  when it didn't come out of my mouth?

7      MR. DEFRANCE:  Your Honor, my client brought it up in

8  the hallway.  He wanted a direct express ruling on the

9  issue.

10     THE COURT:  But did I -- I don't think Mr. Horner --

11 Hornsby -- or what is it?

12     MR. HORNER:  Horner.

13     THE COURT:  Horner should even have to write that.  I

14 didn't say that.  So why would you feel you -- would you

15 have asked any commissioner that?

16     MR. DEFRANCE:  Yes, Your Honor.  I was merely --

17     THE COURT:  I just wondered, because I never said that.

18 So for you to then say to me, "Did you say," when I think I

19 speak English well, is insulting.

20     MR. DEFRANCE:  I'm sorry.  I apologize, Your Honor.

21                  (Recorded hearing concludes.)

22

23

24

25

```
 1                    C E R T I F I C A T E

 2   STATE OF WASHINGTON        )
                                ) ss.
 3   COUNTY OF KING             )

 4        I, Rebecca Donley, a certified court reporter in and

 5   for the State of Washington, do hereby certify:

 6        That the foregoing was transcribed by me;

 7        That the foregoing is a true record of the audio/video

 8   recording given to me, to the best of my ability.

 9        I further certify that I am in no way related to any

10   party to this matter nor to any counsel, nor do I have any

11   interest in this matter.

12        Witness my hand this 31st day of July 2018.

13

14

15

16

17

18

19

20   _____

21   REBECCA E. DONLEY, CCR
     CCR License #3184
22   Certified Court Reporter in and
     for the State of Washington,
23   Court-Approved Transcriptionist
     for King County, Washington,
24   residing in Poulsbo, Washington.

25
```

Casey & Donley, Inc.   509.539.6153   rdonley@caseydonley.com

26

**Superior Court of Washington, County of King**

| | |
|---|---|
| In re the marriage of: | |
| Petitioner: | No. 15-3-06019-1SEA |
| KSENIIA GOLUBEVA | Findings and Conclusions about a Marriage (FNFCL) |
| And Respondent: | |
| EVGENY PISTRAK | |

# Findings and Conclusions about a Marriage

**1.** **Basis for findings and conclusions** *(check all that apply):*

☒ Court hearing on November 7, 8, 9, and 10, 2016, where the following people were present *(check all that apply):*

☒ Petitioner ☒ Petitioner's lawyer

☒ Respondent ☐ Respondent's lawyer

☐ Other *(name and relationship to this case):* _____

☐ Other *(name and relationship to this case):* _____

The court heard testimony from each of the parties, and from witnesses Keith Soltner, Mark Kontos, Dmitrii Lukyantsev, Natalia Melkumova, and Oleg Kazydub.

➢ *The Court makes the following findings of fact and conclusions of law:*

**2.** **Notice** *(check all that apply):*

☒ The Respondent has appeared in this case, or has responded to or joined the *Petition.*

☐ The Respondent was served on *(date):* _____
*(check all that apply):*

☐ in person.

**3.** **Jurisdiction over the marriage and the spouses** *(check all that apply):*

At the time the *Petition* was filed.

CR 52; RCW 26.09.030; .070(3)
Mandatory Form *(05/16,*
*rev. 4/25/16)*
FL Divorce 231

Findings and Conclusions
about a Marriage
p. 1

the Petitioner    ☒ lived in Washington State.

the Respondent    ☒ lived in Washington State.

☒ The Petitioner and Respondent lived in this state while they were married, and the Petitioner still lives in this state or is stationed here as a member of the armed forces.

**Conclusion:**    The court  ☒ **has** jurisdiction over the marriage.

The court  ☒ **has** jurisdiction over the Respondent.

## 4.  Information about the marriage

☒ The spouses were married on September 19, 2014, at Seattle, Washington.

## 5.  Separation Date

The parties separated on May 20, 2015. The parties stopped acquiring community property and incurring community debt on this date.

## 6.  Status of the marriage

☒ **Divorce** – This marriage is irretrievably broken, and it has been 90 days or longer since the *Petition* was filed and the *Summons* was served or the Respondent joined the *Petition*.

☐ **Invalidity** – The *(check one or both):* ☐ Petitioner  ☒ Respondent  want/s to invalidate (annul) this marriage, and the court finds the following facts about the validity of this marriage: The respondent claimed that he was induced to enter into the marriage by fraud, tied to the petitioner's immigration status. The court finds that the parties were introduced to each other by friends and family soon after the petitioner arrived in the United States. The respondent was already in the US, having lived and worked at Microsoft for many years. The parties had a courtship that was typical in that they dated, moved in together, and married after a relationship of approximately one year. Although there was testimony about the occasional reference to the status of the wife's immigration status before and after marriage, there was no credible evidence to support the husband'ss claims that the marriage was merely a sham to assist the wife in her immigration goals. The husband has failed to present clear and convincing evidence to support this claim.

**Conclusion:**    The Petition for divorce, should be:

☒ approved.

☐ denied.

The Petition for invalidity (annulment) should be:

☐ approved.

☒ denied.

## 7.  Separation Contract

☒ There is no separation contract.

## 8.  Real Property (land or home)

☒ The spouses' real property is listed below:

CR 52; RCW 26.09.030; .070(3)        Findings and Conclusions
Mandatory Form *(05/16,*                about a Marriage
*rev.4/25/16)*                              **p. 2**
**FL Divorce 231**

| Real Property Address | Tax Parcel Number | Community or Separate Property |
|---|---|---|
| 12834 176th Place Northeast, King County, Washington, being Lot 2, Hollymor IV, according to the plat thereof recorded in Volume 130 of Plats at pages 1, 2, and 3, in King County, Washington | 339683-0020 | ☐ community property<br>☐ Petitioner's separate property<br>☒ Respondent's separate property |

The court values the house at $476,000. The parties presented a great deal of testimony related to the nature of the house where they lived during the marriage. The husband entered into a purchase and sale agreement for the house prior to the marriage. The loan for the house was solely in the husband's name. He invested approximately $90,000 into the purchase, including a 20% down payment, and various closing costs. The wife contributed nothing. The house purchase closed immediately after the parties were married. The wife was legally required to sign certain closing documents. However, it was the intent of the parties for the house to remain the husband's separate property. The wife signed a quite claims deed at closing expressing this intent. All the closing documents are consistent with this finding. Because the marriage was only 8 months long, the payments toward the mortgage paid by the husband were insignificant in any contribution toward payment of the principal. The community had the benefit of the house as well, during this short period. The house is and was the husband's separate property.

**Conclusion:**    The division of real property described in the final order is fair (just and equitable).

**9. Community Personal Property** (possessions, assets or business interests of any kind)

☒ The spouses' community personal property is listed below. *(Include vehicles, pensions/ retirement, insurance, bank accounts, furniture, businesses, etc. Do not list more than the last four digits of any account number. For vehicles, list year, make, model and VIN or license plate number.)*

| | |
|---|---|
| 1. 2011 Honda CR-V - $16,000 value | 5. |
| 2. | 6. |
| 3. | 7. |
| 4. | 8. |

☐ Other *(specify):* _____

**Conclusion:**    The division of community personal property described in the final order is fair (just and equitable).

**10. Separate Personal Property** *(possessions, assets or business interests of any kind)*

☐ Neither spouse has separate personal property.

☐ The **Petitioner** has no separate personal property.

☐ The **Respondent** has no separate personal property.

☒ The separate personal property has already been divided fairly between the spouses. Each spouse should keep any separate property that s/he now has or controls.

☐ The **Petitioner's** separate personal property is listed in Exhibit _____. This Exhibit is attached and made part of these Findings.

☐ The **Respondent's** separate personal property is listed in Exhibit _____. This Exhibit is attached and made part of these Findings.

☐ The spouses' separate personal property is listed in the separation contract described in 7.

☒ The **Petitioner's** separate personal property is listed below . *(Include vehicles, pensions/ retirement, insurance, bank accounts, furniture, businesses, etc. Do not list more than the last four digits of any account number. For vehicles, list year, make, model and VIN or license plate number.)*

| | |
|---|---|
| 1. Mitsubishi Mirage. not valued | 5. |
| 2. | 6. |
| 3. | 7. |
| 4. | 8. |

☒ The **Respondent's** separate personal property is listed below. *(Include vehicles, pensions/ retirement, insurance, bank accounts, furniture, businesses, etc. Do not list more than the last four digits of any account number. For vehicles, list year, make, model and VIN or license plate number.)*

| | |
|---|---|
| 1. Honda Accord, not valued | 5. |
| 2. | 6. |
| 3. | 7. |
| 4. | 8. |

☐ The court does not have jurisdiction to divide property.

☐ Other *(specify):* _____

**Conclusion:** The division of separate personal property described in the final order is fair (just and equitable).

## 11. Community Debt

☒ There is no community debt.

☐ The community debt has already been divided fairly between the spouses.

☐ The spouses' community debt is listed in Exhibit _____. This Exhibit is attached and made part of these Findings.

☐ The spouses' community debt is listed in the separation contract described in 7.

CR 52; RCW 26.09.030; .070(3)        Findings and Conclusions
Mandatory Form *(05/16,*                  about a Marriage
*rev.4/25/16)*                                  **p. 4**
**FL Divorce 231**

Page 2133

☐ The spouses' community debt is listed below:

| Debt Amount | Creditor (person or company owed this debt) | Account Number (last 4 digits only) |
|---|---|---|
| $ | | |
| $ | | |
| $ | | |
| $ | | |

☐ The court does not have jurisdiction to divide debt.

☐ Other *(specify):* _____

**Conclusion:** The division of community debt described in the final order is fair (just and equitable).

## 12. Separate Debt

☐ Neither spouse has separate debt.

☒ The **Petitioner** has no separate debt.

☐ The **Respondent** has no separate debt.

☐ The separate debt has already been divided fairly between the spouses.

☐ The **Petitioner's** separate debt is listed in Exhibit ____. This Exhibit is attached and made part of these Findings.

☐ The **Respondent's** separate debt is listed in Exhibit ___. This Exhibit is attached and made part of these Findings.

☐ The spouses' separate debt is listed in the separation contract described in 7.

☒ The **Respondent's** separate debt is listed below: ☒    The spouses' community debt is listed below:

| Debt Amount | Creditor (person or company owed this debt) | Account Number (last 4 digits only) |
|---|---|---|
| $ | Alaska Federal Credit Union (for CR-V) | 0430 |
| $339.200 (initial balance) | First Technology Federal Credit Union (for home) | 2619 |
| $ | | |
| $ | | |

☐ The court does not have jurisdiction to divide debt.

☐ Other *(specify):* Parties separate debts post-date their separation.

CR 52; RCW 26.09.030; .070(3)
Mandatory Form *(05/16, rev.4/25/16)*
FL Divorce 231

Findings and Conclusions about a Marriage
**p. 5**

**Conclusion:**     The division of separate debt described in the final order is fair (just and equitable).

**13. Spousal Support** (maintenance/alimony)

☐ Spousal support was **not** requested.

☐ Spousal support should be based on the separation contract listed in 7.

☒ Spousal support was requested. The request is for a judgment for previously paid support.

**Conclusion:**     Spousal support should *(check one)*:

☒ be ordered because: it was previously awarded pending trial.

The wife was unable to work because of visa limitations until just before trial. She became eligible, and immediately employed. During the time she was ineligible, from the date of separation until trial, the wife had extreme need for maintenance, and the husband had the ability to pay. The husband makes $135,000 per year. His claims throughout the pretrial hearings on temporary maintenance, and during trial, that he is unable to pay the modest $2,000 in maintenance were not supported by the evidence. The wife no longer has the need for maintenance, but the temporary maintenance is confirmed, and will be made a judgment to the extent the husband has not paid (he has not paid any maintenance for the past four months, in violation of the court's orders).

**14. Fees and Costs**

☐ Each party should pay his/her own fees or costs.

☒ The *(check one)*:  ☒ Petitioner  ☐ Respondent  incurred fees and costs, and needs help to pay those fees and costs. The other spouse has the ability to help pay fees and costs and should be ordered to pay the amount as listed in the final order. The court finds that the amount of $20,000 ordered is reasonable. The petitioner requested in excess of $33,000 in attorney's fees. This should have been a very straight forward case. The parties were married for only eight months, there are no children of the marriage, and the only real asset was the house. Some, but not all, of the fees incurred by the petitioner were caused by the intransigence of the respondent. In addition, he has the ability to pay, and the petitioner has the need for fees.

☐ Fees for a guardian ad litem (GAL) or other court-appointed professional should be paid as listed in the final order. The court has considered relevant factors including each party's ability to pay, and finds the fees as ordered are reasonable.

☒ Other findings

A.     All fees and costs previously award by the Court in pre-trial orders are affirmed

confirmed and incorporated into the $20,000 total in fees found to be reasonable; such shall be

incorporated in a final judgment in the Final Divorce Order.

---

CR 52; RCW 26.09.030; .070(3)          Findings and Conclusions
Mandatory Form *(05/16,*                     about a Marriage
*rev.4/25/16)*                                      **p. 6**
FL Divorce 231

B.    In addition to petitioner's need and respondent's ability to pay, including his income and his portion of equity in the former marital home, the Court concludes that respondent has been intransigent in this proceeding. He has been intransigent through his repeated, denied motions to terminate temporary maintenance as found by the Commissioners of the Family Law Department and through his continuous, contemptuous refusal to pay ordered temporary maintenance.

## 15. Protection Order

Not applicable in Cause No. 15-3-06019-1SEA. *See* Cause No. 15-2-

## 16. Restraining Order

☒ No one requested a *Restraining Order* in this case.

☐ The *(check one):*  ☐ Petitioner ☐ Respondent requested a *Restraining Order*.

**Conclusion:**    The court should *(check one):*

☐ **not** approve a *Restraining Order* because: _____

_____

_____

☐ approve a *Restraining Order* because: _____

_____

_____

## 17. Pregnancy

☒ Neither spouse is pregnant.

> *Note:* The law considers the other spouse to be the parent of any child born during the marriage or within 300 days after it ends. If the other spouse is **not** the parent, either spouse may file a *Petition to Disprove Parentage of Presumed Parent* (FL Parentage 355) in court. In most cases, the deadline to file the *Petition to Disprove* is before the child turns four. (See RCW 26.26.116, 26.26.500 – 26.26.625.)
>
> If everyone agrees, both spouses and the child's biological father can sign an *Acknowledgment (and Denial) of Paternity*. Those forms must be notarized and filed with the Washington State Registrar of Vital Statistics to be valid.

## 18. Children of the marriage

☒ The spouses have **no** children together who are still dependent.

## 19. Jurisdiction over the children  *(RCW 26.27.201 – .221, .231, .261, .271)*

☒ Does not apply. The spouses have **no** children together who are still dependent.

---

CR 52; RCW 26.09.030; .070(3)        Findings and Conclusions
Mandatory Form *(05/16,*                about a Marriage
*rev.4/25/16)*                              **p. 7**
**FL Divorce 231**

**20.  Parenting Plan**

☒ The spouses have **no** children together who are still dependent.

**21.  Child Support**

☒ The spouses have **no** children together who are still dependent.

**22.  Other findings or conclusions (if any)**

The court started to express these findings orally, in open court, this date, with the petitioner and
her attorney present in court, and with Mr. Pistrak participating by telephone, as suggested
by the court when Mr. Pistrak asked to be excused from the hearing.  He demonstrated
during many hearings, and during trial, that his English was excellent.  Nonetheless, at his
request the court provided Russian interpreters during the trial.  As Mr. Pistrak's
participation at today's hearing was uncertain, there were no Russian interpreters present.
Mr. Pistrak claimed he did not understand even the basic preliminary comments by the
court.  The court did not find this credible, but determined it was appropriate to end the
hearing and to simply enter the findings and decree in writing.

DATED November 18, 2016

JUDGE MARY E. ROBERTS

CR 52; RCW 26.09.030; .070(3)
Mandatory Form *(05/16,
rev.4/25/16)*
FL Divorce 231

Findings and Conclusions
about a Marriage
**p. 8**

Page 2137

FILED
COURT OF APPEALS DIV. I
STATE OF WASHINGTON

2018 JUL 23  AM 8: 37

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Marriage of | ) | No. 76373-3-I |
| | ) | |
| KSENIIA GOLUBEVA, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| and | ) | |
| | ) | UNPUBLISHED OPINION |
| EVGENY PISTRAK, | ) | |
| | ) | FILED:  July 23, 2018 |
| Appellant. | ) | |

VERELLEN, J. — When the court dissolved Kseniia Golubeva and Evgeny Pistrak's marriage, it awarded Golubeva $8,000 for unpaid temporary maintenance.  In challenging this judgment, Pistrak does not point to any specific factors or material evidence the court improperly disregarded.  Pistrak fails to show the trial court abused its discretion when it entered judgment for the unpaid maintenance.  And substantial evidence supports the court's finding of Pistrak's ability to pay because the court had evidence of Pistrak's income and debt obligations.

The court also awarded Golubeva $20,000 in attorney fees and costs.  The court did not enter specific findings supporting the time incurred or the hourly rate

No. 76373-3-I/2

charged.  Because the court did not enter adequate findings to explain the award of attorney fees and costs, we remand for additional findings.

When the court held a hearing to issue its oral ruling, Pistrak indicated he could not understand the proceeding without an interpreter.  In the findings, the court did not find it credible that Pistrak was unable to understand even the basic preliminary comments by the court.  Pistrak fails to provide any basis for relief given the fact the court ended the hearing after he objected and entered the decree and findings in writing.

Therefore, we affirm the judgment for unpaid temporary maintenance.  As to the attorney fees award, we remand for further proceedings on the existing record consistent with this opinion.

<u>FACTS</u>

Pistrak and Golubeva were married on September 19, 2014.  They separated on May 20, 2015.

On November 16, 2015, the court ordered Pistrak to pay Golubeva $2,000 per month in temporary maintenance.  Between November 2015 and 2016, Pistrak brought numerous motions to revoke or modify the temporary maintenance.  Also during that time, the court held Pistrak in contempt multiple times for failing to pay.

Trial occurred between November 7, 2016 and November 10, 2016.  On November 18, 2016, the court held a hearing to issue its findings and conclusions.  When Pistrak indicated he could not understand the proceeding without an interpreter, the court ended the hearing and later entered its written order.

No. 76373-3-I/3

In the dissolution decree and findings of fact and conclusions of law, the court awarded Golubeva $8,000 for unpaid temporary maintenance and $20,000 in attorney fees and costs.

Pistrak appeals.

## ANALYSIS

I.  Temporary Maintenance

Pistrak challenges the trial court's $8,000 judgment to Golubeva for unpaid temporary maintenance.

As a threshold matter, Golubeva argues Pistrak failed to preserve this issue.

In November 2015, Pistrak challenged Golubeva's original request for temporary maintenance.  Between November 2015 and 2016, Pistrak brought numerous motions to revoke or modify the temporary maintenance.  Also during that time, the court held Pistrak in contempt multiple times for failing to pay.

In July 2016, the commissioner reserved the issue of July maintenance for the trial judge because, at the time, trial was scheduled for August.  The trial was ultimately continued until November 2016.  In October 2016, the commissioner entered an order finding Pistrak in contempt for failing to pay temporary maintenance.  The commissioner reaffirmed the reservation of the July maintenance for the trial judge and entered a $6,000 judgment against Pistrak for unpaid maintenance between August 2016 and October 2016.  The commissioner reserved review of the contempt order for the trial judge.

3

No. 76373-3-I/4

Trial started on November 7, 2016.  At trial, Pistrak again challenged the

temporary maintenance.

> [W]hen there was a hearing in July, [the commissioner] . . . ordered
> that all the maintenance money could be—or should be relitigated or
> reconsidered at trial.  So my request to the court is to reconsider the
> maintenance issue in such a way that I do not owe her any
> maintenance starting from the time of that hearing in July.  The
> reason for that being that Golubeva is a healthy person.  She has a
> work authorization.  And . . . as she told us . . . her new job is in the
> same profession as before.  And she, in fact, even has been
> promoted. . . . And also the fact is that I already had paid enough, a
> lot, under the temporary maintenance order.  I already paid $18,000.
> That should be perfectly sufficient.
>
> Also, I would like to draw the court's attention to the fact that
> the reason she was awarded maintenance in the first place was her
> immigration status.  So, that's why I'm asking that the court not
> award any future maintenance from now on, neither retroactively.[1]

On November 18, 2017, when the court entered the decree and findings,

the court awarded Golubeva $8,000 for unpaid maintenance between July 2016

and October 2016.

> The wife was unable to work because of visa limitations until just
> before trial.  She became eligible, and immediately employed.
> During the time she was ineligible, from the date of separation until
> trial, the wife had extreme need for maintenance, and the husband
> had the ability to pay. . . . The wife no longer has the need for
> maintenance, but the temporary maintenance is confirmed, and will
> be made a judgment to the extent the husband has not paid (he has
> not paid any maintenance for the past four months, in violation of the
> court's orders).[2]

Golubeva offers two preservation arguments, but they are not persuasive.

First, Golubeva claims Pistrak's arguments before this court rely on documents

---

[1] Report of Proceedings (RP) (Nov. 10, 2016) at 509-10.

[2] Clerk's Papers (CP) at 3271.

that were filed in the case but not admitted at trial. But the trial court was aware of the filings related to the temporary maintenance order when it ruled on Pistrak's multiple motions to revoke and modify the commissioner's orders. And during the trial, the court indicated that documents filed in the case did not need to be admitted as exhibits.[3]

Second, Golubeva contends, "Having failed to challenge the Temporary Order at trial or to appeal it, Pistrak cannot challenge his duty to pay temporary maintenance."[4] But under RAP 2.4, "an appeal from the final judgment brings up for review most orders and rulings made pretrial and during trial."[5] And on November 4, 2016, when the trial court denied Pistrak's last motion for revision of the temporary maintenance order, the court stated the denial "does not preclude Mr. Pistrak from arguing at trial the appropriate amount or duration of maintenance."[6] And as previously discussed, Pistrak did challenge the temporary maintenance order at trial.

We conclude Pistrak has preserved his arguments concerning temporary maintenance.

---

[3] See RP (Nov. 7, 2016) at 108 ("[T]he financial declaration is already filed in the court file. [T]here's no need to admit it as an exhibit. So, I won't admit it, but you could certainly refer to it and utilize it."); see also RAP 9.1 ("The 'record on review' may consistent of . . . 'clerk's papers' . . . . The clerk's papers include the pleadings, orders, and other papers filed with the clerk of the trial court.").

[4] Resp't's Br. at 14.

[5] Wlasiuk v. Whirlpool Corp., 76 Wn. App. 250, 259, 884 P.2d 13 (1994).

[6] CP at 1964.

5

No. 76373-3-I/6

As to the merits of the temporary maintenance, Pistrak claims the trial court abused its discretion because it did not consider all the statutory factors under RCW 26.09.090 when entering judgment for the previously unpaid temporary maintenance.

"We review a trial court's award of maintenance for abuse of discretion."[7] "Trial court decisions in a dissolution action will seldom be changed upon appeal— the spouse who challenges such decisions bears the heavy burden of showing a manifest abuse of discretion on the part of the trial court."[8]  The trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons.[9]

> A court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard; it is based on untenable grounds if the factual findings are unsupported by the record; it is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard.[10]

An award of temporary maintenance is governed by RCW 26.09.060, which provides, "The court may issue . . . an order for temporary maintenance or support in such amounts and on such terms as are just and proper in the circumstances."[11]

---

[7] In re Marriage of Valente, 179 Wn. App. 817, 822, 320 P.3d 115 (2014) (quoting In re Marriage of Mueller, 140 Wn. App. 498, 510, 167 P.3d 568 (2007)).

[8] In re Marriage of Bowen, 168 Wn. App. 581, 586, 279 P.3d 885 (2012) (quoting In re Marriage of Landry, 103 Wn. 2d 807, 809-10, 699 P.2d 214 (1985)).

[9] Id.

[10] In re Marriage of Littlefield, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997).

[11] RCW 26.09.060(6).

No. 76373-3-I/7

RCW 26.09.090 addresses an award of maintenance after the court

dissolves the marriage.

> (1) . . . The maintenance order shall be in such amounts and for such periods of time as the court deems just, without regard to misconduct, after considering all relevant factors including but not limited to:
>
> (a) The financial resources of the party seeking maintenance . . . ;
>
> (b) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find employment appropriate to his or her skills, interests, style of life, and other attendant circumstances;
>
> (c) The standard of living established during the marriage or domestic partnership;
>
> (d) The duration of the marriage or domestic partnership;
>
> (e) The age, physical and emotion condition, and financial obligations of the spouse or domestic partner seeking maintenance; and
>
> (f) The ability of the spouse or domestic partner from whom maintenance is sought to meet his or her needs and financial obligations while meeting those of the spouse or domestic partner seeking maintenance.

Pistrak provides no authority that a temporary maintenance award requires

findings as to each of the statutory factors governing post-decree maintenance.

Golubeva contends the court properly applied the temporary maintenance statute.

"While temporary maintenance is certainly not based upon the question of whether

maintenance will be continued past the entry of the decree, temporary

7

maintenance cannot be adjudged in a vacuum without reference to post-decree maintenance factors."[12]

Although Pistrak is correct that the trial court should look to the factors under RCW 26.09.090, he fails to point to any specific factors or material evidence the court improperly disregarded.

Pistrak claims the trial court improperly considered Golubeva's visa work limitations. But Golubeva's visa limitations relate to the "financial resources of the party seeking maintenance" under RCW 26.09.090(1)(a). As presented to the trial court, Golubeva's visa limitations inhibited her ability to work, which in turn affected her financial resources. This is reflected in the trial court's finding that Golubeva "no longer has the need for maintenance,"[13] because the visa limitations ended and she found employment.

Pistrak also argues substantial evidence did not support the trial court's finding of his ability to pay.

When reviewing findings of fact made by a trial judge, we apply the substantial evidence standard.[14] "'Substantial evidence exists if the record contains evidence of a sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise.'"[15]

---

[12] 19 SCOTT J. HORENSTEIN, WASHINGTON PRACTICE: FAMILY AND COMMUNITY PROPERTY LAW § 26.2 at 656 (2nd ed. 2017).

[13] CP at 3271.

[14] In re Marriage of Rockwell, 141 Wn. App. 235, 242, 170 P.3d 572 (2007).

[15] Id. (quoting In re Marriage of Griswold, 112 Wn. App. 333, 339, 48 P.3d 1018 (2002)).

No. 76373-3-I/9

In the findings of fact and conclusions of law, the trial court found Pistrak had the ability to pay.[16]  Pistrak argues the trial court "focus[ed] on the husband's gross yearly income without a fair consideration of the money actually available to him."[17]  But the record before this court indicates that the trial court was well aware of the parties' financial situation.  The trial court had Pistrak's pay stubs for May 2016 through September 2016, which indicated he was earning $135,000 per year.

During trial, Pistrak testified that his credit card debt was around $35,000. Pistrak's testimony is supported by his December 2016 credit card statement, which shows his balance was $35,869.31.  But the trial court also had Pistrak's credit card statements for June 2016 through October 2016, and those statements show that prior to December 2016, Pistrak's debt was much lower and he was making significant payments on the card.[18]

We conclude substantial evidence supports the trial court's finding of Pistrak's ability to pay, and the trial court did not abuse its discretion when it entered judgment for the unpaid temporary maintenance.

---

[16] CP at 3271 ("The husband makes $135,000 per year.  He claims throughout the pretrial hearings on temporary maintenance, and during trial, that he is unable to pay the modest $2,000 in maintenance were not supported by the evidence.").

[17] Appellant's Br. at 14.

[18] In May 2016, Pistrak's credit card balance was $2,824.63 and he made a payment of $3,500.  In June 2016, Pistrak's balance was $1,396.56 and he made a payment of $7,899.57.  In July 2016, Pistrak's balance was $15,759.17 and he made a payment of $15,506.82.  In August 2016, Pistrak's balance was $9,247.58 and he made a payment of $14,151.11.  And in September 2016, Pistrak's balance was $21,389.96 and he made a payment of $2,949.99.

No. 76373-3-I/10

## II. Attorney Fees

Pistrak contends the trial court failed to enter sufficient findings and conclusions to support its award of fees to Golubeva.

We review a trial court's determination of reasonableness of attorney fees for abuse of discretion.[19] To determine a reasonable attorney fee, the court "begins with a calculation of the 'lodestar,' which is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."[20] The court must also segregate and "discount hours spent on unsuccessful claims, duplicated effort, or otherwise unproductive time."[21]

The party requesting the fee must provide reasonable documentation of the work performed.[22] But the court must conduct an independent "evaluation of the reasonableness of the fees" and cannot simply rely on the billing records and pleadings of the prevailing party.[23] "[M]eaningful findings and conclusions must be entered to explain an award of attorney fees."[24] "The findings must show how the court resolved disputed issues of fact and the conclusions must explain the court's analysis."[25]

---

[19] Berryman v. Metcalf, 177 Wn. App. 644, 656-57, 312 P.3d 745 (2013).

[20] Id. at 660.

[21] Bowers v. Transamerica Title Ins. Co., 100 Wn.2d 581, 597, 675 P.2d 192 (1983).

[22] 224 Westlake, LLC v. Engstrom Props., LLC, 169 Wn. App. 700, 734, 281 P.3d 693 (2012).

[23] Berryman, 177 Wn. App. at 677-78.

[24] Id.

[25] Id. at 658.

No. 76373-3-I/11

The declaration provided by Golubeva's counsel provided an adequate basis for a lodestar determination; notably, a description of counsel's qualifications, experience, and background, a description of the services provided, and the basis for the claimed hourly rate. The declaration also provided sufficient context to analyze other factors, including the complexity of the matter, the intransigence of Pistrak, and the history of previously awarded but unpaid fees.

But the court did not enter adequate findings. It awarded $20,000, stating:

Petitioner incurred fees and costs, and needs help to pay those fees and costs. The other spouse has the ability to help pay fees and costs and should be ordered to pay the amount as listed in the final order. The court finds that this amount of $20,000 ordered is reasonable. The petitioner requested in excess of $33,000 in attorney's fees. This should have been a very straight forward case. The parties were married for only eight months, there are no children of the marriage, and the only real asset was the house. Some, but not all, of the fees incurred by the petitioner were caused by the intransigence of the respondent. In addition, he has an ability to pay, and the petitioner has the need for fees.[26]

There are no specific findings supporting the time incurred or the hourly rate charged. We conclude the court's findings are insufficient to allow meaningful review and the appropriate remedy is a remand on the existing record for entry of findings and conclusions of law to support the attorney fee award.[27]

---

[26] CP at 3271.

[27] Berryman, 177 Wn. App. at 659 ("Normally, a fee award that is unsupported by an adequate record will be remanded for entry of proper findings of fact and conclusions of law that explain the basis for the award.").

No. 76373-3-I/12

III.  Interpreter

Pistrak challenges the trial court's finding concerning his need for an interpreter.

At the end of trial, the court scheduled a final hearing on November 18, 2016 to issue its oral ruling.  At the hearing, Pistrak appeared telephonically and indicated he did not understand the proceeding because there was no translator present.  The court addressed two exhibits which were discussed during trial but not admitted "because we were waiting for the official copies."[28]  At the hearing on November 18, 2016, the court admitted the official records in place of the photocopies that were referenced during trial.  Pistrak again indicated that he did not understand and that he was unable to participate.  The court ended the hearing because "Mr. Pistrak doesn't understand what's going on, so I'm going to get off the bench and enter this in writing."[29]

In the findings of fact and conclusions of law, the court stated:

The court started to express these findings orally, in open court, this date, with the petitioner and her attorney present in court, and with Mr. Pistrak participating by telephone, as suggested by the court when Mr. Pistrak asked to be excused from the hearing.  He demonstrated during many hearings, and during trial, that his English was excellent.  Nonetheless, at his request the court provided Russian interpreters during the trial.  As Mr. Pistrak's participation at today's hearing was uncertain, there was no Russian interpreters present.  *Mr. Pistrak claimed he did not understand even the basic preliminary comments by the court.  The court did not find this credible, but determined it was appropriate to end the hearing and to simply enter the findings and decree in writing.*[30]

---

[28] RP (Nov. 18, 2016) at 525.

[29] Id. at 526.

[30] CP at 3273 (emphasis added).

12

No. 76373-3-I/13

Pistrak now seeks to reverse this finding, arguing he had a right to an interpreter.[31]  But he misinterprets the court's specific finding.  The court did not reach the underlying question of whether Pistrak needed an interpreter.  Rather the court's specific finding is that it did not find it credible that Pistrak was unable to understand even the basic preliminary comments by the court.

In his narrow assignment of error, Pistrak contends "the trial Court erred in not providing an interpreter to husband during the ruling on the case on November 18, 2016."  But Pistrak fails to provide any basis for relief on appeal given the fact that after the ministerial act of substituting official records for photocopies, the court ended the hearing.  The lack of an interpreter at the November 18, 2016 hearing did not prejudice Pistrak when the court terminated that hearing on his objection.

We deny Pistrak's request to reverse the trial court's finding.

IV.  Fees on Appeal

Golubeva requests fees on appeal under RCW 26.09.140 and based on Pistrak's intransigence.

RCW 26.09.140 allows for an award of fees on appeal based on the financial resources of the parties to a dissolution action.  Golubeva's declaration establishes her need and Pistrak's ability to pay.  Because the statute supports an

---

[31] In his opening brief, Pistrak also seeks to strike the exhibits from the trial record.  In his reply brief, Pistrak claims it is not his goal "in appealing the absence of interpreter [ ] to exclude certain exhibits."  Reply Br. at 14.

No. 76373-3-I/14

award of fees, we need not consider Golubeva's alternative theory of intransigence on appeal.

We grant Golubeva's request for fees on appeal upon her compliance with RAP 18.1(d).

Therefore, we affirm the award of $8,000 for unpaid temporary maintenance. As to the award of attorney fees in the trial court, we remand for further proceedings on the existing record consistent with this opinion.[32]

WE CONCUR:

---

[32] Consistent with the commissioner's April 16, 2018 ruling, we deny the parties' reciprocal motions to strike, Pistrak's motion to take judicial notice, and Golubeva's request for sanctions. As to Pistrak's July 2, 2018 motion to take judicial notice, he failed to assign error to the findings he asks us to amend, and these findings are not germane to this appeal.



€FILED

FEB 25 2019
WASHINGTON STATE
SUPREME COURT

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

In re the Marriage of:

KSENIA GOLUBEVA,

and

EVGENY PISTRAK.

No. 9 6 7 5 2 - 1

Court of Appeals No. 76373-3-I

RULING DENYING REVIEW

Pro se petitioner Evgeny Pistrak seeks discretionary review of an order by Division One of the Court of Appeals denying his motion to "revoke" its unpublished decision affirming a temporary maintenance award as part of a marriage dissolution. Because Mr. Pistrak fails to identify any tenable basis for further review of the order denying his motion to revoke, the motion for discretionary review is denied, as explained below. Sanctions are imposed also for filing a frivolous motion intended for delay.

Mr. Pistrak and Ksenia Golubeva dissolved their marriage. The superior court awarded Ms. Golubeva $8,000 in unpaid temporary maintenance. Mr. Pistrak appealed, but the Court of Appeals affirmed and awarded Ms. Golubeva attorney fees on appeal. The court denied Mr. Pistrak's motion for reconsideration on August 20, 2018. Mr. Pistrak did not file a petition for review in this court. The Court of Appeals issued its mandate on September 28, 2018.

Meanwhile, on August 13, 2018, Mr. Pistrak filed in the Court of Appeals a purported "Motion to Dismiss Golubeva for Want of Jurisdiction Re: Temporary Order." At the direction of the panel, the court's administrator/clerk informed Mr. Pistrak that the motion was not proper and therefore would be placed in the file without any further action. On August 22, 2018, a panel of judges denied Mr. Pistrak's motion to modify the administrator/clerk's ruling.

Then, on September 24, 2018, Mr. Pistrak filed a motion in the Court of Appeals to "revoke" the Court of Appeals decision on appeal for an alleged lack of subject matter jurisdiction. The clerk/administrator at first declined to act on the motion, reasoning that it was analogous to an improper second motion for reconsideration. But a panel of judges later considered the motion and denied it on October 23, 2018.

On November 26, 2018, Mr. Pistrak filed a pleading in this court styled a petition for review, challenging denial of his motion to revoke the Court of Appeals decision. The clerk's office reclassified the pleading as a motion for discretionary review. RAP 13.3(a)(2), (c), (e). Ms. Golubeva filed an answer opposing review and requested attorney fees alternatively under RAP 18.1(j) and RAP 18.9.

Mr. Pistrak argues that this court's review is justified because he is raising a significant question of law under the Washington or United States constitutions and because this case involves an issue of substantial public interest. RAP 13.4(b)(3), (4). He relies on the wrong criteria. This is not a petition for review of a Court of Appeals decision terminating review. RAP 12.3(a); RAP 13.3(b); RAP 13.4(a). Rather, as indicated above, Mr. Pistrak seeks discretionary review of a Court of Appeals interlocutory decision. RAP 12.3(b); RAP 13.3(a)(2), (c), (e); RAP 13.5(a). To obtain review of such a decision, Mr. Pistrak must demonstrate that the Court of Appeals (1) committed an obvious error that renders further proceedings useless; (2) committed probable error that substantially alters the status quo or substantially limits his freedom

to act; or (3) so far departed from the usual and accepted course of judicial proceedings, or so far sanctioned such a departure by the superior court, as to call for review by this court. RAP 13.5(b). Mr. Pistrak fails to meaningfully discuss these criteria, much less show that any of them applies in this instance.

The Court of Appeals has issued its mandate for its decision on the merits of Mr. Pistrak's appeal. RAP 12.5(b). The decision is therefore final. RAP 12.5(a). Neither the Court of Appeals nor this court has the power to change the Court of Appeals decision unless the mandate has been recalled. RAP 12.7(a), (b). The mandate had not been recalled when Mr. Pistrak filed the instant motion to "revoke" the Court of Appeals decision.[1] The Court of Appeals therefore correctly denied Mr. Pistrak's motion to revoke its decision as improper.[2] There is no obvious or probable error or a departure from the accepted and usual course of judicial proceedings within the meaning of RAP 13.5(b). Mr. Pistrak's motion for discretionary review necessarily fails.

As indicated, Ms. Golubeva requests attorney fees, either under RAP 18.1(j) by analogy or under RAP 18.9. The former rule applies only where the respondent has filed an answer to a petition for review of a Court of Appeals decision that awarded attorney fees to the prevailing party. RAP 18.1(j). The rule does not apply in this instance. If it could be applied by analogy, and I am not deciding that it can, the Court of Appeals did not award Ms. Golubeva fees when it denied Mr. Pistrak's motion to revoke for lack of jurisdiction. Therefore, RAP 18.1(j) is not a proper basis for attorney fees.

---

[1] Mr. Pistrak later filed a motion in the Court of Appeals to recall the mandate. RAP 12.9. The Court of Appeals denied the motion on January 23, 2019. That interlocutory decision is not presently before me.

[2] As for the substantive basis of the motion, Mr. Pistrak argued for the first time that the Court of Appeals lost subject matter jurisdiction when it considered Ms. Golubeva's immigration status in relation to maintenance. Mr. Pistrak urges that by doing so the court impermissibly intruded into immigration law matters that are exclusively within federal jurisdiction. There is no conflict between federal immigration law and state dissolution law on this issue. *See, e.g., In re Marriage of Khan*, 182 Wn. App. 795, 801-803, 332 P.3d 1016 (2014). Mr. Pistrak's motion to revoke the Court of Appeals decision for lack of jurisdiction is plainly meritless.

On the other hand, I agree that Mr. Pistrak's motion for discretionary review is subject to sanctions as frivolous, as there is no reasonable possibility of obtaining discretionary review, and it is clearly intended to delay finality of the underlying proceedings. RAP 18.9(a). Accordingly, Mr. Pistrak is directed to pay Ms. Golubeva's reasonable attorney fees and expenses incurred in answering his frivolous motion for discretionary review, provided Ms. Golubeva timely submits an affidavit of fees and expenses in accordance with RAP 18.1(d).

The motion for discretionary review is denied and sanctions are imposed.

Michael E. Johnston
COMMISSIONER

February 25, 2019

FILED
SUPREME COURT
STATE OF WASHINGTON
6/5/2019
BY SUSAN L. CARLSON
CLERK

# THE SUPREME COURT OF WASHINGTON

| | | |
|---|---|---|
| In re the Marriage of | ) | No. 96752-1 |
| | ) | |
| KSENIIA GOLUBEVA, | ) | **O R D E R** |
| | ) | |
| Respondent, | ) | Court of Appeals |
| | ) | No. 76373-3-I |
| and | ) | |
| | ) | |
| EVGENY PISTRAK, | ) | |
| | ) | |
| Petitioner. | ) | |
| | ) | |

Department I of the Court, composed of Chief Justice Fairhurst and Justices Johnson,

Owens, Wiggins and Gordon McCloud, considered this matter at its June 4, 2019, Motion

Calendar and unanimously agreed that the following order be entered.

IT IS ORDERED:

That the Petitioner's motion to modify the Commissioner's ruling is granted and the case

is referred back to the Supreme Court Commissioner for further consideration in light of the

arguments made by the Petitioner in the motion to modify.

DATED at Olympia, Washington, this 5th day of June, 2019.

For the Court

_____
CHIEF JUSTICE



FILED

JUN 10 2019

WASHINGTON STATE
SUPREME COURT

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

In re the Marriage of:

KSENIA GOLUBEVA

                Respondent,

and

EVGENY PISTRAK

                Petitioner.

No. 9 6 7 5 2 - 1

Court of Appeals No. 76373-3-I

RULING DENYING REVIEW

       Pro se petitioner Evgeny Pistrak seeks discretionary review of an order by Division One of the Court of Appeals denying his motion to "revoke" its unpublished decision affirming a temporary maintenance award as part of a marriage dissolution. I initially denied review and imposed sanctions in a ruling issued on February 25, 2019. On June 4, 2019, Department One of this court granted Mr. Pistrak's motion to modify my ruling and referred the matter back to me for further consideration in light of arguments Mr. Pistrak made in his motion to modify. Having done so, I adhere to the results of my original ruling, as explained below.

       To recap, Mr. Pistrak and Ksenia Golubeva dissolved their marriage. The superior court awarded Ms. Golubeva $8,000 in unpaid temporary maintenance. Mr. Pistrak appealed, but the Court of Appeals affirmed and awarded Ms. Golubeva attorney fees on appeal. The court denied Mr. Pistrak's motion for reconsideration on

August 20, 2018. Mr. Pistrak did not file a petition for review in this court. The Court of Appeals issued its mandate on September 28, 2018. On January 23, 2019, the Court of Appeals denied Mr. Pistrak's motion to recall the mandate. *See* RAP 12.9.

Meanwhile, on August 13, 2018, Mr. Pistrak filed in the Court of Appeals a purported "Motion to Dismiss Golubeva for Want of Jurisdiction Re: Temporary Order." At the direction of the panel, the court's administrator/clerk informed Mr. Pistrak that the motion was not proper and therefore would be placed in the file without any further action. On August 22, 2018, a panel of judges denied Mr. Pistrak's motion to modify the administrator/clerk's ruling.

Then, on September 24, 2018, four days before the mandate issued, Mr. Pistrak filed a motion in the Court of Appeals to "revoke" the Court of Appeals decision on appeal for an alleged lack of subject matter jurisdiction. The clerk/administrator at first declined to act on the motion, reasoning that it was analogous to an improper second motion for reconsideration. But a panel of judges later considered the motion and denied it on October 23, 2018, after the mandate issued.

On November 26, 2018, Mr. Pistrak filed a pleading in this court styled a petition for review, challenging denial of his motion to revoke the Court of Appeals decision. The clerk's office reclassified the pleading as a motion for discretionary review. RAP 13.3(a)(2), (c), (e). Ms. Golubeva filed an answer opposing review and requested attorney fees alternatively under RAP 18.1(j) and RAP 18.9.

In my earlier ruling, I stated that Mr. Pistrak filed his motion to revoke after the Court of Appeals had issued its mandate, and therefore, the Court of Appeals properly denied the motion because it lost its power to change its decision unless the mandate was recalled. *See* RAP 12.7(a), (b); RAP 12.9. In fact, Mr. Pistrak filed his motion four days *before* the Court of Appeals issued its mandate. The Court of Appeals then denied the motion more than three weeks after it issued its mandate.

The Court of Appeals did not lose all power and authority to act on Mr. Pistrak's motion after it issued the mandate. As indicated, Mr. Pistrak asked the Court of Appeals to revoke its decision. By the time the Court of Appeals denied Mr. Pistrak's motion, it had issued its mandate, but denial of the motion did not "change or modify" the Court of Appeals decision Mr. Pistrak sought to revoke. RAP 12.7(a). Stated another way, a Court of Appeals case does not disappear when that court issues its mandate. Though under RAP 12.7(a) the Court of Appeals may not change or modify its decision absent withdrawal of the mandate the court retains at least the power and authority to dispose of frivolous motions, including motions filed, but not acted upon, before the mandate issued. *See* RCW 2.06.030.

A matter is frivolous if, considering the entire record, the court determines that the proponent has presented no debatable issues upon which reasonable minds might differ, and the action is so devoid of merit that there is no possibility of reversal. *Tiffany Family Trust Corp. v. City of Kent*, 155 Wn.2d 225, 241, 119 P.3d 325 (2005). In this instance, Mr. Pistrak argued in his motion to revoke that the Court of Appeals lost subject matter jurisdiction over this marital dissolution matter when it considered Ms. Golubeva's immigration status in relation to maintenance. But as I explained in my earlier ruling, there is no conflict between federal immigration law and state dissolution law on this issue as it applies to this case. *See, e.g.*, *In re Marriage of Khan*, 182 Wn. App. 795, 801-803, 332 P.3d 1016 (2014). There is no possibility Mr. Pistrak can prevail under this jurisdictional theory. His motion to revoke was plainly frivolous.

As discussed in my earlier ruling, to obtain discretionary review in this court, Mr. Pistrak must demonstrate that the Court of Appeals (1) committed an obvious error that renders further proceedings useless; (2) committed probable error that substantially alters the status quo or substantially limits his freedom to act; or (3) so far departed

from the usual and accepted course of judicial proceedings, or so far sanctioned such a departure by the superior court, as to call for review by this court. RAP 13.5(b).

The Court of Appeals commits "obvious error" under RAP 13.5(b)(1) when its decision is clearly contrary to statutory or decisional authority with no discretion involved. *See* I Washington Appellate Practice Deskbook, § 4.4(2)(a) at 4-34-4-35 (4th ed. 2016). The error also must render further proceedings "useless." *See id.* at 4-36. Or stated more simply, the court "made a plain error of law that markedly affects the course of the proceedings." II Washington Appellate Practice Deskbook, § 18.3 at 18-14 (4th ed. 2016). One could argue that the Court of Appeals should have waited to issue the mandate until after it acted on Mr. Pistrak's motion. But since the motion to revoke was filed only four days before the mandate issued, and the clerk/administrator initially declined to act on the motion, it is difficult to see how this situation could have been avoided. In any event, since the Court of Appeals decision on Mr. Pistrak's motion to revoke did not change or modify the Court of Appeals decision with the meaning of RAP 12.7(a), there is no "obvious" error within the meaning of RAP 13.5(b)(1), particularly when the motion to revoke was frivolous.

Even if the Court of Appeals committed probable error (which I need not decide), the error did not alter the status quo or substantially limit Mr. Pistrak's freedom to act for purposes of RAP 13.5(b)(2). The status quo remained unchanged and whatever effect the decision had was limited to the related litigation. *See* Geoffrey Crooks, *Discretionary Review of Trial Court Decisions Under the Washington Rules of Appellate Procedure*, 61 WASH. L. REV., 1541, 1546 (1986) (interpreting meaning of "probable error" standard); *see also State v. Howland*, 180 Wn. App. 196, 207, 321 P.3d 303 (2014) (interpreting probable error standard under RAP 2.3(b)(2)).

Furthermore, while the timing of the Court of Appeals denial of Mr. Pistrak's motion to revoke was somewhat unusual in relation to the timing of the mandate, the

seeming deviation in judicial procedure was too slight to justify this court's intervention under RAP 13.5(b)(3). Stated another way, it would not be a good use of judicial resources to force the Court of Appeals to recall the mandate for the sole purpose of reexamining a frivolous motion. As indicated, the Court of Appeals has already denied Mr. Pistrak's motion to recall the mandate (a matter that is not presently before me). In sum, Mr. Pistrak not only fails to show that discretionary review is warranted, his motion for discretionary review is frivolous.

Moving on, the order granting Mr. Pistrak's motion to modify encompasses my earlier ruling granting Ms. Golubeva reasonable attorney fees and costs. Having reviewed the record and briefing again, I still conclude that Mr. Pistrak's motion for discretionary review is subject to sanctions because (1) it is frivolous in that there is no reasonable possibility of obtaining discretionary review of the Court of Appeals order denying Mr. Pistrak's motion to revoke, and (2) Mr. Pistrak's pleadings in this court reflect a vexatious pattern of litigation conduct clearly intended to delay finality of the underlying dissolution matter. RAP 18.9(a). But in recognition of Mr. Pistrak's successful motion to modify, I will limit the sanction to reasonable attorney fees and costs incurred prior to February 25, 2019, the date of my earlier ruling. Accordingly, with that limitation, I adhere to my earlier ruling directing Mr. Pistrak is to pay Ms. Golubeva's reasonable attorney fees and costs incurred in answering his frivolous motion for discretionary review.

The motion for discretionary review is denied and sanctions are imposed.


_Michael E. Johnston_
COMMISSIONER


June 10, 2019

1
2
3
4
5
6
7

**IN THE SUPERIOR COURT OF WASHINGTON
FOR KING COUNTY**

8

In re Marriage of:

9

KSENIIA GOLUBEVA,

10                                                          NO. 15-3-06019-1SEA

11                          Petitioner,        FULL SATISFACTION OF ALL
                                               JUDGMENTS AGAINST
and                                            RESPONDENT

12

EVGENY PISTRAK,

13

                          Respondent.

14

WHEREAS Petitioner Kseniia Golubeva was granted several interlocutory and final

15

judgments against Respondent Evgeny Pistrak in the above-captioned action, including, but not

16

intended by this enumeration to be limited to, the judgments entered on or about November 6,

17

2015, January 15, 2016, March 3, 2016, June 9, 2016, July 25, 2016, October 7, 2016, October

18

18, 2016, November 18, 2016, February 9, 2017, April 19, 2017, April 20, 2017,  March 29,

19

2019, April 15, 2020, and July 2, 2019, and all of said judgments, whether enumerated herein

20

or not, have now been fully satisfied;

21

NOW THEREFORE, full satisfaction of all judgments against Respondent Evgeny

22

Pistrak entered in the above-captioned action, including all of the above-enumerated

23

judgments, is hereby acknowledged and the Clerk of the Court is hereby authorized and

24
25

FULL SATISFACTION OF JUDGMENTS - 1        **Law Office Charles R. Horner, PLLC**
                                          1001 Fourth Avenue, Suite 3200
                                          Seattle, Washington 98154
                                          Tel.: 206-381-8454  Fax: 866-876-8280

1  directed to cancel, to fully satisfy, and to discharge all of said judgments against and as to said

2  Respondent Evgeny Pistrak and his real property.

3

4      DATED this 1st day of July 2020.

5

6                                    _____
                                     Charles R. Horner, WSBA No. 27504

7                                    Attorney for Petitioner/Judgment Creditor

8

9  STATE OF WASHINGTON)
                        ) : ss

10  COUNTY OF KING       )

11  I certify that I know or have satisfactory evidence that Charles R. Horner is the person who
    appeared before me, and said person acknowledged that he signed this instrument and

12  acknowledged it to be his free and voluntary act for the uses and purposes mentioned in the
    instrument.

13
        Dated: July 1, 2020

14

15                                    NOTARY PUBLIC in and for the
                                      State of Washington

16      SHARON VONCLASEN              Residing at: Snohomish
        NOTARY PUBLIC                 My commission expires: 11.19.2020

17      STATE OF WASHINGTON
        COMMISSION EXPIRES

18      NOVEMBER 19, 2020

19

20

21

22

23

24

25

    FULL SATISFACTION OF JUDGMENTS - 2        **Law Office Charles R. Horner, PLLC**
                                              1001 Fourth Avenue, Suite 3200
                                              Seattle, Washington 98154
                                              Tel.: 206-381-8454  Fax: 866-876-8280

FILED
COURT OF APPEALS
DIVISION II

2014 AUG -5 AM 10: 37

STATE OF WASHINGTON

BY_____

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

In re the Marriage of:

NISHAT KHAN,

           Appellant,

and

AZAD KHAN,

           Respondent.

No. 44814-9-II

PUBLISHED OPINION

MAXA, J. — Nishat Khan appeals the trial court's spousal maintenance order, claiming the court erred by limiting the duration of the awarded maintenance. Nishat's former husband, Azad Khan,[1] is obligated to support her pursuant to an affidavit of support he signed under federal immigration law as the sponsor of her application for permanent legal residency. Nishat argues that the trial court erred in not enforcing this obligation through the maintenance award. We hold that Nishat's right to support under federal immigration law is a contract right separate from any rights she had as a result of her marriage, and that this contract right need not be enforced through maintenance payments in a dissolution proceeding. Therefore, the trial court did not err in failing to award maintenance in an amount and duration equal to Azad's independent support obligation under federal immigration law and we affirm.

---

[1] Because Nishat and Azad Khan share a last name we refer to both by their first names, intending no disrespect.

FACTS

Azad, a United States citizen, and Nishat met in India in 2009. In January 2010, Nishat

entered the United States on a K1 (fiancée) visa. She and Azad married shortly thereafter. Azad

sponsored Nishat's application for permanent residency, and as part of this process was required

to sign on her behalf an affidavit of support under section 213A of the Immigration and

Nationality Act, which is known as United States Citizenship and Immigration Services (USCIS)

Form I-864.; *see* 8 U.S.C. §§ 1182(a)(4), 1183a. By signing the affidavit, Azad agreed to

provide the financial support necessary to maintain Nishat at an income level at least 125 percent

above the federal poverty line.

After nearly two years of marriage, Azad and Nishat separated in December 2011. Azad

petitioned for dissolution of marriage in January 2012. Neither the petition nor Nishat's

response referenced Azad's I-864 support obligation. Pursuant to temporary orders, Azad paid

maintenance of $2,000 per month (for 12 months) and contributed to Nishat's moving expenses

and attorney fees. At trial, Nishat sought continued maintenance. She argued that Azad's I-864

support obligation was a basis for a maintenance award.

The trial court concluded that under state law maintenance was not appropriate for

several reasons. Nevertheless, it awarded Nishat maintenance of $2,000 per month through June

2013, three months from the date of the dissolution decree. The trial court based its maintenance

award on a perceived conflict between Azad's I-864 obligation under federal law and

Washington dissolution law. It concluded that Nishat's I-864 rights preempted state law and

limited its ability to impute income to Nishat based on her earning capacity and education, and

2

stated that in awarding maintenance it was balancing federal and state law.  Nishat appeals the duration of the maintenance award.

## ANALYSIS

A.   AFFIDAVIT OF SUPPORT (FORM I-864)

A family-sponsored applicant for permanent residency must prove that he or she is not likely to become a public charge. *See* 8 U.S.C. § 1182(a)(4). To satisfy this requirement, the applicant's family sponsor may be required to execute and submit a legally enforceable affidavit of support on Form I-864.  8 U.S.C. §§ 1182(a)(4)(C)(ii), 1183a(a)(1).  The sponsor must agree to "provide support to maintain the sponsored [immigrant] at an annual income that is not less than 125 percent of the [f]ederal poverty line during the period in which the affidavit is enforceable."  8 U.S.C. § 1183a(a)(1)(A).

The support obligation under I-864 continues indefinitely unless the sponsored immigrant (1) becomes a United States citizen, (2) has worked or is credited with 40 qualifying quarters of coverage (as defined by the Social Security Act, 42 U.S.C. § 413), (3) no longer has lawful permanent resident status and departs the United States, (4) becomes subject to removal but obtains a new grant of adjustment status, or (5) either the sponsor or the sponsored immigrant dies.  8 U.S.C. § 1183a(a)(2)-(3); 8 C.F.R. § 213a.2(e)(2).  Dissolution of the marriage between the sponsor and the sponsored immigrant does not terminate the support obligation. *Liu v. Mund*, 686 F.3d 418, 423 (7th Cir. 2012); USCIS Form I-864, at 8 (rev. Mar. 22, 2013); USCIS Form I-864 Instructions at 10 (rev. March 22, 2013); *see* 8 C.F.R. § 103.2(a)(1) (incorporating the USCIS Form I-864 instructions as part of the regulations governing the affidavit of support).

The affidavit of support creates a binding contract between the sponsor and the federal government, with the intended immigrant as the third-party beneficiary. The sponsored immigrant can enforce the support obligation against the sponsor. 8 U.S.C. § 1183a(a)(1)(B). And by signing the affidavit, the sponsor agrees to submit to the personal jurisdiction of any federal or state court that has subject matter jurisdiction of a lawsuit to enforce the I-864 obligations. 8 U.S.C. § 1183a(a)(1)(C).

B.      MAINTENANCE PRINCIPLES

We review a maintenance award for an abuse of discretion. *In re Marriage of Zahm*, 138 Wn.2d 213, 226-27, 978 P.2d 498 (1999). " 'A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons.' " *In re Marriage of Valente*, 179 Wn. App. 817, 822, 320 P.3d 115 (2014) (quoting *In re Marriage of Littlefield,* 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997)). " 'The only limitation on amount and duration of maintenance under RCW 26.09.090 is that, in light of the relevant factors, the award must be just.' " *Valente*, 179 Wn. App. at 821 (quoting *In re Marriage of Bulicek*, 59 Wn. App. 630, 633, 800 P.2d 394 (1990)).

Under RCW 26.09.090, a trial court may award maintenance in a dissolution proceeding after considering all relevant factors, including but not limited to (a) the financial resources of the party seeking maintenance; (b) the time necessary to acquire education and training to enable the party seeking maintenance to find employment; (c) the standard of living established during the marriage; (d) the duration of the marriage; (e) the age, physical and emotional condition, and financial obligations of the spouse seeking maintenance; and (f) the ability of the spouse from whom maintenance is sought to meet his or her needs and financial obligations while meeting

4

those of the spouse seeking maintenance. The trial court must consider all of the statutory factors, but the factors are not exclusive. *In re Marriage of Washburn*, 101 Wn.2d 168, 179-80, 677 P.2d 152 (1984).

Here, the trial court determined Nishat was not entitled to maintenance based on "traditional Washington law analysis," i.e., consideration of the RCW 26.09.90 factors. Clerk's Papers at 42. Nishat does not challenge this determination.

C.     I-864 OBLIGATION AND MAINTENANCE AWARD

Nishat and Azad both agree that Azad owes an ongoing support obligation under I-864. The question is whether that obligation must be enforced through a maintenance award in the dissolution proceeding. Nishat argues that it is proper for a trial court to award maintenance based on a spouse's I-864 support obligation. Azad argues that a maintenance award cannot be used to guarantee a spouse's I-864 obligation, which remains enforceable regardless of any maintenance award. The relationship between a maintenance award in a dissolution action and a person's I-864 obligation to a former spouse under federal immigration law is an issue of first impression in Washington. We agree with Azad.

The few published cases in other jurisdictions are split on this issue. *See Liu*, 686 F.3d at 419-20 (the right of support conferred by federal law exists apart from whatever rights the sponsored person might or might not have had under state divorce law); *Love v. Love*, 33 A.3d 1268, 1273-75 (Pa. Super. Ct. 2011) (trial court erred in fashioning spousal support award without applying husband's I-864 obligation; trial court should have considered I-864 obligations as an allowable deviation from the spousal support guidelines).

5

We hold that a maintenance order need not include enforcement of a person's I-864 obligation. Three primary considerations support this conclusion. First, there is no "conflict" between federal law regarding I-864 obligations and Washington dissolution law because they are independent of each other. Nothing in the federal statutes or regulations provides that an I-864 obligation must be included in a maintenance award or otherwise be enforced in a dissolution action. On the contrary, federal law expressly provides that a spouse's I-864 obligation does not terminate upon dissolution of the marriage between the sponsor and the immigrant. USCIS Form I-864 Instructions at 10; *see Liu*, 686 F.3d at 423; *Shumye v. Felleke*, 555 F. Supp.2d 1020, 1024 (N.D. Cal. 2008). This provision suggests that a spouse's I-864 obligation exists independent of any dissolution proceedings, including any maintenance award.

Second, RCW 26.09.090 governs the award of maintenance in Washington. This statute lists the factors that a trial court must consider in determining the amount of maintenance. RCW 26.09.090 does not provide that one spouse's contractual obligation under federal immigration law to make payments to the other spouse must be enforced through a maintenance award.[2] And although the statutory factors are not exclusive, a trial court cannot rely solely on a non-statutory factor in making a maintenance determination without also fairly considering the statutory factors. *See In re Marriage of Spreen*, 107 Wn. App. 341, 349-50, 28 P.3d 769 (2001).

---

[2] By contrast, a maintenance award must reflect binding contracts regarding parties' rights and property, including making provisions for maintenance, made in contemplation of marriage (antenuptial/prenuptial agreements) and in contemplation of dissolution (separation contracts). *See* RCW 26.09.070(1) (expressly allows spouses to enter into separation contracts providing for the maintenance of either of them); *In re Marriage of Burke*, 96 Wn. App. 474, 477, 980 P.2d 265 (1999); *In re Marriage of Shaffer*, 47 Wn. App. 189, 193-94 & n.1, 733 P.2d 1013 (1987). Nishat does not argue that Form I-864 should be enforced as a prenuptial agreement, and there is no basis for such an argument.

Here, the trial court found that under Washington law it would not award any maintenance for several stated reasons. However, in an attempt to balance federal and state law the trial court awarded $2000 per month in maintenance for an additional three months. Nishat argues that once the trial court acknowledged that Azad's I-864 obligation could be considered in awarding maintenance, it was required to continue maintenance for as long as Azad had a payment obligation under I-864. However, because we hold that a trial court need not enforce a spouse's I-864 obligation through a maintenance award, we hold that the trial court did not err in failing to extend the maintenance payments indefinitely.[3]

Third, the beneficiary of an I-864 obligation will not be left without remedy if that obligation is not included in a maintenance award. Nishat argues that if the maintenance award does not incorporate Azad's full I-864 obligation, she may be precluded from enforcing that obligation in a subsequent action. We disagree.

Some courts in other jurisdictions have held that an action to enforce a former spouse's I-864 obligation is precluded under certain circumstances when the I-864 support issue was raised in a prior dissolution proceeding. *See, e.g., Schwartz v. Schwartz*, 409 B.R. 240, 249 (B.A.P. 1st Cir. 2008) (denying former wife's affidavit of support claim in former husband's bankruptcy proceeding because claim had been (or could have been) made in earlier state court divorce action); *Nguyen v. Dean*, No. 10-6138-AA, 2011 WL 130241, *3-4 (D. Or. Jan. 14, 2011)

---

[3] The trial court's award of maintenance for three months apparently was based on the trial court's understanding that it must enforce Azad's I-864 obligation through maintenance. Although we hold that a trial court is not *required* to include the I-864 obligation in a maintenance award, we need not address whether a trial court in the exercise of its discretion could incorporate the I-864 obligation into a maintenance award.

7

(holding that former wife's claim seeking support from former husband based on I-864 in federal court was precluded because the I-864 affidavit of support was entered into evidence in their underlying divorce proceedings and considered by the state court judge when determining spousal support amount). But such a holding would be inappropriate here, where the trial court did not adjudicate an action for breach of the sponsor's I-864 obligation.

As Azad acknowledges, an order of maintenance is not an adjudication of his obligation under I-864. And Azad concedes that termination of maintenance does not terminate his I-864 obligation. Because we hold that an I-864 obligation is separate from any rights or obligations imposed by marriage, Nishat will not be precluded from asserting her I-864 contract right in a separate action.

We affirm the trial court's maintenance award, and hold that a trial court need not enforce a spouse's I-864 obligation through a maintenance award.


_____
MAXA, J.


We concur:

_____
JOHANSON, C.J.

_____
MELNICK, J.


8



Home » Data Hub » Unauthorized Immigrant Population

# Profile of the Unauthorized Population: Washington

| Demographics | Estimate | % of Total |
|---|---|---|
| Unauthorized Population | 246,000 | 100% |
| **Top Countries of Birth** | | |
| Mexico | 139,000 | 57% |
| India | 16,000 | 7% |
| Philippines | 14,000 | 6% |
| China/Hong Kong | 11,000 | 5% |
| Guatemala | 9,000 | 4% |
| **Regions of Birth** | | |
| Mexico and Central America | 160,000 | 65% |
| Caribbean | - | - |
| South America | 6,000 | 2% |
| Europe/Canada/Oceania | 19,000 | 8% |
| Asia | 54,000 | 22% |
| Africa | 7,000 | 3% |
| **Years of U.S. Residence** | | |
| Less than 5 | 57,000 | 23% |
| 5 to 9 | 39,000 | 16% |
| 10 to 14 | 50,000 | 20% |
| 15 to 19 | 51,000 | 21% |
| 20 or more | 49,000 | 20% |
| **Age** | | |
| Under 16 | 14,000 | 6% |

| | Estimate | % |
|---|---|---|
| 16 to 24 | 38,000 | 15% |
| 25 to 34 | 72,000 | 29% |
| 35 to 44 | 67,000 | 27% |
| 45 to 54 | 36,000 | 15% |
| 55 and over | 18,000 | 7% |
| **Gender** | | |
| Female | 112,000 | 45% |

| **Family** | **Estimate** | **% of Total** |
|---|---|---|
| **Parental Status** | | |
| Population ages 15 and older | 234,000 | 100% |
| Reside with at least one U.S.-citizen child under 18 | 88,000 | 38% |
| Reside with noncitizen children only under 18 | 17,000 | 7% |
| Reside with no children | 129,000 | 55% |
| **Marital Status** | | |
| Population ages 15 and older | 234,000 | 100% |
| Never married | 90,000 | 38% |
| Married to a U.S. citizen | 32,000 | 14% |
| Married to a legal permanent resident (LPR) | 15,000 | 6% |
| Married to non-U.S. citizen/non-LPR | 62,000 | 27% |
| Divorced, separated, widowed | 35,000 | 15% |

| **Education and Language** | **Estimate** | **% of Total** |
|---|---|---|
| **School Enrollment of Children and Youth** | | |
| Population ages 3 to 17 | 17,000 | 100% |
| Enrolled | 15,000 | 90% |
| Not enrolled | - | - |
| Population ages 3 to 12 | 9,000 | 100% |
| Enrolled | 7,000 | 82% |
| Not enrolled | - | - |
| Population ages 13 to 17 | 8,000 | 100% |
| Enrolled | 8,000 | 98% |

| | Estimate | % of Total |
|---|---|---|
| Not enrolled | - | - |
| Population ages 18 to 24 | 34,000 | 100% |
| Enrolled | 14,000 | 41% |
| Not enrolled | 20,000 | 59% |
| **Educational Attainment of Adults** | | |
| Population ages 25 and older | 194,000 | 100% |
| 0-5 grade | 29,000 | 15% |
| 6-8 grade | 30,000 | 16% |
| 9-12 grade | 28,000 | 14% |
| High school diploma or equivalent | 41,000 | 21% |
| Some college or associate's degree | 26,000 | 13% |
| Bachelor's, graduate, or professional degree | 40,000 | 21% |
| **English Proficiency** | | |
| Population ages 5 and older | 244,000 | 100% |
| Speak only English | 18,000 | 7% |
| Speak English "very well" | 71,000 | 29% |
| Speak English "well" | 56,000 | 23% |
| Speak English "not well"/"not at all" | 98,000 | 40% |
| **Top 5 Languages Spoken at Home** | | |
| Population ages 5 and older | 244,000 | 100% |
| Spanish | 156,000 | 64% |
| English | 18,000 | 8% |
| Tagalog | 11,000 | 4% |
| Chinese | 10,000 | 4% |
| Korean | 5,000 | 2% |

| Workforce | Estimate | % of Total |
|---|---|---|
| **Labor Force Participation** | | |
| Civilian population ages 16 and older | 231,000 | 100% |
| Employed | 156,000 | 68% |
| Unemployed | 10,000 | 4% |
| Not in the labor force | 65,000 | 28% |

| Top Industries of Employment | | |
|---|---:|---:|
| Civilian employed population ages 16 and older | 156,000 | 100% |
| Agriculture | 29,000 | 18% |
| Accommodation and food services, arts, entertainment, and recreation | 22,000 | 14% |
| Professional, scientific, management, administrative, and waste management services | 22,000 | 14% |
| Construction | 21,000 | 14% |
| Retail trade | 12,000 | 8% |
| **Economics** | **Estimate** | **% of Total** |
| **Family Income** | | |
| Below 50% of the poverty level | 28,000 | 12% |
| 50-99% of the poverty level | 28,000 | 11% |
| 100-149% of the poverty level | 34,000 | 14% |
| 150-199% of the poverty level | 33,000 | 13% |
| At or above 200% of the poverty level | 123,000 | 50% |
| **Access to Health Insurance** | | |
| Uninsured | 119,000 | 49% |
| **Home Ownership*** | | |
| Homeowner | 75,000 | 30% |

*Source*: These 2019 data result from Migration Policy Institute (MPI) analysis of U.S. Census Bureau data from the pooled 2015-19 American Community Survey (ACS) and the 2008 Survey of Income and Program Participation (SIPP), weighted to 2019 unauthorized immigrant population estimates provided by Jennifer Van Hook of The Pennsylvania State University.

*Note*: For U.S. and state estimates of the unauthorized population potentially eligible for the Deferred Action for Childhood Arrivals (DACA) program, click here.

Data-related notes
* "Homeowners" are unauthorized immigrants residing in homes that are owned, not rented.

+ Includes the following Colorado counties: Adams, Broomfield, Clear Creek, Douglas, Elbert, Gilpin, and Jefferson, as well as portions of Arapahoe, Boulder, and Weld counties.

++ NECTAs refer to New England City and Town Areas, geographic entities defined by the U.S. Census Bureau for use as alternatives to counties in the six-state New England region.

3/11/23, 3:31 PM
Profile of the Unauthorized Population - WA | migrationpolicy.org
Case 2:23-cv-00362-MJP    Document 10-4    Filed 03/13/23    Page 267 of 274

Estimate for China includes Hong Kong but excludes Taiwan; estimate for Korea includes South Korea and North Korea.

"School Enrollment of Children and Youth" refers to unauthorized immigrants who reported attending school or college at any time in the three months prior to the survey.

For languages, "Chinese" includes Mandarin, Cantonese, and other Chinese languages; "English" includes English, Jamaican Creole, Krio, Pidgin Krio, and other English-based Creole languages; "French" includes French, Patois, and Cajun; "Pacific Island languages" includes Ilocano, Samoan, Hawaiian, Sebuano, Chamorro, Guamanian, Marshallese, Trukese, Tongan, and other Austronesian languages, but excludes Tagalog and Filipino, which are reported separately; "Portuguese" includes Portuguese and Cape Verdean Creole; "Sub-Saharan African" includes Swahili or other Bantu languages, Mande, Fulani, Kru, and other unspecified African languages; "Tagalog" includes Tagalog and Filipino.

For industries, "Other services" are miscellaneous services, not including the following services listed separately: (1) professional, scientific, management, administrative, and waste management services; (2) educational services; (3) health and social services; and (4) accommodation and food services, arts, entertainment, and recreation.

 "-" estimates are zero, not applicable, or not displayed due to small sample size.

Percentages may not add up to 100 due to rounding.

*Methodology in Brief*:
MPI's method uses information from the SIPP to assign legal status to noncitizens in the ACS. In the SIPP, noncitizens report whether they currently have lawful permanent resident (LPR) status—i.e., a green card. Those without LPR status may be recent refugees, temporary visitors (e.g., international students or high-skilled H-1B workers), or unauthorized immigrants. Our method maps characteristics such as country of birth, year of U.S. entry, age, gender, and educational attainment between the two surveys, and those noncitizens in the ACS who have characteristics similar to those reporting LPR status in the SIPP are coded as LPRs in the ACS. The remaining noncitizens—who are similar in characteristics to those not reporting LPR status in the SIPP—are classified as either unauthorized or legal temporary migrants, depending on whether they meet the qualifications for H-1B and the other temporary visa classifications. Estimates of unauthorized immigrants are weighted to match control totals (benchmarks) for immigrants from a set of origin countries and world regions. These control totals are calculated by subtracting the number of legal immigrants from the total of all immigrants for each country and region that are captured in the ACS data. The number of legal immigrants is estimated by adding up all legal admissions from each country and region in every year—using Department of Homeland Security administrative data—and then reducing this number to account for deaths and emigration of legal immigrants. Finally, the unauthorized immigrant population estimates are adjusted upward slightly to account for the undercount of this population in the ACS.

MPI's overall method was developed in consultation with James Bachmeier of Temple University and Jennifer Van Hook of The Pennsylvania State University, Population Research Institute. For more detail on the methods, see MPI, "MPI Methodology for Assigning Legal Status to Noncitizen Respondents in U.S. Census Bureau Survey Data." The control totals were developed by Van Hook. These estimates have the same sampling and coverage errors as any other survey-based estimates that rely on ACS and other Census Bureau data.



DEMOGRAPHICS

FAMILY

EDUCATION AND LANGUAGE

WORKFORCE

ECONOMICS





CONTACT  |  SITE MAP  |  EXPERTS  |  DONATE



Home » Data Hub » Unauthorized Immigrant Population

# Profile of the Unauthorized Population: United States

| Demographics | Estimate | % of Total |
|---|---|---|
| Unauthorized Population | 11,047,000 | 100% |
| **Top Countries of Birth** | | |
| Mexico | 5,313,000 | 48% |
| El Salvador | 741,000 | 7% |
| Guatemala | 724,000 | 7% |
| India | 553,000 | 5% |
| Honduras | 490,000 | 4% |
| **Regions of Birth** | | |
| Mexico and Central America | 7,381,000 | 67% |
| Caribbean | 327,000 | 3% |
| South America | 907,000 | 8% |
| Europe/Canada/Oceania | 440,000 | 4% |
| Asia | 1,697,000 | 15% |
| Africa | 295,000 | 3% |
| **Years of U.S. Residence** | | |
| Less than 5 | 2,370,000 | 21% |
| 5 to 9 | 1,744,000 | 16% |
| 10 to 14 | 2,132,000 | 19% |
| 15 to 19 | 2,368,000 | 21% |
| 20 or more | 2,433,000 | 22% |
| **Age** | | |
| Under 16 | 606,000 | 5% |

| | | |
|---|---:|---:|
| 16 to 24 | 1,577,000 | 14% |
| 25 to 34 | 2,986,000 | 27% |
| 35 to 44 | 3,084,000 | 28% |
| 45 to 54 | 1,772,000 | 16% |
| 55 and over | 1,023,000 | 9% |
| **Gender** | | |
| Female | 5,062,000 | 46% |

| **Family** | **Estimate** | **% of Total** |
|---|---:|---:|
| **Parental Status** | | |
| Population ages 15 and older | 10,513,000 | 100% |
| Reside with at least one U.S.-citizen child under 18 | 3,521,000 | 33% |
| Reside with noncitizen children only under 18 | 806,000 | 8% |
| Reside with no children | 6,185,000 | 59% |
| **Marital Status** | | |
| Population ages 15 and older | 10,513,000 | 100% |
| Never married | 4,057,000 | 39% |
| Married to a U.S. citizen | 1,314,000 | 12% |
| Married to a legal permanent resident (LPR) | 654,000 | 6% |
| Married to non-U.S. citizen/non-LPR | 2,822,000 | 27% |
| Divorced, separated, widowed | 1,665,000 | 16% |

| **Education and Language** | **Estimate** | **% of Total** |
|---|---:|---:|
| **School Enrollment of Children and Youth** | | |
| Population ages 3 to 17 | 733,000 | 100% |
| Enrolled | 651,000 | 89% |
| Not enrolled | 83,000 | 11% |
| Population ages 3 to 12 | 381,000 | 100% |
| Enrolled | 324,000 | 85% |
| Not enrolled | 57,000 | 15% |
| Population ages 13 to 17 | 352,000 | 100% |
| Enrolled | 327,000 | 93% |

| | Estimate | % of Total |
|---|---|---|
| Not enrolled | 25,000 | 7% |
| Population ages 18 to 24 | 1,411,000 | 100% |
| Enrolled | 569,000 | 40% |
| Not enrolled | 842,000 | 60% |
| **Educational Attainment of Adults** | | |
| Population ages 25 and older | 8,864,000 | 100% |
| 0-5 grade | 1,330,000 | 15% |
| 6-8 grade | 1,444,000 | 16% |
| 9-12 grade | 1,334,000 | 15% |
| High school diploma or equivalent | 2,136,000 | 24% |
| Some college or associate's degree | 1,062,000 | 12% |
| Bachelor's, graduate, or professional degree | 1,558,000 | 18% |
| **English Proficiency** | | |
| Population ages 5 and older | 10,951,000 | 100% |
| Speak only English | 773,000 | 7% |
| Speak English "very well" | 2,734,000 | 25% |
| Speak English "well" | 2,450,000 | 22% |
| Speak English "not well"/"not at all" | 4,994,000 | 46% |
| **Top 5 Languages Spoken at Home** | | |
| Population ages 5 and older | 10,951,000 | 100% |
| Spanish | 7,919,000 | 72% |
| English | 780,000 | 7% |
| Chinese | 377,000 | 3% |
| Tagalog | 290,000 | 3% |
| Portuguese | 166,000 | 2% |
| **Workforce** | **Estimate** | **% of Total** |
| **Labor Force Participation** | | |
| Civilian population ages 16 and older | 10,434,000 | 100% |
| Employed | 6,829,000 | 65% |
| Unemployed | 448,000 | 4% |
| Not in the labor force | 3,157,000 | 30% |

| Top Industries of Employment | | |
|---|---|---|
| Civilian employed population ages 16 and older | 6,829,000 | 100% |
| Construction | 1,403,000 | 21% |
| Accommodation and food services, arts, entertainment, and recreation | 1,092,000 | 16% |
| Professional, scientific, management, administrative, and waste management services | 946,000 | 14% |
| Manufacturing | 694,000 | 10% |
| Retail trade | 547,000 | 8% |

| Economics | Estimate | % of Total |
|---|---|---|
| **Family Income** | | |
| Below 50% of the poverty level | 1,344,000 | 12% |
| 50-99% of the poverty level | 1,542,000 | 14% |
| 100-149% of the poverty level | 1,824,000 | 17% |
| 150-199% of the poverty level | 1,575,000 | 14% |
| At or above 200% of the poverty level | 4,762,000 | 43% |
| **Access to Health Insurance** | | |
| Uninsured | 5,823,000 | 53% |
| **Home Ownership*** | | |
| Homeowner | 3,069,000 | 28% |

*Source*: These 2019 data result from Migration Policy Institute (MPI) analysis of U.S. Census Bureau data from the pooled 2015-19 American Community Survey (ACS) and the 2008 Survey of Income and Program Participation (SIPP), weighted to 2019 unauthorized immigrant population estimates provided by Jennifer Van Hook of The Pennsylvania State University.

*Note*: For U.S. and state estimates of the unauthorized population potentially eligible for the Deferred Action for Childhood Arrivals (DACA) program, click here.

Data-related notes
* "Homeowners" are unauthorized immigrants residing in homes that are owned, not rented.

+ Includes the following Colorado counties: Adams, Broomfield, Clear Creek, Douglas, Elbert, Gilpin, and Jefferson, as well as portions of Arapahoe, Boulder, and Weld counties.

++ NECTAs refer to New England City and Town Areas, geographic entities defined by the U.S. Census Bureau for use as alternatives to counties in the six-state New England region.

Estimate for China includes Hong Kong but excludes Taiwan; estimate for Korea includes South Korea and North Korea.

"School Enrollment of Children and Youth" refers to unauthorized immigrants who reported attending school or college at any time in the three months prior to the survey.

For languages, "Chinese" includes Mandarin, Cantonese, and other Chinese languages; "English" includes English, Jamaican Creole, Krio, Pidgin Krio, and other English-based Creole languages; "French" includes French, Patois, and Cajun; "Pacific Island languages" includes Ilocano, Samoan, Hawaiian, Sebuano, Chamorro, Guamanian, Marshallese, Trukese, Tongan, and other Austronesian languages, but excludes Tagalog and Filipino, which are reported separately; "Portuguese" includes Portuguese and Cape Verdean Creole; "Sub-Saharan African" includes Swahili or other Bantu languages, Mande, Fulani, Kru, and other unspecified African languages; "Tagalog" includes Tagalog and Filipino.

For industries, "Other services" are miscellaneous services, not including the following services listed separately: (1) professional, scientific, management, administrative, and waste management services; (2) educational services; (3) health and social services; and (4) accommodation and food services, arts, entertainment, and recreation.

"-" estimates are zero, not applicable, or not displayed due to small sample size.

Percentages may not add up to 100 due to rounding.

*Methodology in Brief*:
MPI's method uses information from the SIPP to assign legal status to noncitizens in the ACS. In the SIPP, noncitizens report whether they currently have lawful permanent resident (LPR) status—i.e., a green card. Those without LPR status may be recent refugees, temporary visitors (e.g., international students or high-skilled H-1B workers), or unauthorized immigrants. Our method maps characteristics such as country of birth, year of U.S. entry, age, gender, and educational attainment between the two surveys, and those noncitizens in the ACS who have characteristics similar to those reporting LPR status in the SIPP are coded as LPRs in the ACS. The remaining noncitizens—who are similar in characteristics to those not reporting LPR status in the SIPP—are classified as either unauthorized or legal temporary migrants, depending on whether they meet the qualifications for H-1B and the other temporary visa classifications. Estimates of unauthorized immigrants are weighted to match control totals (benchmarks) for immigrants from a set of origin countries and world regions. These control totals are calculated by subtracting the number of legal immigrants from the total of all immigrants for each country and region that are captured in the ACS data. The number of legal immigrants is estimated by adding up all legal admissions from each country and region in every year—using Department of Homeland Security administrative data—and then reducing this number to account for deaths and emigration of legal immigrants. Finally, the unauthorized immigrant population estimates are adjusted upward slightly to account for the undercount of this population in the ACS.

MPI's overall method was developed in consultation with James Bachmeier of Temple University and Jennifer Van Hook of The Pennsylvania State University, Population Research Institute. For more detail on the methods, see MPI, "MPI Methodology for Assigning Legal Status to Noncitizen Respondents in U.S. Census Bureau Survey Data." The control totals were developed by Van Hook. These estimates have the same sampling and coverage errors as any other survey-based estimates that rely on ACS and other Census Bureau data.

▼DEMOGRAPHICS

▼FAMILY

▼EDUCATION AND LANGUAGE

▼WORKFORCE

▼ECONOMICS





CONTACT  |  SITE MAP  |  EXPERTS  |  DONATE